IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-HC-2013-BO

UNITED STATES OF AMERICA,    )
                             )
            Petitioner,      )
                             )
      v.                     )
                             )
SEAN ROBERT FRANCIS,         )
                             )
            Respondent.      )

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby files these Proposed Findings of Fact and Conclusions of Law:

**PROPOSED FINDINGS OF FACT**

**THE RESPONDENT'S SEX OFFENSE HISTORY**

1. Respondent Sean Francis was born in June of 1978, and is currently 43 years old. (Gov. Ex. 36 p. 1)

2. He has a long history of making obscene and threatening telephone calls, starting at age 13. (Gov. Ex. 36 pp. 5-10)

3. He has pled guilty to making dozens of such calls involving threats of rape and/or murder. Id.

4. He has admitted that he had actually dialed thousands of women, that approximately half answered, and that he made more threats of rape and/or murder than he was convicted of.

5. The PSR prepared on or about December 6, 2004, describes

the nature of some of these calls. (Gov. Ex. 20, pp. 4-12)

6. Respondent admitted on the stand that he did not object to the factual description of these calls before or during the sentencing for those offenses. Therefore, the Court finds that despite the Respondent's current denial of the details of some of those calls, the descriptions set out in the PSR accurately reflect the nature of the calls. Id.

7. In several of those calls, the Respondent called the woman or her roommate by name and indicated that he knew where they lived and what kind of car they were driving. (Gov. Ex. 20 pp. 9-12) He also asked extremely personal details about their sex lives and what they were wearing. Id.

8. Respondent admitted during the 2009 videotaped interview that he would find some of the victims by "opening up the sports page and looking at the high school girls' and college girls' sports, and then looking up their number on the phone or in the phone book." (Gov. Ex. 42 p. 71)

9. In one particularly disturbing call, the Respondent began the call by threatening to come over and rape the victim in five minutes if she didn't comply with his demands. He asked the victim if she was a virgin, what her

2

favorite sexual position was, and then asked her to masturbate while he was on the phone. He instructed her to insert a hairbrush or other object into her vagina. He asked if she had removed her underwear, and when she said she had, he accused her of lying and again instructed her to do so. The Respondent became angry with the victim because he did not believe she was describing to him enough details about what she was doing. The victim was crying during much of this call, which lasted approximately 10 minutes. He ended the call by threatening the victim if she told anyone about the call. <u>Id.</u> at pp. 11-12.

10. It is clear from the evidence that these telephone calls caused fear and emotional trauma in many of the women receiving the calls. (Gov. Ex. 20)

11. It is also clear from the evidence that the Respondent tried to convince many of the women that he had been watching them, that he knew where they lived, that he knew other details about their lives, and that he was able and willing to carry through with his threats. (Gov. Ex.'s 20 and 42 p. 68)

12. Respondent admitted in 2003 and again in 2009 that he masturbated during these calls, and that he obtained sexual arousal from making them. (Exhibit 42 p. 10)

3

13. Respondent described the phone calls as being "Basically rape through the phone." (Gov. Ex. 42 p. 68)
14. Respondent admitted in 2003, in 2009 and on the stand during the evidentiary hearing that these calls were of an obsessive nature, and that once he started making these calls, he simply couldn't stop himself.
15. Respondent admitted on the stand during the evidentiary hearing that all of the facts on the time line submitted into evidence as Government Exhibit 2 were accurate, with the following caveat: as to those items labeled in green or gold, he admitted only to making the statements indicated, but claims now that such statements were not true.
16. The United States presented evidence of two different victim lists that the Respondent had completed, in his own handwriting, in 2003 and 2009, respectively. (Gov. Ex.'s 12 and 26)
17. The 2003 victim list identified 57 victims, but the document made clear that some of these incidents did not constitute crimes, because he had merely "talked [the woman] into" having sex with him, instead of forcing her into a sex act. For example, Respondent says that the method(s) of manipulation or coercion used against Victim #1 was "talked into / force;" while the method(s) of

4

manipulation and coercion for Victim #2 was just "talked into." (Gov. Ex. 12 p. 1.)

18. The 2009 victim list identified 27 victims. (Gov. Ex. 26.) During the 2009 videotaped interview, the Respondent described the difference between the 57 victims and the 27 victims by explaining to the polygraph examiner that he had excluded from his victim list those women whom he had not engaged in illegal conduct with. He said, "There's a big difference between having a victim and just being a guy who's a jerk, right? . . . [T]hese are all the people I consider victims. . . . Then there's other people that I've had sex with where it's just been like, you know, I've gone out with them with the sole intent to have sex. . . . I was just an asshole after that. Or talked them into having consensual sex and was just an asshole after that." (Gov. Ex. 42 p. 53)

19. The Respondent has acknowledged having between 60-80 sexual partners during his life. (Gov. Ex. 42 p. 78)

20. The Court finds that the difference between the 57 victims identified by the Respondent in 2003 and the 27 victims identified by the Respondent in 2009 is a result of the Respondent omitting victims from the 2009 list which he did not, at that time, consider to be crimes.

21. The United States presented videotape admissions made by

5

the Respondent during 2009 (Gov. Ex.'s 1 and 42), in which he admitted to all of the sexual offenses identified in green on the time line. (Gov. Ex. 2)

22. During the 2009 videotape interview, Respondent admitted that "there have been plenty of times in my history when I've committed date rape, if that's the term you want to put on it." (Gov. Ex. 42 p. 23)

23. Respondent admitted during that 2009 videotape that there was a pattern to his date rapes. In particular, he admitted that if the girl would not agree to have sex, he would simply take what he wanted. In particular, he said, "And if we had sex consensually, that's great. . . . But I just got to the point where it was like, 'You know what? I'm doing this, and that's that,'" (Gov. Ex. 42 p. 47)

24. One of the expert witnesses called by the Respondent, Dr. Plaud, also acknowledged that there was a pattern to the date rapes that the Respondent discussed on the 2009 videotape, and that the pattern involved taking women home after drinking, trying to have consensual sex, but if the girl refused, the commission of a date rape.

25. During a meeting with his therapist, Dr. Michael Bourke, on or about January 27, 2003, Respondent admitted that he was a sexual predator. He said, "I feel I am predatory.

6

I know I am a predator, in fact. The problem is, I don't think I'm too upset by that."

26. Based on the consistency of the admissions with each other and with other evidence presented in this case, the Court finds that the government presented clear and convincing evidence that Respondent did, in fact, commit the multiple date rapes identified on Government Exhibit 2, which took place from approximately 1995-1999.

27. The government also presented clear and convincing evidence of a rape that Respondent committed on December 16, 2001, in Poughkeepsie, NY, against a woman identified as Emily. (Gov. Ex.'s 7, 38, 47 and 48)

28. The evidence of this rape included the videotaped deposition of Emily, which included information that Emily lived in the State of New York, more than 100 miles from the place of trial, therefore making the videotape admissible evidence pursuant to Rule 32 of the Federal Rules of Civil Procedure and Rule 804 of the Federal Rules of Evidence. (Gov. Ex.'s 47 and 48)

29. The evidence shows that on the night of December 15, 2001, Emily went to a party with a female friend at a bar, and had several drinks. She then went to her boyfriend's apartment, and fell asleep on his bed. She awoke close to 4:00 AM on the morning of December 16,

7

2001, and decided to go home, because she was somewhat nauseous. She got a red plastic cup from her boyfriend's apartment, put water in it, and proceeded to walk home. She was approached by the Respondent, who put a hard object in her side, told her it was a gun, threatened to kill her if she did not cooperate, forced her to perform oral sex on him, and then raped her. She obtained a ride home from a campus security guard, and within five minutes of arriving at home, reported the rape to the police. Id.

30. The Respondent admitted during the evidentiary hearing that on the night of December 15, 2001, he was drinking at a bar, and took a girl named Amy home with him to a house rented by his friends (and where he was staying). He admitted that he attempted to have sex or oral sex with her, but that she threw up. He admitted that he fell asleep, and Amy had left before he awoke. He also admitted that he then went out sometime early in the morning of December 16 to try to find another woman. This part of his story is consistent with the story he told in 2009 during the videotaped interview (Gov. Ex. 42 pp. 32-33)

31. The Respondent testified at the evidentiary hearing on October 6, 2011, that when he went out during the early

8

morning of December 16 (after Amy left), he met Emily, engaged in conversation with her, and she agreed to have sex with him. The Court does not find this story to be convincing, because it would require the Court to believe that Emily (a 20 year old college student with a steady boyfriend) had consensual sex, outside, on the ground, in the cold, in the middle of December, in upstate New York, with a total stranger, lying on rocks in an exposed area where other people could see her, gave the Respondent her phone number afterwards, and then reported the incident as a rape to the police within five minutes of arriving at home.

32. The Court finds that the story told by Emily in her deposition (Gov. Ex.'s 47 and 48) is almost identical to the story told by the Respondent during his 2009 videotape interview. In particular, in 2009, the Respondent admitted committing the rape of a young woman when he was 23 years old (which matches the date of December 16, 2001), that the rape had been reported to the police, that he committed this rape immediately after attempting to date-rape another woman (i.e. Amy), that he had gone out to find a woman to have sex with, that he had stuck a hard object in her side and told her it was a gun, that he forced her to perform oral sex on him, and

9

that he then raped her. (Gov. Ex. 42, pp. 22-23, 32) He also admitted, consistently with Emily, that he "did a lot of . . . rough talking to her to scare her even more, because it excited me." (Id. p. 27)

33. Based on the consistency of the stories told by Emily and by the Respondent in 2009, and based on the consistency between those stories and the police report (Gov. Ex. 7), and based on the consistency between his pattern of date rapes and the attempted date rape of Amy that night, as well as the other evidence in this case, the Court finds by clear and convincing evidence that the Respondent did, in fact, rape Emily on the early morning of December 16, 2001.

34. The Court also finds that Mr. Francis was sexually aroused by the fear of the women he made phone calls to as well as by the rape of Emily, and that he admitted to this sexual arousal during the 2009 videotaped interview. (Gov. Ex. 42, p. 27)

35. The Court also finds that Mr. Francis has had long-term fantasies of committing rapes and murders, and that he admitted to these fantasies during the 2009 videotaped interview. (Gov. Ex. 42, p. 25, 99-101)

10

## THE EXPERT TESTIMONY

36. Four experts testified during the evidentiary hearing in this case: Dr. Malinek, Dr. Perkins, Dr. Plaud and Dr. Singer.

37. Dr. Malinek, Dr. Perkins and Dr. Plaud all agreed that the obscene and threatening telephone calls made by Respondent constitute sexually violent conduct, as defined by 18 U.S.C. § 4247(a)(5) and the applicable regulations. Dr. Singer declined to give an opinion on this issue, indicating that he believed it to be a legal, not psychological question. 28 C.F.R. § 549.92 defines sexually violent conduct in such a way that it includes "any unlawful conduct of a sexual nature with another person ('the victim') that involves: (a) The use or threatened use of force against the victim; [or] (b) Threatening or placing the victim in fear that the victim, or any other person, will be harmed." Respondent clearly made these kinds of threats of force and caused the victims to fear that they would be harmed during the obscene and threatening phone calls he made.

38. None of the experts denied that the Respondent threatened the use of force against the victims of the telephone calls, or that at least some of the victims of the telephone calls were placed in fear of harm.

11

39. The Court finds that Respondent's telephone calls, constitute sexually violent conduct by the Respondent.

40. The Court also finds that the date rapes and the rape of Emily in 2001, also constitute sexually violent conduct by the Respondent.

41. All four experts testified that the Respondent currently suffers from some sort of paraphilia, as defined by the Diagnostic and Statistical Manual (i.e. DSM-IV-TR), although they disagreed on the exact type of paraphilia.

42. Dr. Plaud and Dr. Singer both testified that the Respondent suffers from Paraphilia NOS (not otherwise specified) -- Telephone Scatologia. Although their reports were somewhat unclear about whether this diagnosis was in the present or in the past, both doctors clarified on the stand that they believed it was appropriate to conclude that he still suffers from this condition, even if it may be in remission.

43. Dr. Malinek also agreed that the Respondent has Paraphilia NOS – Telephone Scatologia, but opined that he also suffers from Paraphilia NOS, Non-consenting victims, with prominent Sadistic Features. He also diagnosed the Respondent with Anti-social Personality Disorder.

44. Dr. Perkins agrees that the Respondent has Anti-social Personality Disorder, but testified that she believes

that the Respondent's paraphilia rises to the level of Sexual Sadism (instead of just Paraphilia NOS, Non-consenting victims, with prominent Sadistic Features, as opined by Dr. Malinek).

45. Dr. Malinek testified that although Dr. Perkins' diagnosis of Sexual Sadism was technically correct, he was somewhat more conservative in his diagnosis. Both he and Dr. Perkins testified that Sexual Sadism and Paraphilia NOS, Non-consenting victims were on a "continuum" and had many of the same characteristics, and that the proper diagnosis depends on the degree to which the person exhibited the sadistic features.

46. The Court concludes that Dr. Malinek's testimony was the most convincing – that the Respondent suffers from Paraphilia NOS, Non consenting victims, with prominent Sadistic Features, as well as Anti-social Personality Disorder, and that these are serious mental disorders.

47. Dr. Plaud and Dr. Singer testified that they did not believe the Respondent would have serious difficulty refraining from future sexually violent conduct, because, for purposes of their opinions, they assumed the following facts: (1) that the Respondent did not have sexual fantasies of rape and murder, (2) that Respondent had never committed any of the date rapes he described in

13

2003 and 2009, and (3) that the Respondent had not committed the 2001 rape against Emily.

48. Dr. Plaud and Dr. Singer also testified that they did not believe the Respondent would have serious difficulty refraining from future obscene and threatening telephone calls because, as Dr. Singer put it in his report, the seven month period of time he had been out in the community without making calls "supercedes" his prior conduct.

49. On cross-examination, Dr. Plaud acknowledged that there were no published studies indicating that a 7 month period is a sufficient period in the community to indicate that a person is no longer sexually dangerous; and he also admitted that the Respondent had previously had a period of 5 ½ - 6 months in the community without re-offending, but then went back to making the obscene and threatening phone calls. (Gov. Ex. 4 p. 11 demonstrates that from August of 1998 to sometime in February of 1999, the Respondent did not make any obscene or threatening calls, but resumed making them from February to April and again from June to November of 1999, every few days.)

50. The Court does not believe that 7 months in the community without re-offending is sufficient time to conclude that

14

the Respondent will no longer have substantial difficulty in refraining from making obscene and threatening phone calls or other sexually dangerous conduct.

51. The Court also discounts Dr. Plaud's and Dr. Singer's testimony concerning sexual dangerousness, because neither of them considered the fact that the Respondent has sexually violent fantasies, that he has engaged in date rapes or that he raped Emily in 2001.

52. The Court also discounts Dr. Plaud's and Dr. Singer's testimony concerning sexual dangerousness because neither of them used any actuarial analysis to evaluate the Respondent's risk. Although actuarial analysis is not conclusive of future sexual dangerousness, it is an important step in the process; and neither of these doctors performed any actuarial analysis whatsoever.

53. Dr. Malinek and Dr. Perkins both opined that the Respondent would have serious difficulty in refraining from sexually violent conduct, if released. They both testified that their opinion was based primarily on his conduct in making the obscene and threatening phone calls, and that their opinions would be the same, even if he had not committed any date rapes or the rape of Emily in 2001. They also testified, however, that their opinions were confirmed by their belief that at least

Case 5:10-hc-02013-BO   Document 87   Filed 10/17/11   Page 15 of 20

some of the 2009 admissions were true, and that it was likely that the Respondent did rape Emily in 2001.

54. Both Dr. Malinek and Dr. Perkins conducted the actuarial instrument known as the Static-99R. They wrote in their reports and testified that the Respondent had a score of 10 on the Static-99R, which was a very high score – higher than 99% of all other sex offenders. If one applies that score to the high-risk/high-needs norm group, as Dr. Malinek and Dr. Perkins said is appropriate, the Static-99R indicates that other sex offenders with the Respondent's characteristics re-offend, on average, 59.7% of the time within 5 years, and 68% of the time within 10 years. (Gov. Ex. 36 p. 56.)

55. Dr. Malinek also conducted actuarial analyses using the Static-2002R and the MnSOST-R. The Static-2002R confirmed the results of the Static-99R, indicating that the Respondent's score was in the top 99th percentile of sex offenders and that other sex offenders with his characteristics re-offend, on average, 55% of the time within 5 years and 64.6% of the time within 10 years. Dr. Malinek testified that the MsSOST-R results also showed him to be in the high risk category, but with a somewhat lower risk evaluation – 30% after 6-7 years. He testified that the lower risk evaluation of the MnSOST-R

16

is, in part, because the sample included sex offenders who were closely monitored in the community. However, the Respondent only has 1 year left in supervision upon his release, and has recently indicated that he does not intend to cooperate with supervision. (Gov. Ex. 36 p. 56)

56. Dr. Malinek and Dr. Perkins also discussed in their reports that there are a number of dynamic risk factors present that would affect the risk of recidivism. In particular, they discussed in their testimony his apparent contempt for supervised release and the probation office. The Respondent sent letters (Gov. Ex. 46) indicating that he was considering absconding from supervision when released. He indicated that if he did not abscond, he intended to intentionally violate the terms of his supervision by leaving the state whenever he wanted and by hiding his computer. He said he wanted to "live life on my terms." Id. In describing his view of probation and his intent to not comply with the terms of supervised release, he said, "Fuck Probation." Id. Even Dr. Singer (one of the experts called by the Respondent) acknowledged that as late as August 11, 2011, the Respondent indicated to Dr. Singer his intention to not comply with supervision.

17

Case 5:10-hc-02013-BO   Document 87   Filed 10/17/11   Page 17 of 20

57. The Respondent's contempt for supervised release is evidenced not only by his current expressed intentions, but also by his past actions. He has repeatedly violated both state probation and federal supervised release. Dr. Malinek and Dr. Perkins both testified that this failure to cooperate with supervision was empirically validated to increase a person's risk of re-offending.

58. Based on the testimony of Dr. Malinek and Dr. Perkins, as well as the other evidence in this case, the Court finds by clear and convincing evidence that the Respondent will have serious difficulty refraining from future sexually violent conduct if released.

## CONCLUSIONS OF LAW

1. The Court finds that the government has proven, by clear and convincing evidence, the following:
   a. That the Respondent has engaged in sexually violent conduct;
   b. That the Respondent suffers from a serious mental illness abnormality or disorder; and
   c. As a result of the serious mental illness abnormality or disorder, the Respondent will have serious difficulty in refraining from sexually violent conduct if released.
2. Therefore, the Respondent meets the definition of a

18

sexually dangerous person and the criteria for civil commitment under 18 U.S.C. § 4248, and is hereby committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d).

Respectfully submitted, this 17th day of October, 2011.

    THOMAS G. WALKER
    United States Attorney

    BY: /S/ G. Norman Acker, III
    G. NORMAN ACKER, III
    Assistant United States Attorney
    Civil Division
    310 New Bern Avenue
    Federal Building, Suite 800
    Raleigh, NC 27601-1461
    Telephone: (919) 856-4530
    Facsimile: (919) 856-4821
    N.C. Bar No. 12839
    E-mail: Norman.Acker@usdoj.gov
    Attorney for the Petitioner

CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon James Ryan Hawes, counsel for the respondent, by electronically filing the foregoing with the Clerk of Court, on October 17, 2011, using the CM/ECF system which will send notification of such filing above.

/S/ G. Norman Acker, III
G. NORMAN ACKER, III
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, NC 27601-1461
N.C. Bar No. 12839
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Attorney for the Petitioner