| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **RESPONDENT'S PROPOSED** |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| SEAN ROBERT FRANCIS | ) | |

Comes now the respondent, Sean Francis, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  INTRODUCTION

Petitioner, the United States of America ("the Government"), seeks to civilly commit Respondent Sean Robert Francis ("Respondent" or "Francis") as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act of 2006 ("the Act").  The Government's petition states that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act. A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

Prior to the hearing Respondent filed a motion to dismiss the petition based on various constitutional grounds, including that the Act violates the Equal Protection Clause of the Fourteenth and Fifth Amendments to the United States Constitution and that the failure to bring Mr. Francis before the Court for a final commitment hearing within a reasonable time after the Government filed

the Petition seeking § 4248 commitment violated the due process clause.

The Court held an evidentiary hearing in this matter on October 5, 6 and 7, 2011. On October 7, 2011, the Court directed the parties to submit, within ten (10) days, Proposed Findings of Fact and Conclusions of Law. After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the Government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

## II.  FINDINGS OF FACT

### A.  Personal History

1.     Mr. Francis is a 33 year old white heterosexual male born in Charleston, South Carolina to married parents who eventually divorced. His father was in the Air Force and his mother was a dental hygienist. Mr. Francis has no full biological siblings. At the age of two, the family moved to the Orange County area of New York to accommodate his father's Air Force career. His father was reportedly physically and emotionally abusive to Mr. Francis and his mother. Mr. Francis's mother reportedly had a number of extramarital affairs. His parents separated on a number of occasions and the tumultuous marriage finally ended in divorce in 1993. After the divorce a custody battle ensued-- Mr. Francis lived with his mother and only occasionally saw his father. Mr. Francis stated that his mother poisoned him against his father. However, at the age of 15, Mr. Francis sought reunification with his father. He has had no contact with his mother since 1998. He currently maintains contact with his father and step-mother. Mr. Francis has never married and has no children.

2.     Educationally, Mr. Francis was sent to several private schools but never properly adjusted and in 1996 he withdrew from formal education. Mr. Francis earned his GED in 1997. He

took firefighter courses at Eastern Kentucky University but was forced to withdrawal when his mother stopped providing financial support. Later, Mr. Francis enrolled in an Emergency Medical Technician training but had to stop when another student told instructors that he had placed obscene phone calls.

3.      Mr. Francis's work history includes working as a waiter in several restaurants for brief periods. He also worked as a volunteer firefighter from the 1996-1999.

4.      At the age of thirteen, Mr. Francis made an obscene phone call to a female classmate and her mother. Mr. Francis testified that prior to this call, his mother informed him that a neighbor had made a threatening call to her and that she was very disturbed by the call. Although there was apparently some type of law enforcement intervention, he was not adjudicated.

5.      Mr. Francis was first arrested at age 20, on August 29, 1998, by the Goshen Police Department and charged with two counts of Second Degree Aggravated Harassment. Mr. Francis randomly picked numbers from a phonebook and made threatening phone calls. In count one, Mr. Francis telephoned a woman on August 10, 1998 and threatened to rape her. In Count two, Mr. Francis telephoned a second woman on August 13, 1998 and threatened to rape her. A threatening phone call to a teenage girl that occurred on July 19, 1998 was also taken into consideration at sentencing. On February 10, 1999, Mr. Francis was convicted of Second Degree Aggravated Harassment, Communicate Alarm and was sentenced to three years of probation.

6.      A June 15, 1999 Violation of Probation petition was filed charging that Mr. Francis failed to comply with sex offender treatment, that he was working and living in Indiana without permission from his probation officer and that he lied to his probation officer and failed to report to his probation officer as directed. Mr. Francis plead guilty to the violation on September 22, 1999 and

was continued on probation.

7.      On November 22, 1999, Mr. Francis was arrested and charged with eight counts of Making Threatening Interstate Communications for, via the telephone, calling numerous numbers across the country threatening to either rape or kill the female who picked up the phone. On March 21, 2000, he pled guilty to the eight counts and was sentenced to 22 months imprisonment with three years of supervised release. Due to the above federal arrest, a Violation of Probation was filed on November 22, 1999. His probation was revoked and he received a sentence of six months in jail on August 9, 2000. Mr. Francis was released from BOP custody on July 6, 2001.

8.      On November 20, 2001, in a meeting with his probation officer, Mr. Francis admitted to making approximately 50 threatening phone calls in September of 2001 in which he threatened rape or other harassing comments. His supervised release was revoked on December 21, 2001, and he received a sentence of 24 months imprisonment. On September 13, 2003, Mr. Francis was released from federal custody.

9.      On December 16, 2001, Mr. Francis was accused of raping Emily, a female college student at Marist College. This allegation was thoroughly investigated by the Poughkeepsie Police Department. Mr. Francis admitted to having consensual sex with Emily that day. Mr. Francis was never arrested or charged with any offense relating to this investigation.

10.     In December 2003, Mr. Francis was arrested and charged with eighteen counts of Making Interstate Threatening Communications. On September 16, 2005, Mr. Francis received a sentence of 70 months incarceration in the BOP and three years of supervised release on four counts of Intimidation of a Witness and One Count of Extortion. He also received a concurrent sentence of 60 months and three years supervised release on 24 counts of Making Threatening Interstate

-4-

Communications. During his incarceration, from January 27, 2005 through April 11, 2005, the BOP conducted an Evaluation of Mr. Francis in which he was routinely observed by mental health professionals, nursing staff and correctional staff and in which he participated in several clinical interviews and a number of psychological measures were administered. In light of his participation in the SOTP at Butner, the BOP specifically considered the sexual sadism diagnosis and found that it was "not appropriate." At that time, Mr. Francis was diagnosed with "Rule out Telephone Scatologia." He has had no other arrests or charges since that time. Petitioner's Exhibit ("PE") 22. On January 12, 2009, Mr. Francis was released from BOP custody. Upon his release he was **not** required to register as a sex offender. Respondent's Exhibit ("RE") 28.

11.     Prior to his release from BOP custody, on September 12, 2008, the BOP Certification review panel found that Mr. Francis did not meet the definitional criteria of a sexually dangerous person under the Act. RE 31. He has had no other arrests or charges since that time.

12.     In September 2009, Mr. Francis's supervised release was revoked. The initial violation was for renting a pornographic movie on his cable box. PE 28. His probation officer followed up with a second violation for Not Providing Information to his Probation Officer. PE 30. These two violations resulted in his expulsion from Sex Offender Treatment and this led his probation officer to file a third violation (for being expelled from the Sex Offender Treatment Program). PE 31 and 32. As a result of the three violations, Mr. Francis was sentenced to six months imprisonment to be followed by 12 months of supervised release. Mr. Francis was scheduled to be released on February 6, 2010, however, on January 29, 2010, eight days before he was due to be released from prison, the Government certified Mr. Francis under the Act. RE 35. Mr. Francis has been incarcerated at Butner since that time.

## B.  Bureau of Prisons Disciplinary History

13.     On June 20, 2003, Mr. Francis was sanctioned for 15 days to his quarters for being in an unauthorized area.  This is his sole infraction while in the custody of the BOP.

## C.  Sex Offender Treatment

14.     Mr. Francis participated in the Sex Offender Treatment Program at FCI-Butner beginning on July 11, 2002.  In April 2003, Mr. Francis was expelled from the Butner SOTP for "failure to make treatment progress."  He also participated in Sex Offender Treatment while on supervised release in 2009.

## D. TESTIMONY, EVALUATIONS AND OTHER EVIDENCE

### 1.  The Testimony of Mr. Sean Robert Francis

15.     The Respondent, Sean Robert Francis, was called to testify by the Government. During his testimony on October 5 and 6, 2011, he was repeatedly asked about the "victim lists" that he was required to complete while in sexual offender treatment in Butner in 2002-2003 and while participating in the Kentucky Sexual Offender Treatment Program in 2009.  Mr. Francis testified that he made up these hands on victims for the purposes of staying in sex offender treatment.  Mr. Francis testified that he has had approximately 60-80 sexual partners, that his DNA is in the system and that there was substantial media coverage at the time of his first arrest.  Other Courts have found the Butner SOTP to be "highly coercive" recognizing that "[u]nless offenders continue to admit to further sexual crimes, whether or not they actually committed those crimes, the offenders are discharged from the program" and that consequently, participants in the program "had an incentive to lie."  *See*, e.g., *United States v. Johnson*, 588 F. Supp. 2d 997, 1006 (S.D. Iowa 2008).  The Court finds that the government did not present clear and convincing evidence that Mr. Francis committed the "hands

on" offenses described in his victim lists.

16. Mr. Francis testified that he did not rape "Emily". Mr. Francis admitted to having consensual sex with "Emily" on December 16, 2001. Mr. Francis testified that the description of one of the "victims" from his "victim list" was similar to Emily's description of the rape because he had read the police reports and used it as an outline to create a victim for the purpose of remaining in sex offender treatment. The rape allegation was thoroughly investigated by the Poughkeepsie Police Department. Mr. Francis was never arrested or charged with any offense relating to the investigation. The Court cannot find by clear and convincing evidence that Mr. Francis raped Emily.

17. Mr. Francis took full responsibility for the threatening phone calls that he made in the past and testified that he was remorseful and knew that he had hurt the victims of his phone calls. He showed to the court that he fully appreciated the harmfulness of the threatening phone calls that he made. He testified that he has not made any threatening phone calls since 2003, no longer feels the need to make such phone calls and would not make any threatening phone calls in the future.

## 2. The Testimony and Evaluations of Dr. Hy Malinek

18. The first of the Government's experts was Dr. Hy Malinek, a clinical and forensic psychologist whose practice is primarily devoted to evaluation of sex offenders in California. He was retained by the Government to perform a risk assessment of Mr. Francis and to determine whether he meets the criteria for commitment under the Adam Walsh Act. He concluded that Mr. Francis does meet the criteria for commitment.

19. Dr. Malinek conducted a record review of Mr. Francis and issued a report dated April 12, 2011. In his report, he gave Mr. Francis the following diagnoses, based solely on a review of records and without any contact with Mr. Francis: Axis I: Paraphilia NOS, Non Consenting victims,

with Prominent Sadistic Features and Axis II: Antisocial Personality Disorder. Dr. Malinek determined that Mr. Francis met the statutory definition of Sexually Dangerous Person. However, at Dr. Malinek's deposition on August 31, 2011 and during trial testimony, Dr. Malinek stated that the "more accurate" diagnosis would be Paraphilia NOS, Telephone Scatologia.

20.     On September 26, 2011, Dr. Malinek supplemented his report after conducting an in-person interview with Mr. Francis on August 8, 2011. In Dr. Malinek's "Summary" to his Supplemental Report he notes "[t]he interview I conducted with this inmate and reexamination of this case have not altered my original opinion. I continue to see this respondent as a high risk individual to reoffend and continue to believe that the obscene phone calls, which he has engaged in represent an unlawful conduct of a sexual nature, which involved a threatened use of force and thus 'qualify' as sexually violent." Dr. Malinek attached very little if any significance to the fact that Mr. Francis had not reoffended since 2003 and that Mr. Francis was in the community with a cell phone, as mandated by his probation officer, for a period of eight months and did not make any threatening or otherwise inappropriate phone calls. In his initial report, Dr. Malinek stated "[i]nterestingly, one of the women that Mr. Francis' dated was interviewed [as part of the 2004 Presentence Report], and she denied that Mr. Francis was ever sexually coercive, violent or inappropriate." Apparently, Dr. Malinek attached very little significance to this statement as well.

21.     Dr. Malinek testified that, with the exception of "Emily," he did not consider the victims that Mr. Francis named during sex offender treatment to be "real." Dr. Malinek testified that he only considered the threatening phone calls and the alleged rape of "Emily" in his diagnosis and did not consider any of the "victims" that Mr. Francis confessed to during his time in sex offender treatment.

-8-

22.     Dr. Malinek testified that he used an empirically guided clinical approach in assessing Mr. Francis' risk of recidivism.  Initially, Dr. Malinek used three actuarial instruments to assess Mr. Francis' risk of recidivism: the Static-99R, the Static-2002R and the MnSOST-R.  Dr. Malinek acknowledged that the Static-99R has show only "moderate accuracy" in ranking offenders according to their relative risk for sexual recidivism.  He determined that Mr. Francis' scored a 10 on the Static-99R which placed him in the high risk category and in the 99.7-100th percentile when "compared to a representative and international sample of adult male sex offenders."  He decided to compare Mr. Francis to other individuals with a score of 10 in the High Risk/Need offender sample "given the nature and number of his offenses."  Despite the fact that Dr. Malinek acknowledged that the "exact differences between the samples are not fully known," he chose only to compare Mr. Francis to those in the High Risk/Need offender sample.  Dr. Malinek also acknowledged at his deposition that he did not know what percentage of the sample had only been convicted of making threatening phone calls nor did he know what percentage of the sample had never been convicted of any hands on offense.   Though he testified at trial that he only considered the threatening phone calls and the alleged rape of "Emily" in his evaluation, his written report states "Mr. Francis is truly one of the most prolific sex offenders I have evaluated.  I can't recall an individual with a score of 10 on the Static 99, and I have evaluated and reviewed hundreds of candidates for civil commitment as sex offenders since 1996."  Dr. Malinek's statement is particularly suspect given the fact that he conceded at trial (and the Static 99 manual concurs) that  scores of 6 and greater are all considered high risk and **treated alike** (emphasis added).  In other words, a person with a score of 6 on the Static 99 is no more likely to recidivate than a person with a score of 10 or even 12.  He concluded that persons with Mr. Francis' score of 10 had a 59.7% chance of committing a sex offense in five years and 68%

-9-

chance of reoffending in ten years.  It should also be noted that  pursuant to the Static 99R Coding

form, his score can never reach lower than a six throughout his lifetime and the only scoring item that

will ever become lower for Mr. Francis is the "Age at Release" item.  In other words, if he were to

sit in prison for the rest of his life with no new offense, in two years when Mr. Francis turns 35  his

score can get no lower than a 9.  In seven years when Mr. Francis turns 40, his score can get no lower

than an 8.  And in 27 years, when Mr. Francis turns 60 his score can get no lower than a 6.  Mr.

Francis' Static-99R score can never get any lower than 6.

       23.     Dr. Malinek also scored Mr. Francis as a 10 on the Static-2002R.  Importantly, Dr.

Malinek noted that the percentile data for the Static-2002R scores were based on three Canadian

samples and that "the appropriateness of applying these percentiles to sexual offenders in jurisdictions

other than Canada is not known."  He reported that offenders with the same score as Mr. Francis

from the High Risk/Need group have been found to sexually reoffend at a rate of 55% in five years

and 64.6% in ten years.  Again, with the Static-2002R "the exact differences between the samples are

not fully known."

       24.     Dr. Malinek also rated Mr. Francis on the MnSOST-R which is also a "moderately

accurate predictor of sexual recidivism.  The MnSOST-R's definition of sexual recidivism is the

"likelihood of re-arrest for a contact sexual offense within the first six years of release from

incarceration."  It is interesting that Dr. Malinek used the MnSOST-R on Mr. Francis given the fact

that Mr. Francis has never been arrested for a contact sexual offense.  Nevertheless, Dr. Malinek

scored Mr. Francis a 9 which places him in the high risk category.  For individuals with this score the

expected "re-arrest for a contact sexual offense" rate within six years of release is approximately

30%.

25.     Prior to interviewing Mr. Francis and despite Dr. Malinek's warning that "conclusions related to dynamic factors can be offered with more confidence when a clinical interview has been conducted," Dr. Malinek also considered several dynamic factors in determining Mr. Francis' likelihood of reoffending.  These dynamic factors included significant negative social influences, capacity for relationship stability, emotional identification with children, lifestyle impulsiveness, poor problem solving skills, grievance/hostility, offensive-supportive attitudes, sex drive/sexual preoccupations, deviant sexual interests, resistance to riles and supervision.  He noted that no protective factors, factors that decrease the risk of further sexual offending, applied in Mr. Francis' case and that all of the dynamic factors weighed against Mr. Francis' ability to refrain from committing another sexual offense.

26.     On August 18, 2011, Dr. Malinek conducted an interview of Mr. Francis and in a "Supplemental Report" dated September 26, 2011, Dr. Malinek opined "[o]verall, I have not changed any of the opinions I rendered in my comprehensive report dated 4/12/2011."  Further, Dr. Malinek defended his use of the actuarials stating that he  believes that they are "appropriate...given that a criminal justice intervention and substantial investigation was initiated following the 2001 rape allegations in Poughkeepsie, New York."  However, at trial counsel for Respondent pointed out that the Static-99 Coding Rules Revised-2003 specifically states that "**Rule:** Simple questioning by the police not leading to an arrest or charge is insufficient to count as a sexual offence."  At that point Dr. Malinek changed his justification, testifying that he believed that the threatening phone calls were enough to justify the use of the actuarials.  Other Courts have held that the Static-99 test should not be used on offenders never charged or convicted of a hands-on offense whose hand- on offenses are solely the result of self-report.  *See*, e.g., *United States v. C.R.,* 2011 U.S. Dist. LEXIS 53497

(E.D.N.Y. May 16, 2011).

### 3. The Testimony and Evaluation of Dr. Rebecca Perkins

27.     The Government's second expert witness was Dr. Rebecca Perkins, a forensic psychologist who is employed by the Federal Correction Institution at Butner, North Carolina to, among other things, perform sex offender risk assessment. She conducted a forensic evaluation of Mr. Francis dated March 25, 2011 based solely on her review of available records and without any clinical contact with Mr. Francis.

28.     In her report, Dr. Perkins refers to the 2000 psychiatric evaluation of Dr. Bardey who, as she points out, diagnosed Mr. Francis with ADHD and Borderline Personality Disorder. She quotes from the report, "As Mr. Francis grew older the turbulent and abusive relationship he had with his mother fueled feelings of anger and of resentment. Over time, these feelings began to impact significantly on his attitudes towards women in general. Angry at his mother for subjugating him throughout his life, and unable to express angry feelings outright, he attempts to subdue women by threatening them in obscene phone calls. This is a reflection of the power struggle in which he and his mother have engaged throughout his childhood and youth. It is no coincidence that Mr. Francis made his threats from behind the screen of a telephone and its wires; his ultimately empty threats empowered him without requiring him ever to back them up." And that "just as self-mutilators do not intend to kill themselves, so Mr. Francis does not intend to physically harm his victims." Finally, she notes that Dr. Bardey "opined that Mr. Francis did not pose a significant danger to others at that time and 'if appropriate psychiatric treatment is provided to treat his psychiatric illness, the likelihood of his engaging in the offense behavior will be very significantly reduced."

29.     Dr. Perkins diagnosed Mr. Francis with Axis I: Sexual Sadism and Axis II:

Antisocial Personality Disorder. Dr. Perkins opined that "[i]t is highly unlikely that an individual would fabricate disclosures of such as sadistic degree just to prevent expulsion from treatment. As a result, the inmate's self-reports are included in this diagnostic formulation. In addition, it appears that he **may have been a potential** suspect in a sadistic double-rape involving a mother and her daughter and the rape of a college student that occurred in 2001. **Although there is no evidence** that he was charged for these offenses, both incidents would be consistent with his self-reported sexual fantasies and sadistic behaviors. Based on all the aforementioned factors, Mr. Francis is assigned a diagnosis of Sexual Sadism." (emphasis added). Dr. Perkins noted that Mr. Francis had previously diagnosed with Paraphilia NOS, Telephone Scatalogia. She considered the disorder but ruled it out.

30. Dr. Perkins scored Mr. Francis as a 10 on the Static-99R and found that Mr. Francis met the criteria for commitment under the Adam Walsh Act.

### 4. The Testimony and Evaluation of Dr. Joseph J. Plaud

31. Dr. Joseph J. Plaud conducted an interview and evaluation of Mr. Francis at the request of his attorney. Dr. Plaud concluded that Mr. Francis "is not accurately or adequately described, labeled or diagnosed as an individual who has a condition that is in any way consistent with the definition of a sexually dangerous person." RE 46.

32. Dr. Plaud noted that Mr. Francis has never been charged or convicted of hands-on sexual offenses against any person. He did, however, give "significant deliberation to the issue of apparent disclosures made by Mr. Francis" while in sex offender treatment. It was Dr. Plaud's judgment that the "disclosures of hands on victims was solely a function of secondary gain associated with staying at Butner and not having to return to incarceration in New York." Dr. Plaud testified

-13-

that Mr. Francis engaged in sexually violent conduct if the Court considers his sexually threatening phone calls to fit the definition of sexually violent conduct.

33.     Dr. Plaud opined that "Mr. Francis does not 'suffer from a serious mental illness, abnormality or disorder' at this time." Though "at one point he may have met a provisional type of diagnosis for a sexual disorder that is not otherwise specified, telephone scatalogia" there is "no evidence at this time of ongoing urges for him to engage in obscene telephone calling." Dr. Plaud pointed to the fact that in 2009, Mr. Francis was in the community for seven to eight months and in possession of a cellular phone with no indication that he made any obscene or threatening telephone calls, as evidence of Mr. Francis's current level of volitional control. He testified that his most recent behavior in the community was the "gold standard" in measuring Mr. Francis' current level of volitional control.

34.     Additionally, Dr. Plaud testified that Mr. Francis has shown through his behavior while incarcerated, i.e., his lack of institutional infractions, that he is able to conform his behavior to appropriate standards. In his report, he noted that Mr. Francis "evidences excellent general behavioral impulse control, and through the clinical interview demonstrated his understanding of the precipitants of his obscene telephone calls in the past." He further stated that "there is no support for the professional conclusion...that he would have serious difficulty in refraining from sexually violent conduct if he were released from a secure facility."

35.     Dr. Plaud reported and testified that there are "no empirically validated tools, including any actuarials or statistical risk tools, that would be adequate to evaluate Mr. Francis at this time given his history of adjudicated sexual offenses which are entirely non-contact based and limited to telephone verbal behavior."

## 5. **The Testimony and Evaluation of Dr. Jeffery C. Singer**

36.      Dr. Jeffery C. Singer conducted an interview and evaluation of Mr. Francis at the request of his attorney.  Dr. Singer concluded that Mr. Francis does not meet the criteria for commitment under the Adam Walsh Act.  RE 48.

37.      Dr. Singer testified that although it is his opinion that some sexual threats could amount to sexually dangerous conduct, the type of threats that Mr. Francis made over the phone, in his opinion, would not amount to sexually violent conduct.

38.      Dr. Singer also opined that Mr. Francis did not currently suffer from a serious mental illness, abnormality, or disorder.  He diagnosed Mr. Francis with Axis I: Adjustment Disorder with Depressed Mood and Paraphilia NOS-Telephone Scatologia.  Dr. Singer found no Axis II diagnosis.

39.      Dr. Singer quoted Dr. Bourke's 2003 report to convey his opinion on the use of actuarials in Mr. Francis' case: "(actuarials) were constructed for use with sex offenders convicted of contact sex offenses, and as a result the measures have limited utility for people such as Mr. Francis who never have been convicted of a 'hands-on' offense."  Further, Dr. Singer stated that "[t]he scoring of the Static-99R requires human judgment to decide which is the correct reference group to apply.  The introduction of such judgment obviates the very point of actuarial assessment.  Furthermore, the reference group themselves have not been adequately examined regarding group exclusivity."

40.      Dr. Singer noted that, although the  rules regarding the Static 2002R count obscene telephone calls, it is a newer instrument and had not, in Dr. Singer's opinion, reached the general acceptance standard in the professional community.

41.     In his report and at trial, Dr. Singer opined that the "accuracy of the inferences from the behavioral data gathered from Mr. Francis 7-month stay in the community supercedes what can be inferred from an actuarial tally." Dr. Singer agreed with Dr. Plaud that Mr. Francis' most recent behavior in the community was the "gold standard" in measuring his current level of volitional control.

42.     Dr. Singer utilized the SVR-20, a structured clinical checklist designed for the risk assessment of sexual violence in sex offenders. He integrated the SVR-20 variables and concluded that "[t]aken together, the SVR-20 analysis indicates that Mr. Francis' risk for committing a sexual offense is well ensconed in the low range."

### 6.  The Affidavit of Jessica K. Gulett

43.     On September 16, 2011, Jessica K. Gulett provided a signed affidavit to Respondent's counsel. RE 43.

44.     In the Affidavit, Ms. Gulett indicated that she met Mr. Francis for the first time at Eastern Kentucky University. She was eighteen years old and he was nineteen years old.

45.     She stated that her and Mr. Francis quickly became friends and were also sexually intimate on a number of occasions. She further stated that "[m]y sexual relations with Sean were always consensual. At no time was I forced or coerced into having sex with Sean. At no time was Sean ever sexually or physically aggressive towards me. Sean never assaulted me or harmed me in anyway."

46.     After 1998, Ms. Gulett did not see Mr. Francis again until his release from prison in 2009. However, they kept in touch through letters and phone calls. Ms. Gulett has been aware of Mr. Francis' multiple incarcerations for making threatening phone calls and has provided moral

support to Mr. Francis.

47.     When Mr. Francis was released from prison in 2009, they reconnected in Kentucky and began having sexual relations again. Again, Ms. Gulett stated that "[a]t no time was I forced or coerced into having sex with Sean. At no time was Sean sexually or physically aggressive towards me. Sean never assaulted me or harmed me in anyway."

48.     Finally, Ms. Gulett stated that in 2009, Mr. Francis met her children who "quickly formed a bond with Sean and he was affectionately known to my children as 'Uncle Sean.' At no time did Sean harm my children in any way."

### 7.  The Affidavit of Cynthia Thompson

49.     On September 19, 2011, Cynthia Thompson provided a signed affidavit to Respondent's counsel. RE 44.

50.     In the Affidavit, Ms. Thompson indicated that she met Mr. Francis in 2009 while she was working at Verizon Wireless in Lexington, KY. The two went on a date and quickly became friends. Shortly thereafter, Ms. Thompson and Mr. Francis became sexually intimate. Ms. Thompson stated that she was the first person Mr. Francis had sex with after his release from prison. Further, she stated "[m]y sexual relations with Sean were always consensual. At no time was I forced or coerced into having sex with Sean. At not time was Sean ever sexually or physically aggressive towards me. Sean never assaulted me or harmed me in anyway."

51.     Ms. Thompson stated that in 2009 she was aware that Mr. Francis had been in prison and that she is aware that he is currently in prison.

### III.  CONCLUSIONS OF LAW

### A.  Constitutional Issues

## 1. **Section 4248 Violates Equal Protection**

52.     As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public. *Incorporated by reference, United States v. Timms*, 5:08-HC-01256-BO (E.D.N.C. July 1, 2011).

## 2. **Delay in the Proceeding Violated Respondent's Due Process Rights**

53.     This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the Government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

## B. **Standard of Proof and Elements Required to be Established**

54.     The Government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but "by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "Clear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jiminez v. DaimlerChryslet Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotations and citations omitted). It has alternatively been described "as meaning 'highly

-18-

probable.'" *Direx Israel Ltd. V. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n. 7 (4th Cir. 1992) (quoting 9 J. WIGMORE, EVIDENCE § 2498 (3d ed. 1940)).

55.     To commit Respondent, the Government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  18 U.S.C. § 4247(a)(5).  An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).

56.     This phrase has not been defined by statute.  The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Crane*, 534 U.S. 407 (2002).  *See* H.R. Rep. No. 109-218(1) Section-by-Section Analysis and Discussion §511.  In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another."  *Crane*, 534 U.S. at 413.

57.     A finding of dangerousness is also constitutionally required.  *Kansas v. Crane*, 534 U.S. at 407-409, 410 (stating "we have consistently upheld involuntary commitment statutes...[when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is 'coupled...with the proof of some additional factor, such as 'mental illness' or

-19-

'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-58 quotations omitted)). *See also Foucha v. Louisiana*, 504 U.S. 71, 82-83 (1992).

58.     The Court finds that in this regard, the statute and due process considerations require that, in addition to volitional impairment, the Government must prove by clear and convincing evidence that Respondent poses a risk of re-offense that is significant enough to justify finding that Respondent is sexually dangerous and therefore can be preventively detained.

59.     In this case the Government has proven neither.  The evidence in this case does not demonstrate that Respondent currently suffers from volitional impairment.  The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates.

## C.  Elements of "Sexually Dangerous Person"

60.     As to the first element of the statutorily defined "Sexually Dangerous Person," the Court finds that Mr. Francis has engaged in obscene threatening phone calls of a sexual nature. The Court cannot find by clear and convincing evidence that Mr. Francis has engaged in any hands-on sexual offense.

61.     As to the second element of the statutorily defined "Sexually Dangerous Person," the Court finds the testimony of Drs. Plaud and Singer to be the most convincing.   Based on the testimony of Drs. Plaud and Singer, as well as the other evidence in this case, the Court cannot find by clear and convincing evidence that Mr. Francis suffers "from a serious mental illness, abnormality or disorder".

62.     As to the third element of the statutorily defined "Sexually Dangerous Person," the Court finds the testimony of Drs. Plaud and Singer to be the most convincing.  Based on the

-20-

testimony of Drs. Plaud and Singer, as well as the other evidence in this case, the Court cannot find by clear and convincing evidence that Mr. Francis "would have serious difficulty in refraining" from future sexually violent conduct.

## IV. CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Sean Robert Francis is not a "sexually dangerous person" and order his release from the federal Bureau of Prisons.

Respectfully submitted this the 17th day of October, 2011.

**THE EDMISTEN & WEBB LAW FIRM**
 **/s/ _James Ryan Hawes_**
JAMES RYAN HAWES
N.C. State Bar No. 36802
Attorney for Defendant
127 West Hargett Street
Suite 104 (27601)
Post Office Box 1509
Raleigh, North Carolina 27602
Telephone: (919) 831-8700
jim.hawes@ew-law.com

-21-

# CERTIFICATE OF SERVICE

This is to certify that the undersigned attorney has served a copy of the ***Respondent's Proposed Findings of Fact and Conclusions of Law (Local Rule 52.1)*** upon counsel and parties listed below properly addressed to:

G. Norman Acker
norman.acker@usdoj.gov
R.A. Renfer, Jr.
rudy.renfer@usdoj.gov
United States Attorneys Office
310 New Bern Avenue
Suite 800
Raleigh, NC 27601-1461

Michael D. Bredenberg
mbredenberg@bop.gov
Federal Medical Center
P.O. Box 1600
Butner, NC 27509

Michael E. Lockridge
mlockridge@bop.gov
Federal BOP, Legal Center
P.O. Box 1600
Butner, NC 27509

Respectfully submitted this the 17th day of October, 2011.

**THE EDMISTEN & WEBB LAW FIRM**
 **/s/ *James Ryan Hawes***
JAMES RYAN HAWES
N.C. State Bar No. 36802
Attorney for Defendant
127 West Hargett Street
Suite 104 (27601)
Post Office Box 1509
Raleigh, North Carolina 27602
Telephone: (919) 831-8700
jim.hawes@ew-law.com