THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA,          )
                                   )
                 PETITIONER,       )
                                   )
       V.                          )   NO. 5:10-HC-2013-BO
                                   )   OCTOBER 5, 2011
SEAN ROBERT FRANCIS,               )   RALEIGH, NC
                                   )
                 RESPONDENT.       )
_____    )


TRANSCRIPT OF 4248 BENCH TRIAL
(VOLUME 1)


BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE PETITIONER:   G. NORMAN ACKER, III, ESQ.
                      MICHAEL LOCKRIDGE, ESQ.
                      ASSISTANT UNITED STATES ATTORNEY
                      EASTERN DISTRICT OF NORTH CAROLINA
                      800 TERRY SANFORD FEDERAL BUILDING
                      310 NEW BERN AVENUE
                      RALEIGH, NC  27601-1461

FOR THE RESPONDENT:   JAMES RYAN HAWES, ESQ.
                      WOODY WEBB, ESQ.
                      WOODY WEBB & ASSOCIATES
                      127 WEST HARGETT STREET, SUITE 104
                      RALEIGH, NORTH CAROLINA  27601


REPORTED BY:          PATRICIA C. ELLIOTT
                      VERBATIM REPORTER

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  This is the United

3    States versus Francis trial -- bench trial involving the

4    detention of the defendant under the -- Section 4248.

5              Are you ready to proceed?

6              MR. ACKER:  We are, Your Honor.

7              THE COURT:  How about you, Mr. Hawes?

8              MR. HAWES:  Yes, Your Honor.

9              THE COURT:  Okay.  Do you want to make an opening

10   statement or begin with the witnesses?

11             MR. ACKER:  I -- I do have an opening statement,

12   Your Honor.  A couple of housekeeping matters first.  Mr.

13   Webb is here as -- he just made a notice of appearance

14   yesterday, and I'd just like him to clarify his role here.

15             MR. WEBB:  Your Honor, I'm not appointed counsel

16   in this case.  I'm just here second-chairing, not expecting

17   the government to pay my fee or anything.  But I'm here

18   to -- to assist Mr. Hawes.  I will be examining and

19   cross-examining several witnesses.

20             THE COURT:  All right.

21             MR. ACKER:  We have no objection.  I just wanted

22   to clarify he's appearing pro bono.

23             THE COURT:  Okay.

24             MR. ACKER:  The other thing, Your Honor, just as a

25   housekeeping matter, we have provided a -- a bench book of

1  all of our exhibits to Your Honor.  The white notebook is

2  the government's exhibits and the black is the respondent's

3  exhibits.

4          There was a motion filed to exclude virtually all

5  of our exhibits, raising two privilege issues.  One was the

6  psychotherapy privilege and the other is the privilege for

7  probation materials.  And we filed a response, I believe,

8  yesterday, Your Honor.

9          If Your Honor wants to hear that and rule on that

10  now, we certainly -- it would, I think, facilitate the

11  presentation of the evidence, because if that's the case --

12  that was their only objection, and we can go ahead and admit

13  all of the exhibits in the pretrial order.

14          THE COURT:  Well, if the detainee calls witnesses

15  or testifies, doesn't he waive the privilege?

16          MR. ACKER:  He does, Your Honor.  And he testified

17  at his deposition and he --

18          THE COURT:  Without preserving the -- the

19  privilege objection?

20          MR. ACKER:  He tried to preserve the objection as

21  to the polygraph examination that he did in 2009 --

22          THE COURT:  Right.

23          MR. ACKER:  -- which was ordered by probation.

24  But, Your Honor, then he went on -- and I cite in the

25  brief -- in my response brief that he went on to discuss it,

1  so we contend that he did waive it.

2          THE COURT:  Okay.

3          MR. ACKER:  So it -- it certainly would assist in

4  the presentation of evidence if -- if we could go ahead and

5  introduce all of our exhibits at this time.

6          THE COURT:  Are you serious about trying to block

7  the evidence based on privilege?

8          MR. HAWES:  Well, it would be our contention

9  that --

10          THE COURT:  Or are you just preserving it for the

11  record?

12          MR. HAWES:  Well, we're going to preserve it for

13  the record, but it is our contention that it's Mr. Francis's

14  privilege, the psychotherapist-patient privilege, and the

15  government unilaterally waived it for him by getting these

16  documents.

17          I mean, he had no choice -- this is all after the

18  fact that Mr. Francis waived his right at a deposition.

19  They'd already been given to the -- to the government, to

20  the government's experts.  It had been too late at that

21  point.  The -- the judgment -- the damage had been done.

22          THE COURT:  All right.  I'll overrule the motion

23  and deny that motion.

24          MR. ACKER:  Okay.  Then, Your Honor, I would, at

25  this point, move into evidence Exhibits 1 through 45, that

1   being the only objection in the pretrial order as to those.

2              THE COURT:  All right.  They're received.

3              MR. ACKER:  Thank you.  Your Honor, I would like

4   to make an opening statement.

5              This case, Your Honor, is very different from the

6   other three cases that you've heard.  In those cases, this

7   was -- it was primarily a battle of experts.  The government

8   had experts that it called and the respondent had experts

9   that it called.  And there were some minor factual disputes,

10  but, primarily, it was a battle of experts.

11             This case, Your Honor, is totally the opposite of

12  that.  This case is really fact-dependent.  And the reason

13  that is is that there -- there are three -- there are

14  several kinds of evidence that Mr. Francis is disputing.

15             The first is he does not dispute that he made

16  hundreds of obscene and threatening phone calls and that he

17  was arrested for that.  He was charged three different

18  times, once in state court and twice in federal court, for

19  making these obscene and threatening phone calls.  He pled

20  guilty to that.

21             However, he disputes now the nature of those

22  calls.  He now says they weren't of a sexual nature, and

23  that's a very important factual issue that Your Honor is

24  going to have to decide.  More importantly, in 2003, when he

25  was in the sexual offender treatment program at Butner,

1    which he volunteered for, he made numerous admissions about

2    other sex offenses that he had done that he had not been

3    charged or convicted on that he had not been caught for.

4    And so we have in evidence a number of admissions that he

5    made during that SOTP program in 2003.  He now says, and he

6    testified in his deposition, that all that was lies, that

7    none of it happened.

8          Then he got out of prison in 2003.  He reoffended

9    again, caught again for making threatening phone calls.  He

10   went back into prison, served some more time in prison and

11   then got out on probation -- supervised release.

12         And while he was on supervised release in 2009, he

13   made numerous admissions on a videotape.  It was the

14   interview that took place prior to a polygraph examination,

15   and we have -- Your Honor, we're going to -- we've got about

16   two and a half hours of video, and we have selected about 30

17   minutes of those, the clips -- some of the most salient

18   portions that we want to play live in court and have Mr.

19   Francis respond to that.

20         We also -- during that, he admitted to at least

21   ten date rapes that we have on video.  And he also admitted

22   to the facts that are identical to a rape he was

23   investigated for in 2001.  We located the victim of that

24   2001 rape and we have -- she lives in New York.  We -- it's

25   in a civil case.  We don't have the power to -- to subpoena

1   her to trial.  And so we took a de bene esse deposition of

2   her in New York a couple of months ago, and we intend to

3   introduce that evidence to Your Honor as well where she

4   tells about Mr. Francis raping her on December 16th of 2001.

5          He again denies that, and he has a fantastic story

6   about how he had consensual sex with this woman at 4:00 in

7   the morning outside on a cold night, on December 16th, in

8   Upstate New York where she is laying on the ground on her

9   back on rocks voluntarily having sex with him at 4:00 in the

10  morning when she has a boyfriend.  He claims that she gave

11  him her phone number.

12         But the facts will show that as soon as she got

13  home, she immediately called the police and reported this as

14  a rape.  So his story is just absolutely fantastic.  So

15  these factual issues about whether or not the phone calls

16  that he made were of a sexual nature is a fact issue that

17  Your Honor is going to have to decide.

18         The evidence about these ten date rapes and the

19  other admissions that he made are factual issues that --

20  that the government has evidence that they happened and that

21  he admitted to them and he now denies them.  And then the

22  2001 rape of Emily.  We -- we've withheld her last name, but

23  she will testify by videotaped deposition.

24         So these, Your Honor, are -- are really what makes

25  this very, very different from the other cases you've heard.

1   The other thing that makes it different, and the reason

2   these facts are so important, is because when we get to the

3   expert testimony in this case, the experts -- you're going

4   to hear from four experts, two called by the government and

5   two called by the respondent.

6          The government's experts will testify that when

7   they made their determination about whether or not Mr.

8   Francis was sexually dangerous that they believed that it

9   was likely that at least some of those admissions that he

10  made on the videotape in 2009 were true.  And they

11  considered those -- those admissions, at least in part, in

12  reaching their conclusions.

13         They'll testify, however, that even without the

14  date rapes and the 2001 rape that Mr. Francis would still be

15  sexually dangerous because of the extreme nature of the

16  obscene and threatening phone calls.

17         On the other hand, the experts called by the

18  respondent believed every word that Mr. Francis told them.

19  They didn't inquire about the details of the -- of the 2001

20  rape.  They kind of just took it at face value that he

21  denied having raped her.  They took at face value his

22  statements that he didn't masturbate when he was making

23  these hundreds of obscene phone calls.  They took it at his

24  word that he didn't have any sexual -- sexually deviant

25  fantasies, and they took him at his word that -- that none

1   of the date rapes or the 2001 rape happened.

2          So their opinions are based on faulty facts.  And

3   because of that, Your Honor, the only evidence that you will

4   have -- the only expert evidence that you will have on the

5   issue of sexual dangerousness that's based on the facts that

6   we contend are true, and that we believe they'll be clear

7   and convincing evidence of, are the ones by the government's

8   experts.

9          Now, the evidence is going to show, Your Honor,

10  that on this 2001 rape -- and Mr. Francis will argue that,

11  "Well, I -- I -- I didn't do it, and if -- if they had

12  enough evidence, they would have charged me.  They would

13  have taken me to court.  They would have -- you know, they

14  would have tried me for that."

15         Well, what the evidence will show, Your Honor, is

16  that by the time they caught him -- when they discovered

17  that, in fact, that had enough evidence to move forward, he

18  had already been violated on his probation and was back in

19  federal custody.  And a short time after he went into

20  federal custody, he was transferred to Butner, at his

21  request, to go into the SOTP.

22         So we would ask the court to draw the reasonable

23  inference that the reason he wasn't charged with that 2001

24  rape was the fact that, for whatever reason, they thought

25  that he -- he was already in custody, he had already been

1   violated and that they didn't need to -- need to or they

2   just didn't feel like it was worthwhile to pursue him since

3   he was already in custody.

4           Your Honor, you will hear Emily, the -- the victim

5   of the 2001 rape, say that she felt like she was betrayed by

6   the justice system because Mr. Francis wasn't prosecuted

7   there.  And you will also hear her testify that the reason

8   she is testifying is because she doesn't want any other

9   woman to have to go through what she went through at the

10  hands of Sean Francis.

11          And after hearing all the evidence, Your Honor, we

12  will ask you to believe Emily.  And if you do, if you

13  believe her story, we ask that you don't allow the justice

14  system to betray her again, because if you believe her, you

15  will have to believe, as a matter of logic, that Mr. Francis

16  is a liar, that he's a perjurer and that he's a sexually

17  dangerous person.

18          It will be in your hands, Your Honor, and your

19  hands alone.  We trust that you will believe her and trust

20  that you'll do the right thing in this case.

21          THE COURT:  Is there not a -- is -- there's no

22  statute of limitations for the rape that you're talking

23  about?

24          MR. ACKER:  I -- I haven't researched that issue,

25  Your Honor.

1          THE COURT:  I mean, typically, that's a serious

2     felony and not subject to limitations.

3          MR. ACKER:  That may be true, Your Honor.

4     Finally, Your Honor, we understand what you did in the Timms

5     and the Hall and the Wooden cases on the constitutional

6     question of saying that you believe that the Adam Walsh Act

7     was unconstitutional as applied to those defendants.

8          And if you do the same thing in this case, you

9     know, we disagree and -- but we understand.  But that's

10    really a legal issue.  Although there are some facts there,

11    that's primarily a legal issue and that's something the

12    Fourth Circuit can deal with very easily.

13         But on the facts, Your Honor, on the facts of this

14    case, we ask you to keep an open mind.  We ask you to listen

15    carefully to the demeanor of Mr. Francis and the demeanor of

16    Emily.  We ask you to believe -- and we believe that the

17    evidence will show by clear and convincing evidence that Mr.

18    Francis is a sexually dangerous person.  Thank you.

19         THE COURT:  Why would I not keep an open mind?

20    I'm a judge here in the trial.  I'm not a juror.

21         MR. ACKER:  Absolutely, Your Honor.

22         THE COURT:  Yeah.  Okay.

23         MR. ACKER:  And we -- we trust that you will, Your

24    Honor.

25         THE COURT:  Yeah.  Good.

1         MR. ACKER:  Okay.  Unless Your Honor has more

2    questions for me at this point, I'm ready to call my first

3    witness.

4         THE COURT:  Well, I'm going to ask them if they

5    have an opening statement.

6         MR. ACKER:  Yes, sir.

7         MR. HAWES:  We'll reserve, Your Honor.

8         THE COURT:  All right.  All right.  You can call

9    your first witness.

10        MR. ACKER:  All right.  I call Sean Francis.

11   _____

12   (WHEREUPON,

13                   **SEAN ROBERT FRANCIS**

14        was called as a witness, duly sworn, and testified as

15        follows:)

16   _____

17   **DIRECT EXAMINATION BY MR. ACKER:**

18        Q.   Can you state your name for the record?

19        A.   Sean Robert Francis.

20        Q.   And do you know why you're here?

21        A.   Of course.

22        Q.   What's your understanding of why you're here?

23        A.   Because you're trying to civilly commit me.

24        Q.   Okay.  And you understand the question here is

25   whether or not you're sexually dangerous?

1      A.    I do.

2      Q.    And you know what will happen if the court finds

3    that you are sexually dangerous?

4      A.    I do.

5      Q.    What is that?

6      A.    I'll spend the rest of my life in prison.

7      Q.    But you'll have a right to ask for review of that

8    periodically, won't you?

9      A.    Every six months, by statute.

10      Q.    Okay.  And you would be committed for treatment;

11    is that correct?

12      A.    That's what it says, yeah.

13      Q.    Okay.  You've been convicted three different times

14    for making obscene and threatening telephone calls, haven't

15    you?

16      A.    That's correct.

17      Q.    And you've been convicted of making at least a

18    hundred such calls, haven't you?

19      A.    I don't know the exact number, the exact count,

20    how many counts.  I don't believe I was convicted of a

21    hundred counts, no.

22      Q.    Okay.  Did some of those counts involve more than

23    one telephone call?

24      A.    What it was was multiple telephone calls, which is

25    what made up the -- the counts.  You know, it was not

1   multiple calls to -- to the same person.  It was multiple

2   calls all to different people.  So --

3        Q.   Tell us about those telephone calls.  What did you

4   do?

5        A.   I was extremely angry.  I was extremely

6   emotionally angry.  I was truly empty.  I made telephone

7   calls.

8             THE COURT:  How did you identify the people who

9   were the receivers of the call?

10            THE WITNESS:  I didn't, Your Honor.  I dialed

11  random telephone calls.  I -- I knew the exchange --

12            THE COURT:  You just dialed seven digits?

13            THE WITNESS:  No, Your Honor.  What happened was

14  the people that I called were in colleges, and I knew the

15  colleges because I had either gone to school there or I had

16  friends there.  So I knew what the telephone exchange was.

17            THE COURT:  Like, it's 456.

18            THE WITNESS:  Right.  456, the next extension is

19  457, et cetera, et cetera.  So that's -- that's what I did.

20  And I dialed the random telephone calls, knowing -- knowing

21  full well that I was calling a dormitory, knowing full well

22  that I was calling a college.  So that's how I made the

23  phone calls.

24            THE COURT:  So the exchange is 456, and you'd dial

25  1234, then 1235, 1236, 1237, 1238.

1         Sometimes you got men.  Did you yell at men?

2         THE WITNESS:  No, Your Honor, I did not.

3         THE COURT:  Did you hang up when you get a man?

4         THE WITNESS:  I did, Your Honor.

5         THE COURT:  Okay.  Go ahead.

6         BY MR. ACKER:

7     Q.   And you started making these calls when you were

8  13 years old, didn't you?

9     A.   Approximately 13, yes.

10    Q.   And why was that?

11    A.   Why was that?  I mean, I'm -- I'm not a

12  psychologist, but my parents were going through a very messy

13  divorce.  There was a custody dispute.  I was in the middle

14  of that custody dispute.

15        And my mother told me around 13 years old that she

16  had received similar telephone calls -- these types of

17  telephone calls from a neighbor.  And that was -- it's been

18  described by some of my other doctors in the past as a

19  trigger.

20        And that was the way that I lashed out.  That

21  was -- you know, it was the way that I lashed out.  That was

22  the way that I took out my anger, my emotions.  I -- I

23  didn't hit a punching bag.  I -- I didn't -- I didn't break

24  things.  I didn't hurt animals.  I -- I -- you know, I

25  lashed out in this extremely inappropriate way.  That's what

1    I did.

2        Q.   And who did you call that first time?

3        A.   The first time, I believe it was a -- a mother of

4    a girl at school who -- I -- I was -- I was not a popular

5    child at school, and I -- I -- I injured myself.  I had a

6    broken ankle.  And all of a sudden I was part of the cool

7    clique at that school.

8             Then for -- for some reason or another, I was

9    excluded from that clique.  And this girl who was my close

10   friend, girlfriend, whatever you want to say at 13 years

11   old -- I -- I was angry and that's how I -- how I lashed

12   out.  I called her mother, I believe.

13       Q.   She broke up with you, right?

14       A.   Well, I mean, at 13 years old, I don't know if

15   it's really -- it was more like I was shunned, shunned by

16   the "in" crowd.  And -- and I -- yeah.

17       Q.   Well, did you consider her your girlfriend?

18       A.   At 13 years old, I -- I mean, a friend.  There was

19   no intimacy there.  So, no, I guess -- I wouldn't say a

20   girlfriend but a friend.  I mean, at 13 --

21       Q.   Okay.  And you wanted to get back at this girl for

22   her shunning you; is that right?

23       A.   I don't know that I wanted to get back at her or

24   if I was just extremely emotional and this is how I lashed

25   out.  I don't remember sitting there saying, "Well, I'm

1  going to go after Melissa."  I -- I -- I don't remember

2  thinking that, but --

3     Q.   And what did you say when you made this call?

4     A.   All those years ago, quite frankly, I don't

5  remember what I said.  It was not what it morphed into,

6  which was the threatening rape and murder and things of this

7  nature.

8        Was --  was it an obscene phone call?  It most

9  certainly was.  Do I remember verbatim what I said?  No.

10 At -- at 13 years old, sorry, I don't.

11    Q.   You said it morphed into something else.  Tell --

12 tell us how it morphed from that first phone call when you

13 were 13 to threats of rape and murder.

14    A.   Sure.  When I was -- when I was young, my parents

15 split up.  And what happened was my mother -- there was a

16 custody battle.  And my mother was continuously telling

17 me -- my father wanted to be part of my life, and I was

18 continuously told by my mother, "Your father is a horrible

19 person.  Your father is a bad person."

20       My mother bought my affection many times.  She

21 would buy me video games and things of that nature to say

22 what I wanted her to say about my father.  It was a very

23 stressful environment.  Whenever I -- my mother was not

24 happy with me, she'd tell me, "You're just like your father.

25 You're" --

1          THE WITNESS:  (To the Court)  Can I -- can I say

2     it verbatim?

3          THE COURT:  You can say anything you want.

4          THE WITNESS:  All right.  She'd say, "You're an

5     asshole.  You're just like your father.  You're a piece of

6     shit.  You're an asshole."

7          So it was an extremely -- extremely troubling time

8     for me.  School was not -- was not pleasant.  I was shuffled

9     in and out of schools.  I had no stability at school.  My

10    mother took me out of public school.  She put me in three

11    separate private schools between freshman year and senior

12    year in high school.

13         So that's -- you know, that -- that's what was

14    going on during that time.  That's the answer.

15         BY MR. ACKER:

16    Q.   And when did you start making the calls again?

17    A.   Well, at 13, there was a police intervention.  The

18    police intervened, and it was kind of like a scared straight

19    intervention-type thing.  And then I would have to say the

20    next time I started making those calls, sophomore, junior

21    in -- in high school, something around there.

22         I don't recall exactly.  I mean, the first

23    adjudication, of course, was 1998, but I don't recall.

24    Q.   And how old were you in 1998?

25    A.   Twenty or twenty-one; at least twenty.

1      Q.    What year were you born?

2      A.    1978.  Twenty.

3      Q.    And so you made a number of calls that -- where

4  you weren't caught; is that correct?

5      A.    Sure.  Was I adjudicated for every single phone

6  call I made?  No, I was not.

7      Q.    Okay.  So when you were in high school, you -- you

8  continued -- you periodically would make calls and you would

9  call numerous people at the time?

10     A.    That -- that's correct.  I had girlfriends who

11  were in -- I had a girlfriend -- a long-distance

12  relationship -- and she went to the University of Nebraska

13  at Lincoln.  And that is really where it -- where the phone

14  calls were directed and what happened because of the -- the

15  numerical exchange.

16          I had -- I had been out to that college several

17  times to visit her.  I had even looked at going to school

18  there myself.  So that's really where it -- where it was.

19     Q.    And in a given night, how many calls would you

20  make?

21     A.    Well, as far as telephone calls, I mean, I would

22  dial the telephone -- dial hundreds of times.  As far as

23  threats -- you know, and this doesn't mitigate in any way

24  what I did, but, I mean, I must -- I probably made two or

25  three threats a night maybe.  But -- you know, so -- yes.

1        Was there a compulsive dialing of the telephone?

2   Absolutely.  Did I make hundreds of phone calls a night?  I

3   did.  Were those hundreds of phone calls threatening phone

4   calls?  No, they weren't.  Now, did I make a couple of

5   threatening phone calls?  Yeah.

6        Q.   Would you say about half of the times you made a

7   phone call that somebody would at least answer?

8        A.   I would say that's -- that sounds accurate.  I

9   mean, I certainly can't recall, but I would -- I would say

10  it's a safe guess.

11       Q.   Okay.  And so you would make hundreds of calls.

12  Half the time somebody would answer, and, what, you would

13  just hang up?

14       A.   I would.

15       Q.   And then two or three times out of that a night,

16  you would make threats?

17       A.   Well, not every night.  It was not an every-night

18  thing.  It was -- there was a trigger, and the trigger was

19  always -- I had a -- normally, the trigger was -- my mother

20  and I, we couldn't agree on anything.  We could be sitting

21  here talking like you are right now, and the next minute I'm

22  being hit.  She's hitting me and I'm a piece of shit and I'm

23  an asshole and et cetera and so forth.

24            So it was really at times of an emotional release,

25  when there was some -- what I considered stressors on me.

1   And that's when the threats came out.  So was it threats
2   every night?  It was not threats every night.  But was it --
3   was it threats?  Yes.
4        Q.   Okay.  And that --  you were talking about in high
5   school and being -- living with your mother.  Did these
6   threatening and obscene phone calls continue when you went
7   to college?
8        A.   They -- they did.  I mean, from that -- from that
9   period of time, it really -- you know, it continued through
10  my adjudications, obviously, my criminal history.  As -- as
11  you said when you began, three convictions, two federal.
12  So, sure.
13       Q.   Okay.  And you made hundreds of phone calls your
14  first semester of college?
15       A.   I -- I don't know how many I made my first
16  semester of college.  I -- I mean, did I make hundreds of
17  phone calls and dial the telephone?  Absolutely.  Yes.
18       Q.   Did you make dozens of calls during your first
19  semester in college where you made threats to people?
20       A.   Did I make threats?  Absolutely, I made threats.
21  I -- I can't sit here and say I made this many threats or
22  that many threats.  But did I make threats?  Yes, I did.
23       Q.   Okay.  And these were threats -- you would tell
24  the person -- the woman that answered that -- "Don't hang
25  up.  I'm going to rape you"?

1      A.   I would tell them that I had been watching them,

2   that I knew where they were and that I was going to rape you

3   and kill you.  I was extremely upset.

4         Now, I didn't always threaten to rape and kill.

5   Sometimes I just threatened to rape or sometimes I just

6   threatened to kill.  That, of course, doesn't change -- it

7   doesn't make it any better.  But that was -- that was the

8   conduct, yes.

9      Q.   Now, in the spring of 1998 -- well, let me talk

10  about -- in the first semester of college, where were you

11  living?

12     A.   I was living in the dormitories the entire time I

13  was in college, first semester through the last.

14         THE COURT:  Which is where?

15         THE WITNESS:  Eastern Kentucky University, Your

16  Honor.

17         BY MR. ACKER:

18     Q.   Now, after the end of your second semester, did

19  you go home to live with your parents that summer?

20     A.   I did.  Actually, it was an interesting summer.

21  This goes back to my mother.  My mother and I were fighting

22  like cats and dogs.  She had stopped financially supporting

23  me at school.  And I had decided to reach out to my father

24  and go live with him for the first time since I was, I don't

25  know, 12, 11 years old, something like that.

1      Q.   So you lived with your mother for, what, a few
2  weeks right after the semester ended?
3      A.   No.  That's incorrect.  I went home to live with
4  my father immediately after leaving college.
5      Q.   Did you go to your mother's house at all that
6  summer?
7      A.   I -- I did.  Eventually what happened was I
8  reconciled with my mother.  And my mother wanted me to come
9  home, and I went home with her.  So that -- that's what
10  happened.
11          I initially started out living with my father, and
12  then I went back to live with my mother.
13      Q.   You described when you were in high school that
14  you made these phone calls because you were under stress and
15  your mother and you would fight and -- but, now, when you
16  were in college, you were living away from your mother,
17  weren't you?
18      A.   I was.
19      Q.   So it was other stressors that caused you to make
20  these threatening phone calls?
21      A.   No.  I'd have to disagree with that.  My mother
22  and I -- it was all -- as well as my father and ,I spoke on
23  a continuous basis.  I was going home every few months,
24  obviously, for breaks.  My mother stopped financially
25  supporting me.  I didn't even have money to buy food because

1   she took me off the meal plan.

2           So I certainly had quite a bit of stressors there

3   still with my mother.  It was -- it was certainly a constant

4   battle.  But was I away from her?  Absolutely.  I was away

5   from her.

6       Q.   Now, when you went to live with your father, you

7   continued to make the phone calls; is that right?

8       A.   Most certainly did.

9       Q.   And you continued to make threatening phone calls

10  every few days?

11      A.   That's correct.

12      Q.   In August of 1998, you got caught by the police;

13  is that right?

14      A.   I -- I believe those are the dates.  1998, yes.

15      Q.   And you -- you admitted making these calls?

16      A.   I -- I did.  I pled guilty.

17      Q.   Okay.  And now, when did you actually go to prison

18  for that offense?

19      A.   That offense, I didn't.  That was a state

20  misdemeanor and it was adjudicated with probation.  The only

21  time I -- I've done time behind this is -- is federally.

22      Q.   Okay.  And so you were -- you were caught in --

23  sometime in 1998, the summer of 1998.

24          You pled guilty to making those calls on February

25  10th of 1999?

1      A.    I pled guilty.  I don't know what the date is.  If

2   you say that's what it is, I'm sure that's what it is.

3      Q.    Okay.  Now, between that time, in my review of the

4   records, I didn't see any telephone calls that you --

5   that -- that were detected between August of 1998 and

6   February of 1999.  Does that sound about right?

7      A.    Does that sound about right?  I guess yes and no.

8   Was there any detection by local authorities? no.  But

9   the -- the federal -- the federal indictment that came in

10  1999 certainly had plenty of conduct from that time period.

11  So it was certainly detected by the federal authorities.

12     Q.    Okay.

13     A.    Because it was all -- that -- that was the whole

14  issue, which is why it moved from state to federal, of

15  course.  I -- I was making these calls across state lines.

16  So that's why, I mean, the state authorities couldn't get

17  involved.  So --

18     Q.    Okay.  Well, we'll look at those dates in a

19  minute --

20     A.    Okay.

21     Q.    -- when we get to some of the documents.

22           So then in May of 1999, you were on state

23  probation; is that right?

24     A.    That's correct.

25     Q.    And during that month, did you leave -- what state

1  were you in?  Was this New  York?

2       A.   I was on probation -- misdemeanor probation in New

3  York, and what I did was I went to live with a girlfriend in

4  Indiana.

5       Q.   And did you get permission from your probation

6  officer?

7       A.   I did not.

8       Q.   Did you notify your probation officer?

9       A.   I did not.

10      Q.   And did you lie to your probation officer about

11  where you were?

12      A.   I didn't even communicate with him.  I just left.

13      Q.   Okay.  And who were you living with in Indiana?

14      A.   I was living with my girlfriend, Ashley.

15      Q.   Okay.  And what happened with your relationship

16  with her?

17      A.   The relationship deteriorated and I went home.

18      Q.   Now, during that month of May, when you were with

19  Ashley in Indiana, did you refrain from making obscene phone

20  calls during that time?

21      A.   I believe I did.  I -- I -- I -- I simply don't

22  recall one way or the other.  I -- I was there for about a

23  month, Mr. Acker.

24           I -- I worked in a restaurant and I was living

25  with her and her family.  I -- I don't recall making phone

1   calls.  I don't recall it being an issue, but I can't speak

2   intelligently on it one way or the -- one way or another.

3        Q.   Okay.  Now, when you were caught by the federal

4   officials, didn't you admit that from February of 1999

5   through November of 1999 that you made obscene and

6   threatening phone calls every few days except for the month

7   of May?

8        A.   I honestly don't recall.  Did I plead guilty?

9   Yes.  I didn't speak to the FBI.  So if that's what it says

10  in the PSR, that -- then that would be correct.  I mean,

11  I -- I just don't recall.

12       Q.   Okay.  Now, on September 22nd of 1999, you pled

13  guilty in state court to a violation of your probation in

14  state court; is that right?

15       A.   If that's the date you have, yes.  There was a --

16  yes.

17       Q.   And now, you weren't arrested at that time, were

18  you?

19       A.   I was arrested in the probation officer's office.

20  And I made an appearance before the local judge and he RR'd

21  me -- released on recognizance.  And I appeared in court at

22  a later time and probation was continued.

23       Q.   Okay.  Meaning they didn't revoke your probation?

24       A.   That's correct.  It was -- yes.  That's correct.

25       Q.   And isn't it true that on that very day that you

1   pled guilty to the probation violation in state court,

2   September 22nd of 1999 -- on that very same day, you went

3   and made an obscene and threatening phone call?

4       A.   I don't recall that I went out that very same day

5   and made obscene and threatening phone calls.  I really

6   can't speak one way or another.

7           Now, did I -- did I do it in the months leading up

8   to my federal arrest?  Well, of course, I did.  I mean, the

9   record is the record.  But I don't recall going out on

10  September 22nd, or whatever the date you said it is, and

11  resuming that conduct that night.  I simply can't -- I don't

12  recall one way or the other.

13      Q.   Okay.  Well, let's take a look at -- if you've got

14  the notebook up there, if you'll turn to Exhibit 3.

15      A.   Is that just here in the tab?

16      Q.   Yes.

17          MR. ACKER:  And, Your Honor, this is the

18  presentencing investigation report.  And we intend -- when

19  we actually -- sometime by the end of the trial, we will

20  submit this under seal.  I think it would be more

21  appropriate to have this under seal, rather than an unsealed

22  exhibit, if that's Your Honor's preference.

23          MR. ACKER:  All right.

24          BY MR. ACKER:

25      Q.   If you would look at the bottom, there's some

1   Bates numbers that say B-O-P, underscore, F-R-A-N-C,

2   underscore, 000670.  Do you see that?

3        A.   I do.

4        Q.   And that's the first page of Government Exhibit 3?

5        A.   That's correct.

6        Q.   If you'll turn to Page 678 of this exhibit.

7        A.   I'm there.

8        Q.   And do you see at the top Paragraph 88?

9        A.   I do.  I see it.

10        Q.   And the -- the last sentence of that indicates

11   that you pled guilty to the violation of the probation on

12   September 22nd, 1999?

13        A.   That's correct.

14        Q.   Okay.  If you will then turn to Page 671 of this

15   exhibit, the second actual page of the exhibit.

16        A.   Okay.  I'm there.

17        Q.   And does that indicate that you were charged and

18   pled guilty to Count 2 for calling a woman in Nebraska and

19   threatening -- on September 22nd, 1999 -- and raping her?

20        A.   And threatening to rape her?

21        Q.   Threatening -- excuse me.  Threatening to rape

22   her.

23        A.   Yes, that -- that's what it says.

24        Q.   Okay.  So according to this, on the same day that

25   you pled guilty, you called a woman in Nebraska and

1    threatened to rape her?

2         A.   According to this, that's correct.

3         Q.   Now, you pled guilty to these federal charges; is

4    that correct?

5         A.   Correct.

6         Q.   And you were sentenced to 22 months plus three

7    years of supervised release?

8         A.   That's correct.

9         Q.   And within at least two months of getting out of

10   federal prison, you started making these obscene and

11   threatening phone calls again; is that right?

12        A.   That is.

13        Q.   And then your supervised release was revoked?

14        A.   That's correct.

15        Q.   You went back to federal prison?

16        A.   I did.

17        Q.   And during that time, you went down to Butner to

18   the SOTP?

19        A.   Unfortunately, yes.

20        Q.   You were released from federal prison on September

21   13th of 2003?

22        A.   That sounds about right.

23        Q.   And within three weeks of that, you started making

24   threatening and obscene phone calls again?

25        A.   Sounds correct.

1        Q.    Now, the judge asked you about how you got these

2    phone numbers, and -- all right.  And I think you testified

3    here, consistent with your deposition, that you either had

4    gone to college there or you had friends who went to college

5    there, so you knew the local phone exchanges.  Is that

6    right?

7        A.    That's correct.

8        Q.    I'd like --

9              MR. ACKER:  Your Honor, may I approach the easels?

10             THE COURT:  Okay.

11             BY MR. ACKER:

12       Q.    Mr. Francis, I'd like to put up several exhibits

13   here.  And what I'd like you to do is talk about at first

14   only those items that are color-coded either red or blue.

15       A.    Do I have these in my exhibits, Mr. Acker?

16       Q.    You do.  It is -- I believe it's Exhibit 2.

17       A.    Okay.

18       Q.    Either 1 or 2.  Let me see.

19       A.    Yeah, I'm there.  Exhibit 2.

20       Q.    Exhibit 2.  All right.  So this is the first two

21   pages of the timeline that we submitted into evidence as

22   Exhibit 2.

23             And the -- your first phone call -- obscene phone

24   call was in approximately 1991, when you were about 13 years

25   old; is that right?

1      A.    Correct.

2      Q.    And then the second red box up there says 1997 to

3   1998, obscene phone calls from college.

4            That was -- you were in college the -- during the

5   1997-1998 school year?

6      A.    Correct.

7      Q.    And the -- then it says -- the third red box says

8   April 1998 to August 1998, obscene calls -- phone calls from

9   your parents' homes in spring or right after you got out of

10  college from your father's house and then later from your

11  mother's house; is that correct?

12     A.    That is.

13     Q.    And then in August of 1998, you admitted to the

14  police that you'd made threatening phone calls and,

15  specifically, calls that you had made on August 10th and

16  August 13th of 1998.

17     A.    Correct.

18     Q.    If I could put up the next two parts of this

19  timeline.  And again looking at the red and the blue boxes,

20  the evidence was that from February of 1999 to April 30th,

21  1999, you continued making calls every few days.

22     A.    Correct.

23     Q.    And then particularly in March of 1999, you were

24  making calls to Nebraska?

25     A.    Correct.

1      Q.    From June of 1999 to November 22nd, 1999, you

2   continued making obscene calls, including calls to Nebraska,

3   Kansas, Montana and North Dakota and Oregon.  Is that

4   correct?

5      A.    It is what I was convicted for.

6      Q.    And that that period continued on through --

7   through November 22nd, 1999, which was the day you were

8   arrested on federal charges?

9      A.    Yes.

10      Q.    Now, we skipped a couple of the blue boxes that

11   were on the -- above the timeline there.

12            On February 10th, 1999, you pled guilty in state

13   court and received three years probation?

14      A.    Yes.

15      Q.    And on May 1st, 1999, to June 1st of 1999, you had

16   multiple violations of probation.

17            In May, you moved to Indiana.  June 1 you failed

18   to report.  And on June 15th a violation was filed against

19   you for a probation violation.  Is that correct?

20      A.    Sounds correct.

21      Q.    And then September 22nd, 1999 -- we looked at that

22   earlier that -- that you pled guilty to a probation

23   violation in state court, correct?

24      A.    Correct.

25      Q.    So from November 22nd of 1999 to July 6th of 2001,

1  you were in federal custody?

2       A.   Yes.  Yes, I was.  There was a short -- short

3  release for -- for bond.  But, yes -- yes, I was.

4       Q.   And then on December 21st, 1999, you pled guilty

5  to federal charges.  And on March 21st of 2000, you were

6  sentenced to 22 months of active prison time plus three

7  years supervision.

8       A.   That's correct.

9            THE COURT:  Where was that sentencing, what

10  district?

11           THE WITNESS:  Southern District of New York, Your

12  Honor.

13           BY MR. ACKER:

14      Q.   Again looking at only the red and the blue boxes

15  for the time being, in September of 2001, you made

16  approximately 50 obscene and threatening phone calls?

17      A.   Correct.  And, Mr. Acker --

18      Q.   Yes.

19      A.   Just -- I don't know if this will help or not, but

20  I've -- I've gone -- gone ahead and looked at your timeline.

21      Q.   Uh-huh (yes).

22      A.   I agree with -- everything in the red and blue

23  box, I agree with you.  You're absolutely right.

24      Q.   Okay.  So I'll just go through them quickly.  And

25  November 20th of 2001, you were confronted about the calls;

1    December 21, your supervision was released; May 23rd of

2    2002, you consented to treatment at SOTP.  Is that correct?

3          A.    Yes.

4          Q.    And then you were expelled from the Butner SOTP;

5    is that correct?

6          A.    It is.

7          Q.    Now, let me ask you about these yellow boxes.

8    There are four yellow boxes on this part of the timeline

9    dated July 17, 2002, September 5, 2002, just sometime in

10   2003 and April 11 of 2003 that is evidence from things that

11   you were alleged to have said at Butner, and I want to ask

12   you two questions about that.

13         A.    Okay.

14         Q.    One, the first -- and let me tell you both

15   questions.  The first question is going to be did you say

16   those things and the second question will be were they true.

17               So my first question is, these four boxes that are

18   yellow on this chart that you admitted to sexual abuse of

19   four women, did you say that to the folks at Butner?

20         A.    I had -- the way it worked is you filled out a

21   victims list.  And I wrote all kinds of stuff down there,

22   numerous things.  So I would have to say everything on

23   this -- did I say it?  Yes.  I said it during the period of

24   the victim list and the treatment at Butner.

25               The only thing I deny saying is I never said, "I

1   know I'm a predator."  That was a statement from Michael

2   Bourke that was put into my report.  That's not something

3   that I said.

4       Q.   Okay.  So you admitted to sexual abuse of four

5   women in July of 2002.  You admitted to the sexual abuse of

6   five women in September of 2002.  And you admitted to rape

7   fantasies and the details of the calls in April 11 of 2003.

8            You admit saying all those things, but you say now

9   that they're lies?

10      A.   Well, there's a reason why I said them, and I'll

11  be more than happy to expound on that when you -- whenever

12  you'd like.

13      Q.   Okay.  We'll go into that in a little bit.  But

14  you did make those statements during the SOTP?

15      A.   Myself and every other person who was unfortunate

16  to be in that program, yes.

17      Q.   Okay.  And you filled out a -- the -- the box down

18  there that says 2003 at the bottom, "Admitted 57 victims

19  sexually offended" -- you admit that you filled out a victim

20  list admitting to 57 sexual victims?

21      A.   I believe that was the count, yes.

22      Q.   Okay.  But you deny that you ever said, "I know

23  I'm a predator"?

24      A.   That's correct.

25      Q.   Okay.  We've got just two more parts of this

1   timeline.

2           THE COURT:  Weren't you going to ask him if it was

3   true?  You said you had two question.

4           MR. ACKER:  Well, on that one, Your Honor, he

5   denied making the statement.

6           BY MR. ACKER:

7       Q.   Well, I will ask you that.  Is that true?  Are you

8   a predator?

9           THE COURT:  No, that -- that wasn't it.  I thought

10  you were going to ask him were the four yellow boxes true,

11  not only did he say it.

12          MR. ACKER:  I'm sorry.

13          BY MR. ACKER:

14      Q.   The three yellow boxes that you admitted to sexual

15  abuse of four women, of five women and that you had rape

16  fantasies, were those things true?

17      A.   Mr. Acker, I said the things that I said because I

18  was in a sex offender treatment program.  And the way the

19  treatment program worked was -- I was there for telephone

20  calls.

21          And I don't mean to say this to mitigate what I

22  did, but the way the program works is the director, Andres

23  Hernandez, told me upon going in, "You must fill out a

24  victims list and you must say you have hands-on victims.  If

25  you do not say this, you're a liar and you're in denial and

1   we will kick you out of the program and we will send you

2   back to Otisville, where you'll be in solitary confinement

3   and in danger."

4           Did I say things to stay in the sex offender

5   treatment program at Butner?  I most certainly did, myself

6   and every other person who was in there.

7           Was it true?  It most certainly was not.  And you

8   need -- you need to look no farther than the facts of my

9   life to see that.

10          THE COURT:  So the short answer is it's untrue?

11          THE WITNESS:  It is untrue, Your Honor.  It was

12  fabricated for treatment.

13          And I'm -- I'm on your -- your next timeline.  And

14  just to let you know, if you wanted to go through it

15  quickly, I -- I concur that all this is my record and all

16  the blue boxes, red boxes -- yes.

17          BY MR. ACKER:

18  Q.    So all of the red and blue boxes are accurate?

19  A.    They're -- they're all accurate.  I was arrested.

20  I was released from the BOP.  I made more phone calls.  I

21  was arrested.  I pled guilty.  I was sentenced.  Released

22  again.  Your yellow box for sex offender treatment.

23  Admitted to watching six legal movies in my home.  Expelled

24  from the program.  Probation revoked.  Absolutely, all

25  correct.

1    Q.   And the yellow boxes -- there are two yellow boxes

2    on this portion of the timeline.  May 2009, you -- you did

3    admit to sexually offending 27 victims?

4    A.   Well, I mean, let's clarify what we mean by

5    admission here.  Did I say it?  Yes.  Did I admit it?  Well,

6    I mean, that's -- you know, that's a whole different ball

7    game there.

8         Did I say it for the purposes of staying in a

9    program because I was one person in a group with five people

10   who had all been convicted of raping and molesting children

11   and I was there for phone calls?  Did I say things so that I

12   could stay in the community and not be violated and not go

13   to jail?  Guilty as charged.  I said things.

14   Q.   Okay.

15   A.   Was it true?  No.

16   Q.   All right.  You filled out a victims list that had

17   at least 27 -- 27 victims?

18   A.   That's correct.

19   Q.   And you participated in a videotaped interview

20   where you talked about those 27 victims and you also talked

21   about having anal sex with a partner while you were on

22   probation and --

23        MR. HAWES:  At this time, I'd object, Your Honor.

24   This is from a polygraph examination.  And as you know, in

25   the Fourth Circuit, these things are not used -- they are

1   not allowed for hardly anything.  We ask that you not

2   consider them.

3          THE COURT:  Overruled.  I think he's impeaching,

4   aren't you?

5          MR. ACKER:  Yes, Your Honor.

6          THE COURT:  He's adverse --

7          MR. ACKER:  I'm not -- I'm not after what the

8   polygraph results --

9          THE COURT:  Yeah.  He's a adverse --

10          MR. ACKER:  -- were, just the statements.

11          THE COURT:  He's a adverse witness.

12          MR. ACKER:  That's correct, Your Honor.

13          THE COURT:  You called him as a hostile witness.

14          MR. ACKER:  That's correct, Your Honor.

15          THE COURT:  Okay.

16          BY MR. ACKER:

17   Q.   So during that videotaped interview immediately

18   prior to your polygraph, you did admit to having anal sex

19   with a woman; that you knew it was hurting her, but you

20   continued to have anal sex?

21   A.   No, that's -- that's actually not correct.  What

22   happened with me and Chloe was we were having sex.  The anal

23   sex was painful.  She said, "Stop."

24          I said, "All right.  Are you okay?"

25          She said, "Yeah.  You're big.  Let's not do that."

1           And then we continued having sex and we

2    continued -- continued being friends the entire time I was

3    home.

4           Q.   Okay.

5           A.   That's what happened.

6           Q.   Okay.  And you admitted to finding sex partners on

7    the Internet?

8           A.   Myself and half the country, yes.

9           Q.   Okay.  And you admitted to watching pornographic

10   videos?

11          A.   Did I watch perfectly legal movies that I ordered

12   from Time Warner Cable?  Yeah, I did.

13          Q.   Okay.  Let's look at some of the other exhibits

14   that we have in here quickly, or maybe not so quickly.

15          Let's go back to Exhibit 3, if we could, and look

16   on the second page.  This -- Exhibit 3 is the PSR for your

17   2000 conviction?

18          A.   That's correct.  What page number are you on?

19          Q.   I'm looking at the second page of the exhibit,

20   which is Bates-stamped 671.

21          A.   Okay.  Go ahead.

22          Q.   And there's a list of eight different phone calls

23   that you were charged with and pled guilty to?

24          A.   That's correct.

25          Q.   And if you look in Paragraph 6 of the PSR, it --

1   at the bottom on Page 671, does it indicate that you --

2   there were long distance telephone records -- this is the

3   last sentence.

4           "Long distance telephone records indicate that at

5   least 14 calls, including -- at least three of them included

6   a threat of rape and were placed from two telephone numbers

7   listed to Francis's stepmother."  Is that correct?

8       A.   It is.

9       Q.   And you pled guilty to that?

10      A.   I did.  I -- I pled guilty to the entire --

11  everything here, I pled guilty.

12      Q.   Okay.  And on the next page, Paragraph 7, the last

13  sentence of that says, "At least 17 of the calls, including

14  at least 14 which included the threat of rape or death, were

15  placed from two telephone numbers belonging to the

16  stepmother of Francis."

17      A.   That's correct.

18      Q.   And then in Paragraph 8, the last sentence says,

19  "At least 53 of the calls were placed" -- excuse me.  Let

20  me -- let me go back to the first part of Paragraph 8.

21          It says, "Counts 5 and 6, police records of the

22  Bozeman Montana Police Department indicate that from October

23  3rd, 1999, through October 15, 1999, approximately 60

24  threatening phone -- telephone calls were made to women in

25  Bozeman during which the caller threatened to rape and/or

1    kill the receiver of the call.  At least 53 of the calls

2    were placed from two telephone numbers belonging to Francis'

3    stepmother."

4         A.   This is correct.  As well as Count 7, Count 8.

5    All correct.

6         Q.   Okay.  And Count 9 talks about at least three

7    more --

8         A.   I don't see a Count 9.

9         Q.   Excuse me.  Count 7 talks -- at Paragraph 9 says

10   that you made at least three threatening phone calls to

11   Fargo, North Dakota?

12        A.   Correct.

13        Q.   And Paragraph 10 says that you made several

14   threatening phone calls to Corvallis, Oregon?

15        A.   Correct.

16             THE COURT:  Did you ever use a medium other than

17   the telephone?

18             THE WITNESS:  No, Your Honor, I didn't.

19             THE COURT:  Never used e-mail, never wrote a

20   letter, never made a -- stood up in front of somebody and

21   said, "Hey, you know, I'm going to make a threat right now"?

22             THE WITNESS:  No, Your Honor.  The issue --

23             THE COURT:  Okay.

24             THE WITNESS:  Do you want to expound?

25             THE COURT:  No.

1              THE WITNESS:  Okay.

2              THE COURT:  Did you use cell phones or land lines?

3              THE WITNESS:  Both.

4              THE COURT:  Okay.  Go ahead.

5              BY MR. ACKER:

6         Q.   Paragraph 11 of the PSR, Page 672, says, "Francis

7    also made three written statements on June 30, 1998; August

8    25th, 1998; and August 30, 1998.  According to the FBI,

9    Francis admitted that he had made threatening telephone

10   calls to numbers in South Dakota and Kentucky, and that,

11   quote, if I got a woman, I would threaten to rape her, end

12   quote."

13        A.   That is correct.

14        Q.   Okay.

15             THE COURT:  Would people hang up on you?

16             THE WITNESS:  Yes, they would.

17             THE COURT:  Would they -- did you identify

18   yourself?

19             THE WITNESS:  I did not identify myself.

20             THE COURT:  Did you say any name or just start in

21   on the conversation?

22             THE WITNESS:  I'd just start in on the

23   conversation.

24             THE COURT:  And how long would it take for

25   somebody to click?

1          THE WITNESS:  It would usually take probably

2    anywhere from one to three minutes.  I mean, these were very

3    short.  Normally, I was called some pretty vulgar names.

4          THE COURT:  Minutes or seconds?

5          THE WITNESS:  Minutes, usually.  I --

6          THE COURT:  Why would somebody listen to you for a

7    minute?

8          THE WITNESS:  Probably because I was very -- I

9    scared them.  I definitely terrorized them and scared them.

10          THE COURT:  Okay.

11          THE WITNESS:  And they were scared.

12          BY MR. ACKER:

13    Q.    And in at least one of these calls, according to

14    Paragraph 11, you threatened to rape the woman's daughter.

15    Is that true?

16    A.    If it's in there, Mr. Acker.  I concur with all

17    the judgment and commitments and the PSRs.

18    Q.    Okay.

19          THE COURT:  I'm going to have to take a -- a short

20    break to do --

21          MR. ACKER:  That's fine.

22          THE COURT:  -- a technology thing for a minute.

23    We'll come back in five minutes.  Let's go until about 12:45

24    today.  We'll -- we'll resume in a few moments.

25              [RECESS - 11:58 A.M. TO 12:07 P.M.]

1            THE COURT:  You can continue.

2            BY MR. ACKER:

3       Q.   Mr. Francis --

4       A.   Yes, sir.

5       Q.   -- let's go to Exhibit 4, if we could.  And this

6  is a report -- a forensics psychiatric evaluation of you by

7  Dr. Bardey?

8       A.   Bardey.  Correct.

9       Q.   Bardey?

10      A.   Yes, sir.

11      Q.   Do you remember the evaluation by Dr. Bardey?

12      A.   I do.

13      Q.   And do you know why you had this evaluation?

14      A.   I do know why I had the evaluation.  It was a

15 presentence evaluation.  I believe the argument my lawyer

16 was making was for diminished capacity for a guideline

17 deduction.  I believe that was the purpose.  And if I'm not

18 mistaken, the United States Probation Office recommended I

19 get that departure.

20      Q.   Okay.  And you talked to Dr. Bardey?

21      A.   I did.

22      Q.   And did you tell -- talk to him truthfully?

23      A.   I did.

24      Q.   Okay.  Let's go to Page Bates No. 1899 of Exhibit

25 4.

1       A.    Okay.

2       Q.    You there?

3       A.    I am.

4       Q.    Let's look at the very bottom.  It says, "The

5   defendant, who had ceased taking any psychiatric medication

6   since his senior year of high school, resumed placing

7   obscene phone calls during his freshman year of college.  He

8   had joined a fraternity and would also make calls

9   particularly when he was drunk or upset.  He recounts,

10  quote, I'd start dialing and I just couldn't hang up.  I

11  couldn't stop myself, end quote."

12          Are those accurate statements?

13      A.    Those would be -- that would be an accurate

14  statement; I think an accurate description of the -- the

15  behavior at the time, yes.

16      Q.    Okay.

17      A.    As far as dialing the phone goes, yes.

18      Q.    So once you'd start, you just couldn't make

19  yourself hand up?

20      A.    And let's clarify this.  With dialing the phone,

21  correct.  Not with threats, but with dialing the phone,

22  correct.

23      Q.    Okay.  And on the next page, Page 1900 --

24      A.    Okay.

25      Q.    -- the first full paragraph, about the third line

1    down, it says, "Quote, I was hurting people and I didn't

2    want to, end quote.  By the second semester, Mr. Francis

3    recalls feeling depressed.  He no longer attended classes

4    and spent his days sleeping.  By this point, he was making

5    calls every few days.  He explains, quote, once I thought

6    about making the phone call, I couldn't resist, end quote."

7              Is that accurate?

8         A.    That'd be an accurate description.

9         Q.    And that -- not only does it accurately describe

10   what you said to Dr. Bardey, but it was true?

11        A.    Yes, it was true, and I think the record reflects

12   it was true.

13        Q.    Okay.  The next paragraph says, "There was no

14   rhyme or reason" -- and, again, this is a quote from you.

15             "There was no rhyme or reason to who I called, end

16   quote, he remembers, quote, apart from the fact that they

17   were women, end quote.  He called the women's dormitories or

18   private residences.  Quote, when a woman picked up the

19   phone, I felt a log of anger, a lot of hurt.  Then I'd ask

20   them what they were wearing, are you alone and so on.  And

21   then I'd threaten them and hang up, end quote."

22             Does that -- does that accurately describe what

23   you told Dr. Bardey?

24        A.    It does.  As well as the conduct I was convicted

25   for, yes.

1       Q.   Okay.  And you believe that accurately describes

2  the -- the truth of what prompted your calls?

3       A.   Yes.

4       Q.   On the bottom of that same Page 1900, it says,

5  "Feeling uncomfortable and excluded in his new home, the

6  defendant resumed making obscene phone calls within one

7  month of his arrival at his father's home.  Quote, I dialed

8  random numbers, he recalls.  Of his threats, he avers,

9  quote, I never thought of carrying anything out.  I felt

10  awful, end quote."

11       Then the last sentence of that -- is that correct?

12  Does that accurately describe what you told Dr. Bardey?

13       A.   That's correct.

14       Q.   And was it true?

15       A.   Yes, it was true.

16       Q.   And then the last sentence says, "I wasn't" -- of

17  that paragraph at the top of Page 1901:  "I wasn't arrested

18  and I stopped making the calls."

19       Is that correct?

20       A.   That is correct.

21       Q.   The fourth full paragraph on Page 1901, the

22  paragraph starts with "Despite."

23       A.   Okay.  Go ahead.

24       Q.   It says, "Despite the steady relationship with --

25  and the name is redacted -- however, the defendant resumed

1    his phone calls, this time closer to home.  Quote, once I

2    got the idea in my head, I couldn't help it.  I would feel

3    hurt and sad, empty and angry.  I would feel pressure

4    mounting.  I tried to fight it off, but it was more and more

5    intense.  I'd tell myself don't touch the phone, but I

6    couldn't stop, end quote.  He found that he was placing

7    numerous calls to residences in Goshen, New York."

8        And does that accurately describe what you told

9    Dr. Bardey?

10       A.   It does.

11       Q.   And was it true?

12       A.   It was.

13       Q.   And where were you living at this time?

14       A.   During the relationship with Nicole, I was between

15   my father's residence, which is in Middletown, New York, and

16   my mother's residence, which is in Harriman, New York.

17       Q.   And how far is that from Goshen, New York?

18       A.   It's within the same county.  I'd say 30, 45

19   minutes, depending on -- Harriman would be longer.  So 40

20   minutes for Harriman, and I'd say probably about 30 for

21   Middletown.

22       Q.   So during that time, you were calling people

23   pretty close to home.

24       A.   I was calling Goshen, New York.  They were random

25   numbers, but, yes, it was.

1     Q.   And looking at the next page, Page 1902, the

2  second full paragraph.  It starts, "In December of 1998, the

3  defendant returned to his father's house, finding a job as a

4  waiter in a local restaurant.  He had not made any phone

5  calls since August, as his fear finally overwhelmed any

6  compulsions he had towards calling.

7          "As time passed, however, his fear waned and the

8  pressure increased.  He resumed making calls in February

9  1999, placing a call every few days except for during the

10  month of May, until his arrest in November 1999."

11         Does that accurately represent what you told Dr.

12  Bardey?

13     A.   It does.

14     Q.   And is it true?

15     A.   It is.

16     Q.   And so during that time -- I had asked you this

17  earlier.  During that time from about August until about --

18  August of 1998 to about February of 1999, you weren't making

19  calls during that time?

20     A.   You asked me that earlier and my response was that

21  it was covered by the federal indictment.  It was not

22  discovered or adjudicated by the local police.

23         So that was my response then.  It's my response

24  now.

25     Q.   Okay.  So you -- you went a few months where

1  you -- your fear -- you were able to control your impulses

2  during a few -- that few-month period; is that right?

3      A.   You know, Mr. Acker, I don't have the dates.  All

4  I can tell you is that during this time period between 1999

5  and 2003, I made a lot of phone calls.

6      Q.   Okay.

7      A.   I -- I simply can't tell you, on May, I made this

8  many, and on June, I did this.  I don't know.  I don't

9  recall.

10      Q.   Okay.  But you told Dr. Bardey that you had not

11  made any phone calls between August of 1998 and February of

12  1999?

13      A.   It says between August -- (witness examines

14  document).

15           That's what it says.  It says, "In December of

16  1998, the defendant returned to his father's home."  I'm

17  going back here a while.

18           Then it says August -- now, December 1998 -- so

19  August, I would think, would be 1999, because December's at

20  the end of the year.  So then that would be August of 1999.

21           So that's -- I would think that August is

22  referring to August 1999, I -- I would think.  I mean, Mr.

23  Acker, you're asking me questions about a document that's

24  over ten years old.

25           Did I make phone calls?  Yes.  Did I make a lot of

1   phone calls?  Guilty as charged.  Yes.

2       Q.   Okay.  The next paragraph says -- well, let me

3   skip the next paragraph.  At the very end of the middle

4   paragraph on that page, it says, "He resumed placing obscene

5   phone calls in June 1999."  Is that correct?

6       A.   Hold on.  That's at the very end of Paragraph 3;

7   is that correct?

8       Q.   Yes.

9       A.   That -- that's what it says.  I mean, that sounds

10  about accurate.

11      Q.   In other words, that month of May -- we talked

12  about this earlier; that you had a relationship with Ashley

13  and you didn't recall making calls during that month.

14      A.   When I was in Indiana.

15      Q.   Right.

16      A.   That's correct.

17      Q.   So then you came back to New York and started

18  making calls again in June of 1999?

19      A.   That's correct.  I was once  again living -- in

20  June of 1999, I -- I can't recall if I was living with my

21  mother or my father, but there was -- yeah.  That's correct.

22      Q.   Okay.  And the next paragraph says, "At this

23  point, he states that the calls became more frequent, at

24  times daily, though never more than once per day, and that

25  the pressure to make the calls increased dramatically.

1          "Though he was placing calls more often, the

2   defendant states that he is unable to recall what the

3   receivers said."

4          Is that correct?

5      A.   Sounds correct.

6      Q.   All right.  If you'll turn in that same exhibit to

7   Page 1912.  It's the last page of Dr. Bardey's --

8      A.   I'm there.

9      Q.   -- report.  The second full paragraph, about

10  halfway through -- a little bit more than halfway through --

11  six lines from the bottom of the paragraph about halfway

12  through the line -- are you with me?  It says --

13     A.   I'm with you.  Go ahead.

14     Q.   "The pressure, agitation, frustration and

15  cognitive impairments that characterize the disorder turned

16  Mr. Francis's self-destructive behavior into a compulsion to

17  act out as he did."

18         Do you agree that this was a compulsion to act out

19  as you did?

20     A.   I'm not a psychologist.  I'm not -- not qualified

21  to answer that.  I mean, I'll have two of them here tomorrow

22  for you to ask.  I -- I don't know.  I'm not -- I'm not

23  qualified to say what I think, that I think I have a

24  psychiatric illness.  I -- I can't say that.

25     Q.   Okay.  But Dr. Bardey said that?

1       A.   Dr. Bardey did.  He's certainly qualified to say

2   that.

3       Q.   And you used this document to try to get some

4   lower sentence in federal court?

5       A.   Correct.

6       Q.   And then the last part of that next sentence in

7   that same paragraph says, "As his ability to cope with his

8   anger and to manage his interpersonal failures are eroded by

9   his inability to focus and concentrate, the pressure to

10  relieve the pressure and the stress mounts rapidly to the

11  level of the compulsion to act in a destructive manner."

12           Is that correct?

13      A.   That is what this doctor said.  Once again, that

14  is this doctor's opinion.  I cannot --

15      Q.   Okay.  Now, the last sentence of this report says,

16  "It is also my opinion that Mr. Francis does not pose a

17  significant danger to others at this time and that if

18  appropriate psychiatric treatment is provided to treat his

19  psychiatric illness, the likelihood of his engaging in the

20  offense behavior will be very significantly reduced."

21           Is that what it says?

22      A.   That is certainly what it says.

23      Q.   Now, despite this opinion that you -- the

24  likelihood of you engaging in the offense behavior will be

25  reduced, you continued once you got out of prison after this

1  to reoffend.  Isn't that true?

2      A.   Well, it is true.  But once again, you're taking

3  this out of context.  It says if given appropriate

4  psychiatric treatment.  And, furthermore, Dr. Bardey talks

5  about my time on medication.

6          So did I resume?  Yes, I did.  Was I given

7  psychiatric treatment while I was in custody?  No, I was

8  not.  Was I given medication while I was in custody?  I was.

9  It was the wrong medication.  It was corrected upon my

10 release into the community.

11         So once again, the penultimate here, if you will,

12 was the contingent upon me receiving the proper treatment,

13 which I did not receive in custody.

14     Q.   So when did you start receiving the proper

15 treatment in the community?

16     A.   I was released and I continued making more phone

17 calls.  I think you said 50 earlier, as you know, and the

18 probation officer got involved.

19         Now, prior to the probation officer detecting

20 this, my family contracted with a -- went to a psychiatrist.

21 And the psychiatrist diagnosed me with obsessive compulsive

22 disorder and provided -- prescribed Luvox and Metadate CD,

23 which is -- Luvox is an SSRI for obsessive compulsive, and

24 Metadate CD would be like a long-acting Ritalin.

25         The behavior stopped.  I was revoked.  The judge

1    sent me back into custody and I went to a sex offender

2    treatment program, where once again I received no adequate

3    treatment whatsoever.

4         Q.    Where was that treatment program?

5         A.    When I was at Butner.

6         Q.    Okay.  Let's go to Exhibit 5.

7         A.    Okay.

8         Q.    And this is a -- your judgment from 2000.

9         A.    That -- that's correct.  Judgment commitment.

10        Q.    And if you look on Page 529 -- Bates No. 529, it

11   has conditions of supervised release; is that right?

12        A.    It does.

13        Q.    And you were prohibited from making any telephone

14   calls of a threatening or harassing nature?

15        A.    I -- yeah, I was prohibited from committing any

16   crimes, yes.

17        Q.    Okay.  And -- and specifically from making calls

18   of a threatening or harassing nature?

19        A.    Well, I -- yeah.  It's an additional supervised

20   release term, but it's a crime.  So, yes.

21        Q.    Okay.  And -- but, nevertheless, you violated the

22   terms of that?

23        A.    Nevertheless, I did.

24        Q.    Okay.  Go to Exhibit 6.

25        A.    Okay.

1    Q.   And this is --

2    A.   Now, what's your Bates number?  Are you on 662?

3    Q.   662.

4    A.   Okay.

5    Q.   It's Bates No. 662.  And if you'll look at Bates

6  No. 664 of Exhibit 6 --

7    A.   Okay.

8    Q.   Well, I think you've already talked about this.  I

9  think we can skip that.  And let's just look at the very

10  bottom.

11         About four lines -- five lines from the bottom it

12  says, "This AT&T telephone bill" --

13    A.   Uh-huh (yes).

14    Q.   -- "for the month of September 2001 reflects that

15  the offender made over a hundred phone calls to Richmond and

16  Bowling Green, Kentucky.

17         "The offender indicated that approximately half of

18  those phone calls resulted in the person actually answering

19  the phone, while fewer received threats or harassing

20  comments."

21         Is that correct?

22    A.   It is.

23    Q.   On the next page, Page 665, at the top, five lines

24  down, there's a sentence that starts, "They were

25  investigating the matter and were possibly going to

1  subpoena" -- well, let me -- let me go up above that.  Let

2  me start at the very top of the page.

3            "The probation office contacted the eastern --

4  University of Eastern Kentucky and the University of Western

5  Kentucky and spoke with their security departments.  Both

6  had received complaints during the month of September for

7  harassing phone calls.

8            "The director of security for the eastern --

9  University of Eastern Kentucky indicated that they had

10  received approximately eight reports of harassing phone

11  calls during the month of September.  They were

12  investigating the matter and were possibly going to subpoena

13  the telephone records to trace the phone calls.

14            "The probation officer advised them of our

15  offender's admission to these calls during September 2001.

16  The director of security indicated that they traced the

17  telephone number to Mr. Francis.  They would not proceed

18  with criminal charges given his conviction and violation

19  status in our district."

20            Is that correct?

21       A.    That's correct.

22       Q.    So even though you admitted to those phone calls,

23  the law enforcement officials in Kentucky said, "Well,

24  because he's already been violated, we don't intend to

25  actually prosecute him on that."  Is that correct?

1      A.   That's what it says.  I mean, I was not privy to

2   the conversation, but that -- that's apparently what it

3   says, yes.

4      Q.   Okay.  Isn't is possible that's the exact same

5   thing that happened in 2001, when you weren't prosecuted for

6   the rape of Emily?

7      A.   Absolutely not.

8      Q.   We'll get to that in more detail later.

9      A.   Look forward to it.

10      Q.   All right.  Let's skip Exhibit 7 for right now and

11   go to Exhibit 8.

12      A.   Okay.

13      Q.   And this is your judgment and commitment -- a

14   judgment in a criminal case where you were sentenced, on

15   Page 525, to 24 months in prison; is that correct?

16      A.   That's correct.  For the violation.

17      Q.   And they -- the judge strongly recommended that

18   you be incarcerated at FCI Butner so that you could

19   participate in the institution's sex offender program; is

20   that correct?

21      A.   I believe that was a special recommendation, yes.

22      Q.   Okay.  And go to Exhibit 9.

23      A.   Okay.

24      Q.   Now, the next few exhibits are from Butner, and

25   Exhibit 9 is a memo from Patricia Griffin, Ph.D., to Andres

1    Hernandez, the sex offender treatment program director; is

2    that correct?

3        A.    That's what I have.

4        Q.    And it says, the first paragraph, "I interviewed

5    Inmate Francis privately in the special housing unit

6    yesterday.  Inmate Francis is interested in participating in

7    the sex offender treatment program."

8             Is that what this says?

9        A.    It's what it says.  It says it because it's true.

10   I volunteered for the program.  It was a voluntary program.

11   I volunteered.

12       Q.    Okay.  And then the last paragraph of that says,

13   "Inmate Francis has read the description of the SOTP and has

14   consented to participate in all components of the program."

15            Is that true?

16       A.    It is.

17       Q.    And that description indicated that you would need

18   to make admissions about any prior sex offenses, whether

19   they had been detected by the police or not.

20       A.    I do not have that in front of me.  I don't know

21   what it said.  But I do know that the purpose of me going

22   down there was to try and get some help for the phone call

23   issue and, more importantly at that time, to get out of the

24   special housing unit, because I didn't want to live in a

25   closet for the next 18 months.

1      Q.   It was no surprise to you that part of your

2   treatment would involve talking about offenses, whether you

3   had been detected for those or not.

4      A.   Actually, that's incorrect, Mr. Acker.  I'd never

5   been in this type of treatment before.  And when I got down

6   there, I was perfectly well aware that I was going to be

7   talking about telephone calls and I was prepared to do so.

8           At no time when I was at Butner did I get

9   treatment for telephone calls.  I was told I had to focus on

10  my continuing disclosure of victims.  So I was never put in

11  a program where I was told "Here's a victims list.  Give us

12  hands-on victims.  And if you don't, you're a liar and

13  you're in denial and you're not accepting responsibility and

14  we'll kick you out and send you back to Otisville, where

15  you're not safe."

16          No, I was never in that type of -- of position.

17  No.  I'm sorry.  I wasn't.

18     Q.   When did you first learn that part of the program

19  was to talk about your past sexual offenses, whether they

20  were detected or not?

21     A.   I -- it was very shortly after arriving there.

22  I'd say within the first month.

23     Q.   Okay.  So it didn't take you long to learn that

24  that was an expectation?

25     A.   It did not.  I found out from Hernandez himself,

1   and, of course, I found out from the other participants,

2   because my -- when I went in there, they, of course, tell

3   you what's going on.

4           And my thing is, well, I'm -- I'm not a sex

5   offender.  I don't understand why I have to say that.  So --

6   but, yes, I found out quite -- quite quickly what the deal

7   was.

8       Q.   Isn't it true that you found that out from

9   Patricia Griffin?

10      A.   No, it's not.

11           MR. ACKER:  Your Honor, if you may give me a

12   moment.

13                           [PAUSE]

14           BY MR. ACKER:

15      Q.   Mr. Francis, have you had an opportunity to read

16   the filings that your attorney has made on your behalf in

17   court?

18      A.   Mr. Acker, I've read the filings, and at no time

19   did Dr. Griffin tell me you're going to have to go to Butner

20   and you're going to have to say that you're a hands-on sex

21   offender.  That did not happen.

22           I was more than prepared to speak about telephone

23   calls.  I would have been more than happy to do so.  It was

24   not -- it wasn't discussed with me.  The purpose of the

25   program was to try and get people to say they had hands-on

1  victims, because if you don't have hands-on victims you're a

2  liar and you're in denial.

3           That's the issue, Mr. Acker.  That's what this man

4  was doing and that's what he continues to do.  He continues

5  to do to this day.  And the literature, quite frankly -- his

6  peers in the scientific community, as well as the federal

7  courts which have examined his program, have vetted this.

8  You need not take my word for it.

9       Q.   Now -- all right.  I'll move on.  Exhibit 10, if

10  you could turn to Exhibit 10.

11      A.   Okay.  Go ahead.

12      Q.   This was an eligibility review that was conducted

13  on July 17 of 2002; is that correct?

14      A.   It is correct.  Yes, it is.

15      Q.   And in this, it reports that you stated --

16  starting on Line 4, about halfway through the line --

17      A.   Uh-huh (yes).

18      Q.    -- "He" -- that is, you -- "stated that he

19  sexually assaulted four young women, first at age 17 with a

20  same-age girlfriend.  He reported sexually assaulting her

21  approximately five times; i.e., penetrating her vagina with

22  his penis.

23           "At age 18, he reported sexually assaulting an

24  18-year-old girlfriend on one occasion; i.e., penetrating

25  her vagina with his penis.

1          "At age 19, he reported sexually assaulting his

2    19-year-old female date by forcing her to perform oral sex

3    on him.  He" -- is that -- did I read that correctly?

4          A.   You read that correctly, Mr. Acker.  That --

5    that's what it says.  And I said all kinds of things in

6    these programs, absolutely.

7          Q.   So you did say those things as part of your

8    eligibility review?

9          A.   Well, the -- the -- what happened here was I was

10   called into Hernandez's office and he was questioning me

11   about the Emily incident and that's how this all started.

12          And I told him -- I was steadfast about the fact

13   that I did not rape Emily.  It was a consensual sexual

14   encounter.  And that's when I was told, "You're going to

15   have to say that you had victims.  And if you don't say so,

16   Mr. Francis, you're in denial.  You're a sex offender, Mr.

17   Francis."

18          And on and on it went.  So that's -- that's how

19   that worked.  Did I say that?  I most certainly did, Mr.

20   Acker.  I said that.

21          Q.   Okay.  And then it goes on to say, "He also stated

22   that at age 18, he had nonforcible sexual intercourse with a

23   16-year-old girl, thereby constituting statutory rape."

24          Did you say that?

25          A.   If it's in here, I'm sure that I said it, Mr.

1   Acker.

2       Q.   Okay.   The next sentence says, "Mr. Francis also

3   alluded to being investigated for the sexual assault of

4   another girl; i.e., mentioned in the attached memorandum.

5   He stated that because of that incident -- because that

6   incident was reported to the police, he was afraid to

7   discuss the details of his behavior.

8           "He stated, quote, I didn't rape that girl, but

9   I'm not going to say that I didn't."

10           Is that -- was that -- did you say that to Dr.

11   Hernandez?

12       A.   Did I tell him I did not rape that girl?

13   Absolutely.   I don't understand the whole "but I'm not going

14   to say I didn't."   I mean, I -- I just said I didn't rape

15   that girl.   That makes no sense.

16           I -- I didn't rape that girl, but I'm not going to

17   say I didn't.   I just said that.   So I'd have to say that's

18   probably a misquote on Hernandez's part.

19           But, yes, he was attempting to question me about

20   something, and I -- I had -- you know, I -- I had just

21   gotten to the program.   I'm there for a short period of

22   time, less than a month, and I'm being interrogated about

23   something that, you know, the police resolved.

24           So, you know, I wasn't asked about telephone

25   calls, Mr. Acker.   I wasn't asked about obscene phone calls.

1    I was asked about hands-on victims when I've never even been

2    arrested for a sex offense.

3         Q.   You were never asked about the phone calls?

4         A.   It was talked about extremely briefly.  My therapy

5    had nothing to do with phone calls.  In fact, I was told by

6    Michael Bourke that every woman I've ever had sex with is a

7    victim.

8              So -- yes.  Did I say things, Mr. Acker?  I most

9    certainly did.  And I'll also point out, since you want to

10   get into this, that I was in the media when I was arrested

11   in -- in 1999.  Every woman that I ever had sex with --

12   that's about 60, 80 women, Mr. Acker, knew what I had gone

13   to jail for.

14             Now, if I'm date-raping all of my girlfriends,

15   where's the victims, Mr. Acker?  Someone's going to come

16   forward.  It was in the paper.  Francis arrested for making

17   threats to rape and murder.  I'm sorry.  If I'm date-raping

18   all of my girlfriends, someone's going to come forward and

19   say, "He's doing a lot more than just making phone calls."

20   Let me tell you that.

21             So did I say things in the program?  Yeah, I did.

22   I said things to stay in the program.  Guilty.

23        Q.   Okay.  Now, you said you've had about 60 to 80

24   different women that you've had sex with?

25        A.   That's correct.

1       Q.    And many of those one-night stands?

2       A.    I -- I would say that's a safe assumption.  Yes,

3  many one-night stands.

4       Q.    Now, let's go to Exhibit 11.

5       A.    Okay.

6       Q.    Page 824.

7       A.    Okay.  Go ahead.

8       Q.    In the "Additional Comments" section at the bottom

9  of that page -- it's right in the middle of the page, but

10 it's the end of the typing on that page.

11            It says, "Additional Comments:  Mr. Francis has

12 been ambivalent about his treatment since before he arrived

13 at FCI Butner."

14            Is that true?

15      A.    Well, I don't know how you make a determination

16 that somebody is ambivalent about treatment before they even

17 arrive at your facility.  So, quite frankly, no, I don't --

18 I don't understand.

19            As I said, I was there to get treatment for

20 telephone calls.  And as soon as I got there and I was told,

21 "Well, you're going to have to say you're a sex offender.

22 You're going to have to say that you have sexually deviant

23 thoughts and fantasies.  You're going to have to say that

24 you have victims -- hands-on victims," yeah, I'd say at that

25 point I was pretty turned down -- I was pretty turned off by

1   it.

2          But I don't see how Bourke comes to this

3   conclusion before he ever meets me and before I enter his

4   facility.

5      Q.   So you don't think that calling and threatening

6   hundreds of women to rape and murder them is a sex offense?

7      A.   Mr. Acker, what I think is not important.  The law

8   says it's not a sex offense, and you're very well aware of

9   that.  The statute says I am not a sex offender under

10  federal law.  You don't have to like it.

11     Q.   But you don't believe you're a sex offender, do

12  you?

13     A.   The law says I'm not a sex offender.  My

14  understanding is sex offense -- the terms sex offender and

15  sex offense are legal terms.  Therefore, they are defined by

16  law.  Not you, not psychologists.  Law.  The law says I'm

17  not a sex offender.  We follow the law, right?

18     Q.   And so, based on your understanding of the law,

19  you don't think you're a sex offender?

20     A.   Well, let's see.  I was released in 2009 and I

21  wasn't required to register under SORNET and I was on

22  federal probation.  So I'd say it's more than just my

23  understanding of it, Mr. Acker.

24     Q.   Now, the next sentence says, on Page 824 of

25  Exhibit 11, "Although he recognizes that he is a sex

1    offender and that he needs help to avoid reoffense, he

2    continues to" -- and it's a little hard to read the next

3    word.  I think it's --

4         A.   Debate.

5         Q.   "Debate about whether he should take a healthier

6    path or if he should instead choose a self-indulgent,

7    selfish path upon his release.

8              "As recently as two weeks ago, he was considering

9    withdrawing from the program and his lack of motivation is

10   of great concern."

11             How -- how do you respond to what Dr. Bourke said

12   there?

13        A.   Well, specifically, what would you -- what would

14   you like me to say?

15             Did I consider withdrawing from the program?

16   Several times.  I didn't believe in what was going on there.

17   It was an extremely unhealthy situation.  The goal of these

18   psychologists was to shame you, degrade you and humiliate

19   you and to make you say things that weren't true.

20             So did I want to be in that program?  Did I

21   believe in what was going on there?  Did I trust those

22   therapists?  Absolutely not.

23             And as for my statements with the sex offender

24   thing, as you know from deposing Ms. Baker, it was a

25   requirement to stay in this program to say that you are a

1   sex offender.  Requirement.  I mean, have to do it.

2       Q.   Okay.  But you did at that time admit that you

3   were a sex offender?

4       A.   Mr. Acker, I said all kinds of things.  I said

5   anything that I thought they wanted to hear so I could stay

6   in the program.  If they wanted me to say that I was an

7   African-American, I would have said that.

8       Q.   Okay.  Now, if you'll turn to Exhibit 12.

9       A.   The victim list?

10      Q.   Yeah.

11      A.   Okay.

12      Q.   What -- what is this?  Describe this victim list,

13  if you would.

14      A.   It's a victim list.  And when you go into the sex

15  offender treatment program at Butner, this is one of the

16  first things that they give you.  And the purpose of this is

17  you have to disclose hands-on victims of sexual offending.

18  So that's -- that's the purpose of the victim list, for

19  disclosure.

20      Q.   Okay.  Now, if you'll look on this chart on the

21  first page of Government Exhibit 12, which is Bates No.

22  1917 --

23      A.   Okay.

24      Q.   -- there are a number of columns; is that correct?

25      A.   That is.

1      Q.   And one of them is about, oh, two-thirds of the

2   way across, "Methods of manipulation or coercion."

3      A.   Correct.

4      Q.   And so you wrote -- and this is your handwriting

5   on this, correct?

6      A.   I wrote this.  Absolutely.

7      Q.   Okay.  So you gave different ways that you

8   manipulated or coerced the woman to have sex with you.

9      A.   What I did, Mr. Acker -- and let me explain this

10  as I did in the deposition.  We took these victims list, and

11  I was told, as were other people, that every woman you've

12  ever had sex with is a victim.

13          And then what happened was a lot of us -- what we

14  did is we shared victims list.  So I would go and I would

15  say, "Jim, show me what you have.  Oh, that -- that's really

16  good.  Let me see what you have."

17          You had to report a higher number of victims every

18  six months.  The only way you made progress in treatment was

19  reporting victims.  Now, if you think something I said is

20  true, indict me.

21      Q.   Okay.  I just want to make clear what -- what you

22  said back then.  Whether it's true or not, I want to make

23  sure I understand clearly what you said.

24          Let -- let's look at the Victims No. 1 and 2 on

25  here just as an example.

1        A.    Okay.

2        Q.    So Victim No. 1, you said it's not listed in the

3    PSR -- or PSI.  And you said that the victim was a 16- to

4    17-year-old female; that she was your girlfriend; that you

5    were 17 to 18; that you had penile penetration, fellatio,

6    fondling over and under her clothes and digital penetration.

7            So that's the kind of activity that you were

8    describing, correct?

9        A.    Yes, Mr. Acker.  What I did was I took consensual

10   sexual encounters -- and, as you know, I have many, 60 to 80

11   partners -- and I turned them into victims.  So, yes, that's

12   what I did.

13       Q.    Okay.  All right.  And you said that that took

14   place in the bedroom and that you -- when it says "Method of

15   manipulation," you wrote two things.  You said, "Talked

16   into/force."

17       A.    Correct.

18       Q.    And so -- and then if you look right below that,

19   Victim No. 2, you only wrote "Talked into."

20       A.    Correct.

21       Q.    So some of these 50-some victims that you listed

22   on here were not crimes; is that correct?

23       A.    None of them are crimes.  They were all -- they

24   were all fabrications, Mr. Acker.  I said this to stay in

25   the program.  In fact, I just read your expert's deposition.

1   Even he says he doesn't believe what I said in the polygraph

2   is true.

3           I -- I -- yes, guilty as charged.  I said these

4   things to stay in the program.

5       Q.   Okay.  But for Victim No. 1, you said you talked

6   her into it and you forced her, but Victim No. 2, you -- you

7   didn't acknowledge any force.  You just said you talked her

8   into it.

9       A.   Okay.

10      Q.   Is that correct?

11      A.   That's what it says.  That's correct.  That's my

12  handwriting.  That's what I wrote.

13      Q.   Okay.  And that's true on many of these 50-some

14  victims that not all of them were statements that you forced

15  her.  Some of them you just said you talked her into it.

16      A.   That is what it says.

17      Q.   Okay.  Well, let's -- let's look at a few of

18  these.  Victim No. 1 we've already talked about.  Victim No.

19  4, you again said that you talked her into and you used

20  force.  Victim No. 5, you also said you used force.  Victim

21  No. 6 on the next page, you said you used force.  Victim No.

22  8 and 9, you said you used force.

23      A.   Can I -- can I interject something here?

24      Q.   Yes.

25      A.   That's absolutely correct.  Let me interject

1  something here.  Listen, you know, you said in your opening

2  statement this is all about what the court believes.  So

3  there's two things to believe here.  I'm either the world's

4  greatest sex offender and I commit sexual crimes without

5  ever even being arrested, or it's a lie.  Where's the

6  victims?

7           Furthermore, we also have federal courts --

8  federal courts which have said, and I quote, the Butner sex

9  offender treatment program is highly coercive.  Unless

10 offenders continue to make up victims, they are discharged

11 from the program.  Consequently, the subjects in this

12 program have an incentive to lie.

13          MR. ACKER:  Your Honor, I would ask that that last

14 statement be stricken from the record as nonresponsive and

15 hearsay.

16          THE WITNESS:  Your Honor, it's case law.

17          THE COURT:  I'll figure it out.

18          MR. ACKER:  Okay.  Thank you, Your Honor.

19          BY MR. ACKER:

20     Q.   All right.  Is it fair to say, Mr. Francis, that a

21 lot of these on this victim list that you have here,

22 frankly, you were just being an asshole?

23     A.   Absolutely.  Am I an asshole?  Guilty as charged.

24 Thank you.  Yes.

25     Q.   Okay.  And, in fact, that's how you described it

1   in 2009, in your polygraph examination, isn't it?

2        A.   Mr. Acker, if you want, we can go to transcripts.

3   I've -- I've been -- I've been very open about the fact in

4   the past I've been an asshole.

5        Q.   Okay.  Let's play -- I'd like to play a clip from

6   the polygraph video.  It's Clip 17.  And this is -- just a

7   moment.  I'll -- I'll tell you what page.

8        A.   While you're doing that, can I just get a refill

9   on my water?  Is that cool?

10            THE COURT:  Yeah.  We're going to -- we're going

11   to quit in a minute.  Let -- let's quit now --

12            MR. ACKER:  Okay.

13            THE COURT:  -- and you can have your video when we

14   come back at 2:00.

15            MR. ACKER:  Thank you, Your Honor.

16            THE COURT:  We'll start up at 2:00.

17             [LUNCH RECESS - 11:40 A.M. TO 2:01 P.M.]

18            THE COURT:  All right.  Good afternoon.  The

19   witness is still on the stand.

20            MR. ACKER:  Thank you, Your Honor.

21            BY MR. ACKER:

22        Q.   Mr. Francis, before the break, we were talking

23   about Exhibit No. 12.  and that's your victim list that you

24   filled out when you were at the SOTP in Butner; is that

25   correct?

1        A.    I believe so.  I've got Page 1918 Bates stamp.  Is

2   that where you're at?

3        Q.    Yes.

4        A.    Okay.

5        Q.    And on that, you listed approximately 57 victims;

6   is that right?

7        A.    By the time I had completed the program, I believe

8   that's correct.

9        Q.    Now, you did another SOTP program in Kentucky,

10   correct?

11        A.    Correct.

12        Q.    And you had a polygraph there?

13        A.    Correct.

14        Q.    And you did an interview with the -- before the

15   actual polygraph exam, correct?

16        A.    That's correct.

17        Q.    And when you filled out -- you filled out a victim

18   list for that interview as well, didn't you?

19        A.    Yes.  It was part of the program.

20        Q.    And on that one, you only had 27 victims; is that

21   correct?

22        A.    I believe that's correct.

23        Q.    What accounts for the difference between the 57

24   victims that you listed at Butner and the 27 victims that

25   you listed in Kentucky?

1       A.    Well, I lied.  And that's what it counts for.  I

2  lied.

3       Q.    You lied when?

4       A.    I lied the entire time.  I mean, since you're

5  talking -- we're on to Kentucky now.  I was placed in a sex

6  offender program with five other people.  One had been

7  convicted for rape and murder, the other two for raping

8  children, and the other two for abducting and raping women.

9            Now, I don't mean to discount what I did, but I

10  was there for phone calls.  Now, I'm not a psychologist, but

11  I don't know why in the world I was in a group of people

12  like that.  And it was made very clear to me that unless you

13  say that you have hands-on victims and fill out a victims

14  list, then we will terminate you from the program.

15           Sex offender treatment is amazing, because it's

16  the only kind of therapy where if you get kicked out, you go

17  to jail.  Nobody wakes up in the morning and says, "Gee, I'm

18  going to try sex offender therapy today."  You only go if

19  the court orders you to go.

20           So it was either -- you know, you've got me in an

21  unbelievable Catch-22, which is -- say you have victims with

22  this group of people that you're in or you're going to jail.

23  So I did what I had to do to stay out in society.

24       Q.    In fact, Mr. Francis, isn't the reason that you

25  had 57 victims on your list in Butner and only 27 in

1   Kentucky because, in Kentucky, you omitted those that

2   weren't crimes where you were only an asshole?

3       A.   No.  I'm sorry.  I'm going to have to disagree

4   with that.

5          MR. ACKER:  All right.  I'm going to play, Your

6   Honor, a portion of his video interview before the polygraph

7   from 2009 in Kentucky.  This is Clip 17.

8          MR. HAWES:  And, Your Honor, I am objecting for

9   the record.

10         THE COURT:  Okay. Overruled.

11                [VIDEO CLIP 17 PLAYED]

12         BY MR. ACKER:

13      Q.   So didn't you tell the polygraph examiner in 2009

14  that you omitted from your list of offenses in Kentucky

15  those people that you had just gone out with solely for the

16  purpose of having sex; you may have manipulated them, but

17  you didn't force them?

18      A.   Well, is that what I said?  Yeah.  Yeah, that's

19  what I said in the polygraph.  Sure.  I just watched it.

20      Q.   Okay.  Let's go to Exhibit 13, if we could.

21      A.   Okay.

22      Q.   And this is a report of an individual therapy

23  session by Dr. Bourke at the SOTP in -- in Butner; is that

24  correct?

25      A.   You're on 1486, correct?

1      Q.   Yes.  Yes.  On Page No. 1486.  And he says about

2   you, "He made a telling statement during the session today.

3   Quote, I feel I am predatory.  I know I'm a predator, in

4   fact.  The problem is I don't think I'm too upset by that,

5   end quote."

6           Is that what this document says?

7      A.   That's what Dr. Bourke put down there.  That's

8   correct.

9      Q.   But you claim you did not say that?

10     A.   Dr. Bourke is a very interesting person.  The

11  whole purpose of this program is to gather information

12  against you and compile a database against you.

13          So I did not say that.  Did I make a lot of

14  statements in treatment?  Yeah, I did.  Considering what

15  I've already acknowledged making, if I had made that

16  statement, I'd acknowledge that, too.  I didn't make that

17  statement.

18     Q.   Okay.  Let's go to Exhibit 14.

19     A.   Okay.

20     Q.   And about the fourth page in, it's Bates No. 235.

21     A.   Okay.

22     Q.   And this -- this is a psychosexual evaluation of

23  you done at Butner; is that correct?

24     A.   That's what it looks like.  Are you -- are you

25  referring to the highlighted section here?

1      Q.   I'm going to ask you about the first full

2  paragraph, starting with "Mr. Francis claims."

3      A.   Yeah.  Okay.  The high -- yeah.  Go ahead.

4      Q.   Okay.  "Mr. Francis claims he became involved with

5  a 26-year-old Federal Bureau of Prisons staff member he met

6  during his incarceration in New York.  When asked if the

7  relationship began during the incarceration, Mr. Francis

8  replied, 'No.  We knew each other there, but she didn't like

9  me.  I met her again on the outside in a weird kind of

10  coincidence.'

11          "Mr. Francis said he terminated the relationship

12  because, quote, I wanted to be promiscuous.  I'd just been

13  released and I didn't want to be tied down, end quote."

14          Did you tell that to the staff at Butner?

15      A.   Yes.

16      Q.   And was that true?

17      A.   Yes.

18      Q.   And then the next thing -- the next paragraph

19  says, "When asked about his fidelity during these

20  relationships, Mr. Francis laughed and admitted that he has,

21  quote, cheated on every woman I've ever had a relationship

22  with, end quote."

23          Did you say that?

24      A.   I don't recall if I said that or not.  But as I

25  testified earlier, I've had 60 to 80 sexual partners.  So, I

1    mean, the fact that I'm not monogamous, I -- I think is

2    pretty obvious.

3        Q.   Have you cheated on every woman you've ever had a

4    relationship with?

5        A.   I don't know that I've cheated on every woman I've

6    ever had a relationship with.  Have I always been faithful?

7    Absolutely not.

8        Q.   Okay.  And then the next sentence says, "He added,

9    quote, also I forced some of my girlfriends to have sex when

10   they didn't want to or were in pain, end quote."

11           Did you say that?

12       A.   Do I recall specifically saying that in this

13   session that you're talking about?   No.  But given

14   everything that I said, I -- I'm sure that I did say that.

15       Q.   Okay.  And is that true?

16       A.   No, it is not.

17       Q.   If you'll look on the same exhibit, Exhibit 14,

18   several pages over, Bates No. 241.

19       A.   Okay.

20       Q.   And there's a section, "Sexual History."  It's the

21   second paragraph from the bottom.

22       A.   Okay.  I'm there.

23       Q.   If you'll look at the last four lines of that

24   paragraph, "He said" -- and this is about you.

25           "He said he masturbated daily during adolescence,

prior to his arrest for the instant offense and currently.

He describes his fantasies as, quote, rape and sex assault

of women, end quote.  He believes these rape fantasies began

as early as the eighth grade."

          Did you say that?

     A.   I absolutely did.  The issue with the program, as

I've already testified to, is you were required to fill out

a personal history questionnaire and you're required to

say -- required to say that you -- you have sexually deviant

thoughts and fantasies, that you have victims, that you're a

sex offender, and if you don't say these things they're

going to throw you out of the program and you're going to

leave the safe confines of Butner.

          And, of course, the worse you make yourself look,

the happier Hernandez and Bourke are.  So that -- that's how

it works.

     Q.   Okay.  So you said that, but you claim it's not

true?

     A.   I'm telling you it's not true.  There's no

evidence to it.  Yes.

     Q.   Do you claim you don't have any deviant sexual

fantasies?

     A.   Mr. Acker, I'm sure that every single human being

if we were to open their head up has some form or fashion of

a deviant sexual fantasy.  I don't deny that.

1           Do people have deviant sexual fantasies?  Sure.

2    In fact, I had a friend, Brooke, on the outside and she's

3    married.  And we were kind of talking and my deviant sexual

4    fantasy was having an affair with her, even though she's

5    married.  So I guess that's a deviant sexual fantasy.

6           So I guess everybody has sexual fantasies that go

7    against the grain.  I mean, this is not the thought police,

8    from my understanding.  But, sure, I guess everybody has

9    some form or fashion of embarrassing fantasies in the

10   bedroom.

11      Q.   And do yours include rape?

12      A.   No, they do not.  I've had 60 to 80 sexual

13   partners, as I've already said.

14           Sixty to eighty women, Mr. Acker.  Where?  Where

15   is it?

16      Q.   Okay.  Now, if you'll look on Bates No. 242.  It's

17   still part of Exhibit 14.

18      A.   Okay.

19      Q.   About the middle of the page, there's a -- well, a

20   little bit above the middle of the page, there's a paragraph

21   that says, "During his freshman year."

22      A.   Yeah.

23      Q.   If you look about halfway down that paragraph,

24   there's a sentence that says, "When a woman picked up the

25   phone."  Do you see that?

1        A.    I do.

2        Q.    And it says, "When a woman" -- this is quoting

3    you.  "When a woman picked up the phone, I felt a lot of

4    anger, a lot of hurt.  Then I'd ask them what they were

5    wearing, are you alone and so on, lingerie, sexual history

6    and have them masturbate and penetrate themselves vaginally

7    and anally.  Eventually, I would hang up, end quote."

8            Did you tell the folks at Butner that you did

9    that?

10        A.    Did I say that?  Yes, I did say that when I was at

11   Butner.  And the issue was -- when I went down there, I was

12   told point-blank -- see, Dr. Bourke was my one-on-one

13   therapist and Hernandez was the overall treatment provider.

14           And I was told that "There's no way, Mr. Francis,

15   that you're making these telephone calls and not getting

16   sexual pleasure out of doing this."

17           Now, once again, the statement that I made there

18   that you just referred to is, quite frankly, so incredible

19   that -- how -- how do you -- there's -- there's no possible

20   way that I can call somebody from New York and make them

21   masturbate and make them do whatever I want.  And if I can,

22   you need to sign me up as a hostage negotiator.  It's just

23   not reality.

24        Q.    But, in fact, you did keep these women on the

25   phone for one or two or three minutes sometimes?

1        A.    Mr. Acker, I made phone calls, yes.

2        Q.    And -- and you talked to them about sexual things?

3        A.    No.   I made threatening telephone calls.   And did

4    I -- did I -- were the telephone calls obscene?   If this is

5    what you're getting at, they most certainly were.   And I --

6    I conceded that this morning, and I'll concede it now.

7            But once again, you're talking about -- the

8    statement you just read is getting on the phone and telling

9    somebody 600 miles away masturbate over the telephone.   When

10   does common sense kick in?

11       Q.    Did you have them describe their bodies?

12       A.    I did not have them describe their bodies.   Were

13   there times that I asked women what they were wearing?   Yes.

14   Did I tell people that I had been watching them?   Yes.   Did

15   I threaten people?   I most certainly did.

16       Q.    Did you ask them about their breast size?

17       A.    Did not ask them about their breast size.

18       Q.    Did you ask them about their lingerie?

19       A.    Did not ask them about their lingerie.

20       Q.    Did you ask them about their sexual history?

21       A.    Did not ask them about their sexual history.

22           I'd also like to point something else out.   I've

23   been in the criminal justice system for a while now, and the

24   United States Attorney's Office had I done this, I'm sure,

25   would have had me plead guilty to this type of conduct.

1  They didn't.

2      Q.   You didn't plead guilty based on victims'

3  statements that say you did exactly this?

4      A.   I pled guilty based on -- I pled guilty to making

5  threatening telephone calls.  And I've read the plea

6  agreement.  It doesn't say anything in there about you made

7  them describe their bodies, their breast size, masturbate,

8  et cetera and so forth.

9          Had I done that, I feel strongly your counterparts

10 would have made sure it was in the plea agreement.

11     Q.   Well, wasn't it in the PSR?

12     A.   A PSR is a much different beast than a plea

13 agreement.  A PSR is the U.S. Probation Office taking the

14 affidavits from the FBI.  That's what that is.  I'm talking

15 about a plea agreement.

16     Q.   And didn't you have the opportunity to object to

17 the facts laid out in the PSR?

18     A.   I believe there's always an objection -- an

19 opportunity to object, yes.

20     Q.   And did you object to the -- to the facts laid out

21 in the PSR about these precise kinds of things that you said

22 to women on the phone?

23     A.   No.  The issue at that point was my sentence and

24 the issue was the plea agreement.  No, I didn't object to

25 it.  I -- I objected to some enhancements, and I think I won

1   one of those objections.

2       Q.   Now, in this same paragraph, it says, "Mr. Francis

3   said if the woman hung up on him, he would simply call

4   someone else.  He added, quote, but if she began to cry, it

5   would excite me more."

6            Did you say that?

7       A.   Did I say that in sex offender treatment?

8   Probably so.

9       Q.   Okay.  And was it true?

10      A.   No, it was not.

11      Q.   Did you masturbate during these telephone calls?

12      A.   No, I did not.

13      Q.   Did you masturbate soon after the telephone calls?

14      A.   The telephone calls were not a sexual issue for

15  me, so in response to your question, the answer is no.  The

16  issue was it was a venting.  It was a venting of anger.  It

17  was a venting of emotion.  An extremely poor one.  I -- I

18  can see that completely.

19           But it was not one of these issues where I'm

20  sitting there and I'm masturbating and this is turning me

21  on.  That wasn't what was behind this.  There was something

22  else behind it.

23      Q.   The next paragraph on Page 242 says, "He" --

24  again, referring to you, "He noted to a previous examiner

25  that when he felt distressed, he would, quote, start dialing

1   and I just couldn't hang up.  I couldn't help myself, end

2   quote.  He said he would continue to masturbate and call

3   women despite the fact that he felt distressed and out of

4   control."

5           So did you tell them that you continued to

6   masturbate when you were making these calls?

7           A.   As I've already testified, the fact was I was

8   being told by two psychologists that these were sexually

9   motivated phone calls, and unless you accept responsibility

10   for that, you're in denial, you're a liar and we'll move you

11   out of Butner.  Did I say it?  I'm sure I did.

12           Q.   Okay.  The next sentence says, "He noted, quote, I

13   convinced myself I could stop if I really wanted to, and,

14   actually, if I heard the garage door opening or something, I

15   would immediately stop.  So I guess it was -- that was true.

16           "But after I made the calls, I would ask myself

17   why did you do it and I would feel guilty.  Eventually, he

18   became increasingly depressed and he escalated to the point

19   where he was making at least several hundred calls per day.

20           "He reported that once he thought about making the

21   call -- once he thought about making the call, he felt he

22   could not resist the temptation to make the call.  He denied

23   having any specific criteria for selecting his victims,

24   noting only that they had to be girls or women.

25           "He remarked, quote, I continued to make obscene

1    and threatening phone calls even after my release from

2    prison because I got sexual pleasure from it."

3          Did you say that to the people at Butner?

4          A.    As I just testified, yes, I did, and I just

5    explained why.

6          Q.    Okay.  On the next page, Page 243, at the top,

7    first full paragraph, it says, "Mr. Francis reported that he

8    has become sexually aroused by recurring fantasies or

9    thoughts of the following:  smelling and/or touching female

10   undergarments, forcing a partner to submit to sexual

11   advances, binding a partner to the point where resistance is

12   useless, using a phone sex telephone line, talking dirty to

13   a stranger on the telephone other than a sex line, talking

14   or typing dirty to someone through a computer, looking at

15   hard-core pornography, pornographic magazines, films, videos

16   and computer graphics, watching others have sex, including

17   live peep shows, participating in a threesome with another

18   man and a woman, participating in a threesome with two women

19   and participating in an orgy or group sex situation."

20         Did you tell those things to the people at Butner?

21         A.    Did I fabricate that for the purpose of sex

22   offender treatment?  Yes, I did.

23         Q.    And are any of those fantasies true that you have

24   those fantasies?

25         A.    No, they're not, Mr. Acker.  And once again, I

1  point to the fact of the amount of sexual partners that I've

2  had.

3      Q.   The next paragraph, I just want to ask you about

4  the last -- the last couple of sentences.  It starts about

5  three and a half lines from the bottom, beginning with the

6  line "I've manipulated almost every woman I've dated, mostly

7  by lying about who I am or what I did to impress them and

8  get them in bed.  I have always manipulated people to get

9  what I want."

10      Did you say that to the people at Butner?

11      A.   Did I say that, probably so.

12      Q.   And is that true?

13      A.   It is not true.  And this simply goes back to --

14  you know, I'll point this out as well, since you brought up

15  the PSR.

16      The FBI interviewed not only my girlfriend, but

17  other women I had sex with in 2003.  They interviewed me,

18  Mr. Acker.  And they said nothing -- nothing negative about

19  me whatsoever, these women I had sex with.

20      I -- I believe an affidavit has been submitted

21  into evidence from my friend, Jessica, who was sexually

22  active with me at 18, and now at 33 -- or 30 years old.

23  Nothing.  We have scheduled another to testify tomorrow

24  about having sex with me.

25      MR. ACKER:  Your Honor, I would ask for the record

1  that those items be stricken as nonresponsive and hearsay.

2        THE COURT:  Overruled.

3        BY MR. ACKER:

4    Q.   On the next page, Page 244, the -- do you see the

5  heading "DSM-IV Diagnostic Impression"?

6    A.   You're down at the bottom, right?

7    Q.   Yes.

8    A.   Yeah.  Okay.

9    Q.   Let -- let's look at the paragraph above that.

10   A.   Okay.

11   Q.   It says, "Mr. Francis appears to be a dangerous

12 individual and demonstrates -- who demonstrates little

13 motivation to change.  He presents as suspicious and guarded

14 and he lacks an empathetic awareness of the harms he has

15 caused.

16        "He noted, quote, first of all, I don't have

17 empathy, which I think is a problem.  I don't know what

18 intimacy is.  I will usually say or do things just to piss

19 people off and push their buttons.  I hardly ever consider

20 the effect of my actions on others.  I tend not to care

21 about the feelings of others and will do something

22 regardless of whether they like it or not.  I almost never

23 consider stopping my actions, even if I know it will hurt

24 others, end quote.

25        "He evidences psychopathic traits, and when

1  informed he possessed the traits, he replied, quote, I

2  believe I'm a predator.  I'm just not sure that bothers me,

3  end quote."

4          That first part about not having empathy, did you

5  say that to the folks at Butner?

6      A.   I believe it was more something that the treatment

7  providers at Butner consistently told me, which is "Mr.

8  Francis, you don't have empathy," and et cetera and so forth

9  and things like that.

10          Now, I'd also like to -- since you read the

11  paragraph and opened the door -- demonstrates little

12  motivation to change, presents as suspicious and guarded --

13  absolutely.  I didn't trust these people.  Didn't trust them

14  from day one.  Nobody up there trusted them.

15          Was I suspicious and guarded?  Most certainly was.

16  Did I buy into what was going on there?  No, I was not.  I

17  wouldn't even acknowledge them in the hallway.

18      Q.   Now, you told the people at Butner that you

19  masturbated when you were making these calls, correct?

20      A.   I'm sure I did.

21      Q.   And didn't you tell the people in Kentucky the

22  same thing?

23      A.   I'm sure I did.

24      Q.   All right.  Let's take a look at Clip 16, which is

25  another clip from the video from the 2009 polygraph

1   examination.

2                   [VIDEO CLIP 16 PLAYED]

3           BY MR. ACKER:

4       Q.   Now, was the polygraph examiner berating you or

5   trying to get you to admit that you were masturbating on any

6   of those calls?

7       A.   Well, let's put it in the proper perspective, Mr.

8   Acker.  The polygraph examiner was an independent person who

9   was hired by the sex offender treatment program.

10          How this worked is you filled out a victims list

11  for the sex offender treatment program and you went over it

12  with the therapist.  And then the polygraph examiner, who

13  was participating in your therapy, administered this test.

14          So the entire interview was about what I had said

15  in treatment.  That was the entire thing.  This was about

16  treatment.  This was not about was the woman doing the

17  polygraph test intimidating.  That's not the issue.  The

18  issue is if you don't say these things, if you don't accept

19  responsibility, if you don't say that you have a sexual

20  problem, if you don't say you have victims, then you get

21  kicked out of the program and I go to jail.

22      Q.   She didn't even ask you about whether you were

23  masturbating on the calls, did she?

24      A.   Mr. Acker, I don't know if she did or not.  You --

25  you've played several clips.  I haven't seen the whole

1    thing.  I know that I filled out a victims list and my

2    purpose was to try and tell them what I thought they wanted

3    to hear so that I could say in this group and so that I

4    would not go back to jail.

5            Now, you know, you're talking a lot about phone

6    calls, so I'm just going to point this out.  The last time I

7    made a phone call was in 2003.  And prior to my sentencing,

8    the Bureau of Prisons did a psychiatric evaluation on me,

9    90-day long battery of tests.  Their conclusions, I don't

10   have a major mental illness.

11           Furthermore, this conduct, the government --

12   you -- released me in 2009.  I didn't qualify.  And then the

13   probation officer tells me I have to have a telephone.  I'm

14   sorry.  One and one's not equaling two here.

15       Q.   All right.  Let's skip over to Exhibit 18.

16       A.   18, did you say?

17       Q.   18.

18       A.   Okay.

19       Q.   And this is a discharge report where you were

20   discharged from the sex offender treatment program at

21   Butner; is that correct?

22       A.   That's what it says, yes.

23       Q.   Okay.  If you could turn over a few pages in that

24   to the fourth page of the exhibit.  It's Bates No. 252.

25       A.   Okay.

1      Q.   The next to the last paragraph on the page, the

2    last two and a half lines, it says, "When asked about his

3    plans, he would grin and reply in a gloating tone, 'The BOP

4    is not going to know where I'm going.  No one's going to

5    know.  It might not even be in this country.'"

6           Is that what you told the folks in the Butner SOTP

7    when you were asked about your release plans?

8      A.   It most certainly is.

9      Q.   And why did you say that?

10     A.   I had no probation leaving prison in 2003.  And as

11   I've already testified, I had no respect and certainly no

12   trust for the people in that program.

13          Considering that I didn't have any paper when I

14   got out, where I went to live and what I did was, quite

15   frankly, none of the government's business.

16     Q.   Okay.  And isn't it true that even if you do have

17   probation, you don't intend to comply with the terms of

18   probation?

19     A.   As of right now, the issue is in litigation.  I

20   will say this.  I do not recognize that the government gets

21   to detain me for two years past my release date and then if

22   I get out say, "By the way, you still owe us more time."

23          It's got to be accounted for, Mr. Acker, and right

24   now, it's in litigation.

25     Q.   In other words, you still -- you -- when you were

1    sent back to prison for violating probation, you got some

2    active time, but still one more year on probation; is that

3    right?

4         A.    That is correct.

5              THE COURT:  You're all talking about supervised

6    release?

7              MR. ACKER:  I'm sorry.  Supervised release.

8              THE COURT:  Yeah.  Probation -- you know, use the

9    technical term.

10             MR. ACKER: I -- I apologize, Your Honor.

11             BY MR. ACKER:

12        Q.    You still have one year of supervised -- or you

13   were sentenced to one additional year of supervised release?

14        A.    My position is that it has expired while you

15   violated my rights in custody, yes.

16        Q.    And you filed a motion with the U.S. District

17   Court in Kentucky asking for them to determine that your

18   supervised release had expired?

19        A.    Correct.

20        Q.    And the judge there said, no, that it hasn't

21   expired?

22        A.    That's correct.

23        Q.    And you are appealing that to the circuit court?

24        A.    I -- I have appealed it to the circuit court.  And

25   your colleagues have asked that my appeal be dismissed and

1   they have claimed that the appeal is not currently ripe.  In

2   other words, when Francis gets out will be the appropriate

3   time for it to be adjudicated.

4          So, as I said, it's in litigation.

5      Q.   Okay.  Now, even if you lose that, you don't

6   intend to comply with supervision, do you?

7      A.   If I walk -- if I was to walk out of here today,

8   I'm getting on a plane and I'm going home to my family in

9   New York.  That's what I'm doing.

10     Q.   And haven't you told people that you have no

11  intention of complying with probation even -- or, excuse me,

12  with supervised release even if you're ordered to do so?

13     A.   I most certainly have.  You have violated my

14  rights and held me two years past my release date.  When you

15  figure out a way to give me those two years back, I'll

16  figure out a way how to give you your one year.  But this is

17  not free.  This time will be accounted for.

18     Q.   Didn't you write some letters to a woman named

19  Moriah?

20     A.   I most certainly did.

21     Q.   And who is Moriah?

22     A.   Moriah was my roommate.

23     Q.   Tell me about your relationship with Moriah.

24     A.   What do you want to know?  Do you want to know

25  what I told you in the deposition?  Do you want me to go

1    into that detail?

2         Q.    Sure.

3         A.    Okay.  Moriah -- I met her.  We were working at

4    Applebee's.  I was a waiter and she was a -- she was a

5    hostess.  We ended up living together.

6              We were intimate on two occasions.  I broke off

7    the physical relations because of the fact that Moriah

8    equated physical intimacy to -- to a relationship.  And I

9    wasn't ready to give her that.  I wasn't ready to commit.

10   And I knew if the physical relationship continued that it

11   would hurt her.  So I stopped all physical relationships

12   with Moriah.

13             It was a very interesting relationship, as I told

14   you during the depo, which is that we showered together, we

15   slept naked together, but there was no sex.  So that --

16   that's who Moriah is.  She was my roommate.

17        Q.    And after your probation -- or, excuse me, your

18   supervised release was revoked and -- you were in jail in

19   Kentucky; is that correct?

20        A.    That is.

21        Q.    And you wrote Moriah several letters from jail.

22        A.    I did.

23        Q.    And if you could, turn to Exhibit 46 in your book.

24   It's towards the back.

25        A.    I looked at the letters at the table, so you can

1   go ahead while I get there.

2       Q.   Okay.  Does Exhibit 46 consist of letters that you

3   sent to Moriah?

4       A.   Yes.

5       Q.   And these -- this is your handwriting?

6       A.   Yes.

7            MR. ACKER:  Your Honor, I would ask to admit

8   Exhibit 46 into evidence.

9            THE COURT:  Let it be received.

10           BY MR. ACKER:

11      Q.   Let's look at this first one.  And some of them

12  are a little hard to read, including the first page of

13  Exhibit 46, but let's try to look at the very beginning of

14  this letter.

15           Could you read the first two sentences of this

16  letter?

17      A.   I'll try.  "I'm on the verge of tears as I write

18  this, but I know I've got to stay strong.  I was arrested

19  today after a violation, the pornography."

20      Q.   And read one more sentence.

21      A.   "The exact reason is because I trusted Glenn and

22  was a hundred percent honest during my polygraph.  I was

23  not" --

24      Q.   You can stop there.  So you told Moriah that you

25  were -- your supervised release was revoked because of the

1  porn --

2      A.   Correct.

3      Q.   -- that you were watching.  But you said the real

4  reason was because you were a hundred percent honest in your

5  polygraph.

6      A.   That's what I said.  But now, once again, if you

7  continue reading along there, you'll see that the fact is

8  they asked me about the pornography during the polygraph,

9  Mr. Acker.  And the issue was the pornography.

10      That was discussed -- I don't know if you have

11  that clip, but that was discussed during the polygraph test.

12  And that's exactly what I said.  I was honest about the

13  pornography during the polygraph test.  So, yes, that's what

14  I said.

15      Q.   And then later on, you say that "Glenn and the

16  U.S. Attorney will use the polygraph to make me look

17  horrible."  Is that correct?

18      A.   That's true.  That's what I said.  That's what I

19  wrote.

20      Q.   I'm sorry.  That's on that same page about a third

21  of the way down the page.

22      A.   That's correct.  That's what I wrote.

23      Q.   Now, on the -- Exhibit 46, Bates No. 2892, seven

24  lines down, about the middle of the line, there's another

25  letter you wrote to Moriah that says, "I've done nothing but

1   think about my life over the past seven months and I

2   honestly don't know how I could have done anything better."

3   Is that correct?

4         A.   Yes.

5         Q.   Well, didn't you know when you went into the sex

6   offender program in Kentucky that you shouldn't be watching

7   pornography?

8         A.   Did I know that I was not allowed to watch a

9   perfectly legal movie in the privacy of my own home?  No.

10          And now that you've asked the question, I'll go

11  ahead and go into that.  When I was first released from

12  prison, I spoke with my probation officer.  Two days after

13  my release, the probation officer told me I had to have a

14  cellular phone.

15          Now, the technology had changed in the five years

16  that I was in custody, and I asked my probation officer

17  about the issue of what would happen if -- sexting -- if my

18  girlfriend sent me a sext or if we filmed something or

19  something along those lines, would I be in violation of

20  this.  That was my question to Mr. Collins.

21          And I was told, "No, I'm not worried about that.

22  I'm more worried about the illegal stuff."  So by telling me

23  that, Mr. Acker, my understanding was I can watch a movie

24  that I order off of my cable box.  I mean, you know, nobody

25  should go to jail for what they watch on TV.

1       Q.    But -- but you also talked to the people in the
2    Kentucky SOTP, didn't you?
3       A.    Yes.  I was in the Kentucky SOTP.
4       Q.    And didn't they have you sign a document saying
5    that you agreed that while you were in the program, you
6    would not watch pornography?
7       A.    You know, you use the word "agreed" very loosely.
8    I mean, I'm court-ordered to be there.  Let's not pretend
9    that I'm agreeing to this.  Okay?
10            I'm ordered to be there.  If I don't sign the
11   document, I'm not in the program and I go to jail.
12      Q.    So you were ordered to be in the program and the
13   program required that you not watch pornography?
14      A.    That is correct.
15      Q.    And you knew that?
16      A.    That is correct.  But if you'll notice, I was
17   violated for watching pornography.  The initial violation
18   was not termination from the program.
19      Q.    Okay.  The bottom of this -- what did you just
20   say?  I'm sorry.
21      A.    If you'll notice, the initial violation was for
22   watching pornography.  It was not for being terminated from
23   sex offender treatment.
24      Q.    Well, isn't that because, ultimately, there were
25   three different reasons for the -- for the violation of your

1    supervised release?

2        A.   No, you're absolutely incorrect.  In fact, the

3    warrant was issued on one violation, and then after I was

4    arrested for that one violation, being the pornography, two

5    more were tacked on afterwards.

6        Q.   And you pled guilty to all three?

7        A.   Yes, I did.

8        Q.   This same page on this letter to Moriah, Page

9    2892, towards the very bottom, four or five lines up, you

10   say, "My hope is that I get a six- to twelve-month sentence

11   and no paper."

12       When you mean no paper, do you mean no further

13   supervised release?

14       A.   Absolutely.

15       Q.   You continue on.  "Then I can go home and watch

16   all the fucking adult movies I want and fuck whoever doesn't

17   like it.  Ha Ha."

18       Is that what you wrote?

19       A.   Sure is.

20       Q.   On the next page is another letter you wrote to

21   Moriah.

22       A.   Correct.

23       Q.   Page 2893, right?  About halfway down, the second

24   paragraph.

25       A.   Is this the highlighted section?

1        Q.    Yes.

2        A.    Okay.

3        Q.    Well, above that.  The beginning of that

4    paragraph, it says, "I'm really not very happy about being

5    on probation once I get home.  I just don't feel like I'm

6    going to get a fair shot and then I'm going to be fucked

7    with hard.  My thinking is what's the point.  Why not just

8    go on the run if they're going to fuck with me.

9            I know we talked about this and I won't go on the

10   run.  I'm just thinking out loud.  My attitude towards

11   probation is going to be a lot different once I get out,

12   though.  I used to want to make them proud of me.  I thought

13   they really cared about me.  Now I know better.  It's me

14   versus them.

15           Some things are going to change when I come home.

16   I no longer care about following their rules.  If we want to

17   go to Kings Island, Louisville, or to see my family in New

18   York, we're just going to go.  Also, my computer will be

19   kept at a friend's house.  They're not going to take it for

20   two months" -- and then I can't read what the rest of that

21   says.

22           The next page -- I think maybe it says, "What I do

23   on the computer is none of their damn business."

24       A.    That's correct.

25       Q.    "Fuck probation."

1      A.    That's correct.

2      Q.    And is that still your view of probation?

3      A.    My view is that it's in litigation.  But, you

4  know, since you're asking a question directly and I see

5  where you're going, I'll -- I'll go ahead and give you a

6  direct answer.

7          To be perfectly honest with you, I was in society

8  in -- for seven months.  I was working.  I had a job.  I had

9  a home in my name and I was financially independent, and I

10  was sent back to prison because the PO didn't like what I

11  watched on TV.

12          So is that my attitude?  Yes, it is.  Now, what me

13  deciding to leave the courthouse if I was to leave today and

14  go to my parents' house has to do with me being a sexually

15  dangerous person, I'll never know.  I think it just makes me

16  one of many people who violate supervised release.

17          But, you know, I don't think -- I think I did

18  everything I was asked to do; everything that I was asked to

19  do.  I worked.  I did everything I was asked to do.  And I

20  was violated for what I watched on TV.  That's ridiculous.

21      Q.    If you'll look on Page 2898.

22      A.    Are you still in the same exhibit?

23      Q.    Still in the same exhibit.  It's -- there's a long

24  letter that you wrote to Moriah.  I believe it's the same --

25  it may be a different letter, but it's Page 2898.

1           This is your handwriting still?

2      A.   Yes, this is my letter.  I wrote this.

3      Q.   Okay.  At the very top, it says, "I'm giving a lot

4  of thought to leaving Kentucky once I get home and blowing

5  off probation.  At some point, I will get caught and have to

6  face the judge and do a little time.  However, unless I was

7  to break the law or get pulled over, I most likely could

8  stay out for a year or two, possibly more.

9           "The point is I'm not interested in going home and

10 having to be paranoid again, have my life watched by them

11 and fucked with by them.  I want to live my life on my

12 terms.  I want to be left alone."

13          Is that still the way you feel?

14     A.   Is that still the way I feel?  My position now is

15 pretty much the same with a little bit of a twist, which is

16 now that you have completely trashed my rights, I don't even

17 recognize that there's a valid term of supervision left.  I

18 mean, if this is a civil law, then it's been running the

19 entire time.

20          Now, you know, I'll go -- I'll go back to this

21 again.  I've been in prison, unfortunately, for a lot of

22 years, and I don't know one guy who wouldn't rather do some

23 time and be off paper, supervised release, than be on

24 supervised release.  So I guess that makes me like a lot of

25 people.

1        Q.   Isn't the bottom line of how you feel exactly what
2   you wrote in this letter, that you just want to live life on
3   your terms?
4        A.   I want to be left alone by the United States
5   government.  I most certainly do.  I'm tired of you people.
6        Q.   And you don't intend to comply with whatever
7   conditions might be put on you by a court or probation?
8        A.   Probation is over.  That's my position.  There is
9   no more probation.  It's over.
10        Q.   If you could look at the next page, 2899, six
11   lines from the bottom, "I will always remember the lessons
12   I've learned from my past, but as of today, I'm done
13   answering for it.  Anyone who doesn't like that,
14   parentheses, probation, U.S. Attorney, end parentheses, can
15   kiss my ass."
16            Is that still the way you feel?
17        A.   It most certainly is, Mr. Acker.  I was sentenced,
18   I was convicted and I've done my time.
19        Q.   Does that --
20        A.   I've paid what I owe.
21        Q.   And does that include this court, that if this
22   court disagrees that they can kiss your ass?
23        A.   No, it does not include Judge Boyle.
24        Q.   And does that include the judge in Kentucky if he
25   says that you --

1      A.   First of all, you know --

2      Q.   -- that your supervised release is continuing?

3      A.   You've asked a completely absurd question.  Judge

4   Boyle has nothing to do with my supervised release.  That's

5   not being litigated before Judge Boyle.  He's not putting

6   terms and conditions on me.  He has nothing to do with my

7   supervised release.

8      Q.   My question is does this apply to the judge in

9   Kentucky who said that your supervised release is still --

10     A.   Okay.  The question originally, sir, was does it

11  apply to Judge Boyle as well.

12          MR. WEBB:  Excuse me.  Objection, Your Honor.  I'm

13  not quite sure I gather the relevance here to 4248.

14          THE COURT:  I think I get the drift.

15          MR. ACKER:  Okay.

16          THE COURT:  Go to something else.

17          MR. ACKER:  I'll go on, Your Honor.

18          BY MR. ACKER:

19     Q.   All right.  Let's go back to Exhibit 18 again.

20     A.   Okay.  Go ahead.

21     Q.   Okay.  Let's look on Page 253 -- Bates No. 253.

22     A.   Okay.

23     Q.   The top paragraph, the last sentence says, "In the

24  area of empathy, he noted he, quote, doesn't give a shit,

25  end quote, about his victims."

1          Is that true?

2          A.    Well, as I explained during deposition, this was a

3    question that was asked with respect to hands-on victims

4    that I disclosed when I was there, Mr. Acker.  And I believe

5    you're looking for Page 80.

6          I talked about it, and the issue was I never got

7    any treatment for telephone calls.  And if you look at Page

8    80, I say quite clearly several times throughout the

9    deposition I realize what I've done.  I feel guilty for what

10   I've done.  That's one of the reasons I had a hard time

11   using a telephone when I was home.

12         But, no, I can't feel empathy and remorse for

13   victims that are make believe.  And I think I expressed this

14   to you in the depo, but it was about the hands-on victims.

15   I know I expressed to you in the deposition several times

16   the fact that I feel guilty, that I feel ashamed and I feel

17   horrible for what I have done.

18         Q.    And you have -- do you think there were victims of

19   your telephone calls?

20         A.    Of course.

21         Q.    And do you feel empathy for them?

22         A.    I feel horrible for what I've done, Mr. Acker.

23   That's why I couldn't use a phone when I went home.  That's

24   why I had to -- I had to quit a job.

25         I had a job, and it was a second job that required

1   me to make phone -- cold calls.  The job required me to make

2   cold calls.  I would pull off resumes off the Internet and I

3   would call people and I would get them to come in for an

4   interview.  That -- that was what I got paid to do.

5           After about seven to ten days, I quit.  It's

6   simply not possible for me to use a phone without

7   recognizing what I have done not only to victims, but to

8   myself, to my family.  I've thrown a lot of years away.  I'm

9   not going to get them back.  So, you know, I recognize what

10  I have done.

11      Q.   Did you ever ask the victims to call you "sir"?

12      A.   No.

13      Q.   And if you'll look on Page 255, still on Exhibit

14  18 --

15      A.   Okay.

16      Q.   -- about halfway down the page, you're -- you're

17  discussing activities that you engaged in when you were ages

18  18 to 22.  And there's a section that says "Rape of victims

19  who were intoxicated to the point of incapacitation."

20          "Mr. Francis said he raped girls and women who

21  were unconscious or incapacitated as a result of drugs and

22  alcohol.  He estimated he sexually assaulted intoxicated

23  victims, quote, once or twice every three months, end quote,

24  on average during this five-year period.  He added that he

25  intentionally used drugs and" -- excuse me -- "alcohol and

1   drugs to incapacitate his victims."

2           Did you say that to the people at Butner?

3       A.   Was it something that I said?  I'm sure it was

4   something that I said.  And this, once again, goes back to

5   the issue of sexual partners.  And, you know, I'm just going

6   to -- I'm just going to touch on this real quick the easiest

7   way I can say it.

8           I can say I'm the King of England.  That doesn't

9   make me royalty.  That makes me a liar.  If I say that I

10  have a hundred victims in a sex offender treatment program

11  where you're required to say such things, that doesn't make

12  me a sexual predator.  It makes me a liar.

13      Q.   So you didn't use alcohol to incapacitate your

14  victims?

15      A.   No, I did not use alcohol to incapacitate my

16  victims.  Have I had sex with women when I myself am drunk

17  and they're drunk?  Yes, I have.

18          And as far as the drug issue, I've never even

19  smoked marijuana.  I wouldn't even know where to get it.

20      Q.   Did you ever have fantasies about using the date

21  rape drug?

22      A.   Mr. Acker, I have not.  I -- I don't know -- I

23  don't even know where to get it.  I don't even know where to

24  get marijuana.  Where am I going to get the date rape drug?

25      Q.   Okay.  Did you talk about that in 2009 with the

1  polygraph examiner?

2       A.   Do you have a clip?

3       Q.   I do.

4       A.   All right.

5       Q.   All right.  Let's look at Clip 20.

6                       [VIDEO CLIP 20 PLAYED]

7            BY MR. ACKER:

8       Q.   All right.  If you'll turn -- Mr. Francis, did --

9  were those things that you just told the polygraph examiner

10 true?

11      A.   Were they true or did I say them?

12      Q.   No.  Were they true?

13      A.   No, they're not true.  Once again, Mr. Acker, if I

14 had -- if I was raping every girl that I ever had sex with,

15 you would have a conga line of women to come testify.

16      Q.   If you'll turn to Page 257 of Exhibit 18.

17      A.   Okay.

18      Q.   And I won't ask you to read all of these, but is

19 it true that there's a list of sexual fantasies about raping

20 and choking and doing other sexually deviant things to

21 people that you told Butner that you had fantasies about?

22      A.   This I think was taken off the victims list and --

23 you know, yes.  Did I -- did I write it down there?  You

24 know, of course, I did, yes.

25      Q.   Okay.  But you claim today that none of this is

1  true?

2      A.   You know, it's not a matter of claiming today that

3  none of this is true.  I've been receiving mental health

4  treatment in some form or fashion since 1987.  You're

5  telling me this never came out until I went to prison

6  that -- you know, that the psychological gods that they have

7  working at Butner are -- are the ones who finally uncovered

8  this, not the multiple treatment providers who saw me in the

9  community.

10         Where's the evidence of this, Mr. Acker?  If

11  you'll notice, the only time I say these things is when I'm

12  in sex offender treatment, which requires such things to be

13  said.  And I have a long history of being in psychological

14  treatment.  You've got the records.  You've got he PSRs.

15  Where's the statements?  Where is it?

16      Q.   Isn't that where you would expect them to ask

17  questions about your sexual fantasies, in sex offender

18  treatment?

19      A.   Mr. Acker, if you have sexual fantasies like that

20  and you've done all the stuff I said in sex offender

21  treatment, it's coming out somewhere.  It's coming out.

22      Q.   Okay.  Now, didn't you say many of these same

23  things when you talked to sex offender treatment not only in

24  2003 at Butner, but also in 2009 in Kentucky?

25      A.   Absolutely.

1       Q.   Okay.  Let's listen to Clip 15.

2                     [VIDEO CLIP 15 PLAYED]

3            BY MR. ACKER:

4       Q.   And, again, you now claim that those statements

5   you told her are false.

6       A.   I said that for the purpose of staying in a sex

7   offender treatment program with some extremely deviant

8   sexual predators, yes.

9       Q.   Okay.  If you could, turn to the last page of

10  Exhibit 18, Page 261.  And this is the summary and

11  risk-contingent recommendations by Dr. Bourke; is that

12  correct?

13      A.   Yes, that's correct.

14      Q.   And he said, "It is the opinion of the undersigned

15  evaluator that the likelihood that Mr. Francis will reoffend

16  is extremely high, particularly if Mr. Francis does not

17  receive additional treatment for his sexual deviancy and if

18  he is not supervised closely in the community.

19           "It is noteworthy that at the time of this writing

20  Mr. Francis is scheduled to be released directly to the

21  community without any supervision and without any

22  restrictions.  Given his current charges, he has not been

23  classified as a sex offender and he's said he has no

24  intention of registering as a sex offender upon release.

25           "As things stand, the community he releases to

1   will have no knowledge of the history contained in this

2   report.

3           So Dr. Bourke thought that the likelihood that you

4   would reoffend was extremely high; is that right?

5       A.   Well, he did.  But he also thought the Static-99

6   doesn't apply to me.  So, I mean, why are we talking

7   about -- I mean, apparently, it doesn't really matter what

8   Dr. Bourke thinks.

9       Q.   Well, Dr. Bourke was right, wasn't he?

10      A.   No, Dr. Bourke wasn't right.

11      Q.   You didn't have a high risk of sex -- of

12  reoffending?

13      A.   Sexually reoffending?

14      Q.   Yes.

15      A.   No, not sexually.  Where's sexual reoffense?

16      Q.   Well, you had a high likelihood of reoffending on

17  the obscene phone calls, didn't you?

18      A.   This doesn't say obscene phone calls.  This says,

19  "He has a high likelihood of committing sexually violent

20  crimes."  Isn't that what it says, Mr. Acker.

21      Q.   Doesn't it say high -- "likelihood that Mr.

22  Francis will reoffend is extremely high"?

23      A.   "His sexual deviancy is noteworthy at the time" --

24  sex offender -- he's talking about sexual -- here we go.

25  Can we go to 260 for a minute?  Let's just back up.

1      Q.   Well, let's -- we'll go back to 260 in a minute.
2  Didn't he --
3      A.   Oh, okay.  We don't want to talk about that.
4      Q.   -- say that you -- you would likely reoffend and
5  that the likelihood of that was extremely high?
6      A.   He does say that.  And if you go to 260, you'll
7  see he's talking about sexual recidivism.
8      Q.   All right.  Let's look at that.
9      A.   "Mr. Francis poses a very high risk for nonviolent
10 sexual reoffense and a very high risk for engaging in
11 sexually violent behavior."
12     Q.   So he talks about nonviolent sexual reoffense and
13 sexually violent behavior.
14     A.   And he was wrong on both counts.
15     Q.   And the nonviolent sexual offense, you don't think
16 he was including obscene and threatening phone calls?
17     A.   I am not going to speak for Dr. Bourke.  You'd
18 have to ask him what he was thinking and what he was
19 including.
20     Q.   Well, isn't it true that within three weeks after
21 you got out of Butner, you were making obscene and
22 threatening phone calls again?
23     A.   I admitted that at 11:30.
24     Q.   If you would, turn to Exhibit 20.  This is the PSR
25 for the 2004 conviction; is that correct?

1      A.   Yes.

2      Q.   And part of this includes a listing of numerous

3  phone calls that you pled guilty to, including threats of

4  rape and killing; is that correct?

5      A.   Yes.

6      Q.   And if you'll look on Page 95 --

7      A.   Okay.

8      Q.   -- that includes -- in Paragraph 11 on Page 95 --

9  Bates No. 95, it includes calls to Marist College; is that

10 correct?

11     A.   From South Carolina, it does.

12     Q.   Right.  And Marist College is where the encounter

13 with Emily happened in 2001; is that correct?

14     A.   It is.

15     Q.   And that's where she went to college.

16     A.   It is.

17     Q.   And so you were calling back to the college where

18 that incident -- where you were accused of rape happened.

19     A.   I was accused in Poughkeepsie, but, yes.

20     Q.   Okay.  Now, if you'll turn over to Page 98 of this

21 PSR --

22     A.   Got it.

23     Q.   -- Bates No. 98, here there is a more detailed

24 description on Pages 98, 99, 100, 101 of exactly what the

25 victims said that you said on the phone; is that correct?

1       A.   Yes.

2       Q.   And you didn't object to these facts at the time

3  of your sentencing, did you?

4       A.   Well, they had no bearing on my sentence, so, no.

5       Q.   It wouldn't have a bearing on your sentence the

6  exact nature of the phone calls?

7       A.   The issue with the sentence was -- actually, no.

8  I mean, I don't know -- maybe you're not aware of this, but

9  the issue was how many telephone calls you made and the

10 contents.

11      So, no, this -- this verbatim transcript that

12 you're talking about here, this had nothing to do with

13 the -- the sentence itself.

14      Q.   Well, doesn't the sentencing judge have some

15 leeway in terms of how -- where in the range of the

16 sentencing guidelines he can sentence you?

17      A.   Sure, he does.  I think the issue is more the --

18 the mental health evaluation from Springfield.  But I'm --

19 I'm sure he does, yes.  Of course, he does.

20      Q.   And does the nature of your telephone calls have

21 some bearing to the sentencing judge on where within the

22 range he can sentence you?

23      A.   I'm not a judge, but I would assume that they do.

24      Q.   Okay.  And on this first description on Page 98,

25 Paragraph 17, you told the woman that if she hung up, she --

1   you would rape her.  You told her that you'd been watching

2   her all week.  You asked her if there was anybody else in

3   the room.  You asked her what she was wearing.

4        She asked you, "Who is this," and you said, "If

5   you keep asking questions, I'm going to kill you."  You

6   asked her how many people you've had sex with today.  You

7   asked have you -- again, had you had sex today.  She said

8   no.  You said, "Will you have sex with me or I will have --

9   or will I have to rape you?"

10       Does that sound about like what -- one of the

11  calls that you would make?

12       A.   Yes and no.  I mean, were -- were my phone calls

13  threatening in nature?  Yes.  I don't recall ever saying

14  what are you wearing or how many people have you had sex

15  with today or anything of that nature.  I simply do not

16  recall doing that.

17       Q.   I thought you testified earlier today that you did

18  ask women what they were wearing.

19       A.   Asking -- you're right.  Correction.  What you're

20  wearing.  But it says here, "I've been watching you all

21  week," "How many people have you had sex with today," things

22  of that nature.  I did not do that.

23       Q.   So that victim was lying?

24       A.   It's not accurate, Mr. Acker.  I terrified these

25  women.  I scared them in the dead of night.  I don't blame

1  them for what they said.

2      Q.   Okay.  On the next page, Page 99, Paragraph 19,

3  there's a description of another victim, Victim No. 2.

4      A.   Correct.

5      Q.   And among other things, you said to her, according

6  to her, "Listen very carefully and do exactly what I say.

7  I've been watching you for a week, and if you don't answer

8  every last question I ask you, I'm going to rape you."

9          Is that the kind of thing you would say?

10     A.   Once again, did I -- did I make obscene phone

11 calls?  Did I threaten to rape people?  Absolutely.  I did

12 that.

13     Q.   Did you tell them that you'd been watching them

14 for a week?

15     A.   I believe I testified earlier the answer's yes.

16     Q.   And did you tell them that if they didn't answer

17 your questions, you would rape them?

18     A.   No.  No, I don't recall that.  As I think I've

19 already testified, there's no way that I can make someone do

20 something over a telephone in Kentucky.  So -- you know.

21     Q.   So this victim is wrong, too?

22     A.   Mr. Acker, I didn't say that.

23     Q.   Well, is this accurate?

24     A.   I'm sorry.  I did not --

25     Q.   Did you --

1      A.   I did not say what is here in the record, which

2   is --

3      Q.   Okay.

4      A.   That -- that's what I meant.  Clarification.

5      Q.   So this victim was wrong when she said this?

6      A.   Mr. Acker, I made terrifying phone calls to people

7   in the dead of night.  That's what I did.  I'm not proud of

8   it.  I'm not going -- I'm not going to deny it.  That's what

9   I did.

10     Q.   Okay.  Victim No. 3 is described at the bottom of

11  Page 99.  You again are alleged to have said by a different

12  victim, "I've been watching you for a week.  I know you are

13  tall and slender with blonde -- blonde hair and you drive a

14  Saturn."

15          Did you say that to one of your victims?

16     A.   Once again, did I tell people that I had been

17  watching them?  I most certainly did.

18          Now, with respect -- and I'm glad you've asked me

19  about this, with the blonde hair and the Saturn.  The way --

20  when this was investigated by the FBI -- this was

21  investigated by the FBI, your counterparts and the U.S.

22  Probation Office.

23          If there was any evidence whatsoever that I had

24  evidence to carry out these threats, my guidelines would

25  have been higher and I would have been charged with

1    interstate stalking.  In fact, it was proven conclusively --

2    and the government agreed at my criminal trial -- well,

3    criminal trial -- criminal hearing -- whatever -- the

4    adjudication that I did not know these people.

5             And the way that they came to this conclusion, Mr.

6    Acker, is they subpoenaed my telephone records, because they

7    had to prove the interstate commerce hook.  And one of the

8    things that they subpoenaed was the location of the

9    originating telephone calls.

10             In other words, if I make a phone call from this

11   court today, it's going to go to the nearest cell phone

12   tower and then relay.  So they knew -- they knew that all of

13   these telephone calls -- they knew exactly where they had

14   come from.  And because I was only on the street for such a

15   short period of time, they knew that I had never even been

16   to Kentucky during the entire time that I was out.  So, I

17   mean, this was proven.  Your counterparts in Kentucky

18   agreed.

19        Q.   I just have a very simple question.  Did you say

20   that to this woman?

21        A.   No.

22        Q.   And so this in the PSR of what the victim said is

23   wrong?

24        A.   Correct.

25        Q.   Did she lie?

1      A.    Mr. Acker, I believe that she embellished the

2  facts because I scared the absolute hell out of her.

3      Q.    Did you ever refer to any of your victims by name?

4      A.    There -- there were times I did, yes.

5      Q.    And, in fact, this woman says you referred to her

6  by name.

7      A.    Okay.  Question?

8      Q.    Is that correct?

9      A.    That's what she says.  Correct.

10      Q.    Okay.  But you -- you -- did you refer to this

11  victim by name?

12      A.    You're asking me if I referred to this specific

13  person by name.  I can't tell you.  Were there times that I

14  referred to people by names?  Yes, because the answering

15  machine would pick up and I would hear their names prior to

16  them picking up the phone.

17          So were there times that I referred to people by

18  name?  Yes.  And, you know, if she says I referred to her by

19  her name, I -- I'm not going to dispute that.

20      Q.    Did you ever look up newspaper articles or find

21  listings of athletes or other people so that you could find

22  out personal information before you tried to call them?

23      A.    I didn't do that.  The way I made the telephone

24  calls was I knew the -- I knew in the -- in the dormitories

25  when you call one room, the next extension, you're going to

1  get the next room and the next room and the next room.

2        And if we had my -- my phone records here in

3  evidence today, you would see that that's exactly what

4  happened.  It was a -- it was a pattern of -- we'd have

5  phone sheets saying 1101, 1102.  That's how I dialed the

6  phone.  That's what happened.

7        Q.   Did you ever have listings -- telephone listings

8  of all the girls that lived in the dorm and what their --

9  their telephone numbers were by name?

10       A.   No.  I -- I've never had listings.  I -- I -- when

11  I was in Eastern Kentucky University, everybody had a campus

12  directory, but I didn't call Eastern Kentucky at that time.

13  It was more I -- I knew the telephone number for one

14  dormitory and then I inferred what the rest of them would

15  be.  It was just --

16       Q.   If you did sometimes refer to victims by name, how

17  did you know their names?

18       A.   As I just explained, sometime before the victim

19  picked up, the answering machine would pick up and their

20  names would say, "Hi, this is so-and-so."  And that's how I

21  knew the names when that occurred.

22       Q.   Now, this same victim says that you said again,

23  "If you don't answer my questions, I'm going to rape you.

24  What is your bra size?"

25        Did you say that to some of your victims?

1          A.    I do not recall saying that.  I did -- were there

2     times that I asked people what are you wearing?  Yes.  I

3     mean, as I've -- as I've testified all day, did I make

4     obscene, threatening phone calls?  Yes.

5          Q.    Well, I'm just trying to get to the specifics,

6     because you seem to be denying the specifics of what these

7     victims say.

8          A.    Well, I was never charged with saying this stuff.

9     I mean, it was never in the plea agreement that I said this

10    stuff.  But did I -- did I make obscene phone calls?  Yes, I

11    did.

12         Now, your theory -- what you're trying to get at

13    here is that I am somehow magically able to make people do

14    whatever I want over the telephone.  I'm sorry.  I can't

15    call somebody 700 miles away and make them masturbate and

16    make them do whatever I want them to do.

17         Nine times out of ten, I was called, and

18    appropriately so, some pretty vulgar names and they hung up

19    on me.  That's what occurred, Mr. Acker.

20         Q.    Did you try to get them to do those things?

21         A.    No, Mr. Acker.  I'm not trying to get people to

22    masturbate over a telephone.

23         Q.    All right.  Let's look on the next page, Page 100,

24    Victim No. 4, Paragraph 23 of Exhibit 20.

25         And this victim also said you referred to her by

1  name; is that correct?

2      A.   That's what it says.

3      Q.   And you told her "I am the person who has been

4  watching you.  I've been watching you for about a week now.

5  Do you understand me?"

6          Did you say that to some of your victims?

7      A.   As I've already testified, yes.

8      Q.   And you would ask her what she was wearing and you

9  asked her if she was wearing anything else.

10          Is that the kind of thing you would ask?

11      A.   The vast majority of times, I would ask questions.

12  But the issue was I was there to vent my anger.  I was there

13  to vent my emotions.  It was an emotional outrage.  And then

14  I would do that, and I would feel horrible for it after the

15  fact.

16          I would cry.  I would throw phones.  I would be

17  very upset.  I knew what I had just done.  So that's -- I

18  mean -- you know, as I've said, I made phone calls.  I

19  made -- I made obscene phone calls.  I -- I just -- I just

20  don't know what more you want me to say.

21      Q.   All right.  Let's turn to Page 101, and this is

22  Paragraph 26, Victim 5, still in -- on Exhibit 20.  This

23  woman also says you referred to her by name and that she

24  began to cry.

25          Did you have people cry on the phone?

1      A.   Yes, there were times I was -- it was terrifying,

2   what I did, yes.

3      Q.   And didn't you tell some of your treatment

4   providers that that made you sexually excited?

5      A.   Did I say that in sex offender treatment?  Yes.

6      Q.   All right.  Paragraph 27 says you asked personal

7   questions, such as are you dating, are you a virgin, what is

8   your favorite sexual position.

9           Did you ask victims that?

10     A.   I don't recall asking victims that.

11     Q.   It continues in Paragraph 27, "Then the defendant

12  instructed the victim to masturbate while talking on the

13  telephone."  So that's false?

14     A.   Yes, Mr. Acker, that's false.  There's no possible

15  way I could make someone do that.

16     Q.   "The victim told Mr. Francis that she was

17  menstruating and could -- and could not do so at that time.

18  Eventually, Mr. Francis instructed the victim to remove her

19  tampon, get out of bed, find a hairbrush or another item of

20  her choice to place inside of her vagina.  Victim 5 advised

21  Mr. Francis she could not find a hairbrush and Mr. Francis

22  became impatient.

23           "Francis:  Are you beginning to become

24  uncooperative?

25           "Victim No. 5:  No, I cannot locate a hairbrush or

1    anything else.

2              "Francis:  Lie back down on the bed and use your

3    finger."

4              Is this Victim No. 5 -- was she lying?

5         A.   Mr. Acker, I do not recall ever trying to make

6    somebody masturbate over a telephone.

7         Q.   It goes on in Paragraph 28 that you instructed her

8    to remove her underwear.

9              Did you ever ask your telephone victims to remove

10   their underwear?

11        A.   No, Mr. Acker.  As I think I've already testified,

12   these telephone calls were relatively short in length.

13        Q.   Paragraph 29, it says, "Mr. Francis then demanded

14   that the victim place her fingers inside of her vagina and

15   asked her a series of questions, such as how it felt, how

16   many fingers are you using and how fast was she

17   masturbating."

18             Did you ever ask a victim or tell a victim those

19   things?

20        A.   I do not recall ever doing that.

21        Q.   The next sentence says, "Mr. Francis then told

22   Victim 5 that she could hang up the telephone once she had

23   an orgasm."

24             Did you ever tell a victim that?

25        A.   No.

1        Q.    About the middle of Paragraph 29, it says,

2    "Eventually, Mr. Francis gave Victim 5 permission to quit

3    masturbating, stating, quote, it's okay.  You can be

4    finished, end quote, and instructed her to stop crying."

5            Did that happen?

6        A.    How do you give somebody permission to do

7    something over a phone.  So, no, it -- it -- it did not

8    happen, Mr. Acker.  This -- this theory of yours that I

9    have -- I'm able to completely control people over the

10   telephone -- I'm sorry.  No.

11       Q.    It goes on to say in that paragraph that you told

12   Victim No. 5, "It's okay.  My name is Chris and this is a

13   joke."

14           Did you ever tell victims that -- that your phone

15   call was a joke and give them a name?

16       A.    Yeah.  I mean, there were -- there were times that

17   I did that.  I was very -- very embarrassed and ashamed of

18   my conduct.  And as I said, after I got finished making the

19   threats, I felt pretty poor about what I had done.

20       Q.    Isn't it a fact, Mr. Francis, that what you were

21   doing and what you -- that what you were doing was rape over

22   the telephone?

23       A.    I'm not aware of that, no.

24       Q.    Didn't you describe it that way?

25       A.    Do you have a clip?

1     Q.   I do.  We can listen to Clip 13.

2                    [VIDEO CLIP 13 PLAYED]

3          BY MR. ACKER:

4     Q.   So on that clip, you say that there were at least

5     two different ways that you found girls' phone numbers.  One

6     was by looking at online directories.

7          So did you do that sometimes?

8     A.   No, I didn't.  And I'll explain why I said what I

9     said.  The issue was in two thousand and -- what's this --

10    2003, I went to Springfield for an evaluation.  And one of

11    the most important parts of my criminal case, of course, was

12    the Butner report.  As I'm sure you're aware, this was

13    evidence in a criminal case.

14         I spoke with this at length with my criminal

15    attorney, at length with the people at Springfield and at

16    length with the people who did the PSR.

17         Don't forget these things, Mr. Acker.  I was very

18    well aware of what I said in Butner.  I was very well aware

19    that they had what I said at Butner.  I said things to stay

20    in a program so I wouldn't go to jail.  That's what I did.

21    That's what I did.

22    Q.   You lied to stay out of jail?

23    A.   I did lie to stay out of jail.

24    Q.   Okay.  You also said in that clip that you

25    sometimes found girls' names by looking up their sports

1   pages or other ways to find their name and then look up

2   their phone numbers.  Was that true?

3       A.    As I've already testified, no, it was not.  I said

4   things for the purpose of staying in a treatment program.

5   That's what I did, Mr. Acker.

6       Q.    And you described twice, I think, on that clip

7   that, basically, you found a way to rape women over the

8   phone or rape women without actually raping them; is that

9   correct?

10      A.    Is it what I said?

11      Q.    Yes.

12      A.    It's what I said -- it's what I said on the video,

13  sure.

14      Q.    And isn't that the way you actually felt about it?

15      A.    No, it's not.  You've got me sitting in a sex

16  offender treatment program with five other people convicted

17  of raping children and women.  I'm there for phone calls.

18          I had to make it look as bad as I could possibly

19  make it so I could stay in this program and stay out of

20  jail.  That's a fact, Mr. Acker.

21      Q.    Why did you say to the polygraph examiner on that

22  clip, not -- "I don't mean to gloat, but" -- and then you

23  described more then.  Why would you use that word, "gloat"?

24      A.    You're asking something that happened over two

25  years ago.  I mean, I -- I don't know why I said that word,

1   "gloat."

2           I mean, my -- my purpose in this polygraph and my

3   purpose in programming was to give them what I felt they

4   wanted so that I could stay in the treatment program, Mr.

5   Acker.  I mean, it --it -- it's that simple.  It's really

6   that simple.  You can't -- you can't do all these deviant

7   things without any kind of evidence that they actually

8   occurred.

9           THE COURT:  All right.  Let's take a recess at

10  this point.

11               [RECESS - 3:16 P.M. TO 3:40 P.M.]

12           THE COURT:  Do you have more questions?

13           MR. ACKER:  Yes, Your Honor.

14           BY MR. ACKER:

15      Q.   Mr. Francis, if you would, turn to Exhibit 30,

16  please.

17      A.   Okay.

18      Q.   And you had mentioned this before, that the

19  original violation of probation was because of the

20  pornography, but then there was an addendum.

21           In fact, I think there were two addendums to the

22  probation violation report; is that correct?

23      A.   I believe you're right, yes.

24      Q.   And Exhibit 30 is one of those addendums?

25      A.   Yes.

1      Q.   And this one is talking about your refusal to give

2   the probation officer the name of a woman that you mentioned

3   you had hurt during anal intercourse; is that correct?

4      A.   Yes.

5      Q.   And -- and you did refuse to give the probation

6   officer her name; is that correct?

7      A.   I did.

8      Q.   And on the second page of this, which is Bates No.

9   952, it says, "Mr. Francis has by his own admission

10  committed many date rapes.  It's concerning to this officer

11  that he requested not to be polygraphed about his contact

12  with Jane Doe and then refused to provide any information

13  that would allow the probation officer -- office to locate

14  Jane Doe."

15      So, in fact, they wanted to go interview this

16  woman that you had anal sex with, correct?

17      A.   Apparently, they did.

18      Q.   And you refused to give them her name?

19      A.   Well, once again, you're out of context once

20  again.  If the United States Probation Office would have

21  called me to their office and asked me for Chloe's name, I

22  would have given them Chloe's name, and they could have

23  spoken to her.

24      Here's what happened.  The probation officers

25  knocked on my door at 8:00 in the morning and the U.S.

1   Marshals came in and put me in handcuffs, shackles and told
2   me I was under arrest.  At that point, they attempted to
3   question me about this.
4           Now, Mr. Acker, as I told you in the deposition,
5   I've been in the system long enough that once you put
6   handcuffs on me and tell me I'm under arrest, I'm not
7   talking to you without a lawyer.  So, yes, I was violated
8   for exercising my constitutional right to counsel.
9       Q.   Okay.  And now, you did describe some incidents of
10  having anal sex with a woman that you knew she was hurting
11  during that time; is that correct?
12      A.   Chloe and I -- and I assume you have a clip, but
13  Chloe and I -- what happened was we were having anal sex.
14  We had sex.  We had anal sex, And it was painful for her.
15  And she asked me to stop, which I immediately did.
16          She said, "you're big.  Let's not do that."
17          I said, "That's cool.  Let's not do that."  And we
18  continued to have sex.  We continued to remain friends
19  throughout my entire time while I -- while I was out in
20  society.  But the anal sex was painful for her and we
21  stopped.
22      Q.   When you were -- were you asked by the polygraph
23  examiner if you had ever done anything that you considered
24  borderline rape?
25      A.   I don't recall.  I'm sure you have a clip.

1    Q.   And -- and did you talk about this anal sex at

2    that time?

3    A.   I don't remember that I talked about the anal sex.

4    I remember exactly what the quote was was that I felt bad

5    about it.  I did feel bad about it.  I mean, anytime you

6    hurt somebody, you should feel bad, I mean.

7         But, I mean, Chloe and I -- as soon as I

8    penetrated her anally, she asked me to stop, which I

9    immediately did.  And she told me, "You're big.  Let's not

10   do that."  So we didn't have anal sex.

11        As I said, if they wanted to call me down to the

12   office, I would have been more than happy to give them any

13   kind of information they wanted.  But once you place me

14   under arrest, I'm not going to talk to you without a lawyer

15   present.

16   Q.   Okay.

17        MR. ACKER:  Just a moment, Your Honor.

18        BY MR. ACKER:

19   Q.   Let's play Clip 21, if we could, from the 2009

20   polygraph interview.

21                  [VIDEO CLIP 21 PLAYED]

22        BY MR. ACKER:

23   Q.   And it was after you said that, Mr. Francis, that

24   the probation officer asked you to disclose this woman's

25   name?

1        A.    Well, I mean, after -- it was several days after.

2   I mean, I think the polygraph was in July and then the

3   arrest was on August 10th.

4        Q.    Okay.  Now, let's go back to the timeline, Mr.

5   Francis, because we didn't talk about the things that are

6   color-coded green, and I want to go back and look at these

7   things and talk about them in a little bit more depth.

8              And if you could, turn to Exhibit 26 while we do

9   this.

10       A.    Okay.

11       Q.    Now, this -- is this a -- our victim list from the

12  Kentucky SOTP?

13       A.    This is the cover sheet, yeah.  Yes.

14       Q.    And this first page of Exhibit 26 says it's the

15  Commonwealth of Kentucky Department of Corrections; is that

16  correct?

17       A.    That's what it says, yes.

18       Q.    So this SOTP in Kentucky was not part -- part of

19  the Federal Bureau of Prisons; is that correct?

20       A.    It was not part of the Federal Bureau of Prisons.

21  It was -- they were contracted by the U.S. Probation Office.

22       Q.    Okay.  And the rest of Exhibit 26 is a number of

23  sheets; typically, two sheets for each victim that you

24  identified in this treatment.  Is that correct?

25       A.    I -- I believe so.

1      Q.   All right.  Well, let's look at a few of them.

2           Isn't it true that from 1995 to 1996, when you

3    were about 17 to 18 years old, you had a girlfriend for six

4    to eight months, you would hold her down, force sex on

5    her -- force all kinds of sexual acts on her, force her to

6    try anal sex, force her to masturbate herself, you'd hold

7    her down and cover her mouth when she was crying?  Isn't

8    that true?

9      A.   No, it's not true, Mr. Acker.  And once again, I'm

10   just going to point out the obvious here.  If you're doing

11   that, the relationship's probably not going to last six to

12   eight months.

13     Q.   Didn't -- weren't you asked about that, about why

14   this woman would stay with you -- or this girl, excuse me?

15     A.   I don't recall if I was asked.  But, Mr. Acker,

16   how are you going to rape some -- how -- how are you going

17   to do that?  How are you going to do that and never get

18   arrested for that?  Tell me.

19     Q.   Are you not aware that there are women that are

20   abused that stay with their spouse or their boyfriend when

21   they're being abused?

22     A.   Twenty-seven of them?

23     Q.   I'm asking about this victim.

24     A.   Is -- is that -- sure.  Sure.  Does that happen?

25   Sure.  We've got 27 victims there.  Give me some proof of

1   something.  Something.

2       Q.   And isn't it true that they asked you during the

3   polygraph interview why this woman would stay with you -- or

4   this girl in high school would stay with you, and you said,

5   "I don't know.  We were in love"?

6       A.   If you have a clip with me saying that, then I'm

7   sure I said it.  Do I recall that?  Absolutely not.  But

8   that -- that's a pretty warped sense of love.

9           And, you know, let's also point something out.

10  Sixteen, seventeen years old, you know, my girlfriends were

11  around my family, Mr. Acker.  I mean, they were around their

12  family.  I was around their family.

13          I -- you know, I'm sorry, but this is just -- this

14  is extremely far-fetched that somebody can do this and

15  there's just -- there's, once again, no evidence whatsoever,

16  no complaints made, you know.  And, moreover, the fact that

17  the FBI spoke to women who had sex with me in 2003 and they

18  don't have anything -- they don't have anything bad to say

19  about me.  So --

20      Q.   Okay.  Let's talk a little bit about the -- the

21  format of this interview in 2009 with the polygraph

22  examiner.

23          You had already filled out Exhibit 26, correct?

24      A.   Correct.  Exhibit 26 was the prepolygraph form and

25  you have to fill all of this out.  Yes, Mr. Acker.

1     Q.   And then she would show you one of these victim
2     statements or victim forms and ask you about it; is that
3     correct?
4     A.   I think she read it to me and -- and asked me
5     about it.  Generally, yes, that's correct.
6     Q.   Okay.  And a lot of times, actually, she would
7     show you the form and you would read it and go, "Oh, yeah, I
8     remember this."  Isn't that the way it happened?
9     A.   You -- you've watched the video more than I have,
10    so if you say that's what happened, I'll have to defer to
11    your judgment.
12    Q.   Okay.  Well, if you would look at Exhibit 26, Page
13    1719.  And this is a victim that you identified as Victim
14    No. 10; is that correct?
15    A.   That's what it says.
16    Q.   And on Page 1720, you say, "She was my girlfriend
17    and I would hold her down, cover her mouth, not stop when
18    told to."  Is that right?
19    A.   It is.  That's what, I mean, yes, what's written
20    there.
21    Q.   And, indeed, you did have a girlfriend around this
22    time, didn't you?
23    A.   Indeed, I did.
24    Q.   And if you were 17 to 18, that would have been, if
25    you look on the timeline, about 1995 to 1996?

1          A.   I guess it would have been.

2          Q.   Okay.  Well, let's do watch the clip where you

3     talk about this woman, and it is Clip No. 1.  And in the

4     transcript, which is Exhibit 42, this is on Pages 37 to 39.

5     But let's watch Clip 1.

6                          [VIDEO CLIP 1 PLAYED]

7               BY MR. ACKER:

8          Q.   Is that the same victim as Pages 1719 and 1720

9     that you identified as Victim No. 10?

10         A.   Oh, I -- I mean,

11    I have no idea who these people are that I wrote down here.

12    But, you know, since you've once again opened the door, I'll

13    walk through it.

14              I was told that every woman I've ever had sex with

15    is a victim.  That's what I was told at Butner.  That stays

16    with somebody.  And that's exactly what I did.  I took

17    ex-girlfriends and I exaggerated the details to make that

18    into a victim for the purpose of sex offender treatment.

19              You know, you keep showing these clips.  What I

20    see on these clips is I see somebody who's extremely

21    uncomfortable, who's not happy to be there and who's was

22    trying to say anything he can to please his treatment

23    provider to get out of there.  That's what I see.

24              You know, I guess we're going to play clips all

25    day.  Yes, I -- I said the things on the polygraph.  I said

1  those things.  And I -- I've testified as to why I said

2  those things, and -- and I think I've told you about the

3  situation that I was in.

4           You know, once -- once more, as I testified during

5  the deposition, my DNA is in the system, Mr. Acker.  I've

6  had 60 to 80 sexual partners and I was in the media when I

7  got arrested.  You know, where's the victims?

8       Q.   All right.  So what you just said in 2009 on the

9  videotaped clip that we just watched was not true?

10      A.   No, it was not.

11      Q.   Okay.  If you'll again turn to Exhibit 26, Pages

12  1737 to 1738.  We'll try to go through these as quickly as

13  we can.

14      A.   Okay.

15      Q.   And this is somebody you identified as Victim No.

16  15, correct?

17      A.   Where's the -- yes.  Yes.

18      Q.   And you said you were 19 years old?

19      A.   Yes.

20      Q.   That would have been about 1997?

21      A.   I believe so.

22      Q.   And you said you talked to her -- on the next

23  page, you talked her into coming to your dorm room and

24  didn't stop when you were told to; is that correct?

25      A.   Is that correct as to what it says?  Yes.

1      Q.   Yes.  Okay.  If we can watch Clip No. 2.  And for

2   the record, this -- the transcript is on Page -- Exhibit 42,

3   Page 49.

4                        [VIDEO CLIP 2 PLAYED]

5             BY MR. ACKER:

6      Q.   And your testimony today is that that also is a

7   lie?

8      A.   It is, Mr. Acker.  And we'll go back to what I

9   have previously said.  In fact, you -- you asked just a few

10   minutes ago -- I guess you were alluding to battered woman's

11   syndrome or something like that.

12             This, if we look into it, is a one-time --

13   one-time incident.  Now, if I'm really holding this woman

14   down and hurting her, why wouldn't she go to the police.

15   What's the reasoning there?  Exactly.  I don't know either.

16   That -- that's the whole point, Mr. Acker.

17      Q.   Are you aware that many, many date rapes are never

18   reported?

19      A.   Are you aware that 27 is absurd?  Are you aware

20   that you can't do all this and not get even arrested?  Are

21   you aware of that?

22             So, yes, I'm aware that many, many date rapes go

23   unreported.

24      Q.   If you could, turn go Pages 1326 and 27.

25      A.   What's your exhibit?

1       Q.   Still all in Exhibit 26.

2       A.   Okay.  So 1726, you mean?

3       Q.   I'm sorry.  1726 and 27.

4       A.   Okay.  Go ahead.

5       Q.   And this -- you identify this victim as No. 18?

6       A.   Right.

7       Q.   And you again said you were 19 when this happened?

8       A.   Yes.

9       Q.   So, again, that would have been approximately

10   1997?

11       A.   Approximately.

12       Q.   And you said you talked her into coming to your

13   room, that she was a virgin.  And on the next page, you

14   talked her into coming to your dorm room, told her you

15   wanted a relationship and you refused to stop when told to.

16           Is that what you said in this form?

17       A.   Yes, that's what's written down.

18       Q.   All right.  If we can watch Clip No. 3.  And for

19   the record, this -- the transcript is Exhibit 42, Pages 54

20   and 55.

21                   [VIDEO CLIP 3 PLAYED]

22           BY MR. ACKER:

23       Q.   And for the record, your testimony today is that

24   what you told the polygraph examiner in 2009 was a lie?

25       A.   That's correct.

1        Q.    We're still on Exhibit 26.  Could you turn to

2    Pages 1751 and 52?

3        A.    Okay.

4        Q.    You identified this victim as No. 25?

5        A.    Yes.

6        Q.    And you again said you were 19, so you -- we'd

7    still -- we'd still be approximately 1997?

8        A.    Yes.

9        Q.    You said that you talked her into coming to see

10   you.  You knew she would.  You'd had sex before.  And on the

11   next page, you convinced her to come to your dorm room and

12   you wouldn't stop when told to.

13              Is that what this form says?

14       A.    That's what the form says, yes.

15       Q.    Okay.  Can we listen to Clip No. 4?  And for the

16   record, the transcript is Exhibit 42, Pages 62 to 63.

17                     [VIDEO CLIP 4 PLAYED]

18              THE COURT:  How much more of this are you going to

19   plan to do?

20              MR. ACKER:  Your Honor, I have ten date rape

21   victims that I would like to show clips of.  That's the

22   fourth.  I have six more.

23              THE COURT:  How much time do you think you have

24   for this civil case, limitless time, as long as you feel

25   like putting on evidence?  Because I'll just throw some time

1    limits on it and you'll be done tomorrow at noon.

2         MR. ACKER:  Your Honor, I do think that because of

3    the extensive history that he has that I do need to preserve

4    the record.  I will do it as quickly as I can.  I think -- I

5    think the rest of his testimony will go faster.  I do have

6    about -- the deposition of Emily is about an hour and 20

7    minutes or so.

8         THE COURT:  You're going to play that?

9         MR. ACKER:  Yes, Your Honor.  I think the clips I

10   have --

11        THE COURT:  I mean, most of what we did today is

12   cumulative and so it's of little value.  So you figure it

13   out.

14        It's a civil case.  I mean, that's one of the

15   beauties of it.

16        MR. ACKER:  I do understand, Your Honor.

17        THE COURT:  Yeah.  I mean, the judges in this

18   court can give you four hours to do your case in chief, and

19   then when the minute hand clicks, you're finished kind of

20   thing.  I mean, I didn't want to -- to be intrusive, but I'm

21   going to be.

22        MR. ACKER:  Well, Your Honor, I -- I will

23   certainly try to -- and I -- cut out anything that I think

24   is -- is cumulative.  I do think that the -- it's important

25   for you to see his testimony.

1          THE COURT:  I mean, he's testified that it's all

2     the product of the therapy and appeasing the therapists.

3     And if you put on two examples of that or 20 examples of

4     that, do you think it's going to make a difference?

5          MR. ACKER:  I -- I'll be glad to move on, Your

6     Honor.  I -- I wanted to make sure that --

7          THE COURT:  It's either all true or it -- it's --

8     none of it's true.  There's no middle ground.

9          MR. ACKER:  There's very little middle ground.

10         THE COURT:  Yeah.  I mean, the -- there's no

11     substantially true, but some of it isn't true.  It -- as far

12     as I can tell, your position is that everything he said and

13     did in these video depositions is absolutely true.

14         MR. ACKER:  Not quite, Your Honor.  I think what

15     my position is that the -- the similarity of these ten date

16     rapes is sufficiently probative of at least those date rapes

17     being true and then the -- the 2001 stranger rape.  So I

18     certainly do want to move on to the stranger rape.

19         THE COURT:  Well, go ahead and take as much time

20     as you feel like taking, but I can guarantee you that you

21     won't be finished this week.  And when you're not finished

22     this week, we'll just pack up the boxcar and move it to

23     Elizabeth City and do it over the, you know, convenient

24     period.  And we'll be doing these hopscotching around until

25     we get through to the end.

1       MR. ACKER:  Well, I definitely want to finish this
2  week, Your Honor, and I --
3       THE COURT:  Well, you're not going to with -- at
4  this pace, unless you let me examine the experts, which I'll
5  be glad to do.
6       MR. ACKER:  Well, we -- we have talked and our
7  goal is to get all four experts done tomorrow.
8       THE COURT:  I mean, if I examine them, they'll be
9  done tomorrow.
10       MR. ACKER:  Well, I think we can do it quickly,
11  Your Honor.
12       THE COURT:  All right.  Keep going.
13       THE WITNESS:  Excuse me, Your Honor.  May I --
14       THE COURT:  No.  You don't say anything.
15       THE WITNESS:  I just want to use the bathroom.
16       THE COURT:  Oh, okay.  Well, then -- I'm about
17  ready to -- all right.  You can take a recess and you can
18  come back with the rest of your --
19           [RECESS - 4:06 P.M. TO 4:21 P.M.]
20       THE COURT:  Go ahead.
21       BY MR. ACKER:
22  Q.   Mr. Francis, I'm going to try to find a way of
23  getting through several of these clips very quickly, and I'm
24  going to show you five different clips from your 2009
25  polygraph examination.  And after each one, I am merely

1  going to ask you one question that I think can be answered

2  yes or no, and that is was that a lie.  And so that's -- I'm

3  going to try to get through these very quickly by simply --

4  and you've explained why it was a lie, and I don't think we

5  need to go over that again.  So --

6      A.    Okay.

7      Q.    The first one is going to be Clip No. 5.  And for

8  the record, we contend that this is referencing Victim No. 2

9  found in Exhibit 26, Pages 1707 to 1708, and it's in the

10  transcript, Exhibit 42, Pages 27 to 28.  This is Clip 5.

11                    [VIDEO CLIP 5 PLAYED]

12            BY MR. ACKER:

13      Q.    Was that statement you made to the polygraph

14  examiner true?

15      A.    It was fabricated for the purpose of sex offender

16  treatment.

17      Q.    Okay.  Let me show you Clip 22, which is -- we

18  contend is Victim No. 3, which you disclosed in Exhibit 26,

19  Pages 1709 to 1710, and it's on the transcript Exhibit 42 at

20  Page 30.  Clip 22.

21                    [VIDEO CLIP 22 PLAYED]

22            BY MR. ACKER:

23      Q.    And was that also fabricated?

24      A.    Yes, Mr. Acker.

25      Q.    Let me show you Clip 6, which we contend was

1    Victim No. 21, that you identified on Exhibit 26, Pages 1741
2    to 1742, and the transcript of this is Exhibit 42, Pages 57
3    and 58.  Play Clip 6.
4                          [VIDEO CLIP 6 PLAYED]
5              BY MR. ACKER:
6         Q.   And was that also fabricated?
7         A.   Yes, it was, Mr. Acker.  And just -- just to help
8    you out -- I don't know if this will help you out or not,
9    but I'm going to testify on the record that the rest of the
10   clips that you're about to play were fabricated for the
11   purpose of sex offender treatment.
12        Q.   Okay.
13        A.   I don't know if that helps.
14        Q.   Very good.  Let me play Clip 7.  We -- this is
15   from Victim 13, Pages 1733 to 34 of Exhibit 26, and the
16   transcript is Exhibit 42, Pages 45 to 47.
17                         [VIDEO CLIP 7 PLAYED]
18             BY MR. ACKER:
19        Q.   Now, I do have a few questions to ask you about
20   this clip, Mr. Francis.  First, is the specific incident
21   about the woman that came to your house that had her child
22   there and you said that you forced sex on her, was that
23   fabricated?
24        A.   Yes, it was.  It was a consensual encounter with a
25   woman I worked with named Ronnie, and we had a consensual

1    sexual encounter.  And once again, I took a former sexual

2    partner and turned her into a victim for the purpose of sex

3    offender treatment.

4         Q.   Now, the polygraph examiner also asked you if --

5    about what happened afterwards, why she didn't leave

6    immediately.  And you said that you were apologizing and

7    trying to do damage control.

8              Is that something you did after you would have sex

9    with girls that you were taking advantage of, that you would

10   try to do damage control with them and talk nice to them

11   afterwards?

12        A.   Well, first of all, to correct you, I haven't

13   taken advantage of girls.  Secondly, the answer's no.  As I

14   said, that's something I said for the purpose of treatment.

15             You know, once again, I'll beat on this dead

16   horse, which is 60 to 80 women, Mr. Acker.  And your own

17   expert says he doesn't believe what I said in the polygraph.

18   So I -- I -- you know.

19        Q.   And -- and then you -- you also talked about --

20   she asked if this was your -- kind of your pattern.  And you

21   said, "Yeah, you know, if we had sex consensually that's

22   great, but I just got -- I don't know.  I just got to the

23   point where it's, like, you know what, I'm doing this and

24   that's that."

25             Is that what your attitude was with these 60 to 80

1    women, that if you got sex consensually that was great, but

2    if not, you were going to take what you wanted?

3           A.   Mr. Acker, I've always been more popular with

4    women than I am with men, and my closest friends in life

5    have always been women.  So the answer to your question is

6    absolutely not.

7              Once again, you can't do this to 60 to 80 women

8    and not get arrested or charged for something.

9           Q.   All right.  Let me show you another clip.  This is

10   Clip 8.  We contend it's the person you identified as Victim

11   No. 5, and which you identified in Exhibit 26, Pages 1713 to

12   14, and the transcript of this is on page -- Exhibit 42,

13   Pages 33 to 34.

14                    [VIDEO CLIP 8 PLAYED]

15              BY MR. ACKER:

16          Q.   And was this incident fabricated?

17          A.   As I've testified, everything I said on this

18   polygraph was fabricated for the purpose of sex offender

19   treatment.

20          Q.   But you told Moriah that you were a hundred

21   percent honest in your polygraph, didn't you?

22          A.   As I testified earlier, that was referring to the

23   issue about pornography.  It was not referring to what we're

24   getting at here, which is these video clips of victims.

25          Q.   Okay.

1          MR. ACKER:  Your Honor, I have two other sexual

2    encounters that I want to talk to Mr. Francis about.  One

3    happened on December 15th of 2001, the night before the --

4    the stranger rape with Emily and then about Emily herself.

5          Those two will take a little bit longer.  I'm glad

6    to -- to start and continue later, or we can take a break

7    now, whatever Your Honor would prefer.

8          THE COURT:  Go ahead and start.

9          MR. ACKER:  Okay.

10         BY MR. ACKER:

11    Q.    Mr. Francis, let's talk about what happened on the

12    night of December 15th, 2001.  Do you recall that?

13    A.    I do.

14    Q.    And what were you doing on that night?

15    A.    I was out with friends.  We'd gone out partying.

16    Q.    And where were you?

17    A.    Poughkeepsie, New York.

18    Q.    Is Marist College in Poughkeepsie, New York?

19    A.    It is.

20    Q.    And you went out drinking at a bar called McCoy's

21    Ale House?

22    A.    That is correct.

23    Q.    You were staying -- staying with your friend,

24    Justin Spraker?

25    A.    That's correct.

1       Q.    And you worked in Poughkeepsie?

2       A.    Yes, at Red Lobster.

3       Q.    And you lived an hour away?

4       A.    Middletown, yes.

5       Q.    And you would often stay at your friend Justin's

6   house --

7       A.    That's correct.

8       Q.    -- at 56 Sunset?

9       A.    That's correct.

10      Q.    And you went out drinking that night at McCoy's?

11      A.    I did.

12      Q.    You were trying to pick up girls?

13      A.    Absolutely.

14      Q.    You talked to a number of girls in the bar?

15      A.    I did.

16      Q.    You tried to get them to have a drink or dance

17  with you?

18      A.    Absolutely.

19      Q.    You got your fair share of rejections?

20      A.    As every guy does in a bar, yes, I did.

21      Q.    You found a girl who was willing to leave the bar

22  with you, didn't you?

23      A.    Yes, Amy.

24      Q.    Okay.  And her name was Amy.  And you went over to

25  your friend's house -- your friend, Justin's house at 56

1   Sunset?

2       A.   Correct.

3       Q.   And wasn't it -- sometime after 1:00 a.m., on

4   actually the morning of December 16th that you actually left

5   the bar?

6       A.   I don't recall, Mr. Acker.  You're asking me

7   questions about time from ten years ago when I was severely

8   intoxicated.  I -- I -- I don't recall times.  I'm sorry.

9       Q.   Okay.  And you read all the discovery in this

10  case, didn't you?

11      A.   Yes.

12      Q.   And including what you read was a police report

13  from Poughkeepsie, New York?

14      A.   It was.

15      Q.   And included in that police report was an

16  interview of a woman that you tried to pick up at the bar

17  and she rejected you?

18      A.   There was an interview of a woman who I had spoken

19  to at the bar, yes.

20      Q.   And didn't she say in that police report that it

21  was about 1:00 when you tried to pick her up?

22      A.   I -- I don't recall.  If you'll give me the

23  exhibit number, I can answer it for you.  If that's what she

24  says in the police report, then I'm sure that's what she

25  says.

1    Q.   All right.  Well, let's look at Exhibit 7.

2    A.   All right.

3         THE COURT:  Well, just tell him it was 1:00 if

4    it's 1:00 and go on with the question.

5         MR. ACKER:  All right  Well, I'll --

6         THE COURT:  He's an adverse witness.  I mean --

7         MR. ACKER:  That's fine, Your Honor.

8         THE COURT:  This isn't a TV program.

9         MR. ACKER:  That's fine, Your Honor.

10        BY MR. ACKER:

11   Q.   So you have no -- if on Page 1780 of Exhibit 7 --

12   A.   Hold on.  Hold on.  Hold on.  1580, you mean?

13   Q.   If the -- in Exhibit 7, Page 1580, doesn't it say

14   that -- the name is redacted -- "states that she was in

15   McCoy's Ale House on December 16th, 2001, from midnight

16   until approximately 3:00 a.m.  She was with her roommates.

17   She stated at approximately 1:00 a.m., they were standing at

18   the back bar between a bar and the pool table against a pole

19   when they were approached by a white male."  And it goes on

20   to describe it and --

21   A.   Yes, that's what she said, yes.

22   Q.   -- and then she later describes that white --

23   identifies you in a photo lineup as being the white male

24   that approached her sometime -- approximately 1:00?

25   A.   That's correct.  That's what she says.

1      Q.   Okay.  And you don't have any information to
2  dispute her statement that it was about 1:00?
3      A.   Absolutely not.  I mean, I went to McCoy's that
4  night.  There's -- there's no dispute that I was in that
5  bar, Mr. Acker.  All I'm telling you is that, as in the
6  deposition, if you're going to ask me intricate details
7  about what happened at what time, it was ten years ago.
8           THE COURT:  All right.  You don't need to argue
9  with him.  And he needs to know that it's an adverse
10  witness.  I've said this three or four times.  You get to
11  lead an adverse question -- witness.  That's the point.
12           MR. ACKER:  I understand.
13           THE COURT:  You get to ask questions the answer to
14  which is only yes or no.
15           BY MR. ACKER:
16      Q.   You had quite a bit to drink that night, didn't
17  you?
18      A.   Yes.
19      Q.   And at some point that night, you vomited because
20  of too much alcohol?
21      A.   Yes.
22      Q.   And you and Amy walked from McCoy's to the house
23  on Sunset?
24      A.   Yes.
25      Q.   And there you were kissing with her and you were

1   petting?

2        A.   Yes.

3        Q.   And you performed oral sex on her?

4        A.   Correct.

5        Q.   And you tried to get her to perform oral sex on

6   you, but she didn't?

7        A.   Yes.  I requested, yes.

8        Q.   And at some point, she vomited?

9        A.   Yes.

10        Q.   And at some point, you both passed out or fell

11   asleep?

12        A.   Yes.  Yes.

13        Q.   And when you woke up, Amy was no longer there?

14        A.   Correct.

15        Q.   And after that, you went outside again?

16        A.   I went back to the club, yes.

17        Q.   To McCoy's?

18        A.   Yes.

19        Q.   And by this time, it was fairly late in the

20   morning, isn't that right?

21        A.   I don't recall.

22        Q.   And it was cold outside?

23        A.   I believe it was.  It was December.

24        Q.   Okay.  In fact, it was so cold that you testified

25   in your deposition that you refused to get Emily a -- you

1   refused to walk her home because it was too cold.

2        A.   Correct.

3        Q.   All right.  And you told this story to the

4   polygraph examiner in Kentucky, didn't you?

5        A.   What story?

6        Q.   The story about Amy.

7        A.   The story about Amy?  Do you -- do you have a

8   clip?  I don't -- I don't --

9        Q.   I do.  Let's look at Clip 9, which is -- you

10  identified as Victim No. 4 in Exhibit 26, Pages 1711 to 12,

11  and it's in the transcript in Exhibit 42, Pages 32 and 33.

12                    [VIDEO CLIP 9 PLAYED]

13           BY MR. ACKER:

14       Q.   So was this incident that you were talking to on

15  this clip that we just watched -- was that Amy you were

16  referring to?

17       A.   Yeah, it appears to be.  I -- I took the situation

18  with Amy and exaggerated it for the purpose of the victim,

19  yes.

20       Q.   Okay.  But you did mention that you were staying

21  at your friend's house, and that was Justin Spraker's house,

22  right?

23       A.   I believe so.  I believe that's what was on clip.

24       Q.   And you referenced in the clip that you were

25  arrested on a probation violation soon after that, correct?

1        A.    Correct.

2        Q.    And, in fact, you were arrested on a supervised

3   release violation --

4        A.    Correct.

5        Q.    -- soon after this incident with Amy on December

6   15th and 16th?

7        A.    Correct.

8        Q.    And you also said in that clip, didn't you, that

9   this happened right before you went out and raped Victim No.

10  1?  Didn't -- didn't you say that?

11       A.    That's what it says on the clip.  That's what I

12  said on the clip.

13       Q.    Okay.  And you acknowledge that this was Amy?

14       A.    It's -- it's -- that's certainly what it appears

15  to be.  I mean, I -- I didn't put a identifying mark on

16  there.  I mean, you're -- you're taking the facts from that

17  night.  I mean, that's what it certainly appears to be.

18            Can I sit here and say, "Well, this is Amy"?  I

19  mean, I -- I don't know.  I -- these were numbered.  I

20  didn't put names on these.  You know, I mean, I will say

21  this, I mean, Amy spoke to -- the police spoke to Amy.  So,

22  once again -- and you know the police spoke to Amy.

23            Where is the corroboration here?  She doesn't

24  claim this happened.

25       Q.    Now, when the police spoke to Amy, they spoke to

1   her to make sure that Amy and Emily weren't the same person;

2   is that right?

3       A.   I -- I didn't investigate.  I don't know what

4   their purpose was.  I don't know what the extent of it was.

5   I have no idea.  All I know is they spoke to her.

6       Q.   Okay.  Now, so after Amy left and -- you said you

7   fell asleep and then you woke up.  Now, your story and --

8   well, let me back up.

9           That same morning, the morning of December 16th,

10  after Amy left, you went back out to the club, right?

11      A.   Yes, I went back out to McCoy's.

12      Q.   And you acknowledge that you had sex with Emily

13  that night?

14      A.   Emily and I had a consensual sexual encounter,

15  yes.

16      Q.   And this is where your story and Emily's story are

17  diametrically opposed; is that right?

18      A.   It has been for ten years, apparently.

19      Q.   And your story -- well, let's talk first about

20  Emily's story.  Emily's story is that she was on a street

21  corner, that you approached her with a Leatherman tool, that

22  you made her go to an area and perform oral sex on you, and

23  then you took her a little bit further behind the building

24  and forced her to have sex.

25          And then she saw a police car.  She asked for a

1  ride home from the campus police car and that at that time
2  you told her your name was Sean and you drove a Tiburon.
3  And that's basically her story, isn't it?
4       A.   From what I've read, that's her story, yes.
5       Q.   Now, your story is quite different from that,
6  isn't it?
7       A.   Yes, it is.
8       Q.   Your story is that when you went back out after
9  Amy left that you met Emily outside the bar, correct?
10      A.   Yes.
11      Q.   And that she was holding a red Silo [sic] cup, one
12 of those red cups that you buy at the grocery store, right?
13      A.   That's correct.
14      Q.   And you believed it had alcohol in it, but you
15 couldn't be sure?
16      A.   That's correct.  I don't remember -- I don't
17 remember asking her.
18      Q.   And your testimony is that you struck up a
19 conversation with her?
20      A.   That's correct.
21      Q.   And your testimony is that, at some point in the
22 conversation, she told you she had a boyfriend?
23      A.   That's correct.
24      Q.   And your version is that you started kissing and
25 then petting while -- consensually, correct?

1      A.   Correct.

2      Q.   And then your story is that, at some point, you

3    ended up behind some buildings near the bar?

4      A.   Correct.

5      Q.   And that you were in full view of other people,

6    correct?

7      A.   Correct.

8      Q.   And you were in a lighted area?

9      A.   Correct.

10     Q.   That security guard's spotlights shone on you

11   while you were having sex?

12     A.   Correct.

13     Q.   And that at this time, Amy was on her back?

14     A.   Amy?

15     Q.   Excuse me.  Emily was on her back.

16     A.   Yes.  Correct.

17     Q.   And that Emily rolled over, giggling, when the

18   guard's spotlights came and said, "Oh, my God.  I don't want

19   them to see me"?

20     A.   Correct.

21     Q.   And that then when she was on her back, the

22   rocks -- she was laying on the ground and rocks were in her

23   back, correct?

24     A.   Correct.

25     Q.   And it was painful for her?

1      A.    Correct.

2      Q.    And you -- your testimony in your deposition was

3   that she got on top of you and continued having sex?

4      A.    Correct.

5      Q.    Your testimony is that you were kissing her the

6   whole time?

7      A.    Correct.

8      Q.    That she told you how cute you were?

9      A.    Correct.

10      Q.    That she told you you were good at fingering?

11      A.    Correct.

12      Q.    That she placed her [sic] penis inside of you

13   [sic], put her hands on your buttocks and said push?

14      A.    Correct.

15      Q.    And that, afterwards, she gave you her phone

16   number?

17      A.    Correct.

18      Q.    That she also asked you to come back to her dorm?

19      A.    Walk her back to her dorm.

20      Q.    Okay.  And you refused?

21      A.    Correct.

22      Q.    Because it was too cold?

23      A.    Correct.

24      Q.    And you offered to walk her back to your friend's

25   house and you would drive her home?

1      A.    Correct.

2      Q.    And you told her that you had a brand new Tiburon?

3      A.    Correct.

4      Q.    And when she said she didn't want to go back to

5   your house, then you -- you suggested that she ask for a

6   ride from the security guards?

7      A.    Correct.

8      Q.    And she did that?

9      A.    Correct.

10      Q.    Now, why did she give you her phone number even

11   though she had a boyfriend?

12      A.    Mr. Acker, I can't speak for her.  Why would she

13   cheat despite the fact that she had a boyfriend?  My

14   understanding is they had a fight that night.  We were both

15   severely intoxicated.  You know, I -- I can't -- you're

16   asking me to tell you why somebody else does what they do.

17   I -- I can't do that.

18      Q.    And why would she give you her phone number and

19   then immediately after she gets home call the police and

20   report it as a rape?

21      A.    Well, once again, I think you're leaving out a

22   very important detail, which is the campus police law

23   enforcement gave her a ride home.  Gave her a ride home.

24   And when she got home, she didn't immediately call the

25   police.  She called her boyfriend, not the police.

1          So she's riding -- she gets a ride home from the

2    security guards -- from the police and she doesn't say a

3    word.  Now, I'm sorry, if somebody had just been raped and

4    the police are giving you a ride home, I think somebody's

5    going to say something.

6          But, you know, as I testified in the deposition,

7    this was investigated thoroughly by competent law

8    enforcement officers who have years of experience with these

9    types of cases and I cooperated fully.  I don't know what

10   more to say.  I think the facts speak for themselves.

11        Q.   All right.  You say you cooperated fully; is that

12   correct?

13        A.   Yes.  That's what I just said.

14        Q.   Now, if we can turn to Exhibit 7.

15        A.   Okay.

16             THE COURT:  Well, let's do that tomorrow.

17             MR. ACKER:  That's fine, Your Honor.

18             THE COURT:  You say you're going to put this

19   lady's deposition on?  Is it a --

20             MR. ACKER:  It's a video deposition.  Yes, Your

21   Honor.

22             THE COURT:  Uh-huh (yes).  Okay.

23             MR. ACKER:  And we may ask to -- I -- I know that

24   one of my experts -- and I think both of their experts need

25   to get out of here by tomorrow.  And so we may -- if Your

1  Honor is willing, we may ask to put those witnesses in out

2  of order, get through them tomorrow and --

3          THE COURT:  Well, you're the one that called the

4  defendant as the first witness, not me.

5          MR. ACKER:  I understand.

6          THE COURT:  I didn't call any witnesses.  So --

7          MR. ACKER:  I don't have a problem.  I'm trying to

8  accommodate --

9          THE COURT:  And you're still on direct.  So, you

10  know --

11          MR. ACKER:  I am --

12          THE COURT:  -- don't tell me about timing.

13          MR. ACKER:  I'm simply asking if Your Honor -- I

14  think the parties would prefer -- this was a request from

15  respondent's attorney --

16          THE COURT:  I'm not making any representations.

17  You're liable to end up in Elizabeth City with this.  So I'm

18  not going to make any representations about time or

19  accommodations.

20          MR. ACKER:  My only question, Your Honor, is would

21  Your Honor allow us to suspend the inquiry of Mr. Francis

22  and come back to it after the experts?

23          THE COURT:  I don't know.

24          MR. ACKER:  Okay.

25          THE COURT:  Yeah.  That's my answer, because

1  nobody asked me, you know, about a schedule.  You-all are

2  composing this -- this trial.

3          Now, he was certified on 1/29/10.

4          MR. ACKER:  I believe that's correct, Your Honor.

5          THE COURT:  I've got the certification in my hand,

6  so I'm telling you that.

7          MR. ACKER:  I believe that's correct.

8          THE COURT:  And this therapeutic

9  examination/therapy session that he went through that you

10 filmed happened in 2009?

11         MR. ACKER:  Yes.

12         THE COURT:  Earlier than his certification?

13         MR. ACKER:  Yes, Your Honor.  He was --

14         THE COURT:  So he had no idea or expectation or

15 foreseeability that one say he would be in a courtroom

16 having been certified as sexually dangerous.

17         MR. ACKER:  I don't know the answer to that, Your

18 Honor.

19         THE COURT:  Well, I'm going to say he didn't,

20 because you don't give advance notice that you're going to

21 certify.

22         So I'm going to reconsider the whole privilege

23 issue and whether or not his patient privilege was abused by

24 that.  But we can worry about that tomorrow.

25         MR. ACKER:  Okay.

1          THE COURT:  We'll be in recess until 9:30.

2        [WHEREUPON, THIS HEARING WAS ADJOURNED.]

3                [END OF TRANSCRIPT.]

4                - - - - - - - - - -

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN


CERTIFICATE

      I, PATRICIA C. ELLIOTT, VERBATIM REPORTER AND NOTARY PUBLIC FOR THE STATE OF NORTH CAROLINA, COUNTY OF FRANKLIN, HEREBY CERTIFY THAT THE FOREGOING PAGES REPRESENT THE HEARING BEFORE THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, THE HONORABLE TERRENCE W. BOYLE, U.S. MAGISTRATE JUDGE PRESIDING, IN THE MATTER OF UNITED STATES OF AMERICA V. SEAN ROBERT FRANCIS, AND THESE PAGES CONSTITUTE A TRUE AND ACCURATE TRANSCRIPT OF THE PROCEEDING.

      IN WITNESS WHEREOF, I HAVE HEREUNTO AFFIXED MY HAND THIS 23rd DAY OF OCTOBER, 2011.


/s/  PATRICIA C. ELLIOTT

PATRICIA C. ELLIOTT
VERBATIM REPORTER
NOTARY PUBLIC NO.: 19940480043