THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA,        )
                                 )
                PETITIONER,      )
                                 )
        V.                       )  NO. 5:10-HC-2013-BO
                                 )  OCTOBER 6, 2011
SEAN ROBERT FRANCIS,             )  RALEIGH, NC
                                 )
                RESPONDENT.      )
_____)



TRANSCRIPT OF 4248 BENCH TRIAL


BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

FOR THE PETITIONER:   G. NORMAN ACKER, III, ESQ.
                      MICHAEL LOCKRIDGE, ESQ.
                      ASSISTANT UNITED STATES ATTORNEY
                      EASTERN DISTRICT OF NORTH CAROLINA
                      800 TERRY SANFORD FEDERAL BUILDING
                      310 NEW BERN AVENUE
                      RALEIGH, NC  27601-1461

FOR THE RESPONDENT:   JAMES RYAN HAWES, ESQ.
                      WOODY WEBB, ESQ.
                      WOODY WEBB & ASSOCIATES
                      127 WEST HARGETT STREET, SUITE 104
                      RALEIGH, NORTH CAROLINA  27601



REPORTED BY:          PATRICIA C. ELLIOTT
                      VERBATIM REPORTER

1          P R O C E E D I N G S

2          THE COURT:  Mr. Acker, I'll let you handle the

3    scheduling as you see fit to accommodate your witnesses.

4    And so since it's your case in chief, if you want to suspend

5    the current testimony and do something, I'll let you do that

6    for your convenience.

7          MR. ACKER:  Thank you, Your Honor.  The parties

8    have talked about it, and I think it would require a

9    stipulation from the other side to make sure that it's okay

10   for us -- that they don't object for us suspending Mr.

11   Francis's testimony until the end.  I think we can get that

12   stipulation.

13         THE COURT:  Well, you don't need a stipulation.

14   I'm --

15         MR. ACKER:  That's fine.

16         THE COURT:  I'm charge of the trial.

17         MR. ACKER:  That's fine, Your Honor.

18         THE COURT:  I can authorize the presentation of

19   evidence.

20         MR. ACKER:  Very good, Your Honor.  Well, that's

21   what we intend to do.  And we believe that -- we've spoken

22   and  we believe that we can get through all four experts

23   today.  And then it should --

24         THE COURT:  If I thought it would inhibit my

25   ability to determine the facts, I might say something.  But

1    it's not going to -- I mean, I'm the judge and I could hear

2    it all at once or none at once.

3             MR. ACKER:  That's fine Your Honor.

4             THE COURT:  Yeah.

5             MR. ACKER:  And -- and just one question on

6    Friday.  I think -- as far as our case, I think it would not

7    take us more than two hours maximum on Friday to finish with

8    Mr. Francis and the videotape of the -- the videotaped

9    deposition.  And I'm not sure what else Your Honor has on

10   Friday, but that's a prediction of how long I think it would

11   take us on Friday to finish.

12            THE COURT:  Well, we'll just plow ahead and --

13            MR. ACKER:  Thank you Your Honor.

14            THE COURT:  I don't have any handle on it.  I'll

15   react as it comes up, and --

16            MR. ACKER:  Thank you.

17            THE COURT:  -- if I don't finish it, I'll finish

18   it some other day.

19            MR. ACKER:  Thank you, Your Honor.  All right.

20   And we would call as our next witness Dr. Hy Malinek.

21   _____

22   (WHEREUPON,

23                     **HY MALINEK, Psy.D.**,

24       was called as a witness, duly sworn, and testified as

25       follows:)

_____

1

2          THE COURT:  All right.  Now, Dr. Malinek has

3   already testified in a earlier case.  I forget which --

4   which case was that?

5          MR. ACKER:  It was, I believe --

6          THE COURT:  Hall?

7          MR. ACKER:  -- either Hall or Wooden.  I can't

8   remember.  Perhaps Dr. Malinek can tell us.

9          THE COURT:  It was the Hall case.  It was the Hall

10  case, right?

11          THE WITNESS:  No.  It was the case of Walter

12  Wooden, Your Honor.

13          THE COURT:  Oh, Wooden.  Okay.  And that's the

14  only case he -- he was a expert in?

15          MR. ACKER:  So far that's he's testified in, yes,

16  Your Honor.

17          THE COURT:  Okay.  All right.  Well, I'll

18  recognize his professional background and his suitability

19  for acceptance by the court as an expert witness in the area

20  of forensic psychology and the treatment of sex offenders

21  and allow him to express his opinions in this case.

22          MR. ACKER:  Thank you, Your Honor.

23          BY MR. ACKER:

24     Q.   Dr. Malinek --

25          THE COURT:  I'll incorporate his curriculum vitae

1  and resume in from previous testimony and as an exhibit in

2  this case.

3          MR. ACKER:  Thank you, Your Honor.  That was what

4  I wanted to put on the record, that his CV is Exhibit 44.

5  **DIRECT EXAMINATION BY MR. ACKER:**

6      Q.   Dr. Malinek, does Exhibit 44, your CV that you

7  presented in this case -- is that a fairly accurate and

8  relatively recent copy of your CV?

9      A.   (Witness examines document.)  Yes, it is.

10     Q.   Okay.  And, Dr. Malinek, how many times have you

11 testified either in state or federal court concerning

12 sexually violent predators or sexually dangerous persons?

13     A.   Between 150 and 200 times.

14     Q.   And in federal court for the 4248s, how many times

15 have you been asked to render opinions about whether or not

16 the people who have been certified by the government meet

17 the criteria, as you understand it, under 4248?

18     A.   Fifteen or sixteen times.

19     Q.   And of those times, how many times did you

20 conclude that the person did meet the criteria for sexual

21 dangerousness?

22     A.   Nine or ten cases.

23     Q.   And what about the other cases?

24     A.   I did not feel that they met all the criteria for

25 certification.

1      Q.    And did you ever feel any pressure at all from the

2   government to rule one way or the other in your opinion?

3      A.    I never have.

4      Q.    And in your testimony in state courts, have you

5   testified exclusively for one side or the other?

6      A.    No, I have not.

7      Q.    You testify for both sides?

8      A.    I testify quite a bit for the defense as well.

9      Q.    Okay.  Now, Dr. Malinek, there are three questions

10  that you address in your report.  And let me point out that

11  your report is at Exhibit 36.  So if you could, turn there.

12     A.    Yes, it is my initial report in this case.

13     Q.    Okay.  And the first issue that you addressed in

14  that was has Mr. Francis engaged in or attempted to engage

15  in sexually violent conduct or child molestation.

16          What was your conclusion to that answer?

17     A.    My answer was that he has.

18     Q.    And tell us why.  What was the basis of your

19  opinion that he has in the past engaged in or attempted to

20  engage in sexually violent conduct?

21     A.    He was convicted of crimes of a sexual nature, of

22  obscene phone calls on multiple occasions.  I consulted the

23  specific definition of a sexually violent offense in 4248,

24  and it specifically indicates that when an individual has

25  engaged in offenses of a -- of a sexual nature which involve

1   the use of force or the threatened use of force, it is

2   considered a sexually violent offense.

3          Given that many of -- multiple of these offenses

4   involved specific threats of rape or murder, I believe that

5   he met that criteria.

6          THE COURT:  But none of these convictions were

7   hands-on crimes; they were all attenuated crimes?

8          THE WITNESS:  That's correct, Your Honor.  Not a

9   hands-on crime.  There were specific and repetitive threats.

10          THE COURT:  Yeah.  And -- and none of the threats

11   were made in a physically present context.  They were all

12   telephone threats.

13          THE WITNESS:  They were telephone threats.

14          THE COURT:  Okay.  And you think that that

15   establishes the kind of predicate that is contemplated by

16   child molestation or serious sexual crimes?

17          THE WITNESS:  That's my understanding of -- of the

18   law and the specific examples that are provided for what is

19   sexually violent.

20          THE COURT:  So if you were in prison and you wrote

21   a letter and threatened the president in a letter, which

22   people do, I think, from time to time, you would be

23   committing a -- an assault, you say, or a threat, even

24   though there was no expectation that you would ever carry it

25   out?

1        THE WITNESS:  That would be different from the

2   case here where several of the victims were identifiable

3   victims and that he had personal knowledge of and made very

4   specific threats that could certainly be -- be perceived by

5   the victims as real, material threats for their safety.  I

6   know where you live; I know what car you drive.

7        THE COURT:  Uh-huh (yes).  Well, he said that in

8   virtually every -- every contact -- phone contact that

9   materialized.  That was the modus operandi.

10        THE WITNESS:  In some of the calls.  He had stated

11   that he made mostly random calls.  I think he testified

12   yesterday that nine out of ten of the calls were to women he

13   never knew.  It seems from the review of the PSR that he

14   knew or had some information about some, not all, of the

15   women.

16        THE COURT:  The only one I remembered was the

17   13-year-old -- when he was 13 and called his girlfriend's

18   mother, because he knew who that was.

19        THE WITNESS:  If I remember correctly, the PSRs of

20   2000 and 2004 indicate specific victims whose names he knew.

21   He knew who their roommates are.  He knew details about

22   their lives.  He knew the car they drove, one of them

23   specifically.

24        THE COURT:  Okay.  All right.  Go ahead.

25        BY MR. ACKER:

1      Q.   In -- in reaching your decision about whether or

2    not these threats of sexual violence were sufficient, did

3    you consult any other authority?

4           Did you look at, for example, any Code of Federal

5    Regulations or other source to determine what would

6    constitute sexually violent conduct?

7      A.   The Code of Federal Regulations brings one

8    specific example that use of force or threatened use of

9    force constitute one example of sexually violent conduct.

10   The word "threatened use of force" appears in the CFR and

11   that was the basis of my reasoning.

12     Q.   And you cited that on Page 22 of your report; is

13   that correct?

14     A.   One second, please.  (Witness examines document.)

15          Yes, I did.

16     Q.   Okay.  Did you read the reports of Dr. Plaud and

17   Dr. Singer on this point of whether or not the telephone

18   calls constitute a sexually violent conduct?

19     A.   I did.

20     Q.   And what was your observation about their opinion

21   on this first issue?

22     A.   I -- I respectfully disagree with their opinion.

23   It appears they have based their assessment of this prong on

24   state SVP laws, and specifically on the states of New Jersey

25   and New York, where they perform SVP evaluations, and did

1  not consult specifically the CFR and the standard in the

2  federal court.  Those are different standards.

3       Q.   All right.  Let's move on to Issue 2, which is

4  does Mr. Francis suffer from a serious mental illness,

5  abnormality or disorder.

6            What was your conclusion on that prong?

7       A.   I believe that he does.

8       Q.   And, specifically, what conditions do you believe

9  he has that are recognized in the DSM-IV?

10      A.   I diagnosed him with paraphilia not otherwise

11  specified, NOS, nonconsent with prominent sadistic features,

12  as well as antisocial personality disorder.

13      Q.   Let's take those one at a time.  What is

14  paraphilia NOS nonconsent with sadistic features?

15      A.   Paraphilia is a sexual deviation.  NOS stands for

16  paraphilias not otherwise specified, meaning they are not

17  coded specifically or separately on the DSM-IV, which is the

18  manual of diagnostics used by mental health professionals.

19           Nonconsent means the individuals has specific

20  sexually deviant urges involving nonconsenting individuals,

21  sexually deviant arousal to force in this case.  I believe

22  that the evidence -- the overall evidence was clearly

23  suggestive of prominent sadistic features with the

24  consistent need to humiliate, demean, control and denigrate

25  women.  That is why I added the -- the prominent sadistic

1 features.  I based it on the telephone calls, on his own

2 statements, the reports of the victims, codes from the

3 calls.

4          THE COURT:  You're saying sadistic?  Is that the

5 word?

6          THE WITNESS:  It is the word, Your Honor.

7          BY MR. ACKER:

8     Q.    Now, you didn't go so far as the diagnose him with

9 sexual sadism, did you?

10     A.    I did not.

11     Q.    And, Doctor, did you review Dr. Perkins' report?

12     A.    I did.

13     Q.    And she's the psychologist for the BOP?

14     A.    She is.

15     Q.    And she -- she diagnosed him with sadism?

16     A.    Yes, she did.

17     Q.    And -- and what's your response to her diagnosis?

18     A.    I think she -- the diagnosis is, you could say,

19 technically correct.  If you specifically look at the

20 wording in DSM-IV-TR as to when you can diagnose sexual

21 sadism, the -- the picture here -- the history is clear and

22 consistent with sexual excitement that is associated with

23 demeaning and controlling women.  And so urges and fantasies

24 count, and you do not need to have mutilated bodies, as one

25 of the defense expert indicated, in order to make the

1    diagnosis.  I -- I was more conservative in my assessment.

2            And I know that he has not had a hands-on victim

3    that was injured or -- or that there was physical evidence

4    of torture or things like that as you see in some extreme

5    cases of sadism.  I think that the difference between

6    sadistic features and sexual sadism is more on a continuum.

7    These are not specifically separate -- paraphilia NOS

8    nonconsent is not a separate diagnostic entity from sexual

9    sadism.  The difference is more a matter of degree than

10   kind.

11           And I -- I'm basing this thinking on the

12   literature and some current thinking about -- about the

13   phenomenon of sadism, and -- and the difference would be the

14   way that the statement should work.

15       Q.   So did I understand you to say that, basically,

16   there's a continuum between nonconsent -- paraphilia that

17   involves nonconsent and paraphilia that deals with sadism,

18   and he's -- it's your opinion that he's somewhere on that

19   continuum, and you draw him just the one side of the line of

20   sadism and Dr. Perkins draws him on the other side?

21       A.   It is true.  It is true.  I think she -- she

22   technically is correct and you can diagnose sexual sadism in

23   this case.

24       Q.   But you -- you thought it was more appropriate

25   and -- in your opinion, to say that it was nonconsent with

1   sadistic features?

2       A.   That is correct.

3       Q.   Okay.  Now, when you said he hasn't had any

4   hands-on victims that indicate torture -- is that what you

5   said?

6       A.   I did not have --

7       Q.   When you were saying he -- he's -- when you were

8   discussing sadism and you said you were not aware of any

9   hands-on victims where he used torture; is that correct?

10      A.   Or physical injuries, yes.

11      Q.   Okay.  Or physical injuries.  So your diagnosis

12  of -- this diagnosis stands just with the telephone calls?

13      A.   The diagnosis I gave stands with the telephone

14  calls, yes.

15      Q.   Now, you also say on Page 46 of your report that

16  it is undeniable that he suffers from telephone scatologia.

17           What is telephone scatologia?

18      A.   Telephone scatologia is one of the paraphilias

19  that are less typically encountered.  It's typically

20  diagnosed as paraphilia NOS, not otherwise specified.  It

21  involves repetitive obscene phone calls.

22           THE COURT:  Is it fed by the anonymity of being on

23  the telephone?  I mean, in the 19th Century, there were no

24  telephones.  You couldn't do this, right?  You had to look

25  at someone if you wanted to make those statements.

1           THE WITNESS:  It is true, Your Honor.  It is -- it
2   is fed by -- by -- there is a sexually deviant arousal
3   associated with the -- the discussion and disclosure of --
4   of sexually deviant fantasies.
5           THE COURT:  But that involves anonymity.  I mean,
6   you -- the person doesn't know who you are.  You don't call
7   them up and give them your Social Security number and then
8   engage in that -- that kind of behavior.
9           THE WITNESS:  Yes, that is true.  That is true.
10  That's correct.
11          THE COURT:  So that's a big factor in it, the
12  get -- getting away with it aspect?
13          THE WITNESS:  It is a factor, right.  In this
14  case, there was excitement -- sexual excitement associated
15  with the specific sexual questions of the woman as well as
16  the added element of violent threats.
17          THE COURT:  Yeah.  But you're able to hide behind
18  the telephone that's the whole raison d'etre of it, isn't
19  it?
20          THE WITNESS:  Yes, that is significant part of it.
21          THE COURT:  It's the entire part of it.  There's
22  no evidence that anybody stopped people in a shopping mall
23  and said those same things to them and stood there and
24  waited for their reaction.  Wouldn't happen, right?
25          THE WITNESS:  Yes.

1              THE COURT:  Yes, it wouldn't happen?

2              THE WITNESS:  It would not happen.

3              THE COURT:  Right.

4              THE WITNESS:  He does hide behind --

5              THE COURT:  Right.  So the telephone is the

6    essential ingredient?

7              THE WITNESS:  The telephone scatologia, it is.

8    The answer is yes.

9              THE COURT:  Okay.

10             BY MR. ACKER:

11        Q.   Now, you also diagnosed him with antisocial

12   personality disorder; is that correct?

13        A.   I did.

14        Q.   What is the definition of antisocial personality

15   disorder and how does that relate to Mr. Francis?

16        A.   Antisocial personality disorder refers to a

17   long-term and maladaptive pattern of functioning that is

18   markedly deviant from -- deviance from the expectations of

19   the culture of the individual.

20             It refers to what we consider as character

21   psychopathology.  It is evident in -- in -- in unique and

22   pathological ways of thinking relating to other people.  It

23   is typically evident -- first evident in the person's

24   teenage years.

25             THE COURT:  Well, everybody who's committed a

1   crime has antisocial behavior.  But for it to become a

2   disorder, it has to be more pronounced and more continuous.

3   So a large part of the people who receive sentences have

4   antisocial behavior disorder.

5           THE WITNESS:  That is true, Your Honor.

6           THE COURT:  We've been establishing that in all

7   these cases.

8           THE WITNESS:  We have -- about 66 percent of

9   people in prison have character diagnosis.  That is correct.

10          THE COURT:  And virtually everyone who's a 4248

11  detainee has, in addition to whatever else, antisocial

12  personality disorder.

13          THE WITNESS:  Not necessarily.  You don't see this

14  in all cases of pedophiles.  It depends.  There are a number

15  of criteria that need to be met.  Not everyone in prison

16  carries the diagnosis.

17          THE COURT:  No, but I'm saying everybody who has

18  this subset, of being a Adam Walsh detainee, more or less

19  has antisocial personality disorder diagnosis in addition to

20  whatever other diagnosis.

21          THE WITNESS:  Not everyone, Your Honor.  You don't

22  see this in cases of pedophiles we have considered under

23  4248.  You don't see it in quite a few rapist cases.

24          THE COURT:  Okay.

25          BY MR. ACKER:

1       Q.    Now, all of the diagnoses that you've just talked

2    about so far rely -- your diagnosis would stand regardless

3    of whether or not Mr. Francis committed the date rapes or

4    the stranger rape of Emily; is that correct?

5       A.    That is correct.

6       Q.    Now, did you take into consideration the

7    admissions that he made in treatment both with -- at Butner

8    and in Kentucky?

9       A.    I did.

10      Q.    And how did you take those into consideration?

11      A.    They informed of the way he thinks about the

12   world.  They were informative about his feelings and anger

13   about women.  They were consistent with the dynamics of

14   paraphilia and -- and anger at women.  They were consistent

15   with his history of problematic and toxic relationship with

16   his mother and with women.

17           So to that extent, I considered this supportive of

18   my impression and my diagnosis.

19      Q.    You talk in your report about a paraphilic mind.

20   Could you describe what you mean by a paraphilic mind?

21      A.    I refer to a person who has prominent deviant

22   sexual urges and preoccupations that you consider outside

23   the norm and that have a significant and disruptive impact

24   on their conduct.

25      Q.    And do you think that applies to Mr. Francis?

1          A.    I absolutely do.

2          Q.    Did you read the reports of Dr. Singer and Dr.

3    Plaud on this issue about the diagnosis that was appropriate

4    for Mr. Francis?

5          A.    I did.

6          Q.    And what was your reaction to their reports on

7    this issue of the proper diagnosis to give to Mr. Francis?

8          A.    I respectfully disagree with their impressions.

9    It's not clear to me whether they believe he has a

10   paraphilia now or not.  Dr. Singer does diagnosis telephone

11   scatologia.  Dr. Plaud says that maybe for a brief period of

12   time he had shown evidence of telephone scatologia.

13         I believe the evidence in this case is far

14   different.  He told me he had made thousands of phone calls.

15   He testified that he made hundreds of phone calls.  There's

16   a 12-year pattern -- prominent pattern of calling women and

17   a -- an ongoing recidivism the first time he has an

18   opportunity to do so.

19         This is not, I don't believe, a -- a brief

20   transitory period of time of making obscene phone calls.

21   It's been an absolutely firmly established pattern he has.

22   I don't believe that the credit that Dr. Singer and Dr.

23   Plaud give him for being in a community for seven months is

24   a sign that this condition is no longer in place.

25         I further respectfully disagree with Dr. Singer

1  assertion that there is no evidence of antisocial

2  personality here.  I believe that he meets that criteria as

3  delineated DSM-IV-TR from problems in childhood and

4  adolescence towards -- and on to the specific addition of

5  criteria that are needed to meet the diagnosis, trouble

6  conforming to the law, impulsivity, deceitfulness.

7       All these are present, so I believe that -- that

8  this condition is present and supported.  In that sense, I

9  disagree with Dr. Plaud and Dr. Singer.  I also think that

10  they did not consider the -- the additional elements of

11  specific threats of violence that have permeated these calls

12  with some people that he appears to have personal knowledge

13  of.

14       Q.   And the -- what does the DSM-IV say about whether

15  paraphilias tend to be chronic or acute problems?

16       A.   The belief is that sexual deviations are a chronic

17  and lifelong condition.  They might be -- may not be evident

18  every day.  Manifestations of paraphilia often are more

19  significant during times of stress or other destabilizers.

20  It is considered a chronic condition.

21       Q.   Did you see in the review of the records any other

22  periods of time in which Mr. Francis went several months

23  without making telephone calls?

24       A.   Yes, I did.  It's not completely clear.  It seems

25  there were a period of about five months or so, I think, in

1    1999 perhaps where he was out of custody or on probation and

2    was not making phone calls.

3         And so this -- there was a -- a -- I think a brief

4    window of time where -- where he did not, but he certainly

5    resumed doing so and more than once.

6    Q.   And so how does that five-month or so period of

7    time that he went without making the calls -- how does that

8    relate to the seven-month window that Dr. Singer and Dr.

9    Plaud rely on to say that he's no longer sexually dangerous?

10   A.   I don't believe that seven months of -- of

11   offense-free conduct is a sign that he's no longer

12   dangerous.

13        Furthermore, if you look at the literature that

14   followed the recidivism of individual with sexual deviation,

15   there isn't a single study that says that seven months of

16   follow-up is sufficient.  All of the studies in this area

17   employ follow-up periods of several years; five years, ten

18   years.

19        A study of the Department of Justice was

20   criticized for including a three-year follow-up period of

21   time.  There isn't a single study that would say that seven

22   months is an adequate follow-up period.  And I don't think

23   in this particular case -- we hear he recidivated so many

24   times and with thousands of phone calls and despite

25   conviction and treatment -- that the seven months argument

1    has any weight.

2              THE COURT:  Do you think he could be hypnotized

3    and given a suggestion to have a violent physical reaction

4    every time he heard the telephone ring or saw a telephone

5    and retard this behavior?

6              THE WITNESS:  I think it draws, Your Honor, from

7    his thinking and anger at women and from how -- how he goes

8    about meeting his needs in the world.

9              THE COURT:  I mean, we give people Anabuse to stop

10   them from drinking, right?  And when they take a drink they

11   get violently ill.  Is that not correct?

12             THE WITNESS:  Yeah.  There are attempts to -- to

13   treat alcoholism with this kind of -- of

14   counter-conditioning.  I'm not -- I'm not aware of treatment

15   of -- of obscene phone calls with this method.  There are

16   attempts -- there have been attempts to use

17   counter-conditioning in treating pedophiles.

18             THE COURT:  How widespread is this behavioral

19   abnormality of the telephone caller?  Is it a very, very

20   narrow subset or is it -- are there a lot of people who do

21   this?

22             THE WITNESS:  It's not common Your Honor.

23             THE COURT:  Like, one in a million or one in ten

24   million or one if fifty million or one in a hundred?

25             THE WITNESS:  I don't know the base rate for --

1  specifically for obscene phone calls.  I think in this case

2  it's extraordinarily --

3          THE COURT:  Intense?

4          THE WITNESS:  -- unusual given the velocity,

5  intensity and the juxtaposition of violent threats with

6  these specifically sexual phone calls.

7          THE COURT:  Some of the people who make phone

8  calls have no idea who the victim is and some are targeting

9  victims.  Isn't that the case?

10         THE WITNESS:  Could be.  It could be.  In this

11 case, it seems like he had personal knowledge of a few and

12 made lots of random calls to women he did not know.  So he

13 had both.

14         THE COURT:  Yeah, but it doesn't seem like the --

15 knowing who the person was was the driving force.  It was

16 making the call that was the driving force.  So it may have

17 just been a matter of convenience that he happened to know

18 some of the people.  The -- the real point was internally to

19 make the call.

20         THE WITNESS:  The real point was to scare the

21 woman, to get sexually excited, to control the woman, to

22 give her the instructions that he enjoyed giving.

23         To terrorize the woman, as he had said yesterday,

24 and to scare her, that was associated with sexual arousal

25 judging from the specific sexual questions and instructions

1    that -- that he made in the calls.  The instructions to a

2    woman to stick a -- a hairbrush in her vagina, the questions

3    about your bra size, have you had sex today, are you a

4    virgin; specific --

5            THE COURT:  Where did -- this information came

6    from him when he was talking to the polygraph examiner?

7            THE WITNESS:  Not just from him.  It's also --

8            THE COURT:  Just from him, not from any victims?

9            THE WITNESS:  No, Your Honor.  It's documented in

10   the PSR.

11           THE COURT:  Yeah.

12           THE WITNESS:  Not just -- I mean, he also

13   confirmed this.  But even if he -- if we disregard what he

14   had said --

15           THE COURT:  It's all self-confession, though.

16   There's no external collaboration.

17           THE WITNESS:  My understanding, Your Honor, that

18   there's information in the PSR of 2004 from the victims --

19           THE COURT:  Uh-huh (yes).

20           THE WITNESS:  -- and or from him.

21           THE COURT:  Okay.

22           BY MR. ACKER:

23      Q.   And -- and, in fact, Dr. Malinek, on that last

24   point, the -- the information in the PSR was very specific

25   from the victims about exactly what he said.  Isn't that

1   right?

2        A.   Verbatim quotes.

3        Q.   And that the -- the things about the hairbrush and

4   the other things that you just mentioned all came from the

5   victims' statements, not only from Mr. Francis; is that

6   right?

7        A.   I think it looks like there was a portion of the

8   recording that is -- that is mentioned in the PSR 2004 or a

9   verbatim report from a woman given word for word.  It says

10  that she's crying and then he tells her, "If you call the

11  police, I will kill you."  I mean, all those specific

12  threats of violence -- don't hang up the phone and so forth.

13  It looks like either a recording or a verbatim statement

14  provided by the woman.

15       Q.   Now, moving along to the issue of evaluating risk,

16  or the third prong, which is whether or not that Francis

17  will have serious difficulty refraining from further

18  sexually violent conduct if he's released, what was your

19  opinion about whether or not he has -- will have serious

20  difficulty refraining from further violent sexual conduct?

21       A.   My feelings that he would.

22       Q.   And what is the basis for your opinion?

23       A.   I looked at the totality of the database in this

24  case.  I considered a number of actuarial instruments that I

25  utilize in assessing recidivism, specifically --

1      Q.    Now, are you -- go ahead.  Go ahead.

2      A.    And I interviewed him, and, obviously, I listened

3   to him yesterday.

4      Q.    Well, let's talk first about the actuarial

5   instruments.  Which actuarial instruments did you use?

6      A.    Used total of four.  I used initially Static-99,

7   which is now called Static-99R.  I used Static-2002, which

8   is now called Static-2002R for revised.  I used the

9   MnSOST-R, the Minnesota risk assessment screening tool

10  and -- I used five.  I'm sorry.

11          After I had an opportunity to evaluate him and to

12  see him on August 18, I considered the results of the

13  Psychopathy Checklist Revised and I used a relatively new

14  measure for assessing dynamic risk factors that's called

15  SRA-FV -- it stands for Structured Risk Assessment Forensic

16  Version -- that was put out by the group of Dr. Thornton and

17  that allows a more accurate assessment of which normative

18  data to use while assessing recidivism.

19          THE COURT:  All of this is in your reports, right?

20          THE WITNESS:  It is in my reports, Your Honor.

21          THE COURT:  Okay.  We'll leave it in the reports.

22  Get to the point and tell me what your conclusions were

23  based on this testing.

24          THE WITNESS:  I think that the totality of the

25  database, Your Honor, is such as that he would have

1   difficulties refraining from sexually violent conduct.  The

2   scores he has on the actuarial instruments are consistently

3   high.

4           I used the high risk or high need reference group

5   in -- in trying to calibrate the risk.  The -- employing the

6   newest measure by Dr. Thornton indicated this is the correct

7   database to use in his case.

8           THE COURT:  Well, now, if he's never had --

9   assumedly, he's never had a hands-on sexual crime.  How

10  could he have a future predictability of a hands-on sexual

11  crime?

12          THE WITNESS:  The -- he had -- the obscene phone

13  calls are considered a sexual offense.

14          THE COURT:  Uh-huh (yes).

15          THE WITNESS:  They're coded in the -- in the

16  instruments.  They're specifically mentioned as --

17          THE COURT:  So you think he's going to recidivate

18  by having more obscene phone calls?

19          THE WITNESS:  Either phone calls or hands-on

20  violent offenses.

21          THE COURT:  But there isn't any history of

22  hands-on violent offenses.

23          THE WITNESS:  There's a history of -- of --

24          THE COURT:  No prosecution.

25          THE WITNESS:  He was not prosecuted.

1           THE COURT:  Right.  It's self-confession.

2           THE WITNESS:  He was criminally investigated in

3     2001 and the confessions he made on two separate occasions.

4     And he was investigated in -- in the Emily case in

5     Poughkeepsie, New York.

6           THE COURT:  So to what extent are you relying on

7     his self-confession?

8           THE WITNESS:  I think that his report in 2009

9     regarding the 2001 rape is remarkably and strikingly

10    congruent with the details provided by the woman.

11          THE COURT:  Incongruent?

12          THE WITNESS:  Completely congruent, Your Honor.

13          THE COURT:  Congruent; consistent with?

14          THE WITNESS:  Totally consistent.  Specifically,

15    details, timing, how old he was, the fact the police was

16    called, this was his more serious crime, the sequence of the

17    sexual offenses, what he did; initially forceful oral

18    copulation and then rape and that he had stuck the

19    Leatherman tool that he had and threatened with that.

20          There's remarkable congruence in this particular

21    incident between what he said and what she said, even though

22    he was not convicted of the crime.

23          THE COURT:  He wasn't arrested for the crime.

24          THE WITNESS:  He was not arrested for it either.

25          THE COURT:  Right.  Okay.

1          BY MR. ACKER:

2          Q.    Specifically, on the Static-99, what was the score

3     that he received?

4          A.    Score of ten.

5          Q.    How -- how does that relate to the scores of other

6     sex offenders?

7              THE COURT:  Well, that's at the top end.  I mean,

8     it would be hard to get a higher score, wouldn't it?

9              THE WITNESS:  It would be, Your Honor.

10             THE COURT:  Yeah.

11             THE WITNESS:  That is a high score.

12             THE COURT:  Yeah, I understand that.

13             BY MR. ACKER:

14         Q.    What -- what percentile is that among all sex

15    offenders?

16         A.    Ninety-ninth percentile.

17         Q.    So only one percent of sex offenders would score

18    higher than that?

19         A.    That is correct.

20         Q.    Now, you also scored him on the 2002R?

21         A.    I did.

22         Q.    And what was his score on that?

23         A.    It's ten.

24         Q.    And where does that fall on the percentile?

25         A.    The same.

1     Q.   And then you said you -- you applied those to --
2  let's go back to the Static-99R.

3          THE COURT:  Doesn't that show how subjective and
4  unreliable the Static-99 is?  I mean, child molesters come
5  in with scores of -- with -- with historic convictions,
6  multiple historic convictions come in with scores of six,
7  seven typically.

8          And here you have a person whose criminal history,
9  if any, is all reliant on his own self-confession during
10  therapy, when he had no foreseeable expectation that he
11  would be Adam Walshed and detained civilly.  And that's the
12  entire nexus within which you're basing this Static-99.

13          THE WITNESS:  But, Your Honor, the various
14  dimensions and elements comprise the Static-99.  There are
15  ten different risk factors.

16          THE COURT:  Yeah.  I've read it.

17          THE WITNESS:  And the -- there's not just the --
18  the index offense or the -- the specific reason he's in
19  custody.  There is -- other elements of risk included
20  threats of violence, nonsexual violence, his age, the type
21  of victims that he targets.

22          I mean, there's certain variability in the scores,
23  certainly, for pedophiles as well.  The scale heavily relies
24  on detection.  That's one of the problems with the
25  Static-99, that it really requires that you rely only on the

1   technical officially recorded offenses.

2          We do know that most sexual offenses are

3   undetected or not reported.  One out of six rapes get

4   recorded.  So by definition, it is an underestimation of

5   recidivism by a degree, a certain degree.  There's debate as

6   to how much it underestimates, and one needs to look at a

7   specific case and the elements of the scoring to assess

8   this.

9          THE COURT:  Yeah.  Thank you.

10         BY MR. ACKER:

11    Q.   Well, Dr. Malinek, let me clarify.  The score that

12   he got on the Static-99R, did that have anything to do with

13   his self-reporting of these date rapes or of the rape in

14   2001?

15    A.   It did not.

16    Q.   So the Static-99 does not take those

17   self-admissions into account at all?

18         THE COURT:  So -- so all of the behavior of the

19   obscene phone calls?

20         THE WITNESS:  Obscene phone calls and threats of

21   violence.

22         THE COURT:  Any obscene phone calls?

23         THE WITNESS:  In -- in juxtaposition to the phone

24   calls, that is correct.

25         THE COURT:  Contained within the phone calls?

1          THE WITNESS:  Yes.

2          THE COURT:  That's -- the threats are a component

3   of the phone -- of all the phone calls?

4          THE WITNESS:  Normally, threats of violence are

5   not part of obscene phone calls.  They are in this case.

6          THE COURT:  Uh-huh (yes).  Okay.

7          BY MR. ACKER:

8      Q.   Now, in -- in evaluating the Static 99, you did --

9   in determining whether or not there was violence or

10  nonviolent threats or sexual threats or nonsexual threats,

11  you did rely, did you not, on the statement of the victims

12  as reflected in the PSRs?

13     A.   Yes, I did.

14     Q.   Okay.  But the Static 99 is just about the

15  telephone calls.  You did not -- that instrument did not

16  take into account his self-reporting.

17     A.   No.  This instrument does not consider

18  self-reporting; does not.

19     Q.   Okay.  So even without examining those, he came in

20  with a very, very high score?

21     A.   It's a high score.  That is correct.

22     Q.   And did you have a chart on page -- if you could,

23  look on Page 56 of your report.

24          Did you summarize the three -- three of the

25  instruments that you used:  the Static-99R, the Static-2002R

1   and the MnSOST-R?

2        A.   I did.

3        Q.   And the five- to seven-year risk of offense for

4   those three instruments, what does that show actuarially

5   that -- people that have similar characteristics to him --

6   the group that has similar characteristics to Mr. Francis,

7   what does it show their -- that group's rate of recidivism

8   is after five to seven years?

9        A.   The five -- five-year recidivism estimates of

10  the -- of people who have similar scores on the Static-99R

11  is 59.7 percent.  The ten-year risk is 68 percent.  Similar

12  numbers for the Static-2002R:  55 percent five-year

13  recidivism estimate and 64.6 percent recidivism estimate,

14  ten years.

15            The score on the MnSOST-R was lower and that is

16  associated with a six-year -- the follow-up time window on

17  the MnSOST is six years.  It was 30 percent.

18            Thirty percent in the MnSOST-R refers to

19  recidivism estimates if the person is under tight community

20  supervision.  The author of the scale indicates that the

21  scores on the estimates are much higher if -- without

22  community supervision.

23            I think the original numbers for scores nine

24  and -- and -- and scores between nine and twelve, I believe,

25  was 57 percent for recidivism without or when you do not

1    have a conditional release requirement of supervision.

2        Q.    And what's your understanding of how much

3    supervised release time Mr. Francis still has?

4        A.    Very little.

5        Q.    About a year?

6        A.    About a year and no intention to comply.

7        Q.    Did you talk to him about his -- when you

8    interviewed him about his intention to comply with

9    supervision?

10       A.    Yes.

11       Q.    What did he say?

12       A.    He said he's -- he would rather do his time in

13   custody, that he does not wish to be under conditional

14   release of any kind.  He was very up front about it.  Same

15   tone as yesterday here.

16            THE COURT:  Would you hold that against him?

17            THE WITNESS:  I don't hold it against him, Your

18   Honor, but I think that his presentation and his statement

19   clearly speak to his state of mind for --

20            THE COURT:  You -- you know what?  I -- I don't

21   have the specifics with me, but I think I'm within bounds.

22   When he got revoked by the federal judge last time, I think

23   he said to his lawyer, "Is this going to result in my being

24   Adam Walshed?"

25            And they said, "No.  No.  You'll be okay.  This is

1    just the revocation." And, of course, that's untrue. Here

2    he is today.

3            And so the skepticism about outcome is not

4    unforeseeable given the reality of it and the fact that he,

5    I think, had the due diligence to say, you know, "Before I

6    admit to this and before I get adjudicated, I need to know

7    what the consequences are going to be," and they said, "Oh,

8    there aren't going to be any consequences." And then, you

9    know, three years later, you're in a federal courtroom.

10           THE WITNESS: I understand, Your Honor. I was

11   thinking more about his historical attitude towards

12   probation and conditional release all the way back to 1998.

13           THE COURT: I was thinking about the last time it

14   happened. Okay.

15           BY MR. ACKER:

16   Q.    Dr. Malinek, did I understand your testimony

17   correctly that the MnSOST-R -- when it discusses the

18   recidivism rate, the 30 percent relates to people who are on

19   close community supervision and that the rate would be

20   higher if the person is not on close community supervision?

21   A.    The original recidivism rates were higher and were

22   revised based on information about the client base rates.

23   And Dr. Epperson, who was the author of the scale, draw this

24   kind of a -- attempts to draw this kind of a differentiation

25   between people who are tightly supervised and those who are

1    not.

2        Q.    Now, just for the record, there were a couple of

3    places in your written report where you referred to a Mr.

4    Douglas.  Were those typographical errors?

5        A.    Two typos there.  Yeah, there are two typos where

6    I said Mr. Douglas.  That is incorrect.  It has to be Mr.

7    Francis.  That's a typo.

8        Q.    I just wanted to correct that for the record.

9            THE COURT:  Suppose instead of sexual addiction he

10   had a substance addiction, like alcohol or drugs, and they

11   said to him, as part of your punishment, you have to go to

12   therapy and you have to go to AA meetings or NA meetings.

13           And he goes to the meeting and they say, "Hi.

14   What's your name?"

15           And he says, "My name is Bob."

16           And they say, "Are you an alcoholic?"

17           "No, absolutely not."

18           They say, "Well, you know, you're not eligible for

19   participation because we only deal with people who are

20   trying to recover.  And if you haven't hit that point yet,

21   then you need to take off."

22           Isn't that similar to what's going on here with

23   this sexual therapy, that if you don't admit that you're a

24   sexual predator or sexual deviant, they don't want you in

25   the program because the program's only for people who admit

1    it?

2            THE WITNESS:  I don't believe that that's the way

3    they construct the program, but, Your Honor, taking

4    responsibility for your crime is an essential part in all of

5    the sex offender community programs.

6            THE COURT:  But he wasn't being treated for the

7    telephone calls.  He was being treated for some other sexual

8    crime.  And he had to create those crimes, he says.

9            THE WITNESS:  That is what he has claimed that

10   this is why he did not fit the program.  His creditability

11   is very suspicious, Your Honor.

12           THE COURT:  You think he's a malingerer or a

13   manipulator?

14           THE WITNESS:  I think he's a pathological liar

15   based on statements, yes.

16           THE COURT:  Was he lying when he said "I did all

17   these things" in the past or was he lying when he said on

18   the stand that I didn't do them?

19           THE WITNESS:  I think he exaggerates.  He has

20   the -- it is difficult to -- I think I -- you have to -- I

21   don't believe everything that he says.  I look for external

22   and additional corroboration.

23           THE COURT:  Well, that's a two-edged sword,

24   because it's what he said that got him in this trouble.

25           THE WITNESS:  But what he said --

1           THE COURT:  I mean, when do you -- when do you not

2    believe him?  Do you not believe him here in the courtroom

3    or do you not believe him when he's being videotaped?

4           THE WITNESS:  I don't know if that's a -- a --

5    everything he's telling is a -- is a lie, Your Honor.  I

6    don't believe that everything he had said is a lie.

7           THE COURT:  But how do you -- how do you pick and

8    choose?

9           THE WITNESS:  I looked for what -- what he had

10   said and what additional corroboration fits with what we

11   know, what was available, what we know about the phenomenon.

12          I specifically look at what he said about the 2001

13   incident that matches so strongly with what the woman had

14   reported and what he said about his own attitudes towards

15   women and why he made these phone calls that we know to be

16   consistent with paraphilia.

17          THE COURT:  Well, if we can't believe anything

18   that he says ever, all of the proof has to be external then.

19   It has to be independent of him.

20          THE WITNESS:  Has to be corroboration.  It has to

21   match with what we know and --

22          THE COURT:  Not -- corroboration has to be

23   completely independent of him.  Its source and its content

24   has to be external to him.  If -- if he's a pathologic liar

25   who never, irrespective of what's asked, tells you the

1    truth, then his testimony had no value at all.

2              THE WITNESS:  Well --

3              THE COURT:  Whether it's incriminating or

4    exonerating.

5              THE WITNESS:  I tried to differentiate stuff that

6    he had -- he said and look for what was consistent.

7              THE COURT:  Thank you for the answer.

8              BY MR. ACKER:

9         Q.   Now, did you prepare a revised report?

10        A.   I did.

11        Q.   Or a supplemental report?

12        A.   Yes, I did.

13        Q.   And why did you do a supplemental report?

14        A.   I was not given an opportunity to interview him

15   initially and I was told that I can't see him.  And his

16   attorney had agreed to the interview, so I saw him on August

17   18th at Butner.

18        Q.   And is Exhibit 45 your supplemental report?

19        A.   Just a second, please.  (Witness examines

20   document.)

21             Yes, it is.

22        Q.   Did -- describe the interview that you had with

23   Mr. Francis.

24        A.   He was alert.  He understood the purpose of the

25   interview.  He was very informed and intelligent about the

1    proceedings.  He told me that he had, you know, read my

2    report and the other reports and that he does not agree with

3    anything that I'd written; that I've taken things out of

4    context to lock him up.  He was unusually angry and defiant

5    throughout the interview.

6            Historical information he provided about his

7    background was largely similar to the one that I had in the

8    records.  When I specifically asked him about verbatim

9    quotes offered by the victims, he stated that this is a lie.

10   The women lied, this never happened.

11        Q.   So -- so I need to just make sure I understand

12   what you just said.  You confronted him with the reports of

13   the victims of the telephone calls from the PSR?

14        A.   That is correct.

15        Q.   And these were things that he had pled guilty to?

16        A.   That is correct.

17        Q.   And he said, "No.  She's lying.  I never said

18   those things"?

19        A.   That is correct.

20        Q.   All right.  What else do you recall about the

21   interview that you had with him?

22        A.   He insisted that -- that he was just venting his

23   anger.  That he is -- he suffers from -- was diagnosed with

24   obsessive-compulsive disorder and that the only medication

25   that helped him ever was Luvox, a psychotropic medication

1    used in treating anxiety disorders, and that he was -- has

2    had a very long association or relationship with -- history

3    of psychotherapy with people in my profession.  The way he

4    described it then, that it was not helpful to him.

5           He discussed the early history and the facts of

6    the divorce of his parents and his relationship with his

7    mother is a significant factor.  He said he had 60 to 80

8    sexual partners, denied any sexually deviant urges or

9    conduct.

10      Q.   Now, did you have the opportunity to do any

11   further testing or evaluation of -- I think you mentioned

12   that you used a total of -- of five actuarial instruments?

13      A.   I did.  I had an opportunity for an interview.  I

14   studied him on the psychopathy checklist.  That's a measure

15   of psychology developed by Robert Hare.  And I also employed

16   the SRA-FV, the Structured Risk Assessment Forensic Version,

17   to perhaps more -- more appropriately or more -- or an

18   additional assessment of which reference group to use from

19   the actuarial instruments to assess his recidivism.

20      Q.   And what is your -- what was your conclusion about

21   his level of psychopathy?

22      A.   I scored him in the moderate range of psychology.

23   I think I -- I underscored him, certainly given his

24   presentation yesterday on several of the dimensions of

25   psychopathy that are tapped by the scale.  And he received a

1    score of 3.475 on the -- on the measure on the SRA-FV which

2    is consistent with the placement in the -- in the high risk

3    offenders or in what the authors refer to as offenders who

4    have high needs and a -- are typically requiring a placement

5    in an intensive treatment programs to avert recidivism.

6        Q.   And did you also go back in your supplemental

7    report and discuss some of the factors that the Code of

8    Federal Regulation says mental health professionals may

9    consider in evaluating the potential risk of reoffense?

10       A.   I did.  I went line by line.  Went to the CFR to

11   look at the elements of risk and how risk is assessed

12   according to the CFR and summarized the content on my view

13   of where he is in that regard.

14       Q.   And those comments are on Pages 11 and 12 of your

15   supplemental report, Exhibit 45?

16       A.   Yes, it is.  They are.

17       Q.   Okay.  After doing the evaluation of him at

18   Butner, your interview of him, and these additional tests

19   that you did, did it change your opinion at all either about

20   your diagnosis of Mr. Francis or about your evaluation of

21   his risk of -- of recidivating?

22       A.   It did not.

23       Q.   Did it affect it at all?  Did it -- did it

24   strengthen your opinion?

25       A.   It reinforced my opinion about dangerousness, his

1  presentations, his anger, his defiance, lack of amenability

2  to treatment.

3       Q.   Now, were you in court yesterday to hear Mr.

4  Francis's testimony?

5       A.   I was; of course.

6       Q.   And did hearing him affect your opinion about his

7  diagnosis and his serious difficulty in refraining -- did

8  that affect your opinions and how?

9       A.   It did not.  It strengthened my opinion.  His

10  presentation, the way he spoke, the undeniable anger, the

11  efforts to control the courtroom, the utter lack of empathy,

12  the way he says in the same sentence that he terrorized and

13  scare the women but he had no victims, zero empathy.

14       Expressions of attitudes and thinking patterns

15  that -- that sees -- see him as entitled to act on whatever

16  he wants, the perception that rules and laws do not apply to

17  him.

18       He doesn't have any intention to comply with

19  probation; not recently, not previously.  So none of this

20  allays concerns.  I think it indicates that he has a higher

21  score on the psychopathy checklist, has a -- a significant

22  view of himself that's -- that's -- that's grandiose,

23  self-indulgent --

24            THE COURT:  Narcissistic?

25            THE WITNESS:  Narcissistic.  Has no regard for

1    laws.  No remorse whatsoever.  I think that this is his way

2    of -- of how he sees himself as unique.  That he is not

3    about complying with rules.  They do not apply to him.  It

4    is the government's problem.  The treatments fail again and

5    again.  It's not his problem.

6            I think that the combination of thinking patterns

7    that are conducive to violence, his kind of history, the

8    undeniably sexually deviant conduct, content of the calls,

9    the zero empathy.

10           BY MR. ACKER:

11      Q.   And how do those things, the psychopathy and the

12   lack of empathy, how do they relate to sexual conduct?

13      A.   I think that the way people think mediate their

14   conduct.  How we think are trajectories to -- to what we

15   feel is appropriate and legitimate.

16           If somebody believes that they are entitled to act

17   on what they want and what their urges are, then -- then

18   they're going -- much more likely to go ahead and do this.

19   If somebody's on the stand here showing zero empathy and

20   remorse, it tells you how they think about the consequences

21   of their actions.

22           He makes no qualms about this, and he's not trying

23   to convince anybody that he has changed even when he's here

24   on the stand before the court.  So he says pretty much how

25   he thinks and where he is.  I think when you take this in

1  consideration, in conjunction with anger that he's always

2  had in his life well before he was considered for

3  certification under 4248 -- this is not anger just is

4  present because he's in custody and has lost two years of

5  his life.  It is a very significant part of his personality.

6  I don't think that this is going to go away if he walks out

7  of the courtroom.

8      Q.   And that lack of empathy and the psychopathy, how

9  does that relate to the specifics of the telephone calls

10 that he made?

11     A.   It is consistent with that.  He -- he says, "I

12 terrorized and scared these women, but I had no victims.

13 He's in the deposition with your office specifically on the

14 record stating, "How could I have empathy for victims I do

15 not have?"

16         When you asked him about it, I think he repeats

17 the same statement again and again.  So that's pretty clear

18 by now that he has no empathy.  I wonder if he has capacity

19 for empathy given that he's emphasized it so many times.  It

20 is related to the conduct in the sense that he had no

21 appreciation of the impact of his calls.

22         You can make quite a bit of damage by calling

23 women for three minutes and telling them that you're

24 watching them or following them, that you'll kill them,

25 going to murder them, you know where they live and who they

1  are.  I don't know that it needs to be a very long call to
2  have an impact on a victim.  That, in my mind, makes him
3  dangerous.
4      Q.   Is this -- these -- the paraphilia that you
5  diagnosed him with, the psychopathy, the lack of empathy --
6  these things, are they also consistent with his self-reports
7  of these date rapes?
8      A.   They totally are.
9      Q.   And how so?
10     A.   I mean, he's specifically on the record stating
11 when he was asked -- I don't remember; it was in the
12 deposition maybe -- why he did this.  He says anger at my
13 mother, anger at women, frustration, obsessive-compulsive
14 disorder.  He lists -- gives you right then and there the
15 components of the disturbance.  It is commonly believed that
16 a common dynamics in paraphilia is anger at women and the
17 juxtaposition of anger at women with sexual arousal, which
18 is exactly what we have here.
19          So what he did with the phone calls -- just what
20 the victims say of what he says is very consistent with what
21 he says and his own explanation as to where this comes from
22 in him -- inside of him.  It gives it more credence.
23     Q.   In one of the letters that you cited in your
24 report and that we looked at in court yesterday, he said he
25 wants to live life his way; is that right?

1        A.    Yes.

2        Q.    And is that also consistent with his self report

3    of these date rapes, that if he got the sex consensually,

4    fine, but if he didn't, he was going to take what he wanted?

5        A.    It is consistent with his presentation yesterday

6    about how he -- how he is -- how he is in the world and how

7    he wants to live.  I think the answer's yes.

8        Q.    And is -- are these features that you've talked

9    about with him -- the paraphilia, the -- the lack of empathy

10   and the psychopathy, are those also consistent with his

11   report of the rape of Emily in 2001?

12       A.    It certainly is.  A stranger, threats, pushing a

13   hard object against her, absolutely.  I mean, it was more

14   the ,details I think, that he gave on that -- in the -- in

15   the interview that were very consistent and congruent with

16   what she said.

17            THE COURT:  Does he have trouble with his gender

18   identity?

19            THE WITNESS:  I don't think so, Your Honor.

20            THE COURT:  You don't.  I mean, yesterday he

21   talked about that he relates better to women than men, which

22   doesn't, you know, matter, but all of his victims are women.

23   It's all pushed down.  It's all weaker versus stronger and

24   he's not -- I mean, I've -- I haven't heard that he had any

25   fights with guys, you know, or that he's a stand-up kind of

1   guy or combat kind of guy.  It -- it's all taking advantage

2   of people who he can bully, basically.

3          Is there any truth to that observation?

4          THE WITNESS:  I don't know that it has to do so

5   much with gender identity, Your Honor, as it is discussed.

6   It has to do with his relationship with women, the pursuit

7   of women and not taking no for an answer, the -- the arousal

8   to nonconsent, the excitement that he takes in scaring the

9   women and controlling her.

10         THE COURT:  Well, he doesn't exhibit any violence

11  against men --

12         THE WITNESS:  He does not.

13         THE COURT:  -- is what I'm saying, you know.  I

14  mean --

15         THE WITNESS:  It's all in his relationship with

16  women.

17         THE COURT:  Yeah.  Well, isn't that a form of

18  bullying and being a predator and not -- not interacting

19  with your peers in your own age group or force group?

20         THE WITNESS:  It is, Your Honor.  I totally agree.

21  These are the dynamics of power rapes, of taking advantage

22  of women, of pursuit of self-indulgent in the sexual realm,

23  of -- of seeing women as sexual objects only.

24         He's not interested in a -- in a relationship and

25  never had one.  So it is bullying women in the sexually

1 deviant way, yes.

2          BY MR. ACKER:

3     Q.   Dr. Malinek, the final conclusion that you gave in

4 your initial report was, "Based on the above information,

5 it's my opinion that Mr. Francis meets the criteria of a

6 sexually dangerous person as described in 18 USC Section

7 4248."

8          Was that your opinion at the time you gave your

9 report?

10    A.   It was.

11    Q.   And is that still your opinion today?

12    A.   It is.

13    Q.   And is that to a reasonable degree of professional

14 certainty?

15    A.   It is.

16         MR. ACKER:  All right.  I have no further

17 questions.

18         THE COURT:  Does the detainee's counsel -- do you

19 want to ask any questions?

20         MR. HAWES:  Very briefly, Your Honor.

21         THE COURT:  Go ahead.

22 **CROSS-EXAMINATION BY MR. HAWES:**

23    Q.   Good morning, Dr. Malinek.

24    A.   Good morning.

25    Q.   Initially, in your reports and your update to your

1    report and today, you said that you've diagnosed Mr. Francis

2    with paraphilia NOS nonconsenting victims with prominent

3    sadistic features; is that correct?

4        A.    It is correct.

5        Q.    But on your -- in the deposition on August 31st of

6    this year, didn't you say that the more accurate diagnosis

7    would be paraphilia NOS telephone scatologia?

8        A.    With telephone --

9        Q.    With --

10       A.    -- with telephone scatologia.  That is correct.

11       Q.    So the scatologia would be the more correct

12   diagnosis, not the nonconsenting victims is what you said at

13   the deposition; is that right?

14       A.    The diagnosis is probably -- it is paraphilia NOS

15   nonconsent.  It's got different manifestations.  One of them

16   is telephone scatologia.  That is correct.

17       Q.    Well, I'll read for you what you said in the

18   deposition.  It's on Page 44, if you have it.

19       A.    Say what?  What exhibit are you in?

20       Q.    I'm looking at your deposition.  It's on Page 44

21   if you have that.

22       A.    I'm looking for it.

23       Q.    I'll just read it for you.

24       A.    Okay.

25       Q.    It's -- the question is, "And so you think that

1    the severe mental disorder that he's currently suffering

2    from is paraphilia NOS scatologia.  Am I understanding you

3    correctly?"

4            "Scatologia.  Yes, I do.  I do."

5       A.   Yes.  I said that, yes.

6       Q.   So it's not the nonconsenting?

7       A.   Telephone scatologia is part of nonconsenting.

8       Q.   Okay.

9       A.   It is.  The victims are nonconsenting, obviously.

10      Q.   And yesterday, we spent a significant amount of

11   time on the 2009 polygraph.  And at your deposition, you

12   said that the fact that he passed the polygraph in 2009

13   doesn't carry a lot of weight with you; is that correct?

14      A.   It does not.  Didn't take every word as -- as a --

15   as for the fact as true.

16      Q.   Right.  And you said that you didn't believe that

17   him passing the polygraph meant that he had 27 victims --

18      A.   That's correct.

19      Q.   -- or that any of the victims were real?

20      A.   That is correct.  That's correct.

21      Q.   In the deposition, you said, in fact, that with

22   the exception of the alleged rape of Emily in 2001, you

23   don't think that any of the 27 offenses occurred.

24      A.   I don't recall that I said that none of them

25   occurred, but I didn't buy every word he said.  Absolutely.

1    Q.   I asked you, "So how do you determine" --

2         MR. ACKER:  What page?  I'm sorry.

3         MR. HAWES:  This is Page 23 of the deposition.

4         BY MR. HAWES:

5    Q.   I asked you, "So how do you determine which of

6    these attempted rapes and sexual assaults that you believe

7    really occurred and which ones that you just made up?"

8         You said, "Like I testified earlier, I believe

9    that the 2001 rape of Emily, which has some

10   cross-corroboration not only by his statements but by the

11   police department, probably took place.  I don't consider

12   all the other victims that he has acknowledged to be real

13   victims.  I don't know is my answer."

14        I said, "Are there any other victims besides the

15   victim in the 2001 rape where there's supporting evidence of

16   a sexual assault or rape conviction occurred?"

17        You said, "The answer is no."

18        And I said, "And so you believe those -- those

19   actually existed?  Do you take those other victims into

20   account or you don't take them into account at all?"

21        You said, "I don't think they occurred."

22        And you kind of flip-flopped on what you've taken

23   into consideration in your diagnosis of Mr. Francis.  Today,

24   you're saying you only took into account the phone calls; is

25   that correct?  Did I understand --

1      A.   The diagnosis is based on the phone calls, the

2  totality of information in this case.  I did not assume

3  facts that were not in evidence.

4      Q.   At the deposition, you said you did consider the

5  rape of Emily.

6      A.   I said that it looked like it likely occurred is

7  what I said.

8      Q.   I think your exact words were probably took place.

9      A.   Probably took place.

10     Q.   Probably is not clear and convincing evidence; is

11  it?

12          MR. ACKER:  Objection.  Calls for a legal

13  conclusion.

14          THE COURT:  Sustained.

15          BY MR. HAWES:

16     Q.   And you didn't go to -- to a psychology program

17  that teaches you how to determine guilt from innocence, did

18  you?

19     A.   No.

20     Q.   In her deposition, Emily admitted that she was

21  drunk, didn't she?

22     A.   She did.

23     Q.   And, in fact, that she had been bar-hopping for at

24  least seven straight hours?

25     A.   That's correct.

1     Q.   Her boyfriend also told investigators the next day
2     that she immediately passed out when she got home, didn't --
3     didn't he?
4     A.   Yes.
5     Q.   And the allegation was thoroughly investigated.
6     You've seen the investigation records, haven't you?
7     A.   Yes.
8     Q.   And Sean was never charged, arrested?
9     A.   He was not charged with a crime.
10     Q.   And Emily didn't bring a civil suit either, did
11     she?
12     A.   She did not.
13     Q.   Now, today and in your reports, you made a big
14     deal of this lack of remorse.  You've said today that he has
15     no remorse whatsoever and he has an utter lack of empathy.
16     And you point to when he says "How can I have victims
17     for" -- what -- what's the quote that you said?
18     A.   I think he said, "How could I have empathy for
19     victims I don't have" in the same breath with "I terrorized
20     these women."
21     Q.   Right.  And in your updated report at Page 11, you
22     say, "As noted earlier, Mr. Francis has minimized and denied
23     the severity of his crimes.  Specifically, in his deposition
24     and in this case two months ago, he communicated what looks
25     like a firm belief that his crimes were victimless.

1          "Specifically, when the government's lawyer asked

2     him about a report that indicated that he does not give a

3     shit about his victims, Mr. Francis -- Mr. Francis's initial

4     response was 'I am not sure I said that or not.'  He then

5     said, 'How do you show empathy for victims that's not there?

6     How can I feel remorse and shed tears for victims that I

7     don't have?'  He reiterates that belief again minutes later,

8     saying, 'How do you have empathy for a victim you don't

9     have?'

10          "Specifically, the inability to appreciate the

11    harmfulness of his conduct reduces the chance he will take

12    precautions to avoid reoffense or even comply with

13    conditions that are placed on him for this purpose."

14         A.   Yes

15         Q.   But aren't you taking his statements out of

16    context here?  Didn't he say yesterday that he was sorry for

17    everything he did and that he knew that he had hurt these

18    victims and he felt a lot of remorse?

19         A.   He made the statement.  He told me in the

20    interview that he would cry after the phone calls, but that

21    obviously had no -- no containing impact on him whatsoever,

22    for he has immediately done this again.

23         Q.   When he said he doesn't give a shit about his

24    victims, he was referring to the victims that he made up,

25    was he not?

1           He wasn't referring to these phone calls.  He's

2    shown that he's remorseful for those.

3        A.    I don't know what he was referring to in response

4    to Mr. Acker's question at the deposition specifically.

5        Q.    Well, let's look at the deposition, Page 80 of --

6    this is Mr. Francis's deposition, Page 80.

7           And on that page, he's talking about the job that

8    he took while he was out in 2009.

9        A.    I'm sorry.  Can you refer me to the appropriate

10   exhibit?

11          MR. ACKER:  It's not an exhibit?

12          MR. HAWES:  No.  It's his deposition.  I was just

13   reading from his deposition.

14          BY MR. HAWES:

15       Q.    You read that, didn't you?

16       A.    Of course, I did.

17       Q.    He said, "I then took a second job.  I was getting

18   a second job.  The economy, much like it is now, sucked, and

19   the second job was at Bankers Life and Casualty, which was

20   an insurance company.  And he said, 'I can't hire you

21   because you're a felon as an agent, but I can hire you as an

22   appointment setter.'

23          "And my job was to make phone calls.  They would

24   take the resumes off of Amazon and my job was to make cold

25   calls and get people to come in for an interview.  And the

1  probation officer says, 'Yeah, that's fine.'  Considering my

2  history, 'Yeah, that's fine.'

3          "I finally had to quit the job after ten days

4  because I'm at a point in my life when I was 30 years old

5  and today I can't look at a phone, pick up the phone and

6  make a telephone call without being reminded of what I had

7  done.  Without being reminded of where I have placed myself,

8  my family, the people I've hurt and the damage I've wreaked,

9  my life and what I've done to other people.

10          "So it's impossible for me to do that without

11  feeling a tremendous sense of guilt.  And that's why I loved

12  having a smart phone, because I can text and I can e-mail

13  you, but I did everything possible to avoid making telephone

14  calls."

15          Now, does that seem remorseful for his victims of

16  the telephone calls?

17      A.    At the time of the deposition, maybe, if you

18  believe him.

19      Q.    Okay.  And then in regards to Static-99, in your

20  deposition, you testified that you can use the Static-99 in

21  Sean's case even though there are no contact charges,

22  correct?

23      A.    That is correct.

24      Q.    You said this is based on the fact that the

25  alleged rape in 2001 resulted in what you referred to as

1   some form of criminal justice intervention; is that correct?

2        A.    That's one reason for using the Static-99R.

3        Q.    That was the only reason you gave at your

4   deposition.  Now are you saying that the phone calls are

5   enough to use it?

6        A.    Well they are.  They are also enough to use it.

7   They are considered Category A offenses.

8        Q.    So you're saying using the phone calls alone, you

9   can -- you can use the Static-99?

10            THE COURT:  You know, I covered all of this.

11   That's why I asked questions.  Pay attention to what I'm

12   questioning the witness about.

13            MR. HAWES:  Yes, Your Honor.  I'll move on.

14            BY MR. HAWES:

15        Q.    And you scored Sean a ten?

16        A.    I did.

17        Q.    And isn't it true that you can't differentiate --

18   differentiate between a score of six and above?  Aren't they

19   all the same?  Six or twelve, it doesn't matter.  There's --

20        A.    Specifically in the higher scores, that is true.

21   There are not specific calculations for -- for people in the

22   cells.  Six and above is considered a high score.  That is

23   correct.

24        Q.    And whether Sean had made ten threatening phone

25   calls or had raped ten children, he's going to get the same

1    score; is that correct?

2        A.    If he has four convictions or more or six charges

3    or more, he gets the maximum score.  That is correct.

4        Q.    Okay.  Then with phone calls, you keep referring

5    to he's made thousands of phone calls.  But, in fact, he's

6    only made 50 or 60 threats; is that correct?

7        A.    That is what he says.

8        Q.    And he -- he said yesterday and he's maintained

9    that he did not know the victims?

10       A.    Well, based on information of the victims, it

11   appeared to suggest that he had personal knowledge of some

12   of them.

13       Q.    And when --

14       A.    He says nine out of ten.

15       Q.    And what he pled guilty to was to making

16   interstate threats, not stalking, not forcing women to stick

17   hairbrushes in their vaginas.

18            He pled guilty to the interstate threats, correct?

19       A.    That's the code he pled guilty to.

20       Q.    And isn't it true that throughout his various

21   incarcerations, Sean has had access to cellular phones and

22   other phones?

23       A.    I don't know if it's true.  He told me has -- he

24   had access to phones at Butner and he can make these calls.

25   I don't know if this a true statement.

1    Q.   Well, it's pretty common knowledge that cell

2    phones are available at the -- at the various BOP

3    institutes.

4    A.   I don't know that this was possible, available and

5    feasible to him to engage in this kind of conduct in

6    custody.

7        I doubt it.  I doubt he could make thousands of

8    phone calls with threats of murder from custody without

9    being detected.

10   Q.   Right.  But if it was something that he -- it was

11   a volitional kind of thing, he'd have to do it.  He'd have

12   no -- he'd have to do it from there.

13       Whether he's going to get detected or not, he'd

14   still do it, right?

15       THE COURT:  This isn't helpful to you.

16       BY MR. HAWES:

17   Q.   We talked about the eight months when he was out

18   on custody and he didn't reoffend.  But, really, he hasn't

19   reoffended in eight years, since 2003, correct?

20   A.   He didn't have an opportunity to do so in custody,

21   and he hasn't done this in custody previously.  But when he

22   got out, he resumed.

23   Q.   Not since 2003, he hasn't.

24   A.   He's been in custody for 70 months and he was out

25   for seven months.

1          MR. HAWES:  I have no further questions.

2          THE COURT:  All right.  Are you finished with the

3     witness?

4          MR. ACKER:  I have no -- I'm finished with the

5     witness, Your Honor.

6          THE COURT:  Thank you, Doctor.

7          MR. ACKER:  And I would just like to ask that he

8     be released.

9          THE COURT:  He's released.

10                       [WITNESS EXCUSED]

11          THE COURT:  We'll take a recess now.  Who's your

12     next witness?

13          MR. ACKER:  Dr. Rebecca Perkins.

14          THE COURT:  All right.  We can start in about 15

15     minutes.

16                [RECESS - 10:49 A.M. TO 11:07 A.M.]

17          THE COURT:  Are you ready with your next witness?

18          MR. LOCKRIDGE:  Yes, Your Honor.  The government

19     would call Dr. Rebecca Perkins.

20     _____

21     (WHEREUPON,

22                    **REBECCA PERKINS, Psy.D.**,

23          was called as a witness, duly sworn, and testified as

24          follows:)

25     _____

**DIRECT EXAMINATION BY MR. LOCKRIDGE:**

Q.   Good morning, Dr. Perkins.

A.   Good morning.

Q.   Please state your name and occupation.

A.   Rebecca Eileen Perkins.  I'm a sex offender forensic psychologist at FCI Butner.

Q.   And that's a federal correctional institution?

A.   That is.

Q.   And how long have you been employed there, Dr. Perkins?

A.   Well, in my current capacity, I've been there about two and a half years.  I've been employed at Butner for about four years.

Q.   In your current capacity as a forensic psychologist, what are your duties and responsibilities?

A.   Well, primarily, I prepare forensic reports for the district courts.  These are comprised of competency, criminal responsibility, risk assessments.  I also prepare evaluations for the BOP and these are sex offenders risk assessments pursuant to the Adam Walsh Act.

Q.   And how long have you been at Butner?

A.   Since October 2008.

Q.   And where did you get your psychology degree from?

A.   I got my psychology degree from the Georgia School

1  of Professional Psychology.

2       Q.   And your bachelor's degree?

3       A.   From the University of West Florida, Pensacola,

4  Florida.

5       Q.   All right.  In your current position at FCI

6  Butner, do your duties include conducting forensic

7  evaluations?

8       A.   That's correct.

9       Q.   And can you explain that a little bit, please?

10      A.   Well, I conduct forensic evaluations for the U.S.

11 District Courts, as I said.  I conduct competency to stand

12 trial and criminal responsibility.  I also conduct

13 presentencing evaluations, and I also conduct risk

14 assessments, general and sex offender specific.

15      Q.   And at FCI Butner, do you have additional duties

16 in addition to those evaluations?

17      A.   Well, I perform routine on-call duties for general

18 population, and those include crisis intervention, suicide

19 risk assessments and things of those nature.

20      Q.   And in performing those risk assessments,

21 including the forensic evaluations, have you had any --

22 other than your college degree, do you have any particular

23 training in those areas?

24      A.   Yes.  As part of my requirements for licensure,

25 I'm required to -- to participate in continuing education

1    credits.  Also, I've participated in conferences that are

2    specific to sex offender assessment and treatment of sex

3    offenders.

4         Q.   Dr. Perkins, I want to refer you to Government's

5    Exhibit 43 in the white binder.

6         A.   Okay.

7         Q.   And is that your CV, Dr. Perkins?

8         A.   It is.

9         Q.   And does that appear to be a current CV?

10        A.   It does.

11        Q.   Okay and does that accurately depict your

12   experience?

13        A.   It does.  I recently attended a training in Boston

14   for the American Academy of Forensic Psychology workshop

15   series, and those are not reflected.  But other than that,

16   it is current.

17        Q.   Dr. Perkins, you mentioned that you conduct

18   forensic evaluations.  Approximately how many have you done

19   in your employment with the Bureau of Prisons?

20        A.   Total of about a hundred and five.

21        Q.   And are those mostly criminal evaluations or --

22        A.   I would say, yes, most are criminal.

23        Q.   And under what statutes primarily?

24        A.   4241, 4242, 3552, 4244 and -- yes, those are from

25   criminal.

1        Q.    And how many -- how many evaluations have you

2    conducted under 4248?

3        A.    I've conducted 12.

4        Q.    And of those 12, approximately how many did you

5    come out with the finding or with an opinion that the person

6    was a sexually dangerous person under 4248?

7        A.    Seven of those that I've reached that.

8        Q.    And that means five of them were negative?

9        A.    That's correct.  Five of them did not meet

10   criteria.

11       Q.    Turning back to Page 1 of your CV there, Dr.

12   Perkins, you -- you have listed that you were staff

13   psychologist at Butner from November 2007 to February 2009.

14       A.    That's correct.

15       Q.    And could you explain your duties and

16   responsibility during that time?

17       A.    During that time, I provided direct clinical

18   services to general population inmates, medium security.

19   And my duties included providing individual therapy, group

20   therapy and responding to critical incidents and again

21   performing on-call duties, including crisis interventions

22   and suicide risk assessments.

23       Q.    Now, that's at a different facility than you

24   currently work at, right?

25       A.    Right.  It's a different prison on the same

1  complex.

2       Q.   So --

3       A.   There are about five prisons on that complex and

4  that's a different one.

5       Q.   So those services were performed for all criminal

6  and sentenced offenders?

7       A.   That's correct.

8       Q.   And the services you currently perform, are those

9  for sentenced offenders and civil detainees?  Please explain

10 that.

11      A.   Well, currently, I perform evaluations primarily

12 with pre -- pretrial inmates, but I also perform evaluations

13 with detainees and those who are about to be sentenced.

14      Q.   And have you ever been qualified as a expert in

15 federal court?

16      A.   I have.

17      Q.   On how many occasions?

18      A.   Two.

19      Q.   And any before this court?

20      A.   Yes.

21      Q.   And what was the -- what was that circumstance?

22      A.   That was a 4241 hearing.

23           MR. LOCKRIDGE:  Your Honor, based on Dr. Perkins'

24 knowledge, skill, training and experience in the field of

25 forensic psychology, we would offer her as an expert in the

1   field of forensic psychology.

2          THE COURT:  I'll accept the witness as an expert

3   in the field of forensic psychology and allow her to express

4   her opinions in that area.

5          MR. LOCKRIDGE:  Thank you, Your Honor.

6          BY MR. LOCKRIDGE:

7      Q.   Dr. Perkins, are you familiar with the respondent,

8   Sean -- Sean Francis?

9      A.   Yes.  I conducted an evaluation, 4248, on Mr.

10  Francis.

11     Q.   And how many evaluations have you conducted on

12  him?

13     A.   Two.

14     Q.   Could you turn to Tab 34, Government's Exhibit 34,

15  and is that forensic evaluation you conducted on Mr. Francis

16  dated 2009?

17     A.   Correct.  That's an evaluation I prepared for the

18  sex offender certification review branch.

19     Q.   And was that prior to his certification or after

20  his certification?

21     A.   That was prior.

22     Q.   And what was the purpose of that particular

23  evaluation?

24     A.   Well, this evaluation provides an assessment and a

25  classification of his risk to the SOCRB, which I already

1  told you what that stands for, the sex offender

2  certification review branch.

3          It's not a court-ordered forensic evaluation.  It

4  just helps them -- assists them in determining if the

5  individual should be certified as a sexually dangerous

6  person.

7      Q.   And as part of that evaluation, did you make any

8  diagnoses as to Mr. Francis?

9      A.   I did.

10     Q.   And what were those?

11     A.   Those diagnoses were sexual sadism, paraphilia not

12 otherwise specified nonconsent and telephone scatologia and

13 antisocial personality disorder.  Those are three diagnoses.

14     Q.   Based on those opinions, did -- are -- did you

15 render an opinion as to whether he might met the criteria

16 for commitment under Section 4248?

17     A.   I did.

18     Q.   And what was that opinion?

19     A.   I opined to a reasonable degree of professional

20 certainty that Mr. Francis was a person suffering from

21 serious mental illness, abnormality or disorder as a result

22 of which he would have serious difficulty refraining from

23 sexually violent conduct.

24     Q.   And as part of that opinion, did you opine that

25 sexual sadism was a serious mental illness, abnormality or

1  disorder?

2      A.   I did.

3      Q.   And with regard to the other two as well?

4      A.   That's correct.

5      Q.   Okay.  Please turn to Government's Exhibit 35, Dr.

6  Perkins.  Is that -- is that the second evaluation you did

7  on --

8      A.   That's correct.

9      Q.   -- Mr. Francis?

10         And why -- why did you do another evaluation?

11     A.   This evaluation was a -- was an evaluation

12  pursuant to 4248.  This was for the courts, not for the --

13  the panel I mentioned previously.

14     Q.   Was this conducted before or after his

15  certification?  That would be after, correct?

16     A.   Correct.

17     Q.   And what, if any, evidence or information did you

18  consider in conducting the -- your evaluations of Mr.

19  Francis?

20     A.   Well, there was a voluminous amount of data that I

21  received, collateral information, much more even than I had

22  when I conducted my precertification evaluation.

23         I also -- I also used the DSM-IV-TR and any

24  statutes and legal documents guiding the statute.

25     Q.   And as a result of that second evaluation, you

1   were also able -- were you also able to render an opinion as

2   to whether he suffered from any serious mental illness,

3   abnormality or disorder under 4248?

4           A.    Yes.

5           Q.    And what was that opinion?

6           A.    Similar to my previous report, I opined that he

7   did suffer from serious mental -- serious mental illness,

8   abnormality or disorder.

9           Q.    And -- and which one was that?

10          A.    Those diagnoses were sexual sadism and antisocial

11  personality disorder.

12          Q.    And so you no longer opined that he met the

13  criteria for paraphilia NOS, telephone scatologia?

14          A.    I did not diagnose those two -- those diagnoses in

15  the second report.

16          Q.    And -- and why not with regard to paraphilia?

17          A.    Well, those are elements of telephone scatologia

18  and nonconsent, and Mr. Francis's presentation, I felt that

19  sexual sadism was a more appropriate diagnosis and did a

20  better job explaining the motivations underlying his

21  behaviors.

22          Q.    In what ways?

23          A.    Well, I believe that the motivation that was

24  driving Mr. Francis was his sexual arousal to the suffering

25  of others.

1      Q.   And did you -- in your second evaluation, did you

2  render an opinion as to whether he met criteria for civil

3  commitment under the statute?

4      A.   I did.

5      Q.   And what was that opinion?

6      A.   Again, I opined that he did.

7      Q.   Let's talk about your sexual sadism diagnosis just

8  a bit.

9      A.   Okay.

10      Q.   Is sexual sadism a diagnosis listed in the

11  DSM-IV-TR?

12      A.   It is.

13      Q.   And could you briefly describe what the criteria

14  for sexual sadism are?

15      A.   Well, sexual sadism involves acts that are real,

16  not role-played or simulated, in which the person is

17  sexually aroused specific to the physical or psychological

18  suffering of the victim, to include humiliation.

19      Q.   And did you have any evidence of psychological or

20  physical suffering of the victim that aroused Mr. Francis?

21      A.   Well, I based this diagnosis on his -- well, first

22  of all, his sexual offense behaviors.  Over a period of five

23  years, he was convicted on three occasions for placing

24  sexually threatening telephone calls and violated his

25  supervised release on one occasion also for making these

1   telephone calls.

2            These telephone calls were recurrent.  He

3   continued to make these telephone calls despite being on

4   probation/supervised release.  He would resume making these

5   telephone calls shortly after being incarcerated.  He would

6   place hundreds of call in one setting.

7            And these are not typical obscene telephone phone

8   calls.  These are -- Mr. Francis said in his testimony

9   yesterday --

10           THE COURT:  If you could use the microphone a

11   little more --

12           DR. PERKINS:  Oh, sure.

13           THE COURT:  -- it would be better.  I think

14   just -- just move it into place --

15           DR. PERKINS:  Okay.

16           THE COURT:  -- and it'll pick everything up.

17           DR. PERKINS:  Okay.

18           THE COURT:  That's good.

19           THE WITNESS:  Actually, Mr. Francis said in his

20   testimony yesterday that he would terrorize and scare the

21   recipients of the phone calls.  Mr. Francis would -- noted

22   that they would be crying, that he told him that he was near

23   them, that he was watching them, had been stalking them,

24   that he on some occasions knew the recipient of the caller's

25   name.

1          Further, other records indicate that victims have

2     said that Mr. Francis asked them degrading sexual questions,

3     that he asked them to disrobe, to masturbate, to insert

4     objects into their vaginas.  Mr. Francis had admitted to

5     masturbating during these telephone calls and that he found

6     them sexually arousing.

7          Furthermore, his admissions add further evidence

8     and further support for this diagnosis, the treatment

9     admissions he made both in 2003 and in 2009, where he

10    disclosed fantasies consistent with sexual sadism and

11    behaviors that are also -- involve the suffering of

12    nonconsenting victims.

13         BY MR. LOCKRIDGE:

14    Q.   Are you saying you believe his -- during those

15    phone calls, would it -- would the diagnosis of sexual

16    sadism -- would his alleged masturbating through those phone

17    calls be consistent with such a diagnosis?

18    A.   Yes.  It would show that he had sexual arousal

19    during those telephone calls.

20    Q.   Dr. Perkins, I want to -- staying with Exhibit 35,

21    I want you to turn to Bates No. -- strike that.

22         On Page 11 of that -- well, let's turn to Page 12.

23    A.   Page 12?

24    Q.   And on Page 12, 13 and 14, there are various

25    references to victims and Francis.  Those are apparently

1   phone calls?

2       A.   Yes.

3       Q.   And in any of those -- in any of those

4   transcripts, is there any evidence that you -- that he

5   actually committed a sexually dangerous act against the

6   victim that caused the victim to suffer physically?

7       A.   To suffer physically?

8       Q.   Yes.

9       A.   There's no evidence that they suffered physically

10  except in the instance on Page 14.  The victim indicated

11  that he requested that she insert her fingers into her

12  vagina.  So that would be some physical suffering there if

13  she had followed through with those requests.

14      Q.   And how -- looking at Page 14, how did you

15  describe that particular call?

16      A.   I'm sorry.  Could you repeat that?

17      Q.   Looking at Page 14, on the second paragraph

18  down --

19      A.   Uh-huh (yes).

20      Q.   -- you use the words "particularly describing" --

21  or "disturbing."

22      A.   Yes.  Actually, that is taken from the 2004 PSR.

23  It was described as particularly disturbing.

24      Q.   Now, do you understand -- from your reviewing the

25  2004 PSR, do you understand that to be the victim's

1    statements?

2        A.    That was my understanding, yes.  Since Mr. Francis

3    also denies that.

4        Q.    You understand -- is it your understanding that --

5    that the victim, in fact, did engage in self-penetration due

6    to Mr. Francis's speaking to her on the phone?

7        A.    It's my understanding that this victim firmly

8    believed that Mr. Francis was capable of carrying out

9    threats of rape and murder and that she was terrified.

10           I'm not -- I couldn't say with a hundred percent

11   certainty that she carried out these threats.  But I know

12   that she was terrorized and that terror afforded Mr.

13   Francis's certain amount of control over her.

14       Q.    Dr. Perkins, other than these -- other than the

15   phone calls that -- is there any other evidence that the

16   facts or any ways that informs your opinion as to the

17   sexual -- sexual sadism diagnosis?

18       A.    In -- in addition to the telephone calls?

19       Q.    Yes.

20       A.    Yes.  In addition to the telephone calls, there's

21   more support for this diagnosis in Mr. Francis's

22   self-reports during treatment in 2003 and 2009.

23           As I discussed previously, he -- he endorsed

24   fantasies which are consistent with sexual sadism and

25   involved physical suffering of victims, such as choking

1   them, raping them, murdering them, humiliating the victims

2   such as urinating on them, watching them urinate in fear,

3   making them call him sir.

4          Psychologically, they were suffering in his

5   fantasies in that he would discuss that he would fantasize

6   about raping an individual in front of their loved one or

7   having individuals rape each other in front of each other

8   unwillingly.  Furthermore, his disclosures of undetected

9   defense -- of undetected offenses do indicate that, you

10  know, he made comments that he would be sexually excited to

11  their pain and would keep going and continue his sexual

12  activity despite them being in pain because it was sexually

13  gratifying to him.

14     Q.   And are you aware of an incident from 2001

15  involving an alleged victim named Emily?

16     A.   I am.

17     Q.   And did that -- do the -- does the evidence

18  surrounding that incident inform your opinion as well?

19     A.   Again, it's very consistent with -- with his

20  behavioral pattern of telephone calls with his admissions in

21  treatment.  In fact, in 2009, he made an admission that was

22  striking similar to that alleged sexual assault.  Statements

23  by the victim also are -- circumstantially implicate that

24  this rape did occur.

25     Q.   And as part of your evaluation, did you use any

1    actuarial tools?

2         A.   I did.

3         Q.   And what was that?

4         A.   I used the Static-99R.

5         Q.   And what did you score Mr. Francis on that?

6         A.   As a ten.

7         Q.   And are there any rules governing the use of the

8    99R scoring?

9         A.   Yes.

10        Q.   And did you consult those rules in order to

11   determine whether the Static-99R could be used in this case?

12        A.   I always consult the Static-99R before using it.

13        Q.   And after, you did determine they were

14   appropriate?

15        A.   Absolutely.

16        Q.   In addition to the -- in addition to the

17   Static-99R, did you consider any dynamic risk factors in

18   this case?

19        A.   I did.

20        Q.   And what are some of those that inform your

21   opinion?

22        A.   Well, I looked at his intimacy deficits and these

23   are quite pronounced.  He has hostility towards women, anger

24   towards his mother.  He has not demonstrated capacity to

25   sustain a intimate relationship for a significant period of

1   time.  He has demonstrated a complete lack of remorse and

2   lack of empathy for others.

3          Furthermore, I looked at his behavioral pattern of

4   noncompliance with supervised release, which is another

5   empirically validated risk factor.  This man was on

6   probation to continue to make the phone calls.  As soon as

7   he would get out of prison, he would shortly begin making

8   the phone calls while on supervised release.

9          And then in 2009, during his most recent

10  supervised release, he engaged in high-risk behavior, such

11  as viewing pornography and using Internet to engage in

12  impersonal sexual activity with women.  He has made

13  statements to this court and in the past that he fully plans

14  to be noncompliant with supervision in the -- in the future

15  as well.

16         Another dynamic risk factor that I considered was

17  his sexual regulation.  Again, that speaks to his high risk

18  behavior while on supervised release.  It also speaks to

19  his, you know, admissions that he's had 60 to 80 partners

20  although he has not been out of prison for a long period of

21  time.  He engages in multiple impersonal sexual acts with

22  others.

23      Q.   Dr. Perkins, do you agree with -- do you, sitting

24  here today, agree with the ultimate opinion provided in 2011

25  forensic evaluation report?

1      A.    I do.

2      Q.    And changing subjects just a little bit, you --

3  you do have prior experience working in the sexual offenders

4  treatment program at Butner?

5      A.    I do.  I was a postdoctoral trainee in that

6  program.

7      Q.    And from what -- what period of -- what year was

8  that?

9      A.    That was in 2006, 2007.

10      Q.    And approximately how long of a period?

11      A.    For about a year.

12      Q.    Just about a year.  And -- and any knowledge

13  during that year of any persons being removed from the

14  sexual offender treatment program due to failure to list

15  additional victims?

16      A.    No, not specific to that.

17      Q.    Any knowledge of anyone that was removed from the

18  sexual -- what would typically happen from a -- if a person

19  was removed from the sexual offender treatment program?

20  Would they be removed to another facility, or do you know?

21      A.    Actually, what struck me in the testimony

22  yesterday was Mr. Francis's account that he would be taken

23  back -- sent back to New York if he were terminated from the

24  program.

25            Well, the way the program worked was these

1  participants would engage in sex offender treatment towards

2  the end of their sentences.  So they had very little time

3  left on their sentence when they were completed with

4  treatment.  So many of them, while I was there, were just

5  kept in Butner.  They weren't in the program, but they were

6  not actually transferred to another institution because they

7  had short sentences.  I didn't know of any cases where they

8  were transferred.

9       Sometimes they would go to a lower security

10  institution, for example, if their -- their charges were

11  child pornography and they didn't meet -- meet the security

12  level of a medium security prison.  But I was not aware of

13  anyone that was sent back to the parent institution.

14       Q.   I just have one final question, Dr. Perkins.

15       A.   Uh-huh (yes).

16       Q.   Are the -- are the phone calls recorded?  Are the

17  inmate phone calls recorded at Butner?

18       A.   Yes.

19       Q.   And are they -- the inmates there aware of that?

20       A.   They are very aware of that.

21       Q.   How would that affect their ability to make a

22  phone call if they were going to make a -- perhaps

23  hypothetically a phone call to an alleged victim?

24       A.   Well, it wouldn't be a very smart thing to do.

25            THE COURT:  What about the testimony from the

1   detainee that remaining in the program was highly desirable

2   and something you would fabricate information about in order

3   to remain in it?  Is that -- is that consistent with your

4   experience?

5              THE WITNESS:  It could be.  It could be desirable

6   to -- to complete treatment; you know, to show that you've

7   made an effort and completed treatment.

8              THE COURT:  Would that affect your term of

9   service?

10             THE WITNESS:  No.  You wouldn't be released any

11  sooner.  Like, the drug abuse program --

12             THE COURT:  right.

13             THE WITNESS:  -- how you have certain -- if you --

14  if you finish the program, you get out earlier or you get

15  time off your sentence, nothing like that.

16             THE COURT:  Is it considered to be a favorable

17  outcome among the general population if you're in sex

18  offender treatment?

19             THE WITNESS:  If you complete or if you're just in

20  the --

21             THE COURT:  If you're in.  I mean --

22             THE WITNESS:  Actually, when I first came to

23  Butner, I -- I was wondering how that would work on a -- on

24  a general population compound with, you know, known sex

25  offenders in the program.  And I was really surprised to see

1   and I was, you know, pleasantly surprised to see that --

2   that really there's not a lot of intimidation or threats of

3   things of that nature on that compound.

4           It is a heavily program, you know, focused

5   compound.  People are in the drug program.  They're in the

6   rehabilitation program, things of that nature.  So most

7   everyone on the -- on the compound is involved in some sort

8   of program.  But I didn't see any -- you know, any of that

9   intimidation that you might see in other prison compounds.

10          THE COURT:  Well, there is some stigma attached to

11  being a child molester, isn't there, in the general

12  population, or not?

13          THE WITNESS:  Yes.

14          THE COURT:  Yes?

15          THE WITNESS:  Uh-huh (yes).

16          THE COURT:  And -- and the prospect of internal

17  violence from -- from that status, right?

18          THE WITNESS:  Yes.  That had -- I've been at

19  Butner for four years.  I have not -- that has not been the

20  case.  I have not seen incidents of that.

21          THE COURT:  Okay.

22          MR. LOCKRIDGE:  I have one further question, Your

23  Honor.

24          BY MR. LOCKRIDGE:

25      Q.   Dr. Perkins, if the 2001 rape of Emily actually

1    occurred, would -- does that strengthen your diagnosis of

2    sexual sadism in this case in his likelihood of reoffense?

3         A.    Those are two questions.  So what was the first

4    part of that?

5         Q.    If the 2001 rape of Emily actually occurred, does

6    that strengthen your diagnosis of sexual sadism in this

7    case?

8         A.    It is consistent.  There are elements of the

9    accounts of that -- that sexual assault that would be

10   consistent with sexual sadism.

11        The fact that it was so cold, yet she was raped

12   outside; the fact that there was gravel in her back; the

13   fact that he told her "I'm going to take you somewhere

14   else" -- according to her, that "I'm going to take you

15   somewhere else and my friends will also have sex with you";

16   the fact that she says that he struck her while she was

17   already subdued.  Those types of things are consistent with

18   a diagnosis of sexual sadism.

19        MR. LOCKRIDGE:  Thank you, Your Honor.  I have no

20   further questions.

21        THE COURT:  Any cross?

22        MR. WEBB:  Yes, sir.

23   **CROSS-EXAMINATION BY MR. WEBB:**

24        Q.    Were you here this morning when your predecessor

25   witness testified?

1      A.   Yes.

2      Q.   Did you hear him say that Mr. Francis generally

3 didn't believe that rules and laws applied to him, that he

4 was narcissistic?

5      A.   Yes.

6      Q.   Now, you are aware of the fact, are you not, that

7 he's had no infractions while he's been in BOP custody?  Are

8 you not?

9      A.   That's incorrect.  He did have an infraction.

10      Q.   What infraction was that?

11      A.   It was being in an unauthorized area.  I can't

12 recall exactly what year that was, but I could consult my

13 report.

14      Q.   Is that the only one you're aware of?

15      A.   That's the only one I'm aware of, yes.

16      Q.   Now, turning to your report, you make reference to

17 a psychiatric evaluation of Mr. Francis by a Dr. Bardey?

18      A.   Uh-huh (yes).

19      Q.   Alexander Sasha Bardey?

20      A.   Yes.

21      Q.   And on Page 18 of your report, you refer to his

22 diagnosis of Mr. Francis as having ADHD and a borderline

23 personality disorder.  You actually quote from his report,

24 and it says, essentially -- I'm just going to summarize for

25 you -- that "Mr. Francis had a turbulent, abusive

1   relationship with his mother and this is a reflection of the

2   power struggle in which he and his mother have engaged

3   throughout his childhood and youth.

4              "It is no coincidence that Mr. Francis made his

5   threats from behind the screen of a telephone and its wires.

6   His ultimately empty threats empower him without requiring

7   him to back them up."

8              Do you agree with Dr. Bardey's assessment?

9        A.   So let's see.  Which part of that, that it's no

10  coincidence?

11       Q.   Well, I mean, you -- you agree that they were

12  empty threats, that those empty threats empowered him

13  without requiring him to back them up?

14       A.   I do not believe that those were empty threats

15  because the victim -- I -- I honestly believe the victim

16  believed that Mr. Francis could carry out those threats.

17       Q.   So you don't agree with Dr. Bardey?

18       A.   I do not believe those were empty threats, no.

19       Q.   And he also went on to analyze -- analogize Mr.

20  Francis's behavior to that of self-mutilators.  And he said,

21  as quoted in your report, "Furthermore, Dr. Bardey indicated

22  that Mr. Francis used obscene telephone calls as an

23  emotional release, similar to the act of self-mutilation.

24  It was noted that just as self-mutilators do not intend to

25  kill themselves so Mr. Francis does not intend to physically

1  harm his victims."

2        Would you agree with that?

3     A.   I would not.

4     Q.   But there's no evidence that he did, in fact -- as

5  the judge said, these were all attenuated contacts.  They

6  were through a telephone.

7     A.   It is my opinion that the -- the nature of these

8  telephone calls is much more than just heavy breathing, what

9  are you wearing.  These were violent acts.

10     Q.   On Page 20 of your report, you said that Mr.

11  Francis reported -- I'm not quite sure where he reported

12  maybe --

13     A.   Wait.  Which page is that?  I'm sorry.

14     Q.   Page 20.

15     A.   Okay.

16     Q.   Right in the middle.

17     A.   Okay.

18     Q.   It might have been a part of a questionnaire he

19  did for the -- for Butner, but he reported that he began

20  masturbating at age five.  Do you believe that?

21     A.   I believe that Mr. Francis does exaggerate things,

22  but I do believe that Mr. Francis may have been expressing

23  his hypersexuality, which he has endorsed on several

24  occasions in -- in treatment.

25        Age five, I -- I don't know that it was exactly

1    age five, but I do find that credible.

2         Q.   You do find that credible?

3         A.   I do find that there was some hypersexuality from

4    a young age from Mr. Francis, yes.

5         Q.   And on Page 21 of your report, you indicate that

6    Mr. Francis said that he tried to have sex with his -- with

7    the family dog, the Doberman; without success, but he

8    nevertheless tried.  Do you believe that?

9         A.   I mean, it could happen.

10        Q.   It's at the bottom of Page 21.

11        A.   It is possible.  This is a extremely hypersexual

12   individual.

13        Q.   Okay.  Now, he did -- and this, of course, is in

14   your report and other reports -- indicated that there were

15   some 57 sexual offenses he committed, and that's set forth

16   on your report on Page 23.  Am I right?

17        A.   Yes, he disclosed as many as 57 victims.

18        Q.   Actually, it's more than that, but let's talk

19   about what's on your report right here on Pages 23 and, I

20   guess, 24.

21        A.   Uh-huh (yes).

22        Q.   It was reported that he fondled victims while they

23   were sleeping.  It was reported that when he was between the

24   ages of 16 and 17, he raped approximately five girlfriends

25   between one and 30 times each.

1           It was reported that Mr. Francis estimated he

2     forcibly raped strangers on approximately ten occasions.  He

3     also reportedly met less than ten women from telephone calls

4     who agreed to meet him in person and forced each of them to

5     perform -- to perform oral sex and engage in fondling and

6     digital penetration.

7           It was also noted that Mr. Francis said he made

8     obscene telephone calls to juvenile girls who agreed to meet

9     him and he raped eight of these girls, and he also reported

10    that he met five minor girls online who agreed to meet him

11    in person and he raped every single one of them.

12          And, finally, it's estimated he raped girlfriends

13    approximately one to ten times every three months.

14          You believe all that?

15    A.    Again, I believe that Mr. Francis likely

16    exaggerated -- exaggerates things.  He has presented as a

17    very angry -- arrogant and boastful individual.  However,

18    the flavor of what he's saying is very consistent.  It's

19    consistent with the phone calls.  It's consistent with other

20    disclosures that he's made in treatment, not only here in

21    2003 but also again in 2009.  It's also consistent with an

22    individual who would rape someone in 2001, which he was

23    implicated in.

24          Do I -- do I take each fact and say do I believe

25    this, do I believe that?  No.  I look at the record in its

1   totality and I look at what fits and what's consistent and

2   what is not.

3        Q.   Well, turning to Page 25 of your report, you

4   indicate that Mr. Francis, in addition to the 57 instances

5   that he cited, also said -- this is toward the middle of the

6   page -- that there are at least ten to fifteen women I used

7   for sexual satisfaction by lying about myself and creating

8   phantom lives.  I lied my way into bed with them.  Right?

9        A.   That's what it says.

10       Q.   That's what it says.

11       A.   Uh-huh (yes).

12       Q.   So if he has 57 and then he's got ten more, that's

13  567 or maybe 15 more.  That's 72.  That's 72 instances of

14  sexual violation of a very violent, forceful way.  And yet,

15  from what I've seen, there hasn't been any arrest or

16  conviction on any of those:  57, 67 or 72 instances.

17            Am I wrong about that?

18       A.   Are you wrong that he's not been convicted for any

19  of these instances?

20       Q.   No.  Am I wrong that he hasn't even been charged?

21       A.   He has not been charged with -- with these

22  offenses, no.

23       Q.   I mean, not 57 -- not one of 57, not one of 67,

24  not one of 72.  Right?

25       A.   He has not been charged with these offenses, no.

1       Q.   Now, turning to Page 26 of your report, it's true,

2    is it not, that Mr. Francis underwent a forensic evaluation

3    at the United States Medical Center for federal prisoners in

4    Springfield, Missouri?  Correct?  This is in 2005.

5       A.   Uh-huh (yes).

6       Q.   And -- and, apparently, this evaluation went on

7    for some period of time, from January to April, according to

8    your report.  This is on Page 26.

9       A.   Right.  I see it.

10      Q.   And it was noted, was it not -- I mean, this is in

11   your report -- that based upon the absence of documented

12   arrests or convictions of sexual offenses and his denial of

13   such, he was not diagnosed with paraphilia at that time?

14           It was opined that he did not meet criteria for

15   having a major mental illness and was not in need of

16   inpatient mental health treatment.  That was in Springfield

17   in 2005 after a three- or four-month evaluation.

18      A.   That's correct.

19      Q.   Is that correct?

20      A.   That was not a psychosexual evaluation.  That was

21   a fit-for-treatment evaluation.  It was not specific to sex

22   offenders.

23      Q.   Well, I hope it was somewhat more comprehensive

24   since it took three to four months.

25           Now, in June -- turning to Page 27, in June of

1    2008, Mr. Francis underwent a precertification review

2    evaluation at FCI Seagoville in -- in Texas, outside of

3    Dallas.  Right?

4         A.   Correct.

5         Q.   And he was not certified at that time as a

6    sexually dangerous person by the CRP.

7         A.   He was not.

8         Q.   Turning to Page 36 and 37 in your report -- and

9    this is, I believe, your conclusion at the bottom of Page

10   36.

11        You indicate that, as a child, he demonstrated

12   behavioral problems in school, inability to get along with

13   others, fighting, compulsive lying.

14        So you do acknowledge that he's a congenital liar,

15   do you not?

16        A.   Yes.

17        Q.   And on the next page, you also conclude -- this is

18   at the top, in the middle of that first paragraph.  I'm

19   quoting from you.

20        "He's demonstrated chronic deceitfulness and has

21   admitted he lied compulsively since adolescence about

22   himself and his life as a way to manipulate others and

23   elicit admiration."

24        That was your conclusion, correct?

25        A.   That is correct.

1      Q.    So a recurrent theme through his life seems to be

2    lying.  Wouldn't you agree with that?

3      A.    I would.  That's why it's important to look at

4    where things are consistent and where they're not.

5      Q.    So in 2005, he didn't meet the criteria --

6    criteria for a major mental illness.  In 2008, he was not

7    certified as a sexually dangerous person.  And here we are

8    today.

9          And I'm assuming that you just conclude that the

10    prior evaluations from Springfield and Seagoville are just

11    wrong?

12      A.    I'm not concluding that they're just wrong.  No, I

13    wouldn't -- that wouldn't be fair to say.

14      Q.    Thank you.

15          THE COURT:  All right.  Any redirect?

16          MR. LOCKRIDGE:  Just briefly, Your Honor.

17    **REDIRECT EXAMINATION BY MR. LOCKRIDGE:**

18      Q.    Dr. Perkins, Mr. Webb referred to a Dr. Bardey

19    about a report and evaluation dated 2000.

20      A.    Yes.

21      Q.    In that report, Dr. Bardey obviously wouldn't have

22    had the opportunity to have the -- the evidence and

23    information that occurred after 2000 to form his decision;

24    is that correct?

25      A.    That was 11 years ago.  I don't think so.

1        Q.    And Mr. Webb also -- also questioned you about

2    a -- a possibility that Mr. Francis masturbated at age five.

3    Do you recall that?

4        A.    That's correct.

5        Q.    And is it possible that the term "masturbation"

6    could -- could mean, for lack of better term, playing with

7    himself?

8        A.    I think actually they -- yes, I do.

9        Q.    And was there -- was there information with regard

10   to that event about his mother laughing?

11       A.    I recall there -- I'm not recalling exactly.

12   I'm -- I'm recalling that he was -- he had made a statement

13   that he would be rubbing the sheet over him or masturbating

14   and his mother would see him doing this behavior and laugh,

15   yes.  I believe that's in the record.

16            MR. LOCKRIDGE:  Nothing further, Your Honor.

17            THE COURT:  All right.  Thank you.  Thank you,

18   ma'am.

19                        [WITNESS EXCUSED]

20            THE COURT:  All right.  Are you ready with your

21   next witness or do you want to resume --

22            MR. ACKER:  Consistent with our agreement, I think

23   they would like to put on their witnesses -- their expert

24   witnesses, and then we'll come back to Mr. Francis and

25   Emily's videotape.

1          THE COURT:  We're going to break at noon, but

2    we're going to go forward with the next witness now.

3          MR. WEBB:  Joe Plaud.

4    _____

5    (WHEREUPON,

6              **JOSEPH J. PLAUD, Psy.D.**,

7         was called as a witness, duly sworn, and testified as

8         follows:)

9    _____

10   **DIRECT EXAMINATION BY MR. WEBB:**

11        Q.   Will you state your full name for the record,

12   please?

13        A.   Yes.  It's Joseph J. Plaud, P-l-a-u-d.

14        Q.   Are you a licensed clinical psychologist?

15        A.   I am.

16        Q.   Have you testified in these Adam Walsh cases

17   before?

18        A.   I have.

19        Q.   And have you been accepted by the court as an

20   expert?

21        A.   Yes.

22        MR. WEBB:  I would tender Dr. Plaud as an expert

23   at this time.

24        THE COURT:  I will accept the witness as an expert

25   in field forensic psychology and allow him to express his

1    opinions in that area.

2              BY MR. WEBB:

3        Q.    Dr. Plaud, have you had an opportunity to evaluate

4    Mr. Sean Francis, seated to my right here?

5        A.    Yes, I have.

6        Q.    And, in your opinion, does he meet the criteria --

7    the statutory criteria as a sexually dangerous person under

8    Title 18 USC 4248?

9        A.    I do not.

10       Q.    Can you tell me exactly what went into your

11   evaluation?

12       A.    Yes.  I reviewed records that were sent to me

13   pertaining to Mr. Francis's background, his history,

14   developmental history, his sexual history, sex offense

15   history, his institutional and treatment histories.

16             I traveled to Butner and conducted a clinical

17   interview of Mr. Francis.  I took the information from the

18   interview, coupled with my record review and my training in

19   this specific area, and reviewed three questions pertaining

20   to whether or not in my judgment Mr. Francis was or was not

21   sexually dangerous at this time.

22       Q.    And you rendered an opinion that's in written form

23   and dated May 26th, 2011; is that correct?

24       A.    That's correct.

25       Q.    And what did you conclude in your report?

1      A.   What I concluded in my report, firstly, was, yes,
2    that Mr. Francis had indeed engaged in behavior was
3    sexual -- sexual offense -- sexually offensive behavior,
4    although I questioned whether it would meet the criteria for
5    sexually violent conduct, as that term is defined under
6    federal law.

7         I further concluded that it could be possible to
8    diagnosis Mr. Francis at this time with a paraphilia not
9    otherwise specified known as telephone scatologia.  However,
10   I think it is a weak diagnosis at the present time, open to
11   challenge and to criticism, but I -- by his record, there
12   certainly is that -- the criteria for paraphilia not
13   otherwise specified could be met in that regard, although I
14   could not diagnosis him credibly with any other sexual
15   disorder.

16        Insofar as the third prong is determined, as a
17   result of this illness, would he have serious difficulty in
18   refraining from such conduct if he were released from
19   confinement, my judgment is that with those types of
20   disorders, there would be some probability that he might
21   engage in further obscene telephone call making.  There is
22   some possibility of that.  It's not that it's no risk.

23        However, I would note that Mr. Francis was in the
24   community for a period of time in 2009 -- seven-,
25   eight-month period of time which he had possession of a

1  telephone and which there's no evidence that he engaged

2  during that entire period of time in any such conduct.  So

3  for a period exceeding six months in duration, where in

4  possession of a telephone where he did not engage in such

5  behavior.  So you do not have to take my word for it.  I

6  look at his own behavior while he's in the community more

7  recently -- this is 2009 -- where he did not engage in that

8  behavior.

9          So I believe that there really isn't even much

10  credibility at this point to conclude that he would be

11  likely to even make crank telephone calls or sexually

12  motivated telephone calls in any -- in any manner.

13          So in all three elements, there's doubt, there's

14  questions which lack and -- and so, overall, I'm unable to

15  conclude in the affirmative that at this time he would be a

16  sexually dangerous person.

17      Q.   Well, seven to eight months without making a phone

18  call doesn't seem like a long period of time to assess

19  whether or not he might take it up again.

20          Can you weigh in on that, give an opinion about

21  that?

22      A.   Well, there's every indication non -- some

23  noncontact-based offenses -- and as a matter of fact, the

24  diagnosable ones themselves, such as exhibitionism, tend to

25  have an underlying component that is very anxiety

1    disorder-related.

2            What I mean by that -- and I've treated many of

3    them over the years.  I am never in a position unless

4    someone is dead or in a coma to say they're not likely to

5    exhibit themselves again.  It's very motivated by underlying

6    emotional mood anxiety states.  And it doesn't generally

7    involve sexual deviance, per se.

8            And that -- I mean, they're not sexual deviants in

9    the sense they have an underlying pattern of sexual arousal

10   disorder.  They just engage in behavior that's inappropriate

11   and illegal.  But what is the underlying function of that

12   behavior?

13           It reduces stress.  It reduces tension.  It

14   reduces anxiety.  It does have many obsessive-compulsive

15   disorder components to it.  And the same with telephone

16   scatologia.  Very similar, it's a noncontact-based offense.

17           So when someone is in the throes of this

18   disorder -- this type of disorder, you see it happening as

19   you have in Mr. Francis's history when he was doing it,

20   engaged in this behavior up to 2003.  You will see that he

21   engaged in it a number of times; by his own estimation, well

22   over a hundred times.

23           So to put him in a position in the community where

24   he has access and possession of a phone and, like I said,

25   seven or eight months go by and there's no indication that

1    he was motivated to do that, that's -- it's a time warp.

2    That's a significant period of time for that type of

3    behavior.

4            So I look at that as very significant, at least

5    consistent with the notion that it -- and I use sort of a

6    medical term, but it's a remission; that it's not an active

7    part of his daily functioning at this time the way it was

8    earlier in his life.

9        Q.   But would you agree with Dr. Bardey that a lot of

10   these phone calls were simply empty threats that he never

11   intended -- intended to follow through on them; he was

12   hiding behind a phone?

13       A.   I do -- I do think that there is certainly a lot

14   of plausibility to that conclusion, yes.  And what this gets

15   at is are these sexually motivated.  Yes, they have sexual

16   content, obviously.

17           There are threats involved.  There are -- but if

18   the underlying motivation is one in which involves anger

19   towards women, general instability, anxiety or mood-related

20   components, the -- the topographical behavior might be

21   sexual in nature, but the underlying motivation really

22   isn't.  It's not a sexually motivated behavior.

23           It's a behavior -- just like much exhibitionism

24   isn't a sexually motivated behavior.  It's sexual behavior,

25   but on the surface, the function of it is to achieve other

1   goals psychologically, and that is anxiety reduction, mood

2   stabilization.

3           So you have to look at the underlying dynamics in

4   many of these cases.  And when you do that in this case,

5   there's every indication, from my own experience dealing

6   with this clinical population over the last 25 years, that

7   it's really not -- I don't even think even when it happened

8   with great frequency a primarily sexually motivated

9   behavior.

10          THE COURT:  Well, you could say that about rape,

11  too.

12          THE WITNESS:  Judge, in certain -- for nonsexual

13  sadists, you absolutely can say that.  And as we've learned

14  from many years and -- that rape -- many rape -- not all,

15  but many acts of rape are acts of violence where sex is used

16  as a weapon

17          THE COURT:  Correct.

18          THE WITNESS:  That's right.

19          BY MR. WEBB:

20      Q.  Well, there's been a lot of testimony about him

21  admitting to sexually violent, forceful episodes in his

22  life.

23          Do you have an opinion satisfactory to yourself as

24  to his truthfulness and his ability to manipulate the truth?

25      A.  Well, look, I'm aware of the record.  I've read

1    the record.  I talked to Mr. Francis about these issues,

2    whether it was 27 or 57 or 67 or 72.  The numbers have

3    differed over the different descriptions that I've read.

4          I wasn't there.  I don't know, but I can assume

5    that they did unless he is admitting to them at this time.

6    During the clinical interview, at that -- by that time, he

7    had recanted and he had given me an explanation which I find

8    is more credible as a reason for why these admissions came

9    out to begin with than the probability that he did the

10   things that he originally admitted to and then recanted.

11         Q.   What was the explanation?

12         A.   It had to do with full disclosure as a part of

13   cognitive behavioral treatment at the Butner program.

14         Q.   They encourage that there?

15         A.   Well, I'm aware of several individuals where that

16   is -- seems to be the case.  I'm aware of it in treatment

17   programs that I've been involved in and even that I've

18   administered over the years where full disclosure has been a

19   part of it, yes.

20         MR. WEBB:  Okay.  That's -- that's all the

21   questions I have, Your Honor.

22         THE COURT:  All right.  Why don't we stop here and

23   you can pick up with the cross at 1:30.

24         [LUNCH RECESS - 11:58 A.M. TO 1:37 P.M.]

25         THE COURT:  Good afternoon.

1          MR. ACKER:  Good afternoon.

2          THE COURT:  You want to have your cross?

3          MR. ACKER:  Yes, Your Honor.

4          THE COURT:  Go ahead.

5    **CROSS-EXAMINATION BY MR. ACKER:**

6          Q.   Dr. Plaud, I want to go over some of the things

7    that you said during your direct examination and some of the

8    things you said during your deposition.

9          Now, you testified a few minutes ago that these

10   phone calls that Mr. Francis made were sexual offenses; is

11   that correct?

12         A.   Yes.

13         Q.   And -- but you weren't sure whether they met

14   the -- whether they were sexually violent conduct as defined

15   by federal law; is that right?

16         A.   Not all of them.  That's correct.

17         Q.   Okay.  Some of them you think were sexually

18   violent conduct?

19         A.   Yes.  If you read the -- the definition contained

20   in the law concerning threats, threatening behavior, yes,

21   I -- I mean, it could rise -- some of the calls that I saw

22   in the records in terms of some of the transcripts of the

23   calls could be consistent with that.

24         Q.   Okay.  And when you say when you look in the law,

25   you're talking about the Code of Federal Regulations?

1       A.   Yes.

2       Q.   And --

3       A.   549.42, I believe.

4       Q.   Okay.  And that -- that says that basically --

5   well, let's just make sure that your understanding -- we're

6   talking about the same thing.

7            That defines sexually violent conduct and says,

8   "For purposes of this subpart, sexually violent conduct

9   includes any unlawful conduct of a sexual nature with

10  another person -- parentheses, the victim, end

11  parentheses -- that involves (a) the use or threatened use

12  of force against the victim or (b) the threatening or

13  placing the victim in fear that the victim or any other

14  person will be harmed."

15      A.   Correct.

16      Q.   And so it does meet that definition of sexually

17  violent conduct?

18      A.   That's right.

19      Q.   And I think you also testified on direct

20  examination that it is possible to diagnose Mr. Francis

21  currently with telephone scatologia, correct?

22      A.   It is possible.  I -- I think the -- the strength

23  of the diagnosis can be questioned today given that

24  nine-month period, no other records while he's incarcerated

25  that he's engaging in this type of behavior.

1        So, yes, I mean, the problem with the -- with

2    diagnoses along sexual dimensions is it's based on a medical

3    model, where issues such as remission are typically subject

4    to disagreement in the professional community.

5        In other words, if you get this diagnosis, you

6    always have it.  And that's -- so the strength -- I will

7    refer to as the strength of the current diagnosis, since

8    this is about Mr. Francis today and tomorrow.

9        His history certainly plays into that

10   understanding and the diagnostic impression that I came up

11   with.  But --

12       Q.   Okay.  I --

13       A.   -- it -- it doesn't appear that he has as acute

14   difficulties in that domain today, and I think that should

15   be noted.  I think that's important.

16       Q.   And telephone scatologia is a paraphilia?

17       A.   It is a paraphilia not otherwise specified.

18       Q.   Okay.  And the DSM-IV talks about paraphilia as

19   being long-term and chronic?

20       A.   Some of them, yes.

21       Q.   Okay.  And you said, I believe, in your direct

22   testimony that you really view this more as an anxiety

23   related disorder; is that right?

24       A.   That's correct.  My experience, my training in

25   this area, I've worked with a number of noncontact offenders

1    over the years.  And I will tell you that the first thing I

2    generally do when I treat noncontact offenders is I get a

3    medical consult immediately and this -- frequently

4    pharmacological intervention of anti-anxiety or SSRIs or

5    something to treat other psychological dimensions that are

6    part of the constellation of this type of behavior.

7        Q.   And you said that you -- you believe that this is

8    currently in remission?

9        A.   I believe there's good evidence.  The evidence

10   that I have is in -- in -- most recently and going back

11   several years -- remember, the last phone calls now are

12   going back eight or so years.

13        So if you look at 2009, in the community for seven

14   or eight months, no evidence that he was engaging in this

15   behavior, even though he had at his disposal a mobile

16   telephone.  I look institutionally at his behavior where he

17   has access to a phone, and even though they're recorded, of

18   course, in the institutional setting.

19        If someone doesn't have control, who cares if

20   they're recorded or not?  They're probably going do it if

21   they lack control.  Just like they engage in criminal

22   behavior knowing there's going to be a consequence to it if

23   it's -- if it's uncontrollable types of behavior.

24        Q.   Now, in the past, when he was in prison -- in

25   fact, he's never offended while he's in prison, has he?

1      A.    Correct.

2      Q.    But when he got out of prison, he went right back

3  to it?

4      A.    He did.

5      Q.    Now --

6      A.    Except 2009.

7      Q.    Right.  For that seven-month period.

8            Now, if this is an anxiety-related disorder in

9  remission, won't he have other periods of high anxiety in

10  his life?

11      A.    Sure, it's possible.  It's possible and it's

12  possible he might make obscene telephone calls in the

13  future.  The question is is it likely.  Given the -- the

14  period in the community when he didn't do it, given his

15  current age and understanding of issues, I -- there's doubt.

16  There's doubt all over this case, from his conduct, what he

17  did, what he didn't do, what type of diagnosis is most

18  appropriate in this case.

19            There's so much doubt from the beginning to the

20  end of this case that it's -- I'm flooded with it as a

21  professional trying to get a sense of exactly what to do,

22  to -- in order to predict what he might do in the future,

23  which is just another stretch.

24            And so when you have a foundation of a case like

25  this built on sand and you try to make a future prediction,

1    it's not possible.

2        Q.    Now, Dr. Plaud, you said that you didn't believe

3    that these telephone calls were sexually motivated.  Is

4    that -- was that your testimony?

5        A.    I -- well, yes.  My testimony was there's

6    question -- again, I use that term deliberately.  There's

7    question as to the sexual motivation behind them.

8        Q.    Okay.

9        A.    There -- there probably was other things going on

10   with him, and it did involve anger, negative attitudes

11   towards women and -- and these -- and control of a

12   vulnerable person, which are not sexual deviants, per se.

13   These are other psychological issues.

14       Q.    Now, the -- the mental disorder that is necessary

15   for someone to be certified or committed under 4248 doesn't

16   have to be a sexually motivated disorder; does it?

17       A.    I -- no, it's not defined as -- it's not a --

18   although there are lists of enumerated offenses, there's no

19   lists of particular diagnoses.

20              But then where's the nexus?  What's -- where's the

21   volitional control?  If -- if it's not a sexual-based

22   disorder and there's no sexual deviance that's underlined or

23   motivating or compelling that -- that behavior, then how can

24   you say with any degree of scientific validity that they're

25   going to act in a certain way in the future.

1       Because even when it is sexually motivated, like

2  pedophiles, that is part of it, but even that gives you

3  difficulty to predict future behavior.  So when you have

4  this obtuse -- something is out there.  It may have this

5  component.  It may have that component.  How do you use that

6  as a reason to opine affirmative risk?

7       Q.   Did you just testify that, under federal law,

8  there's a list of sexual offenses that qualifies?

9       A.   Well, I'm saying enumerated offenses that I would

10  think it varies in states that -- which the person comes

11  from.  But, generally, sexual crimes, I would say.

12       Q.   Where -- where is that enumeration of offenses in

13  federal law?

14       A.   I don't know what -- where the list is.  I don't

15  think there is a particular list, because it -- it's the

16  states that -- where the charge conduct is mostly.

17       Q.   So the state -- when you were referring to

18  enumerated lists, you're talking about state law, not

19  federal law, correct?

20       A.   In -- in all SDP cases in states and about the 20

21  states that have them, yes, there is a enumerated list.

22       Q.   Well, that's not true in federal, is it?

23       A.   True.

24       Q.   So you're applying state law standards, not

25  federal law standards?

1       A.   No.  I'm -- I'm applying -- question one, which I
2   stated earlier, it defines sexually violent conduct.  That's
3   what it says, has the person engaged in either -- or
4   attempted to engage in either sexually violent conduct or
5   child molestation.  That's what I'm talking about.
6       Q.   Now, your testimony today is different from the --
7   from what you put in your report on that first prong, isn't
8   it?
9            You testified today that his phone calls -- some
10  of his phone calls do constitute sexually violent conduct,
11  correct?
12      A.   I said, yes, they do.  There's a question as to
13  whether all of them do, but, yes, some of them, given the
14  definition, could qualify under that, yes.
15      Q.   And that's different from what you put in your
16  report?
17      A.   Well, I'd have to look and be referred back to my
18  report.
19      Q.   Didn't you say that the first prong of the statute
20  he didn't meet?
21           MR. WEBB:  If you'll allow me to show him the
22  report.
23           MR. ACKER:  That's --
24           MR. WEBB:  I've got Exhibit 46.
25           BY MR. ACKER:

1     Q.   Exhibit 46.

2     A.   I -- point me where you say I say --

3     Q.   Yes, I certainly will.

4     A.   Thank you.

5     Q.   On the first page of your report --

6     A.   Yes.

7     Q.   -- bottom paragraph.

8     "The professional conclusion of this evaluation of

9 Mr. Francis is that, from the outset, it is not possible to

10 conclude that he has engaged in any sexually violent

11 conduct."

12     A.   I do see that.

13     Q.   That is totally contrary to what you testified

14 here today?

15     A.   No, it's not totally contradictory.  I would say

16 given the specifics of the definition involving threats,

17 some of the calls at least could fall under that rubric,

18 yes.  I would agree with that.

19     Q.   And at the time you wrote your report, you hadn't

20 even read the federal -- Code of Federal Regulations section

21 that you testified to about today, had you?

22     A.   That's not true.  Of course I did.

23     Q.   You did?  Okay.  Well, you said that it's not

24 possible for him to have engaged in sexually violent

25 conduct, and today, you say, in fact, he did engage in

1    sexually violent conduct.

2        A.    He made obscene telephone calls, some of which

3    involved threatening behavior.  Those could -- I'll say it

4    again.  Those could qualify, yes.

5        Q.    Okay.  Let's get back to the sexual motivation

6    part.  I think you testified a moment ago that it is not

7    necessary under the federal statute for the disorder to be a

8    sexual disorder.

9        A.    Right.

10       Q.    And, in fact, it could be a head injury?

11       A.    It could be.

12       Q.    In fact, somebody could get hit with -- kicked in

13   the head by a mule and have a brain injury and that could

14   qualify as a disorder as long as it resulted in the person

15   engaging in sexually violent conduct?

16       A.    It's certainly within the realm of possibility.

17       Q.    And you testified in your deposition that that

18   would qualify under the statute, didn't you?

19       A.    Sure.

20       Q.    Under those precise facts that I just said?

21       A.    Right.

22       Q.    And whether this is a sexual disorder or not or is

23   an anxiety-related disorder, in Mr. Francis's case, the

24   result of his disorder, whatever it is, is that he engages

25   in sexually violent conduct?

1      A.    There is evidence he has engaged in the past in
2   some of that conduct, yes.
3      Q.    Okay.  And I think you testified just a moment ago
4   that he has anger issues and anger towards women issues?
5      A.    I think that's certainly a -- an issue that there
6   is evidence from the record, yes.
7      Q.    And that's part of his underlying motivation for
8   his sexually violent conduct?
9      A.    Yeah, it's part of the record and I think it does
10   play in the motivational scheme.  And during the interview,
11   I think he was well aware of these issues.  He certainly
12   communicated that to me.
13      Q.    Let's talk a little bit about that interview.  You
14   had an interview with him; is that correct?
15      A.    Correct.
16      Q.    And during that interview, was he calm, cool and
17   collected?
18      A.    He was very cooperative.  It -- there was nothing
19   that I can recall that indicated that he was either
20   resistant or hostile to my questions.
21      Q.    Now, you weren't here yesterday, were you?
22      A.    I was not.  Well, I was -- I arrived in the
23   afternoon.  I wasn't in the courtroom, though.
24      Q.    You were not in the courtroom?
25      A.    That's correct.

1      Q.   So you did not hear any of Mr. Francis's

2  testimony?

3      A.   No.

4      Q.   Have you heard anything about his testimony?

5      A.   Well, I heard that it went long.

6      Q.   Okay.  Was it your understanding that yesterday

7  contrary to the -- the mood he was in with you that he was

8  agitated and angry?

9      A.   I didn't hear that specifically, no.

10      Q.   Okay.  Is it your impression from looking at the

11  whole record that, in fact, when he doesn't get his way, he

12  does get angry and agitated?

13      A.   Certainly in the record, it indicates that he's

14  had issues with anger management, sure.  He feels that he's

15  not being treated properly.  That's -- it is what it is.

16      Q.   Let's go back to this issue of remission.  And you

17  mentioned in your testimony and also in your report that

18  there was a seven-month period when he was out in the

19  community on supervised release that he didn't make any more

20  phone calls; is that correct?

21      A.   That's correct.

22      Q.   Now, are you aware of any studies that say that if

23  somebody is in remission with a paraphilia for seven months

24  that that's sufficient to say that he's not going to have

25  trouble with that again in the future?

1    A.    No, I'm do -- what I am aware of is it's direct

2    behavior.  Let's base this -- that is the only gold standard

3    of psychology, is behavior.  Everything else, you have to go

4    inside the organism.

5         And psychologists love to make hypothetical

6    statements or conclusions or deductions.  May be true; it

7    may be not.  There's generally no way to prove it one way or

8    the other.  What I'm saying is I have my own theories.

9         I've treated dozens and, oh, probably over a

10   hundred noncontact offenders over the years.  Each case is

11   unique.  There's some commonalities.  We do a lot of

12   different types of cognitive restructuring techniques with

13   offenders.

14        But if you have eight -- seven, eight months of

15   direct, observable behavior in which the person's not doing

16   it, you don't need to get into hypothetical arguments.

17   You've got the behavior in front of you.  Let his behavior

18   tell you if he's dangerous or not, not what psychologists

19   hypothesize about based on records going back decades and

20   then trying to hypothesize about what might happen in the

21   future.  There's so much error of judgment in all of that.

22        Take his behavior.  2009, that's within the last

23   two years.

24   Q.    Do you remember what my question was?

25   A.    I do.

1      Q.    What was my question?

2      A.    Your question had to do with are there any studies

3   that show that if it's a seven- or eight-month period that

4   means that they're over it, essentially.

5      Q.    Okay.  And so the answer is, no, you're not aware

6   of any studies?

7      A.    Not specifically seven or eight months, no.

8   But --

9      Q.    Okay.  Now, isn't it true that Mr. Francis had

10  another period in his history where he was in remission,

11  he -- he didn't commit offenses for a period of five or six

12  months?

13     A.    Correct.

14     Q.    And, in fact, I've put this chart up, and if you

15  could turn to Exhibit 4 in the notebook.  And Exhibit 4 is a

16  report by Dr. Bardey -- Bardey; is that correct?

17     A.    That's correct.

18     Q.    And you read this report?

19     A.    I do.

20     Q.    And if you'll turn to Page 1902 -- Bates No. 1902.

21     A.    Yes, I'm there.

22     Q.    Second paragraph.  It reads, does it not, "In

23  December of 1998, the defendant returned to his father's

24  home, finding a job as a waiter in a local restaurant.  He

25  had not made any calls -- phone calls since August, as his

1    fear finally overwhelmed any compulsions he had towards

2    calling.

3             "As time passed, however, his fear waned and the

4    pressure increased.  He resumed making calls in February

5    1999, placing a call every few days except for during the

6    month of May until his arrest in November 1999."

7             Did I read that correctly?

8        A.   You did.

9        Q.   And so, according to the record and according to

10   Dr. Bardey's evaluation of Mr. Francis and interview of Mr.

11   Francis, from August of 1998 until February of 1999, Mr.

12   Francis didn't make these calls.  Isn't that right?

13       A.   That's what it says.

14       Q.   And that's a period of about five and a half to

15   six months?

16       A.   That seems right, yes.

17       Q.   So -- but then, after that, he went right back to

18   making phone calls again, right, in February of 1999?

19            And if you look on the -- the timeline up here,

20   which Mr. Francis has acknowledged is true, he started

21   making calls again in February of 1999, that it continued

22   until April of 1999, he skipped the month of May and then

23   started again between June and November.

24            And during all of that time, except during the

25   month of May, he was making calls every few days.  Isn't

1    that right?

2         A.    That's what the timeline says.

3         Q.    So the mere fact that he had five or six months in

4    remission during that time didn't mean that he didn't still

5    have a problem?

6         A.    Apparently not.

7         Q.    So the mere fact that he had seven months out

8    without making any calls doesn't mean he's not going to go

9    back to it, does it?

10        A.    I never said it meant it would mean he wouldn't.

11   There is a chance he would.  But let me just say this.

12   Seven or eight months is certainly longer than five or six

13   months.

14              But putting this aside, they're separated by

15   almost ten years.  I mean, I think the more proximal data --

16   the closer in time to today is the more important data.  So

17   if -- if he was in a period during this time in the 1990s

18   when he didn't and then 1998, he -- he did, that might

19   suggest something different.

20              The fact that he didn't over that more extended

21   period that's closer in time to the present again

22   underscores the issue that he certainly has demonstrated

23   control over that behavior.

24        Q.    But since that seven-month period, he has been

25   continuously incarcerated; is that correct?

1        A.    He has.

2        Q.    And he's never offended while he's been

3  incarcerated?

4        A.    No.

5        Q.    Now, let's go back to your report itself.  When

6  you formed your opinion in this case and when you wrote your

7  report, it was your judgment that there was no factual basis

8  behind any of the alleged contact w-based offenses; is that

9  correct?

10       A.    If I had to make a choice, I'd say, yes, I

11  would -- I would make a choice that these events did not

12  occur based on the way they were treated in terms of not one

13  of -- I mean, we have potentially -- first of all, what's

14  the number of them?

15            It ranged from twenty-something to

16  seventy-something.  The context under which the statements

17  were made, meaning in treatment, under full disclosure, and

18  the fact that he did recant them and the fact that I wasn't

19  aware of one instance, not one out of 70-plus, some of

20  these -- if you look at it on the surface, violent sexual

21  acts, rapes, not one was even investigated by any law

22  enforcement agency, never mind charged.  No even

23  investigation.

24            So what am I to conclude from that?  Again, I

25  wasn't there.  I have to take data in -- in the best

1    possible way it can be viewed.  And my conclusion is there's

2    no rational basis to conclude that that behavior occurred.

3        Q.   Not one of these was investigated, was it?

4        A.   Not that I know of, no.

5        Q.   Now, wasn't there a report from -- the police

6    report from Poughkeepsie, New York?

7        A.   You're talking about the 2001?

8        Q.   Yes.

9        A.   Well, that's -- I'm not including that in there.

10   That's -- that's separate.

11       Q.   Wasn't that a contact-based offense?

12       A.   He wasn't charged or convicted.  He wasn't even

13   arrested.

14       Q.   No, I'm quoting what you just said, that there was

15   absolutely no investigation of any of the contact-based

16   offenses.  But that's not true, is it?

17       A.   Well, I -- that is true, but that's a separate

18   issue.  I'm talking about the disclosures he was making in

19   treatment a few years later.

20            I'm well aware of the 2001 -- the fact that there

21   was an investigation.  But that investigation again resulted

22   in not even an arrest, never mind a charge.  So I can't

23   convict him of rape when law enforcement didn't even arrest

24   him for it.  I wasn't there.

25       Q.   Okay.  Now, he did disclose the 2001 rape in his

1   polygraph exam, didn't he?

2        A.   Yes.

3        Q.   So on that disclosure, there was a report?

4        A.   Yes.

5        Q.   And there was an investigation?

6        A.   Yes.

7        Q.   But you -- you concluded for purposes of your

8   evaluation that that did not happen either?

9        A.   I have no reason to believe it did.  He denies it.

10  I've read the material.  I read the statement.  I read the

11  affidavit from the victim -- alleged victim and I looked to

12  see what law enforcement -- how they handled it.

13       I don't assume people commit sexual or other

14  crimes unless there is a legal basis for it.  I -- I -- I --

15  if I -- I -- you can't do that.  It's not the right way to

16  do things.

17       Q.   Isn't -- isn't it true, Dr. Plaud, that when you

18  formed your opinion and wrote your report that you had not

19  read the entire police report?

20       A.   I had not read it that time, but I had certainly

21  looked at records and seen the references.  I got more

22  records after which -- you're absolutely right.

23       Q.   You hadn't even read what was in the discovery at

24  the time you wrote your report?

25       A.   I don't -- I'm not sure about that.

1          MR. ACKER:  It's on Page 27 of his deposition.

2          BY MR. ACKER:

3     Q.   You gave a deposition on July 14 of 2011; July 14

4     of this year in this case?

5     A.   I'd have to look -- yes, I gave a deposition.  I

6     don't recall the specific date.

7     Q.   Okay.  And on Page 27, Line 17 and 18, you said,

8     "I don't think I read the whole thing," referring to the

9     police report.

10    A.   Yeah, the whole thing.  Right.

11    Q.   So you did not read the whole police report?

12    A.   I wasn't sure at that time because I didn't have

13    the record with me.  It was on disk and I -- so you asked me

14    a question.  I said I don't know if I read the whole report.

15    But I certainly was aware of it.

16    Q.   Okay.  You were aware of it, but -- but what you

17    said was "What I did was I went over it.  I don't know if --

18    I don't think I read the whole thing."

19    A.   Okay.  There you go.

20    Q.   Now, you also did not confront Mr. Francis with

21    the details of that report; did you?

22    A.   No.

23    Q.   You just asked him "Did you commit that," and he

24    told you, no, it was consensual sex?

25    A.   It wasn't quite that easy, but, yes.

1       Q.   But you didn't ask him about had he been out with

2   Amy that night before Emily?

3       A.   Right.

4       Q.   You didn't know that he -- Amy had gone home with

5   him?

6       A.   At -- during the interview?

7       Q.   During the interview or by the time you wrote your

8   report, you didn't know that --

9       A.   Right.

10      Q.   -- this girl Amy had gone --

11      A.   I don't think so.

12      Q.   -- that they had engaged in oral sex, that she --

13  that she either left or passed out and he passed out and

14  then only after that did he go out and have sex with -- with

15  Emily?

16      A.   Right.

17      Q.   You didn't know any of that when you formed your

18  opinion that there was no evidence, no factual basis behind

19  that encounter or allegation?

20      A.   I -- I don't -- sitting here, again, I don't know

21  exactly all that I asked and all the details.  But I

22  certainly had looked at the -- used that as a basis to ask

23  questions about the interview -- in the interview.

24          He denied it.  I had seen -- I saw what happened

25  legally.  He was not charged or convicted, and that, to me,

1  is the most important piece of information to proceed in

2  that issue.

3      Q.    Okay.  But the specific facts that I just

4  mentioned you did not know about.  You didn't know that he'd

5  gone home with -- well, that Amy had gone home with him and

6  performed oral sex with him, right?

7      A.    I -- I don't even know if I did at this time.  It

8  was months ago, so I don't know.

9      Q.    Okay.  Well, you said in your deposition that he

10  told you nothing about that?

11      A.    Correct.

12      Q.    And he didn't tell you that Amy threw up, right?

13      A.    Correct.

14      Q.    And he didn't tell you that it was only after that

15  that he went back out late at night and had sex with Emily?

16      A.    Correct.

17      Q.    Now, you're aware, aren't you, that by the time

18  that the police finished its report that Mr. Francis was

19  already in federal custody?

20      A.    That was what I was led to believe, yes.

21      Q.    And that's evidenced in the -- in the report,

22  isn't it?

23      A.    Yes.

24      Q.    And Mr. Francis doesn't deny that, does he?

25      A.    Not to my knowledge.

1     Q.   And that soon after that, he was transferred down

2    to North Carolina?

3     A.   Correct.

4     Q.   So he wasn't in New York?

5     A.   That's right.

6     Q.   And didn't you say in your deposition that all of

7    those things could be relevant as to why New York didn't

8    arrest him?

9     A.   Of course.  Anything could be relevant, including

10   specific issues that you mentioned.  But, ultimately, he was

11   not arrested or charged and -- so how do I ignore that

12   information?

13    Q.   Now, to have a qualifying offense on prong one of

14   4248, that is that the person has engaged in or has

15   attempted to engage in sexually violent conduct or child

16   molestation, you don't have to have an adjudication of that

17   sexually violent conduct, do you?

18    A.   No.

19    Q.   And, in fact, there's no requirement that that

20   sexually violent conduct be a hands-on offense, is it?

21    A.   There's no requirement.

22    Q.   Let's talk a little bit about the phone calls he

23   made.  Isn't it true that some of the girls actually did

24   what he asked them to do because they were afraid?

25    A.   It would appear, yes, from the transcripts of the

1  victims' statements that some of them at least did cooperate

2  with what he was threatening, yes.

3      Q.   And he asked them to masturbate or stick things in

4  their vagina?

5      A.   Yes, in some -- I mean, yes, on some occasions,

6  the incident with the hairbrush, yes, or allegedly -- I

7  don't think it actually involved a hairbrush, but at least

8  it was verbiage to that effect.

9      Q.   Do you also agree that the disclosures, as you put

10  it, or admissions that he made during treatment -- that many

11  of them fell within what would be categorized as date rape?

12      A.   Yes.

13      Q.   And that there was some consistency to the pattern

14  of date rape that he described?

15      A.   Consistency?  He reported a number of incidents.

16      Q.   And -- and they had certain common elements,

17  didn't they?

18      A.   Yes.

19      Q.   And -- and included oftentimes drinking?

20      A.   Drinking.

21      Q.   And the person -- the woman going home with him?

22      A.   Yes.

23      Q.   And the person -- the woman agreeing to some type

24  of intimate contact, kissing or something?

25      A.   Correct.

1      Q.   And that -- then she would --

2      A.   Right.

3      Q.   And then he went ahead and had sex with her

4  anyway?

5      A.   That was the initial disclosure, yes.

6      Q.   And there was a pattern of a number -- as many as

7  ten of those different -- different victims that had that

8  same pattern?

9      A.   At least, yes.

10      Q.   Let's talk a little bit about treatment.  You've

11  done sex offender treatment, haven't you?

12      A.   For about 25 years now, yes.

13      Q.   And --

14      A.   Don't let my youthful appearance fool you.

15      Q.   And you ask the people that you're doing sex

16  offender treatment with to disclose their past sex offenses,

17  right?

18      A.   Disclosure is a part of my treatment.  That is

19  correct.

20      Q.   And it's a part of most treatment.  Isn't that

21  correct?

22      A.   Well, cognitively, behaviorally based treatment

23  does usually involve an element of disclosure.  Correct.

24      Q.   And isn't it true that the reason you do that is

25  because what they're adjudicated for could be just a piece

1   of their offending, and if you don't find out their other

2   offenses, then you may be treating just a small part of it

3   and not addressing other issues that may come up and put the

4   person at higher risk and that's why you have these

5   disclosures?

6        A.   In part.  I mean, there's other reasons, too, but

7   what you said is certainly true.

8        Q.   That -- wasn't I pretty much quoting you from your

9   deposition?

10       A.   Yeah.  It sounded very good, so it must -- I

11  guess.

12       Q.   So the reason you want disclosures is because it's

13  therapeutic and it -- it allows you to -- it -- to evaluate

14  their whole sexual history, their sexual motivation and

15  making sure that you're not missing a big component of their

16  offense history and -- whether it's been disclosed --

17  discovered or adjudicated or not?

18       A.   True.

19            MR. ACKER:  I have no further questions.

20            THE COURT:  Any redirect?

21  **REDIRECT EXAMINATION BY MR. WEBB:**

22       Q.   You didn't use any actuarial instruments in your

23  report on -- can you explain --

24            MR. ACKER:  Your Honor, I object.  It's exceeding

25  the scope of cross exam.

1          THE COURT:  Overruled.

2          THE WITNESS:  No, I did not.  And the reason is

3    there's no tool, no actuarial or statistical risk assessment

4    tool that would be appropriate in this particular case with

5    the type of offenses from this -- for which Mr. Francis has

6    been adjudicated.

7          It's more like -- it's even worse than apples and

8    oranges comparison.  This question whether he would even

9    fall under -- regardless of what coding rules may say or

10   don't, they're a little bit vague on the issue of telephone

11   scatologia.  There's no contact-based offenses.

12         Beyond that, if you look at the validation

13   samples, the question always is in any area of psychological

14   research, in any test construction, the reference groups for

15   which you're making comparisons of a person against those

16   groups.  That's the key.  That's what statistical or

17   actuarial risks are.

18         There's very few people in that group with that

19   type of background used for comparative purposes.  I mean,

20   to say he scores a ten, for example, on the Static-99R,

21   which is a high -- you know, very high number.  Pedophiles

22   with multiple child victims can score five or six.  You

23   know, it's -- it's -- what's the comparison?

24         It's an entirely different set of behaviors we're

25   talking about, number one.  Number two, there are

1   pedophiles -- large sample of pedophiles in the Static-99

2   reference group.  I'm -- I'm not -- there may not be ten in

3   the reference group who have had a primary diagnosis of

4   telephone scatologia as a paraphilia NOS.

5          So it's -- it's invalid to use something like

6   that.  It violates the most fundamental assumption of test

7   use.  And to say then you're going to get five them -- five

8   times zero is still zero the way I figure it out.  So it's

9   not appropriate in this case with Mr. Sean Francis to use

10  any actuarial tool.  It's misleading at its most charitable.

11      Q.   Thank you.

12           MR. ACKER:  Your Honor, may I recross on that?

13  **RECROSS-EXAMINATION BY MR. ACKER:**

14      Q.   You mentioned the Static-99 coding rules.

15      A.   Yes.

16      Q.   Are you familiar with those?

17      A.   2003, yes.

18      Q.   Yes.  And in the 2003 rules, on Page 5, there's a

19  section that said this -- the heading is "Who can you use

20  the Static-99 on?"

21      A.   Yes.

22      Q.   And doesn't it say, "The Static-99 is an actuarial

23  risk prediction instrument designed to estimate the

24  probability of sexual violent reconviction for adult males

25  who have already been charged with or convicted of at least

1  one sexual offense against a child or a nonconsenting adult?

2       A.   Yes, it says that.

3       Q.   And so isn't it true that Mr. Francis is an adult?

4  Correct?

5       A.   He is.

6       Q.   And that he's already been charged with and

7  convicted of at least one sexual offense against a

8  nonconsenting adult?

9       A.   He has been.

10      Q.   And, in fact, there's more clarification in the

11  coding rules on Page 46 that has a listing -- an example

12  listing of convictions of noncontact sex offenses, and it

13  includes obscene telephone calls in that list.

14      A.   It does, but -- it talks about A and B.  Usually

15  what -- in that case, that means that's part of their

16  constellation of offenses.  So they would have an indecent

17  assault and battery or a rape or something that and an

18  obscene telephone call type of thing.

19           Go -- forget about what those coding rules say.

20  Go back to the data samples.  How many individuals in those

21  reference groups are -- have a diagnosis of paraphilia NOS,

22  meaning telephone scatologia?  How many?  Very few.  I'm not

23  even aware of any, to be honest with you.

24           I'm sure just by the numbers, it's probably maybe

25  a few.  Then you're going to use that as your basis for

1   comparison?  That's the most funda -- I don't care what

2   coding rules -- that's a fundamental violation of

3   psychological science and test construction.

4           Your reference groups have to mirror -- they have

5   to share common variance with the person you're making

6   comparisons.  That is violated in this case.  That's all I'm

7   saying.

8       Q.   But the coding rules do allow for the use of

9   Static-99.  I understand that you've testified twice now

10  that you don't think it's appropriate, but the coding rules

11  do allow it?

12      A.   I -- I have a question about it.  I think you

13  really wanted to, you can make justification for it.  But in

14  my judgment, you'd be showing you don't understand test

15  construction.  It's as simple as that.

16          MR. ACKER:  I have no further questions.

17          THE COURT:  All right.  Thank you.

18                     [WITNESS EXCUSED]

19          THE COURT:  Who's turn is it?

20          MR. HAWES:  Dr. Jeff Singer.

21  _____

22  (WHEREUPON,

23                  **JEFFREY C. SINGER, Psy.D.**,

24      was called as a witness, duly sworn, and testified as

25      follows:)

**DIRECT EXAMINATION BY MR. HAWES:**

 Q. Good afternoon, Dr. Singer.

 A. Good afternoon, Mr. Hawes.

 Q. Will you please state your full name for the record?

 A. Jeffrey, J-e-f-f-r-e-y, middle initial C, last name Singer, S-i-n-g-e-r.

 Q. And what's your occupation?

 A. I'm a licensed psychologist.

 Q. Can you turn to Exhibit 47 in the respondent's exhibit book?  It's the black book on the left.

 A. Got it.

 Q. Now, is that your CV, your curriculum vitae?

 A. Yes, it is.

 Q. Can you tell me a little bit about your education and training?

 A. I received my bachelor of arts in 1984 from Boston University.  I was awarded my master of arts in psychology from Fairleigh Dickinson University in May of 1991.  I earned my Ph.D. from Fairleigh Dickinson University in Teaneck, New Jersey in October of 1993.  I earned my psychology license in the state of New Jersey in November of 1996 and got my New York license in February of 1997.

 Q. It goes on Pages 3 and 4 to talk about

1    publications and presentations you've done; is that correct?

2        A.   Yes.  There's only one -- one publication and a

3    non-peer reviewed -- it's actually a newsletter, but I've

4    done several presentations.

5        Q.   It talks about your honors, et cetera?

6        A.   Yes.  Well, one honor from 1984.

7        Q.   And what's that honor?

8        A.   I think it was for distinguished research as an

9    undergraduate.

10       Q.   Okay.  And have you ever testified in a case

11   pursuant to the Adam Walsh Act?

12       A.   I've never testified in a case pursuant to the

13   Adam Walsh Act.

14       Q.   What about other cases where you had to determine

15   whether a person was sexually -- was a sexually dangerous

16   person?

17       A.   Numerous times.

18       Q.   Do you know how many times, approximately?

19       A.   Approximately between a hundred and seventy-five

20   to two hundred.

21       Q.   And were you qualified an expert in all those

22   cases?

23       A.   In all but two.  There's a -- a jurist in

24   Poughkeepsie, New York, who as a matter of practice does not

25   qualify experts and there were two cases before him.  He did

1    not qualify me, but I was allowed to -- as far as I could

2    tell, to testify as an expert.

3            MR. HAWES:  At this time, I'd offer Dr. Jeff

4    Singer as an expert in the field of clinical general

5    psychology.

6            THE COURT:  I'll accept Dr. Singer as an expert --

7    expert forensic psychologist and allow him to express his

8    opinions.

9            BY MR. HAWES:

10       Q.   And, Dr. Singer, did you perform an evaluation of

11   Mr. Francis?

12       A.   Yes, I did.

13       Q.   And the purpose was to determine whether he met

14   the criteria of 4248, the Adam Walsh Act, correct?

15       A.   Correct.

16       Q.   Did you reduce your findings to a writing?

17       A.   Yes, I did.

18       Q.   And if you'll turn to Exhibit 48, is that -- is

19   that your evaluation report?

20       A.   Yes, it is.

21       Q.   Tell me a little bit about your evaluation.  How

22   did you go about doing it?

23       A.   I was given a CD and some reports to look at of

24   past records on Mr. Francis, past evaluations, past

25   treatment notes from Butner program, legal PSRs, all sorts

1   of documentation like that.

2       Q.   Did you list some of those documents on Page 2 and

3   3 of your report?

4       A.   Yes, I did.  That's a representative sample of

5   what -- what I reviewed.

6       Q.   Now, did you meet with Mr. Francis in connection

7   with the evaluation?

8       A.   Yes, I did.

9       Q.   How long did you meet with him for?

10      A.   Approximately an hour and half, hour and forty

11  minutes.

12      Q.   And Exhibit 48 was prepared as a writing of your

13  evaluation; is that correct?

14      A.   That is correct.

15          MR. HAWES:  At this time, I'd offer Exhibit 48

16  into evidence, Your Honor.

17          THE COURT:  Received.

18          BY MR. HAWES:

19      Q.   After reviewing discovery and meeting with Mr.

20  Francis, did you form an opinion as to whether he met the

21  criteria of the Adam Walsh Act?

22      A.   Yes, I did.

23      Q.   And what did you determine?

24      A.   That within a reasonable degree of professional

25  psychological, certainty Mr. Francis does not meet the

1   threshold, as I understand it, of the Adam Walsh Act.

2       Q.   Okay.  Now let's talk about how you got there.

3   There's three prongs, right?

4       A.   Correct.

5       Q.   Take me through that.  Take me through the first

6   prong.  Has Mr. Francis attempted to engage in sexually

7   violent conduct or child molestation?

8       A.   That's a tricky question.  Sexually violent --

9   certainly, child molestation there's nothing collaborating

10  anything about that.  But as far as sexually violent conduct

11  goes, I would assume that there were a list of qualifying

12  offenses, and I'm not aware of any list like that.

13          So, to me, that's more of a legal -- to me, that's

14  more of a legally grounded prong, if you will.  As a

15  psychologist looking at sexually violent conduct, physical

16  proximity, physical contact to me is very, very important

17  for that to be there.

18      Q.   So you -- would it be fair to say that threats --

19  to you, threats can amount to sexually dangerous conduct?

20      A.   Threats can?

21      Q.   Correct.

22      A.   Yes.  In theory, threats mostly certainly can.

23      Q.   It just depends on the context of it?

24      A.   Context is everything.

25      Q.   And so how does it change -- change things that

1   Mr. Francis did by telephone?

2       A.   I mean, you know, it's -- it's -- its obscene

3   telephone calls.  I'm a little flabbergasted that we're

4   talking about compulsive, repetitive, insatiable almost at a

5   certain point in his life of obscene telephone calls.

6   That's a lot different than anything actually I've ever

7   seen, which has overwhelm -- has always involved being in

8   the presence of an actual victim.

9       Q.   So it's more of a legal question?  If a

10  threatening phone call amounts essentially to sexually

11  dangerous conduct, then it is what it is?

12      A.   Correct.  And it really, I think, should be

13  legally determined question.

14      Q.   Okay.  Let's move to the second prong.  Does Mr.

15  Francis suffer -- currently suffer from a serious mental

16  illness, abnormality -- abnormality or disorder?

17      A.   Not in my opinion.

18      Q.   And explain yourself, please.

19      A.   Well, I diagnosed him with a paraphilia NOS

20  telephone scatologia, which is the sexual gratification of

21  making obscene phone calls.

22           I gave him an adjustment disorder with depressed

23  mood, which really is a very -- it's a situationally

24  based -- upset based on a situation.  It has nothing to do

25  with sexual behavior.  And those are the diagnoses I

1   rendered.

2       Q.   Now, in your opinion, are those -- do any of those

3   qualify as a serious mental illness, abnormality or

4   disorder?

5       A.   None, not -- no, nowhere near.

6       Q.   Then we don't really have to reach the third prong

7   because you don't think that these are even a serious

8   disorder?

9       A.   That is correct.

10      Q.   And so he wouldn't have a serious difficulty

11  refraining from any sexually violent conduct?

12      A.   It's possible he may pick up a phone again, but I

13  don't think that that warrants a danger of imminent

14  awfulness to people.

15      Q.   Now, did you do any tests or actuarials on Mr.

16  Francis?

17      A.   Well, I certainly did not administer any

18  actuarials.  I think that when you're making a diagnosis,

19  actuarials are best used if they're -- I don't think they're

20  worth anything for -- for risk.

21           If you're making a diagnosis, I -- I don't think

22  an actuarial is designed for a diagnosis.  It would be, in

23  my mind, like going to a cardiologist and the cardiologist

24  taking your life history and information, applying it to an

25  actuarial table and then diagnosing whether or not you have

1   cardiac disease or not.  To me, an actuarial under these

2   particular circumstances is a mismatch.

3            The only kind of instrument that I did use was

4   called the SVR-20 which stands for Sexual Violence Risk-20,

5   meaning there are 20 items plus a catchall at the end called

6   other considerations, which is a memory aid checklist to

7   make sure that I reviewed over all the relevant domains and

8   integrated that information to help inform my opinion.

9        Q.   Okay.  And will you kind of go through that where

10   you think it's pertinent and tell us what you found about

11   Mr. Francis?

12       A.   Well, that's really all enumerated on my report

13   and on Page -- on Page 12.  Would you like -- you want me to

14   go item by item?

15       Q.   No.  We didn't -- we -- let's get back to the

16   report.

17            Did you take a look at -- well, first of all, will

18   you turn to Exhibit 49?

19       A.   Yes.

20       Q.   And that is an article entitled "Paradoxical and

21   double bind communication and treatment for people who

22   sexually offend."

23            Tell me about that article and how it pertains to

24   Mr. Francis.

25       A.   That article is authored by two former directors

1   of treatment programs for individuals who have been civilly

2   committed under their own states' sexually violent predator

3   law.  It might have different names, sexually dangerous

4   person -- Robin Wilson was in Florida.  David Prescott was

5   in Minnesota.

6         And it's an entire article designed to highlight

7   the common double binds that individuals who are undergoing

8   sex offender treatment are put into.  And a double bind is

9   the idea of, like, when your wife asks you, "Does this dress

10  make me look fat?"  It's a no-win situation.

11        And these authors highlight several -- I think

12  about ten of these kinds of double bind issues that

13  individuals like Mr. Francis are -- are faced with in their

14  treatment programs.

15        And one of them is, like, you know, give us your

16  full disclosure and it won't be held against you.  And, you

17  know, it's -- it really highlights the major difficulties

18  with using treatment-generated information to adjudicate --

19  adjudicate facts.  And I -- I think it's a very apt article

20  for the current circumstances here.

21    Q.   Okay.  Mr. Singer, if you just kind of wrap up

22  things give me your overall conclusions about Mr. Francis

23  and --

24        THE COURT:  Where's that article?  It's exhibit

25  what?

1          MR. HAWES:  Forty-nine.

2          THE COURT:  Okay.

3          MR. ACKER:  Your Honor, I just need to put on the

4    record that I -- they have not sought to introduce it into

5    evidence.  And the rules are very clear that he can quote

6    from it, he can discuss it, but he cannot introduce it as an

7    exhibit.

8          I think it's Rule 803.  There's a place that talks

9    about learned treatise, and the rule is very specific that

10   it should not be introduced into evidence.  So I object to

11   it being introduced into evidence.  He's testified about it.

12   I haven't objected to that, but I -- I'm not sure.  Maybe

13   803-17.  I'm not sure about the 17, but I'm pretty sure it's

14   Rule 803.

15         THE COURT:  Yeah, let me just go to that.  Just

16   give me a minute.

17                         [PAUSE]

18         MR. ACKER:  Take your time, Your Honor.

19         THE COURT:  Okay.  This set of articles that

20   Prescott and Wilson did, you've read it?

21         THE WITNESS:  Yes, I have, Your Honor.  It's one

22   article, sir.

23         THE COURT:  Yeah.  And you rely on it?

24         THE WITNESS:  I rely on it.

25         THE COURT:  And you find it to be authoritative?

1          THE WITNESS:  Oh, for sure.

2          THE COURT:  And you find it to be respected and

3     accepted in your discipline?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  And the statements made in it are

6     things that you would use in your testimony?

7          THE WITNESS:  Yes, Your Honor.

8          THE COURT:  Okay.  Well, under 803-18, exception

9     to hearsay, while it's not received as an exhibit, it will

10    be considered as evidence by the court.

11         MR. ACKER:  And -- and, Your Honor, I think that's

12    what I said, is that the -- the document itself should not

13    be considered by the court.

14         The portions that are read into the record and

15    discussed by the witness should be accepted by the court,

16    but not the document itself.

17         THE COURT:  Yeah.  Well, you made --

18         MR. ACKER:  Very last sentence of that.

19         THE COURT:  Yeah.  You've read it all and you and

20    I have discussed it here in my examination of you, and so

21    I'll read it as being admitted as statements.  And I'm

22    reading it as such.

23         MR. ACKER:  I preserve my objection for the

24    record.

25         THE COURT:  Yeah.  Well I'm -- I'm saying right

1   now that here we are in open court and I'm actually reading

2   it because he's read it and relied on it.  So --

3            MR. ACKER:  And I think precise -- that's

4   precisely what the rule excludes, Your Honor.

5            THE COURT:  I don't think it excludes me from

6   reading it.  I can say that while court's in session and

7   while the witness is on the stand I'm silently reading it in

8   front of all the parties.  And so you'll just have to take

9   my bona fide assertion that I'm actually reading it and that

10  it will be a part of the evidence in the case.

11           MR. ACKER:  Your Honor can do what you want to do.

12  I just preserve my objection for the record.

13           THE COURT:  Yeah.  Well -- okay.  Then --

14           MR. ACKER:  Thank you.

15           THE COURT:  That's the hearsay exception.  And now

16  let's explore Rule 7.

17                        [PAUSE]

18           THE COURT:  Now, prior to this hearing today, have

19  you read that article and used it as a basis for forming

20  your opinions?

21           THE WITNESS:  The --

22           THE COURT:  Is it not a fact that you have?

23           THE WITNESS:  Well, I first formed my opinion in

24  this case --

25           THE COURT:  This isn't a trick question.

1              THE WITNESS:  I understand.  I'm sorry, Your

2    Honor.  I --

3              THE COURT:  The answer is yes.

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:   Have you ever been a witness before?

6              THE WITNESS:  Yes, I have, Your Honor.

7                            [PAUSE]

8              THE COURT:  And under Rule 703, do you rely on it

9    in forming the opinions that you have expressed in this

10   case?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  All right.  Thank you.  You still have

13   questions?

14             MR. ACKER:  I just want to put on the record the

15   objection that it's -- it's either in Rule 703 or somewhere

16   else in the rules of evidence that says that a witness -- an

17   expert witness may testify about things even if they're not

18   admissible.  And we contend he certainly can testify about

19   this, but the document itself is not admissible, even if he

20   relied on it.

21             THE COURT:  Yeah.  Well, under 803-18, it wasn't

22   admitted as an exhibit, but it was read by the jury.

23             MR. ACKER:  Well, I -- we've -- we've gone over

24   that, Your Honor.

25             THE COURT:  Yeah.

1          MR. ACKER:  Right.

2          MR. HAWES:  Just a few more questions, Your Honor.

3          THE COURT:  Go ahead.

4          BY MR. HAWES:

5     Q.   You did say that you didn't think that the

6     telephone scatologia, at least in Mr. Francis's case,

7     amounted to a serious mental illness.  But tell me what

8     significance the seven- or eight-month period of him in

9     society not reoffending has and whether you believe he'll

10    make phone calls again.

11    A.   Well, that seven- or eight-month period, to me, is

12    substantial because it's a -- it's a -- you know, I -- I

13    don't mean to repeat what's already been said, but I agree

14    that the gold standard of behavioral data is what happens in

15    the real world.  And if past behavior predicts future

16    behavior, past behavior that's most recently demonstrated is

17    substantially more reliable than past behavior that is way

18    distal.

19          Furthermore, Mr. -- Mr. Francis is somewhat older

20    now and so the time in the community, I would assume --

21    based on what we know about him, his -- his drive to or

22    compulsion to make these phone calls in -- in -- it's in

23    likelihood is that it's waned.  He was put in repeated high

24    stressful circumstances.  It's not easy being out on parole

25    or community supervision.  I forgot which one it technically

1    was.

2           He was given the object of his offending behavior

3    and told you've got to use this.  You need -- I -- I as the

4    community supervisor want you to have a cell phone.  He had

5    a stint with it -- for a job temporarily and there were no

6    phone calls.

7           I mean, if you're going to set somebody up to

8    reoffend in the way that they reoffend, that's a perfect way

9    to do it.  And there was no known behaviors of that kind of

10   telephone -- obscene telephone callmaking.  So I put a lot

11   of stock into that seven-month period.

12        Q.   Thank you, Dr. Singer.

13             MR. HAWES:  That's all I have.

14             THE COURT:  Any cross?

15             MR. ACKER:  Yes, Your Honor.

16   **CROSS-EXAMINATION BY MR. ACKER:**

17        Q.   Dr. Singer, you've testified in both New York and

18   New Jersey in state civil commitment hearings; is that

19   correct?

20        A.   That is accurate.

21        Q.   And in New York and in New Jersey, they have an

22   initial civil commitment proceeding similar to the one we're

23   engaged in today; is that correct?

24        A.   That is correct.

25        Q.   And you've testified in that sort of hearing

1   approximately 20 times in New York; is that correct?

2       A.   That is correct.

3       Q.   And in all twenty of those, you opined that the

4   person did not meet the criteria for civil commitment under

5   New York law; is that correct?

6       A.   That is correct.

7       Q.   And in 16 out of those 20 times, the court

8   disagreed with you and said, yes, this person is committed?

9       A.   Yes, the trier of fact.  Sometimes it was the

10  jury.  Sometimes it was a judge.  Yes.

11      Q.   Now, you also have testified in New Jersey; is

12  that correct?

13      A.   Correct.

14      Q.   And you used to work for the state of New Jersey;

15  is that correct?

16      A.   Yes, for a two-year period.

17      Q.   And then after you stopped working for the state

18  of New Jersey, you then testified in approximately ten cases

19  in New Jersey for initial civil commitment hearings?

20      A.   That would be at the outside upper limit for those

21  initials.

22      Q.   So eight, nine, ten civil --

23      A.   That's probably much more accurate.

24      Q.   Okay.  And you testified in all of those cases

25  that the person did not meet the criteria for civil

1   commitment; is that correct?

2        A.   That is correct.

3        Q.   But in all of those cases, the court disagreed

4   with you and found that the person did meet the criteria for

5   civil commitment?

6        A.   That is correct as well.

7        Q.   Now, other than the statute itself in 4248, did

8   you look at any other federal materials in order to

9   determine whether or not the actions of Mr. Francis

10  constituted sexually violent conduct?

11       A.   In a very -- in a very amateurish way, I did.

12       Q.   And what did you look at?

13       A.   I -- I looked at -- I forgot the -- the code it

14  was.  I -- I mentioned it in my deposition because I had the

15  note in front of me of what it was.  But it had to do with

16  what the term "threat" meant in a sex offense.

17       Q.   And sitting here today, you -- you -- you do agree

18  that a threat can constitute a sexually violent conduct?

19       A.   Depends on the threat and the context of the

20  threat.

21       Q.   There's nothing in the CFR that says that it

22  depends on the context of the threat; does it?

23       A.   No, there is not.

24       Q.   And at the time you formed your opinion in this

25  case, you had not read the deposition or seen the deposition

1   of a woman named Emily from an alleged rape against Mr.

2   Francis?

3        A.   That is correct.

4        Q.   When you interviewed Mr. Francis, you did ask him

5   about a letter that he wrote concerning absconding from

6   probation?

7        A.   I did.

8        Q.   And he told you, "So, quite frankly, "I have no

9   problem absconding from probation."

10            He told you that during your interview?

11       A.   Correct.

12       Q.   And when was your interview?

13       A.   August -- Monday, August 1st.

14       Q.   Of this year?

15       A.   Correct.

16       Q.   He also told you that he made 20 phone calls; is

17  that correct?

18       A.   I'm not recalling that -- I'm not recalling the

19  number 20.

20       Q.   All right.  Let me see.  In your deposition,

21  you're quoting him and you say, "He said, 'It's not a

22  coincidence that I lashed out in a way that threatened.  I

23  didn't have a punching bag.  I didn't bar fight.  I made 20

24  phone calls.  The people I called were thousands of miles

25  away."

1           Didn't you quote him as saying that?

2      A.   I may have quoted him, but I don't think the

3   number twenty was -- was accurate or accurately recorded.

4   I -- could -- could I look at -- I'm not really sure what he

5   put in that point, but I -- I don't think the number 20 was

6   actually mentioned.  It was my understanding he made

7   hundreds.

8      Q.   Right.  I think this was in your notes.  Do you

9   happen to have your notes with you?  You took notes when you

10  interviewed him, correct?

11     A.   Correct.

12          MR. ACKER:  May I approach the witness, Your

13  Honor?

14          THE COURT:  You may.

15          BY MR. ACKER:

16     Q.   And is this your handwritten notes that you took?

17     A.   Absolutely not.

18     Q.   Oh, no.  That may be Dr. Malinek's.  Let me find

19  the other notes.

20     A.   Those look more legible.

21     Q.   Is this your handwritten notes?

22     A.   Oh, yeah.

23     Q.   Okay.  Would you look through there and see if you

24  can find a quote where you quoted Mr. Francis when -- and

25  these were notes you took contemporaneously during the

1  interview, correct?

2      A.   Correct.  Yeah, that's not all of them.

3      Q.   That's not all of them?

4      A.   Nope.

5      Q.   There's more of them there?  Do you have them up

6  there with you?

7      A.   I'm going to look.  I apologize for the time.

8           (Witness examines document.)  It was during the

9  punching bag statement?

10     Q.   Yes.

11     A.   Yeah, I got it.  Yeah, I -- I had it -- 20 phone

12  calls.  Yeah, there it says it.  Does say -- it looks like

13  20.

14     Q.   So he told you that he had 20 phone calls and the

15  people he called were thousands of miles away?

16     A.   I think that says 20, yeah.

17     Q.   And -- but neither of those statements is true, is

18  it?  He made over a hundred threats and thousands of calls.

19     A.   That's certainly my understanding.

20     Q.   And, in fact, not all of the people he called were

21  thousands of miles away.  Isn't that true?

22     A.   That's totally accurate.

23     Q.   In fact, some of them were in the same county

24  where he was located when he made the telephone calls?

25     A.   Yes.

1          MR. ACKER:  Your Honor, may I approach just to

2    retrieve those?

3          THE COURT:  (Nods affirmatively.)

4          MR. ACKER:  Thank you.

5          BY MR. ACKER:

6     Q.    So he's still minimizing his offenses even August

7    of this year when he's talking to you?

8     A.    Well, yes, that would be a good example of a

9    minimization, which has very little to do with being a

10   sexually dangerous person.

11    Q.    And when you were writing your report, you

12   believed that it was important for you to determine whether

13   or not, in fact, Mr. Francis had ever raped anybody.

14          Didn't you think that was important?

15    A.    Yes, I did think that was important.

16    Q.    And you concluded that no legal rape had occurred?

17    A.    That is correct.

18    Q.    Part of the discovery was about a three-hour

19   videotape of a polygraph examination and interview preceding

20   the polygraph examination; is that correct?

21    A.    That is correct.

22    Q.    And you were provided that in discovery?

23    A.    I certainly was.

24    Q.    But you didn't watch the whole thing, did you?

25    A.    No, I did not.

1        Q.   You just kind of skipped around?

2        A.   I watched about two hours and fifteen minutes.

3        Q.   Okay.  But you didn't see the portion where he

4   described the most significant crime that he believed he had

5   committed?

6        A.   I don't know how one would -- out of 27 or 57 or

7   even more than that, I don't know how one puts a value

8   judgment on the most significant.

9        Q.   Well, so you didn't see the part where the

10  polygraph examiner specifically asked him, "What do you

11  believe is your most significant sexual offense?"

12       A.   Didn't you show that in court yesterday?

13       Q.   I'm asking you did you watch that when you --

14       A.   It doesn't really ring a bell.

15       Q.   Actually I didn't show that portion yet.

16       A.   Okay.  It -- the -- the -- the -- the video was

17  rather dry and it just didn't mean that much to me.

18       Q.   And so you -- you didn't see the portion where she

19  asked about the most significant sexual offense he's

20  occurred?

21       A.   I -- I may have, I may not have.  It doesn't stand

22  out.

23       Q.   And it didn't stand out that the facts that he

24  described matched almost exactly the statement of the rape

25  victim in 2001?

1      A.    Not at all because you -- you're making up stuff

2    as you go along in that.  Eventually, you can say enough

3    things that something's going to match.

4      Q.    So that wasn't significant to you in determining

5    whether or not a legal rape had occurred?

6      A.    In the absence of a finding of fact or in the

7    absence of a police investigation that resulted in some kind

8    of prosecution, no.

9      Q.    Do you agree that the central theme of this case

10    is whether or not the 27 victims that he admitted to

11    actually occurred or not?

12      A.    Oh, we went over this during the deposition.  To

13    a -- to a large degree, yes, but, you know, in final

14    analysis he's still a telephone -- obscene telephone caller.

15    So that's important, too, I think.

16      Q.    Well, those aren't just my words, are they?

17      A.    No.

18      Q.    Those -- that's a quote out of your report, isn't

19    it?

20      A.    Yes, it is.

21      Q.    In fact, on page -- the Page 14 of your report,

22    you say, "It is ironic that this central theme remains in

23    the matter before the court regarding whether the sexual

24    offenses against 27 other victims actually occurred or is

25    another example of Mr. Francis filling his life with, quote,

1    deception and dishonesty, end quote, trying to impress his

2    treatment providers."

3              So you're the one that said that whether or not he

4    really committed those acts of 27 acts of -- of sexual

5    violence occurred that that's the central theme of this

6    case.

7         A.   Yes, it is.

8         Q.   When Mr. Francis made the telephone calls, he was

9    trying to cause fear in the women, was he not?

10        A.   Sometimes I believe so, yes.

11        Q.   And he was trying to cause humiliation, wasn't he?

12        A.   Sometimes.

13        Q.   And he was sexually aroused by those things,

14   wasn't he?

15        A.   I assume so sometimes.

16        Q.   In fact, in your deposition, when you answered

17   that question, it was frequently.

18        A.   Okay.

19        Q.   You still think it was frequently?

20        A.   It's hard to know what sometimes frequently is.  I

21   mean, there was so many -- I'm sure it happened a lot.

22        Q.   Okay.  And it's your understanding that he

23   masturbated during or subsequent to those calls?

24        A.   On occasion, yes.

25        Q.   Now, you didn't give that qualification when I

1   asked you that question in deposition, did -- did you?  You

2   just said "Correct."

3        A.   Correct.

4        Q.   Now, if the events on December 16 of 2001 were as

5   Emily described them -- that is, he held an object to her

6   side, that he was -- that she was forced to perform oral

7   sex, that she was forced to lie on her back in gravel in the

8   middle of December in Upstate New York outside -- those

9   would be consistent with a sexual sadist wanting to cause

10  humiliation and pain for sexual arousal.  Isn't that true?

11       A.   No, it's really not true.  All -- all acts of rape

12  are sadistic in nature.  The question is whether or not is

13  it a -- is it a sadistic pattern of sexual arousal driving

14  that kind of behavior.  Most rapes are situational,

15  opportunistic, impulsive, hedonistic.

16            Is there a pattern of that kind of behavior,

17  that's very important to see.  There's no pattern of that

18  kind of behavior here.  So is it possible that somebody with

19  sexual sadism would engage in that kind of behavior?  It's

20  absolutely possible.  But the fact is that most rapes are

21  not driven by sexual -- a sexual sadistic paraphilia.  Most

22  rapes are impulsive, antisocial, hedonistic, situationally

23  determined acts.

24       Q.   My question was not whether it would be conclusive

25  whether he was a sexual sadist.  My question is would that

1  be consistent with what a sexual sadist would do?

2      A.   Well, when you hear hooves, think horses, not

3  zebras and think -- and since sexual sadism is pretty rare,

4  my first -- my first differential diagnosis in my head is

5  that that sounds like a -- a rape -- a typical rape, awful

6  as they are.

7          But there's nothing particularly sadistic.

8  There's no glorification of the individual's discomfort,

9  humiliation and pain.  There's no -- there's no implements

10 of torture.  There's no binding.  I mean, it's a

11 straightforward rape.

12     Q.   Now, she did say that he forced her down to her

13 knees to perform oral sex on him?

14     A.   Yes.

15     Q.   And she said that while he was having sex with

16 her -- forcing sex on her that he was talking to her about

17 going back to his apartment and having sex with other

18 roommates?

19     A.   Yes.

20     Q.   And he made her lie down in gravel?

21     A.   Yes.

22     Q.   And he made her -- didn't he hit her at one point,

23 at least --

24     A.   Per --

25     Q.   -- according to her?

1      A.   Per her statement, yes.

2      Q.   Okay.  And aren't those consistent with what a

3  sexual sadist might do?

4      A.   No, they're not.  It's an instrumental violence to

5  get the victim to comply.

6      Q.   Okay.  But that's not the answer you gave in your

7  deposition, is it?

8      A.   I don't remember what I said in my deposition.

9      Q.   All right.

10         MR. ACKER:  If I could approach, Your Honor?

11         THE COURT:  Yeah.

12         BY MR. ACKER:

13     Q.   Does this appear to be a copy of your deposition

14  testimony?

15     A.   I'm sure you're going to give me the right

16  document.

17         THE COURT:  Yeah.

18         BY MR. ACKER:

19     Q.   All right.  And does this not say when you were

20  asked that "Okay" and "All right."

21         Question:  "If the facts were as Emily describes

22  them, that he held an object to her side, that she was

23  forced to perform oral sex, that she was forced to lie down

24  on her back in gravel in the middle of December in Upstate

25  New York outside, would those be consistent with a sexual

1   sadist wanting to cause humiliation and pain for sexual

2   arousal?"

3           And your answer was "Not necessarily," right?

4       A.   That's what it says, "Not necessarily."

5       Q.   Then I went on to say, "I didn't ask -- I didn't

6   say if it would be conclusive of it.  I said would it be

7   consistent with what a sexual sadist might do?"

8           And you said, "In theory, yes."

9       A.   In theory, yes.

10      Q.   Okay.  You mentioned during your direct testimony

11  that you assumed that there was a list of qualifying

12  offenses for the Adam Walsh Act; is that correct?

13      A.   I did make that assumption.

14      Q.   But that's not true, is it?

15      A.   It turns out it's not.

16      Q.   And so you were really basing it on state law

17  assumptions?

18      A.   Based on my experience of doing these hearings and

19  these kinds of evaluations in New York and New Jersey,

20  there's a -- a list of qualifying offenses.  So I just

21  assumed there'd be one here, too.

22          THE COURT:  I mean, do you really think this

23  nitpicking cross-examination is impeaching him?

24          MR. ACKER:  I'm -- I'm almost through, Your Honor.

25          THE COURT:  I know, but I'm just -- as a general

1  principle.

2          MR. ACKER:  I'm almost through.

3          THE COURT:  I mean, you get to say, "Well, I made

4  a mistake," you know, "I can't remember," et cetera.  I

5  mean, this is -- big picture, you think I'm going to have

6  greater or lesser value on his credibility because of that?

7  Because I'm not.

8          MR. ACKER:  I -- I understand, Your Honor.

9          THE COURT:  Yeah.

10         BY MR. ACKER:

11     Q.   You talked about actuarials, and you said you

12  didn't use them in this case; is that right?

13     A.   Yes.

14     Q.   Do you use them at all anymore?

15     A.   No, not anymore.

16     Q.   So -- so it's not the specifics of this case in

17  particular; you just don't use actuaries?

18     A.   Well, my practice has evolved over the years based

19  on how -- how accurate they are.  I think they're really

20  oversold and you really would not use it to -- as a

21  diagnostic tool.

22     Q.   Now, you drew an analogy to a doctor -- a cardiac

23  doctor and a cardiac doctor shouldn't use actuarials to

24  diagnose; is that correct?

25     A.   Correct.

1      Q.   But that's not -- not how psychologist use

2  actuarials.  They don't use it to diagnosis, do they?

3      A.   I hope not.

4      Q.   They use it to determine once there's a diagnosis

5  is -- if there's a risk of reoffense and how high that risk

6  is?

7      A.   I don't know.

8      Q.   Well, let's go back to a doctor.  Isn't it true a

9  doctor -- cardiac doctor, using your analogy, wouldn't use

10 and shouldn't use actuarials to diagnose something, but they

11 would use actuarials to determine what the risk of a certain

12 condition would be or what the risk of -- of somebody --

13 relapse after treatment?

14     A.   Yes, they're a risk tool, and you have to make

15 sure your -- your -- your database is applicable to the

16 person in front of you.

17     Q.   Okay.  And you mentioned this problem of somebody

18 being in a -- in a double bind where they're in treatment

19 and they're told -- and I believe your quote was something

20 like, "Give us full disclosures and it won't be held against

21 you."

22     A.   Correct.

23     Q.   But that's not what the Butner program did, is it?

24     A.   I'm not -- I -- I don't know.

25     Q.   Do you know anything about the Butner program?

1        A.    I know something about the Butner program.

2        Q.    Well, did you ever look at the consent form that

3    was signed by the participants in the Butner program?

4        A.    That was -- yes.

5        Q.    And isn't it true that that says, in fact, not

6    what you said about we won't hold it against you?

7              It specifically says the opposite.  Doesn't it say

8    that "Although admitting to unreported crimes may result in

9    additional criminal prosecution, the SOTP strongly

10   encourages all its participants to be completely honest

11   about the extent of their sexual deviance and sexual offense

12   history"?

13       A.    That's what it says.

14       Q.    Okay.  So they were told that, in fact, it could

15   be used against them, but they were still encouraged to make

16   disclosures.

17       A.    How does that make any sense?

18       Q.    Well, I'm just saying you said they were put in a

19   bind because they were told their disclosures wouldn't be

20   used against them.  And, in fact, that's not true.  They

21   were --

22             THE COURT:  You've got a guy in jail and he's

23   staying in jail.  And you don't know what else he's done and

24   you say, "Tell me everything you've done and we still might

25   use it against you."

1           And his point is, being an average American with

2    some common sense, how does that make any sense.  And the

3    answer is it doesn't.

4           If the guy wasn't in jail, if he wasn't behind

5    bars, if he was in a Walmart and you said that to him, he'd

6    walk away.  So I get the point.

7              THE WITNESS:  Thank you Honor.

8              THE COURT:  Yeah.

9              MR. ACKER:  My point goes, Your Honor, to whether

10   or not he had a reasonable expectation that this could be

11   used against him.

12             THE COURT:  But you're in jail.

13             MR. ACKER:  I understand.

14             THE COURT:  And the forecast of the future is that

15   you might be 4248'd, but you don't know.

16             BY MR. ACKER:

17      Q.   Is it true, Dr. Singer, that Sean Francis

18   volunteered to go to Butner for the sexual offender

19   treatment program?

20      A.   Where I come from, sometimes you're made an offer

21   you can't refuse.

22             MR. ACKER:  Okay.  I have no further questions.

23             THE COURT:  Yeah, I don't either.  We'll take a

24   recess.  Who's going to be the next witness?

25             MR. ACKER:  Unless they have another witness, I

1   believe it'll be the videotaped deposition and put Mr.

2   Francis back on the stand.

3            THE COURT:  All right.

4            MR. WEBB:  If Your Honor please, I forgot to move

5   into evidence Dr. Plaud's report at Exhibit 37.

6            THE COURT:  It'll be received.

7            MR. WEBB:  Thank you.

8                 [RECESS - 2:54 P.M. TO 3:14 P.M.]

9            THE COURT:  What are we going to do now?

10           MR. ACKER:  Your Honor, I would like to recall Mr.

11  Francis to the stand.

12           THE COURT:  Okay.

13           MR. HAWES:  And if I may, Your Honor, can the

14  doctors be released?

15           THE COURT:  Yeah.  They're your witnesses.

16           MR. HAWES:  Okay.

17  _____

18  (WHEREUPON,

19                    **SEAN ROBERT FRANCIS**

20       was called as a witness, having been previously duly

21       sworn, and further testified as follows:)

22  _____

23  **CONTINUED DIRECT EXAMINATION BY MR. ACKER:**

24       Q.  Mr. Francis, before we took a break with you, I

25  believe you were testifying saying that you fully cooperated

1    with the police.  Do you recall that?

2         A.    I do.

3         Q.    And that's still your testimony, that you fully

4    cooperated with the police?

5         A.    Well, I think the record reflects it, yes.

6         Q.    Now, isn't it true that when the police first

7    interviewed you, you lied to them about having sex with

8    Emily?

9         A.    I don't recall lying.  Can you -- can you read a

10   statement?  I don't recall lying to them.  I recall it

11   was -- we spoke a few hours at the metropolitan detention

12   center in Brooklyn.

13              I voluntarily did so.  I did so without counsel,

14   and I answered all their questions.

15        Q.    Isn't it true, Mr. Francis, that originally when

16   you first spoke to the police that originally you said that

17   you had not left your house after the encounter with Amy?

18        A.    I don't recall saying that, and I only spoke with

19   them once.

20        Q.    And isn't it true that that's what the police

21   report says about your interview?

22        A.    That's a -- that -- that's the notes that they've

23   taken about the interview.  I -- they did not ask me to sign

24   a statement.  I believe that's what it says.  That's what I

25   read.

1     Q.   Let's look at that just briefly, Exhibit 7.

2     A.   1589; is that correct?

3     Q.   Yes, 1589.  And if you'll look on -- not including

4  the top heading, when it starts the actual notes -- fifth

5  line down.

6     A.   Yes.

7     Q.   It says, "Began by saying he did not leave 56

8  Sunset after looking for Amy.  Changed story to meeting

9  Emily and having consensual sex with her."

10    A.   That's what it says.

11    Q.   So are you saying that the -- the police officer

12  that wrote that was lying?

13    A.   Well, Mr. Acker, that's not what I'm saying.  I'm

14  saying as I recall saying this.  I mean, we've done a lot of

15  depositions in this case.  I find it interesting you didn't

16  go find the police officers and -- and -- we haven't spoken

17  to them.  And, basically, this is something somebody else

18  wrote about what I said.  I guess that's hearsay.  I guess

19  that's the word.

20    Q.   Well, I'm asking you --

21    A.   I don't recall making these statements.  I have

22  given you testimony through deposition about my -- my take

23  on what happened that night, and I do not recall saying

24  this.  I was being questioned about if we want to --

25    Q.   Mr. Francis I'm asking you a yes-or-no question.

1      A.   Well, I've answered you.

2      Q.   Do you --

3      A.   I said no.  I don't recall.

4      Q.   Let me just have you answer yes or no.  Do you

5 deny saying what the police officer indicates you say?

6      A.   I do not recall saying that.

7      Q.   So you do not deny saying it?

8      A.   I do not recall saying that.

9      Q.   You don't deny saying it?

10     A.   Mr. Acker, I don't recall.  I'm sorry.  That's my

11 answer.  I don't know what else you want me to say.

12     Q.   Now, you also recall us looking at letters that

13 you wrote to Moriah?

14     A.   That's correct.

15     Q.   And isn't it true that you lied to her about the

16 incident with Amy?

17     A.   With Amy?

18     Q.   Excuse me.  With Emily.  I apologize.

19          Didn't you lie to -- to Moriah about the incident

20 with Emily?

21     A.   I -- no.  I believe what happened was -- and I

22 believe you're going to go to the letter.  What happened was

23 after my arrest, United States probation spoke with Moriah.

24 They had an interview with Moriah to find out if -- if I was

25 this big monster and if I had hurt her since she had lived

1    with me for six months.

2              And they told her, by the way, there was an

3    allegation made against him all these ago.  And I believe

4    my --

5         Q.   Mr. Francis, I'm not talking about an interview.

6    I'm talking about the letter that you wrote.  And would you

7    answer my question?

8              Did you write to Moriah that you did not have sex

9    with Emily?

10        A.   I don't recall write --

11        Q.   Okay.  Well, then if you don't recall, let me show

12   you the exhibit.  If you'll turn to exhibit forty-six, page

13   2899.

14        A.   Okay.

15        Q.   The first full paragraph, which is nine lines

16   down, says, "As for the rape -- quote, rape Glenn told you

17   about, the one who, quote, didn't get justice, end quote,

18   she was a girl I met at a club.  We fooled around but never

19   had sex."

20        A.   Okay.

21        Q.   And isn't that a lie?

22        A.   Well. it depends.  Is it Amy or is it Emily?  I

23   don't know.  I mean, you know, you're -- you're questioning

24   me -- your entire -- you're questioning me about Emily.

25   Charge me.

1      Q.   I'm asking you if you lied to Moriah.

2      A.   I'm telling you --

3      Q.   Are you denying that you're talking about Emily in

4  this sentence?

5      A.   I don't know if I was talking about Emily or if I

6  was talking about Amy.

7      Q.   Well, you --

8      A.   I have no idea.  I did not rape Emily.  I'm sorry.

9      Q.   Was there anybody else that -- that came forward

10  to the police that claimed rape for who -- for which she

11  didn't get justice?

12      A.   Contact the police.  How should I know?

13      Q.   Well, you wrote this letter.  For the -- as for

14  the rape Glenn told you about, the one who didn't get

15  justice -- well, weren't you talking about Emily?

16      A.   Ask Glenn.  I don't know.

17      Q.   I'm asking you.  This is your letter.  When you

18  wrote this --

19      A.   Glenn is the one who said it.

20      Q.   Who were you referring to?

21      A.   I do not recall who I was referring.  All I can

22  tell you is that I didn't rape Emily.  I understand the

23  answer that you want.  We're going to play a video here and

24  everything.  I didn't rape her.

25          If you don't believe me, scrape together probable

1    cause and indict me.

2       Q.   You do not deny that you in this letter were

3    talking about Emily when you were talking about the girl who

4    claimed rape and didn't get justice?

5       A.   Mr. Acker, I don't ,recall but if you want me to

6    say it's Emily, I'll say it's Emily for you.  I -- I don't

7    recall.  I'm sorry.

8       Q.   But you told Moriah that you didn't have sex with

9    her?

10      A.   That's what's in the letter Mr. Acker.

11      Q.   Okay.  Now, it's fair to say, isn't it, your

12   version of what happened on December 16th, 2001, and Emily's

13   are diametrically opposed versions of what happened that

14   night?  Isn't that true?

15      A.   That would be fair.

16           MR. ACKER:  All right.  Your Honor, at this time I

17   would like to introduce Exhibits 47 and 48.  They are -- 47

18   is the transcript of Emily -- of -- of the videotaped

19   deposition of Emily and 48 is the actual videotape itself.

20           MR. HAWES:  We're objecting to that, Your Honor.

21   It's -- as far as I know, that deposition was done prior to

22   discovery.  I still have more questions for Emily.  If they

23   want to bring her here as a witness, I'll be glad to -- to

24   question her then.

25           MR. ACKER:  Your Honor, he was at the -- he

1    participated at the deposition.  He was noticed of the

2    deposition.  He appeared at the deposition.  He

3    cross-examined her.

4           She's more than a hundred miles away.  She's

5    beyond the subpoena power of this court in a civil case, and

6    the rules clearly allow for her deposition to be admitted.

7           THE COURT:  Do you cross the Sixth Amendment?

8           MR. ACKER:  Your Honor, the Sixth Amendment

9    applies to criminal cases and this is a civil case.

10          THE COURT:  So you don't have a right to confront

11   the witnesses against you in a case in which you're going to

12   be detained?

13          MR. ACKER:  The rules say that you do have a right

14   to have your -- to be present either in person or by your

15   counsel, and counsel was present.

16          MR. HAWES:  And I was present, Your Honor, but I

17   was -- my understanding was that was part of discovery.  I

18   never knew that it was going to be used in the trial in --

19   instead of her actually being here.

20          MR. ACKER:  Your Honor, the very first question I

21   asked her in the deposition was do you live more than a

22   hundred miles away and do you live outside of North

23   Carolina.

24          And I also asked at the deposition why are you

25   testifying here instead of in North Carolina and she

1   answered that.

2          So Mr. Hawes certainly did know during the

3   deposition or should have known -- regardless of whether he

4   knew or didn't know, the rules allow us to use statements as

5   long as he had the right to cross-examine her, and he did.

6   He did cross-examine her.

7          THE COURT:  Okay.

8          MR. HAWES:  And, Your Honor, now I have further

9   questions in addition to that.

10                        [PAUSE]

11         MR. ACKER:  Your Honor, I believe it's Rule 32.

12         THE COURT:  Yeah, I was just hoping that maybe a

13  federal courtroom would have the US Constitution in it, but

14  I don't believe it does.

15         MR. ACKER:  I think it's in the book, Your Honor.

16         THE COURT:  It used to be, but they don't put it

17  in the book anymore.

18         MR. ACKER:  They don't?

19         THE COURT:  No.  We've become digital.

20         MR. ACKER:  The last time I looked, they did.

21         THE COURT:  Who needs it, you know.  I'll reserve

22  a ruling on the Sixth Amendment bar to having witnesses

23  against you in a case in which you can be imprisoned to not

24  appear in person and will write an order on that.  So I'll

25  hear the evidence now.

1          MR. ACKER:  Thank you, Your Honor.  So,

2    provisionally, Exhibits 47 and 48 are admitted, subject to a

3    later order disqualifying them?

4          THE COURT:  Correct.

5          MR. ACKER:  Thank you.  At this time, we would

6    play the video deposition of Emily, her last name withheld,

7    and would ask that that be played at this time.

8          THE COURT:  I think I'm probably going to rule

9    that you have to bring the witnesses, just like I ruled that

10   Brady had to be constitutionally -- the fact that they call

11   it a civil case doesn't exempt it from the U.S.

12   Constitution.  So I'll -- I'll get to that, but it'll be

13   days or weeks from now.

14         MR. ACKER:  Thank you, Your Honor.

15              [DEPOSITION VIDEOTAPE PLAYED]

16         MR. ACKER:  Your Honor, just for clarification,

17   Government Exhibit No. 39 is in our notebook and has already

18   been admitted into evidence.

19         THE COURT:  All right.

20              [DEPOSITION VIDEOTAPE PLAYED]

21         MR. ACKER:  Your Honor, for the record we've

22   already admitted Exhibit 38.

23         THE COURT:  It's received.

24         MR. ACKER:  It's the same exhibit.

25              [DEPOSITION VIDEOTAPE PLAYED]

1          MR. ACKER:  Your Honor, just for the record we're

2     showing her from Exhibit 1, which is the videotape of the

3     2009 polygraph.  And we will show that -- it's the exact

4     clip that we showed to her to Your Honor as well.  But

5     that's what she's referring to when I asked if the man that

6     raped her was the man on the screen.

7          THE COURT:  Okay.

8               [DEPOSITION VIDEOTAPE PLAYED]

9          THE COURT:  How much more do we have?

10          MR. ACKER:  Your Honor, it's about 30 more

11     minutes.

12          THE COURT:  Thirty more minutes.  Why?  Stop it.

13     What are you going to do for the next 30 minutes?  I mean --

14          MR. ACKER:  Well, I think there's about maybe 15

15     minutes of direct and about 15 minutes of cross.

16          THE COURT:  Well, everything now is cumulative.  I

17     mean, you -- the event is over.  What -- what do you -- what

18     do you expect to accomplish?

19          I mean, you're going over the same thing ad

20     nauseam.  One time, same question, same question, where you

21     on the rocks, were you -- and I'm not -- I mean, you got

22     the -- the -- all the evidence in.

23          What -- that's one of the problems with

24     depositions, is that they're not vital.  They're not alive.

25     You know, you got it -- you've done it in a time past and

1  you did it to protect all the conceivable things you can do,

2  and then you're in trial and they don't fit.

3            MR. ACKER:  Well, Your Honor I -- I -- I haven't

4  gone through specifically in mind to see if there's some of

5  it we can redact.  If you want to take a five-minute break,

6  I can do that or we can just continue on.

7            THE COURT:  And what -- what's the cross?

8            MR. ACKER:  Mr. Hawes cross-examined her.

9            THE COURT:  I mean, this is just a gross waste of

10  time from here on.  Go ahead and -- you know, you can waste

11  some more time and I'll sit here.  Go ahead.  And then at

12  some point, I'll stop it.

13                  [DEPOSITION VIDEOTAPE PLAYED]

14            THE COURT:  You know, I think we'll stop at this

15  point and take a brief recess.  And you can take a look at

16  your cross and see if any of it is relevant, and if it's

17  not, don't play it.

18            And the point is that since you get to take

19  advantage of the big picture ruling that it was a civil kind

20  of proceeding and not have Sixth Amendment confrontation,

21  you don't get the -- you can use that as a -- a shield.  But

22  you don't get the sword of making me listen to everything

23  that you bring in the deposition.

24            I don't find anything hereafter being relevant and

25  so I would exclude it on that basis.  So, I mean, that's --

1    that's the reconciliation of the key issue.  I mean, the
2    point you want get to is you want to cross-examine him about
3    this.
4            It's -- you -- you've got everything in that is
5    relevant and material and operative.  Now you want to be
6    able to cross-examine him about that.  If you spend 30 more
7    minutes on this, you won't get to do that.
8                    [RECESS - 4:17 P.M. TO 4:29 P.M.]
9            THE COURT:  Okay.  Do you want to play any of the
10   remaining video?
11           MR. ACKER:  Your Honor, I think you can address
12   that to responding party.  You already instructed me not to
13   play any more.
14           THE COURT:  You don't want to play any of it?
15           MR. HAWES:  No, Your Honor.
16           THE COURT:  Okay.
17           MR. ACKER:  Your Honor, I would say that you have
18   admitted the videotape and the transcript into evidence.
19           THE COURT:  Right.
20           MR. ACKER:  And so I may later on refer to some
21   things --
22           THE COURT:  All right.
23           MR. ACKER:  -- and parts that weren't played.
24           BY MR. ACKER:
25      Q.   Mr. Francis --

1      A.   Yes, sir.

2      Q.   -- you heard Emily's sworn testimony, did you not?

3      A.   I have.

4      Q.   And is she lying?

5      A.   She is.

6      Q.   Now, her story is almost exactly the same as what

7   you told the polygraph examiner in 2009, isn't it?

8      A.   I said stuff in 2009 for the purpose of being in

9   sex offender treatment program.

10          I -- I guess are there similarities?  Yes, there

11   are.  Was I referring to Emily?  No, I wasn't.  Sorry.  I

12   didn't rape that one.

13      Q.   You were not referring to Emily?

14      A.   I was not referring to Emily.  I did not rape

15   Emily.  We had a consensual encounter.

16      Q.   All right.  You say there are some similarities.

17   Isn't it true that there -- the stories are almost

18   identical?

19      A.   Mr. Acker -- I'm sorry.  Yes, there --

20      Q.   Go ahead.  I apologize.

21      A.   Yes, there are similarities.  The issue is look at

22   the context where I said that, which was a sex offender

23   treatment program where I had to have victims.

24          I didn't rape Emily.  I cooperated with the

25   police.  I wasn't arrested.  It was fully investigated.  I

1    just -- I think the facts speak for themselves.  I mean,

2    I -- I understand you're trying to circumvent the criminal

3    justice system here, but I don't know what you want me to

4    say.

5            MR. ACKER:  Your Honor, I'm -- I'm happy to play

6    and I would like to play, but I don't want to bore Your

7    Honor, the tapes of where from the -- you heard the audio

8    portion on the deposition, but I can play the portions --

9    the video of him from 2009.  I'd like to, unless Your Honor

10   would prefer I don't do that.

11           THE COURT:  Go ahead.

12           MR. ACKER:  All right.  Clip 10 is from Exhibit 1

13   and it's the portion that's in the transcript in Exhibit 42.

14   I'll see if I can have the exact page numbers.  It -- I

15   don't have the page numbers right here, but it is from

16   Exhibit 1 and Exhibit 42.

17                   [VIDEO CLIP 10 PLAYED]

18           BY MR. ACKER:

19       Q.   Now, is it your testimony that this statement you

20   made in 2009 is just completely made up out of whole cloth?

21       A.   It's my statement that I said it for the purpose

22   of sex offender treatment.  I was not confessing to raping

23   Emily.  And I assure you had I known that this was going --

24   going to go in your hands and you were going to misuse it

25   like this, I simply would have violated by refusing

1  treatment and gone to jail.  I said what I had to say to

2  stay in the program.

3       Q.   Okay.  My question to you is was this made up out

4  of whole cloth?

5       A.   It was a fabricated incident for the purpose of

6  sex offender treatment program.

7       Q.   You testified earlier that some of the things that

8  you said were exaggerations or you took an actual incident

9  and -- and exaggerated it.

10           Is this one of those incidents or is this just

11  completely made up?

12      A.   Did I -- did I take -- it's probably an

13  exaggerated incident.  I was well aware of the police

14  report.  I was well aware of the probation officer had it.

15  I had seen the police report.  I knew about it.  So, I mean,

16  I said it for the purpose of having a victim for sex

17  offender treatment.

18      Q.   So you were admitting to raping Emily for the

19  purpose of sex offender treatment?

20      A.   No, I was not admitting to raping Emily.  I was --

21  I was creating a victim to have for my victim for sex

22  offender treatment.  I've never admitted to raping Emily.  I

23  didn't rape Emily.  The police concluded I didn't rape

24  Emily.

25      Q.   Now, did you -- so you knew about the police

1    report, right?

2         A.   Yes.

3         Q.   And so you based this statement in 2009 on the

4    police report?

5         A.   Did I -- did I take details and -- and create the

6    victim out of this?  Probably so, yes.

7         Q.   That's contrary to what you told me in your

8    deposition, isn't it?

9         A.   It might be.  I don't know.

10        Q.   In your deposition, didn't you tell me that you

11   made this up completely and it had absolutely nothing to do

12   with Emily?

13        A.   Well, you just showed me the video clip, Mr.

14   Acker.  I didn't have the video clip in my possession at

15   that time.  I mean, you're asking me to think about what I

16   was doing two years ago.

17        Q.   So this was based on -- on the facts that you knew

18   about for Emily?

19        A.   It may have been Mr. Acker.  I created a victim

20   for sex offender treatment.

21        Q.   Now, in this that we just watched, it said in the

22   beginning there was a night that you went home with a female

23   and you were not able to force her or convince her to do

24   what you wanted her to do.

25             So you were talking about Amy there, correct?

1    A.   Well, and the police interviewed Amy, as you may

2    understand, and --

3    Q.   I -- I -- Mr. Francis, I -- this will take forever

4    if you don't answer my questions "yes" or "no" if they're

5    yes-or-no questions.

6    A.   Mr. Acker, I did not admit to raping Emily.  I was

7    not talking about Amy.  It was a fabricated incident for the

8    purposes of sex offender treatment.  Please indict me.

9    Q.   I -- I just need yes-or-no answers if it calls for

10   a yes-or-no answer.  The section here where you said you

11   went home with another female and weren't able to force her

12   or convince her to do what you wanted to do, was that Amy?

13   A.   No.

14   Q.   Now, later on in this 2009 polygraph examination,

15   when you were talking about Victim No. 4, didn't you say

16   that Victim No. 4 was who happened right before Victim No.

17   1?

18   A.   I don't recall what I said.  If that's what I

19   said, that's what I said.  I don't recall.

20   Q.   You don't recall --

21   A.   If you say that's in the transcripts, I'll take

22   your word for it.  I don't recall specifically.

23   Q.   Okay.  Let's keep going on what you said on this

24   video clip we just watched.  You said that the first girl

25   you were with left and you had a little tool in your pocket.

1          Now, isn't it true that Amy left after you tried
2   to convince her to have sex and you didn't have sex?
3       A.   Amy left after we both passed out together.  Amy
4   got sick and threw up.
5       Q.   And then she left?
6       A.   That's right.  She left.
7       Q.   And you woke up?
8       A.   I woke up.
9       Q.   And then you went out and found Amy -- found
10  Emily?
11      A.   I went out -- I went back to the club, yes; went
12  back to McCoy's.
13      Q.   Okay.  And it says you had a little tool in your
14  pocket, and that's consistent with what Emily said.  Yes?
15      A.   Is it consistent with what Emily said?  Yes.  My
16  friends were interviewed.  They saw what happened that
17  night.
18      Q.   I'm simply asking you if it's --
19      A.   I know you don't want that.
20      Q.   It says, "So I went out downtown because I knew
21  other drunk girls would be stumbling around."
22          Is it true that you went back downtown to have --
23  for the purpose of having sex with someone else?
24      A.   No.  Downtown is not where Marist College is,
25  Poughkeepsie downtown.  It's two completely separate areas.

1   In fact, if you have a map somewhere, Marist College is not

2   located downtown.

3       Q.   Is it true that after Amy left, you went out again

4   for the purpose of having sex with someone?

5       A.   I went back to the club.  I didn't go out

6   purposefully to have sex.  I went back to the club.

7       Q.   To look for someone to have sex with?

8       A.   Mr. Acker, I went back to the club to have a good

9   time.

10      Q.   It says -- you also said in the tape we just

11  watched that you forced her to perform oral sex.

12           That's consistent with what Emily said, is it not?

13      A.   It's with -- it's consistent with what she said,

14  but not with the DNA the police got.

15      Q.   Well, now DNA would only prove whether or not you

16  had sex with her, not whether it was rape, correct?

17      A.   I don't know, Mr. Acker.  Let's ask a police

18  officer.

19      Q.   And you admitted to having sex with her?

20      A.   Mr. Acker, I would assume that if you had oral sex

21  with somebody, there'd be some DNA.  I assume the police

22  can -- can ascertain that.  I'm not a -- I'm not a

23  prosecutor or police officer, but I assume they can figure

24  that out.

25      Q.   But you admitted to the police that you had sex

1  with Emily?

2      A.   That's correct.

3      Q.   And so DNA wouldn't show anything, would it?  It

4  would just show whether or not you had had sex with her.

5      A.   The issue is oral sex here, not intercourse.

6      Q.   Okay.  Now, it also says that -- you say in the

7  tape that you raped her.

8           That's consistent with what Emily said, isn't it?

9      A.   It is.

10     Q.   And it said -- you also said, "There have been

11  plenty of times in my history when I've committed date

12  rape."

13          And that's consistent with the other things you

14  said in 2009 and in 2003, isn't it?

15     A.   Is it consistent with things I said?  Yeah.  With

16  reality?  No.

17     Q.   Okay.  Then you said in -- on the tape in 2009

18  that you told her that the tool that you had was a gun.

19          And that's consistent with what Emily said, isn't

20  it?

21     A.   Not just consistent with what Emily said.

22     Q.   And you said that you were in your 20s, but you

23  didn't want to give a precise age.

24          But isn't it true that on the victim list that you

25  wrote out that you did put your exact date and you put that

1    you were 23?

2         A.    I don't know.  If -- if you say I did, then I'll

3    take your word for it.

4         Q.    And isn't it true that -- that in December of

5    2001, you would have been 23 years old?

6         A.    I believe so.

7         Q.    Now, there's another section of the 2009 polygraph

8    where you went back and described a little bit more detail

9    about this incident.  I'd like to play Clip 11, which is

10   also from Exhibit 1 and 42.

11                     [VIDEO CLIP 11 PLAYED]

12             BY MR. ACKER:

13        Q.    And isn't it true, Mr. Francis, that when you say

14   you did rough talking to her to scare her -- isn't that

15   consistent with what Emily said?

16        A.    With what she said.

17        Q.    And isn't it true that when you say you slapped

18   her once, that's consistent with what Emily said?

19        A.    Yes.

20        Q.    Now, you also say in here that you did rough

21   talking to her "to scare her even more because that excited

22   me."

23             Isn't that true, that -- that when you talked

24   rough to her, it made her scared that that sexually excited

25   you?

1      A.   I didn't talk rough to Emily.

2      Q.   Isn't it true that you have -- you continued after

3  this event to fantasize about this rape that you committed

4  and to masturbate to it?

5      A.   I didn't rape Emily.  I haven't committed a rape.

6  The answer is no.

7      Q.   All right.  I want to play another clip.  It's

8  Clip 12, again also from the 2009 polygraph examination.

9  Clip 12 is part of Exhibit 1 and 42.

10                     [VIDEO CLIP 12 PLAYED]

11       BY MR. ACKER:

12      Q.   So isn't it true that this rape of Emily was

13  sexually exciting to you?

14      A.   There was no rape of Emily, and, no, it was not

15  sexually exciting.

16      Q.   And have you gone back and relived the incident

17  with Emily and masturbated to that recollection?

18      A.   As I've already testified, no.

19      Q.   And you say in this that you have fantasies of

20  rape and committing those offenses and you believe you

21  always will.

22           Isn't it true that you still have fantasies of

23  rape and that you believe that you always will have those

24  fantasies?

25      A.   Absolutely not.

1      Q.   You also say, "The difference is nine out of ten

2    times, I'm not masturbating to those fantasies anymore."

3           So in 2009, would you say one in ten times you

4    were masturbating to rape fantasies?

5      A.   As I've already testified, I do not have rape

6    fantasies.  I said that for the purpose of treatment.

7      Q.   So you, a few minutes ago, called Emily a liar,

8    that she lied under oath.

9           You've also called your other victims liars,

10   haven't you?

11     A.   I've said things that were in the PSR were not

12   accurate, yes.

13     Q.   Even though you pled guilty to those charges?

14     A.   I pled guilty -- you know, there's a big

15   difference between what I pled guilty to and what's in your

16   PSR.  That's from the affidavits.  So there's a big

17   difference, and you're not acknowledging that.

18     Q.   Isn't it true that you routinely lie to get what

19   you want?

20     A.   Do I routinely lie?  Do I have a history of

21   telling lies?  Guilty as charged.  I'm a liar.  I mean, we

22   established that yesterday.

23     Q.   You lie to get women in bed?

24     A.   Mr. Acker, do I lie to get women in bed?  Have I

25   ever gone out and picked up women and had consensual sexual

1  relations?  Of course, I have.  I've had 60 to 80 partners.

2        Q.    And lied to them about who you were?

3        A.    Yes, Mr. Acker.  I don't know it's a crime.  Yes.

4        Q.    Lied to them about what you did for a living?

5        A.    Yes, Mr. Acker.

6        Q.    Didn't you lie to Dr. Singer when you said how

7  many calls you had made?

8        A.    No, I don't believe I did lie to Dr. Singer.  I

9  think he said it was a typo or he missed -- got the number

10  down or something like that.  I mean, I told Dr. Plaud it

11  was around 50 to 60.

12              I've testified here I don't know exactly how many

13  phone calls I've made.  All's I can looked at -- all I can

14  look at is what I've been arrested and charged for.

15        Q.    Didn't you lie to Dr. Singer when you said that

16  the calls were a thousand miles away?

17        A.    Mr. Acker, you're absolutely right.  I concede

18  your point.  Kentucky from South Carolina is probably four

19  hundred miles.  Absolutely.

20        Q.    Well, in fact, you made calls in the same county,

21  didn't you?

22        A.    This is 1998.  So it's a long time ago.  This

23  isn't a federal charge.  It's in 1998.  Had I been making

24  calls in the same county, I wouldn't be sitting here.

25        Q.    Isn't it true that you're perfectly willing to lie

1   to stay out of prison?

2        A.   Am I willing to lie to stay out of prison?  This

3   isn't about me going to prison.  This is civil.  It's about

4   hospital treatment.  So --

5        Q.   Are you willing to lie to stay out of prison?

6        A.   Mr. Acker, I'm telling you the truth.  I'm not

7   willing to lie to stay out of prison.

8        Q.   You're not going to lie to stay out of prison?

9        A.   Mr. Acker, I'm not going to prison.  You're --

10  we're not trying to put me in prison.  I don't understand

11  the question.

12       Q.   But isn't that your claim; that, in fact, you lied

13  in 2009 to stay out of prison?

14       A.   Oh, I thought you meant right now.  But, I mean,

15  of course -- if you're in the community, Mr. Acker, of

16  course.  Who wants to go to jail?  Of course.

17       Q.   So you don't mind lying to stay out of prison?

18       A.   No, Mr. Acker, I don't mind lying to stay out of

19  prison when I was on supervised release and this program was

20  part of my probation.

21            MR. ACKER:  I have no further questions Your

22  Honor.

23            THE COURT:  Any cross?

24            MR. HAWES:  Very briefly, Your Honor.  I'm going

25  to beat a dead horse very briefly.

1    **CROSS-EXAMINATION BY MR. HAWES:**

2        Q.   You're very familiar with the investigation that

3    we talked about today?

4        A.   Yes, I am.

5        Q.   If you look at Exhibit 7, isn't it true that her

6    boyfriend and her were having problems at least that night?

7    If not, they had been -- been -- been having problems

8    leading up to that night; is that correct?

9        A.   That's what the police -- the police report

10   reflects, yes.

11       Q.   That morning after she had supposedly been raped,

12   he even told police in his report that he had told her that

13   he wasn't going to the formal and wished she wasn't either;

14   is that right?

15       A.   According to the police report, that's what he

16   told them, yes.

17       Q.   And then in another statement later, he told them

18   that he had been in a bad mood all day and that he was not

19   happy that she was going to the formal; is that right?

20       A.   That's what he told the police.

21       Q.   And on this -- on the deposition video, Emily

22   admitted that she was drunk, didn't she?

23       A.   She did.

24       Q.   She admitted that she'd been drinking from 5:00

25   until 12:00?

1          A.    She did.

2          Q.    She said that she drank all liquor drinks?

3          A.    She did.

4          Q.    She said that she doesn't hold her alcohol very

5    well?

6          A.    She did.

7          Q.    And her boyfriend, if you look back at the

8    reports, told police that same morning that she came home,

9    put on his clothes and immediately -- and this is the phrase

10   he used -- passed out; is that right?

11         A.    That's correct.

12         Q.    And she said on the deposition video that she

13   drank so much that she later got nauseous that morning.

14         A.    That's correct.

15         Q.    And she said she doesn't drink anymore because she

16   never wants herself -- she never wants to be at a point

17   where she has no control; is that correct?

18         A.    That's correct.

19         Q.    And let's talk about this investigation.  Though

20   Emily in the deposition video, which took place ten years

21   later, says that security guard did not see you guys

22   together, the security guard himself says -- if you'll turn

23   to Page 1572 in Exhibit 7 --

24         A.    Okay.

25         Q.    -- he says himself that he saw the two of you

1  walking; is that right?

2       A.  Yes, it is.

3       Q.  And I'll read it.  He said before he got out of

4  his vehicle he saw a male and female walk down from behind

5  an old garage in the south position.  This garage is part of

6  the Kim Carts business and not used anymore.  He stated that

7  the male and female walked out from behind the garage and

8  appeared to be having a conversation as they walked toward

9  the open gate.

10      He stated he drove a little closer to them to the

11 parking lot, which was empty of vehicles.  Mr. Winfield, who

12 again is the Marist College security officer, stated as he

13 approached subjects, they did not react.

14      He said he drove out of the parking lot in a

15 westerly direction across Beck Place into another student

16 parking lot, keeping an eye on the two subjects.  He goes

17 on -- he states that he was flagged down by the female and

18 described the male as follows.  He goes on to describe you.

19      And he says that when the female flagged him down,

20 he pulled over to her she got in the vehicle and he drove

21 her to her apartment, A2.  He stated that five minutes

22 later, he was asked to respond to A2 for a report of a

23 possible rape.  He said he drove up Fulton Street to look

24 for the subject he saw earlier, but couldn't find him.

25      A.  That's correct.

1      Q.   And so he didn't note that she was visibly shaken.
2    She wasn't crying.  Is that right?
3      A.   That -- that's correct.  I mean, she got into the
4    car with the campus police officer and, you know, if you had
5    just been raped, I can't imagine you wouldn't tell the
6    police officer that.
7      Q.   Emily also said that she did a rape kit at St.
8    Francis Hospital that morning; is that correct?
9      A.   That is.
10      Q.   And she refused to take a formalized statement
11    that morning.
12      A.   That's correct.
13      Q.   But that morning, detectives collected evidence
14    and took photographs of the scene and wrote down the tags
15    of -- of your -- supposedly, your Tiburon; is that correct?
16      A.   That's correct.  And it was my Tiburon.
17      Q.   And the next day, Detective Cole notes in his
18    notes that several daytime detectives were working on the
19    case, the rape case.
20      A.   That's correct.
21      Q.   And the detective finally took Emily's formalized
22    statement a day later, which she now calls -- ten days [sic]
23    later, she's calling the deposition -- she says it was
24    mostly accurate.
25      A.   Correct.

1        Q.    Detectives also the day after went to the house

2    where your Tiburon was found and photographed the interior

3    and exterior of the house and collected from the house for

4    possible DNA typing; is that right?

5        A.    It is.  I  also believe they interviewed my -- my

6    friends who I was staying with.

7        Q.    Well, I'm not sure what day, but it wasn't the

8    17th.  The 18th, they interviewed several people about the

9    alleged rape.

10       A.    That's correct.

11       Q.    And they interviewed Emily again on the 18th.

12       A.    That's correct.

13       Q.    And then in February, they're still interviewing

14   several people about the alleged rape; is that right,

15   February of 2002?

16       A.    It is.

17       Q.    And they interviewed you in March of 2002; is that

18   right?

19       A.    That's correct.

20       Q.    And they interviewed -- Emily said they

21   interviewed her again a year later after the alleged rape.

22       A.    That's correct.

23       Q.    And she says in the deposition tape that she felt

24   betrayed by the justice system.  However, did she ever bring

25   a civil lawsuit against you?

1        A.    At no time.

2        Q.    And also is there anywhere in the notes -- in the

3    police notes where Emily noted that you said, "I'm going to

4    jail anyway," or is that something that came up in the

5    deposition?

6        A.    I believe that is something that has just come up

7    in the deposition.

8        Q.    Okay.  If you'll look at the respondent's

9    exhibits, No. 36.

10        A.    Hold on.  Okay.  Exhibit 36.

11        Q.    And that's a detainer letter; is that correct?

12        A.    It is, from Otisville, New York.

13        Q.    And where's that to?

14        A.    It's to the Dutchess County District Attorney's

15    Office.

16        Q.    And that was May 8, 2002?

17        A.    That's correct.

18        Q.    And it says, "This office has received the

19    following report.  A report has been received that there may

20    be a possible pending rape charge.  He is serving a 24-month

21    sentence for a supervised release violation.  The original

22    charge was making threatening interstate communications.

23    Current release date is September 12th, 2003.

24            "Will you please investigate this report and

25    advise what disposition, if any, has been made on the case?

1    If subject is wanted by your department and you wish a

2    detainer placed, it will be necessary for you to forward a

3    certified copy of your warrant to us along with a cover

4    letter stating your desire to have it lodged as a detainer

5    or indicate you have no further interest in -- in the

6    subject."

7              Is that what it says?

8        A.   Yes, it is.

9        Q.   Turn to the next exhibit, 37.

10       A.   Okay.

11       Q.   Is that the same thing, except for it says it's

12   the second and final notice and it's from June 8, 2002?

13       A.   That is correct.

14       Q.   Now, Mr. Francis, we've talked a lot about this.

15   You know what a hands-on offense?

16       A.   Yes.

17       Q.   Have you ever committed a hands-on offense?

18       A.   No, I have not.

19       Q.   Are you going to commit any hands-on offenses in

20   the future?

21       A.   No, I am not.

22       Q.   Are you going to commit anymore of these

23   threatening phone calls in the future?

24       A.   No, I am not, as I proved the seven months that I

25   was out in the community and ordered to have a cellular

1   phone by the United States Probation Office.

2           MR. HAWES:  I have no further questions.

3           MR. ACKER:  Just a few, Your Honor.

4   **REDIRECT EXAMINATION BY MR. ACKER:**

5       Q.   You were asked several questions about what Emily

6   said in her deposition, the portions that we didn't play; is

7   that correct?

8       A.   Yes.

9       Q.   And isn't it true that also in her deposition, Mr.

10  Hawes asked her how many drinks she had had that night?

11      A.   I believe I still have the transcript.  Correct.

12      Q.   And that Mr. Hawes asked her, "So would you say it

13  was less than one drink an hour?"  Do you recall that?

14      A.   I think I saw that in transcript, yes.

15      Q.   And that she also testified that the last drink

16  that she had was between 11:00 and 12:00 at night and that

17  the rape took place at 4:00 in the morning?

18      A.   That's her testimony, yes.

19      Q.   So her testimony was that she had had less than

20  one drink an hour over the period of about six or seven

21  hours and that she then was -- five hours later was when she

22  was raped?

23      A.   That's what she says.

24      Q.   Okay.  And you were also asked about what the

25  security guard said, that he saw you walking.

1          Isn't that consistent with Emily's statement that
2  you were having a weird conversation with her after the
3  rape?
4      A.   I guess that's consistent with her statement,
5  but -- yeah.  Yeah.  I'm sorry.  Your answer is yes.
6          MR. ACKER:  Okay I have no further questions.
7          THE COURT:  All right.  Thank you.  This is the
8  end of this witness's testimony?
9          MR. ACKER:  Yes, Your Honor.
10                      [WITNESS EXCUSED]
11         THE COURT:  What are you going to do tomorrow?
12         MR. ACKER:  Your Honor, the only thing I would ask
13  is that we be given a brief opportunity to make closing
14  statements.  It won't be long.
15         THE COURT:  Are you going to offer more evidence?
16         MR. HAWES:  No, Your Honor.
17         THE COURT:  No?
18         MR. HAWES:  No.
19         THE COURT:  Okay.  Yeah.  Well, we can resume
20  tomorrow at 9:30.
21         MR. ACKER:  Thank you Honor.
22         [WHEREUPON, THIS HEARING WAS ADJOURNED.]
23                    [END OF TRANSCRIPT.]
24                  - - - - - - - - -

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN


<u>CERTIFICATE</u>

      I, PATRICIA C. ELLIOTT, VERBATIM REPORTER AND NOTARY PUBLIC FOR THE STATE OF NORTH CAROLINA, COUNTY OF FRANKLIN, HEREBY CERTIFY THAT THE FOREGOING PAGES REPRESENT THE HEARING BEFORE THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, THE HONORABLE TERRENCE W. BOYLE, U.S. MAGISTRATE JUDGE PRESIDING, IN THE MATTER OF <u>UNITED STATES OF AMERICA V. SEAN ROBERT FRANCIS</u>, AND THESE PAGES CONSTITUTE A TRUE AND ACCURATE TRANSCRIPT OF THE PROCEEDING.

      IN WITNESS WHEREOF, I HAVE HEREUNTO AFFIXED MY HAND THIS 20th DAY OF OCTOBER, 2011.


      <u>/s/  PATRICIA C. ELLIOTT</u>

      PATRICIA C. ELLIOTT
      VERBATIM REPORTER
      NOTARY PUBLIC NO.: 19940480043