THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,       )
                                )
            PETITIONER,          )
                                )
      V.                         )   NO. 5:10-HC-2013-BO
                                )   OCTOBER 7, 2011
SEAN ROBERT FRANCIS,             )   RALEIGH, NC
                                )
            RESPONDENT.          )
_____ )

TRANSCRIPT OF 4248 BENCH TRIAL
(VOLUME 3)

BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PETITIONER:   G. NORMAN ACKER, III, ESQ.
                      MICHAEL LOCKRIDGE, ESQ.
                      ASSISTANT UNITED STATES ATTORNEY
                      EASTERN DISTRICT OF NORTH CAROLINA
                      800 TERRY SANFORD FEDERAL BUILDING
                      310 NEW BERN AVENUE
                      RALEIGH, NC  27601-1461

FOR THE RESPONDENT:   JAMES RYAN HAWES, ESQ.
                      WOODY WEBB & ASSOCIATES
                      127 WEST HARGETT STREET, SUITE 104
                      RALEIGH, NORTH CAROLINA  27601

REPORTED BY:          PATRICIA C. ELLIOTT
                      VERBATIM REPORTER

1                    P R O C E E D I N G S
2              THE COURT:  Good morning.
3              MR. ACKER:  Good morning.
4              MR. HAWES:  Good morning, Your Honor.
5              THE COURT:  Do you have any more evidence?
6              MR. ACKER:  No more evidence, Your Honor.
7              THE COURT:  Do you have any more evidence?
8              MR. HAWES:  No, Your Honor.
9              THE COURT:  All right.  Do you want to make your
10   closing argument?
11             MR. ACKER:  I do, Your Honor.  Your Honor, as --
12   as I said at the very beginning of this case, you have a
13   stark choice, and that's whether to believe Sean Francis or
14   whether to believe the victims, and -- particularly, Emily
15   and the victims of telephone calls.  Because, if you recall,
16   on Page 3 of Dr. Malinek's supplemental report, he says that
17   when Dr. Malinek talked to Sean Francis, he denied all those
18   statements in the PSR from his victims.
19             So, basically, he's calling all of his victims
20   liars.  You've got to decide who's telling the truth.
21             Now, let's suspend this belief for just a moment
22   and talk about the expert reports, because all the experts
23   looked at the telephone calls and Dr. Malinek and Dr.
24   Perkins both said that even if you just looked at the
25   telephone calls, he's still sexually dangerous.

1        And I'm not going to belabor all of the evidence.
2   It's -- if we don't believe Emily and we don't believe that
3   these date rapes happened, then, basically, it's the typical
4   case of the battle of experts and who you're going to
5   believe. But let me just point out a couple of things that
6   are different from the reports.
7        Dr. Plaud in his report said that, in his opinion,
8   Sean Francis had not committed a sexually violent act,
9   sexually violent conduct as defined by the statute. On the
10  stand, he changed that. On the stand, he said, "No, I've
11  gone back and looked at the CFR and I do acknowledge that
12  those telephone calls because of the nature of them, because
13  of the nature of the threats were sexually violent conduct."
14       All the experts agree he has some sort of
15  paraphilia. They differ on what that paraphilia is. Dr.
16  Plaud and Dr. Singer say it's telephone scatologia. Dr.
17  Malinek and Dr. Perkins say it's -- it's even more serious
18  than that. But they all agree he has a paraphilia.
19       So if it's a battle of experts, it comes down to
20  where it normally comes, and that is the last -- the third
21  prong of the test and that is the likelihood of reoffense
22  and whether Mr. Francis is going have to serious difficulty
23  in refraining from this action.
24       And as you've heard in other cases, the first step
25  in that -- not the last step, the first is using actuarials.

1  And Mr. Francis's score in the Static-99 was a ten.  That's
2  very high and -- it's at the 99th percentile.  Only one
3  percent of sex offenders have a higher score than that.
4          And the actuarials show that -- and this is
5  summarized in Dr. Malinek's report, that on the Static-99
6  and the Static-2002 he has people in his group that have
7  similar characteristics as him reoffend at a rate of 59 --
8  55 to 59 percent of the time within five years.  And within
9  ten years, they reoffend between 64 and 68 percent of the
10 time.
11         So, Your Honor, the actuarials show that this is
12 a -- is a very sexually dangerous man.  Dr. Plaud didn't use
13 actuarials at all in this case and Dr. Singer -- excuse
14 me -- yes.  Dr. Singer doesn't use actuarials at all.  So
15 the evidence from the actuarials is this is a very dangerous
16 man and he is likely to reoffend.
17         But then you go on to the dynamic risk factors --
18 and I'm not going to go through all of them.  The reports
19 talk about the different dynamic risk factors.  Let me talk
20 about one, because one that's been scientifically validated
21 among several is cooperation with supervision.
22         When somebody repeatedly doesn't cooperate with
23 supervision, it increases his risk to reoffend.  And we know
24 what Mr. Francis's position is on that.  We know it from the
25 letters that we submitted into evidence that he wrote to

1  Moriah.
2          He said, "Fuck probation."  He said, "I'm going to
3  live life on my terms."  He expressed as late as -- I think
4  it was August 11th when he interviewed with Dr. Singer --
5  that he still intended to abscond from supervision.
6          Now, Dr. Plaud and Dr. Singer also talked about
7  the seven months out of custody and that they said that --
8  in Dr. Singer's words, that superseded all of his prior
9  conduct because he had seven months out in -- in -- out of
10 custody without reoffending.  But Dr. Plaud admitted on the
11 stand that there was no evidence in the literature to
12 support that that was a long enough time to draw that
13 conclusion.
14         And the evidence also showed that during this time
15 frame from August of 1998 until February of 1999, he was out
16 in the community for five and a half months and didn't
17 reoffend and then he went right back to making the calls.
18 So five and a half months versus seven months -- it's about
19 the same time frame.  It's not enough time to show that he
20 is not likely to reoffend.
21         All right.  So now let's get to the heart of the
22 case, Your Honor, and that is -- as Dr. Singer put in his
23 report, the central theme of this case is whether or not Mr.
24 Francis had any hands-on offenses.  Because if he did, then
25 it's absolutely clear that he's a sexually dangerous person

1  and should be committed.
2          The only people who considered that evidence were
3  Dr. Perkins and Dr. Malinek.  They said we believe he's
4  sexually dangerous just on the telephone calls, but we also
5  believe that it's likely that the rape in 2001 happened and
6  it's possible that these other date rapes happened.  And if
7  they did, then that confirms our -- our opinion -- it's
8  consistent with our opinion of the kind of man that this man
9  is.
10         So he admitted on the stand -- when I asked him,
11 "Are you a liar," he said, "Guilty as charged."  And, you
12 know he lies to get girls in bed, he lies to get his way, he
13 lies to get what he wants.  He even admitted that -- on the
14 stand yesterday that he lies -- he has no problem lying to
15 stay out of prison.
16         Well, if he lies to stay out of prison, he'll lie
17 to stay out of civil commitment.  He blames his victims.  He
18 blames -- he accuses Emily of lying.  He accuses the victims
19 of the -- of the telephone calls of lying.  But, you know,
20 the bottom line is -- Your Honor asked a great -- great
21 question when Dr. Malinek was on the stand.
22         Your Honor asked if this guy's a -- a pathological
23 liar, then can I believe anything he says.  And Dr. Malinek
24 said, you know, you look for congruencies; you look for
25 corroboration; you look for consistency.

                And, you know, I'd say even a pathological liar --
as the saying goes, even a stopped clock is right twice a
day.  And so, Your Honor, you can believe some of what he
says and discard other things.  And if that -- that's
consistent with the jury instructions that you give to
juries all the time.  You tell juries you can believe all,
part or none of what a witness says.  And in Your Honor's
jury instructions, you say, "What do you do?  You look for
corroboration.  You apply your common sense.  You look at
the witness's demeanor and then you decide -- you use those
things to decide to tell whether somebody's telling the
truth, even if it's only part of the truth."
                So let's look at that for just a moment.  The rape
of Emily, the external corroboration, if you take his
statements from 2009, what corroborates that?  Emily's
statement to the police which is Exhibit 38; the police
report and all the other investigation they did, Exhibit 7;
but, most importantly, her videotaped deposition.
                And when you contrast, which we did yesterday --
you contrast her videotaped deposition of what happened in
that rape and you contrast what he said in 2009 about that
rape, the facts match almost exactly.
                And so, Your Honor, we would say that that
external corroboration -- there's also internal
corroboration even within the 2009 statement.  Because if

1  you recall, he admitted on the stand that Victim No. 4 that
2  he was talking about in the 2009 statement was Amy.  And he
3  said, "Oh, I embellished.  I exaggerated.  I didn't really
4  try to force Amy to have sex."  But he admitted that -- that
5  person was Amy.
6          And then he also says in the 2009 videotape,
7  "Well, this is the woman" -- that is, Amy -- "that I tried
8  to have sex with right before I went out and raped Victim
9  No. 1," which was Emily.  And so even internal to the 2009
10 statement, it's corroborated.
11         Common sense, Your Honor.  Which of those stories
12 makes more sense, his story that he went out at 3:00 or 4:00
13 in the morning, found a girl who had a serious boyfriend,
14 convinced her in a very short period of time to have sex
15 outside in the middle of December in Upstate New York in
16 weather that was so cold that he refused to take her -- to
17 walk her home on the ground, on top of gravel that he knew
18 was hurting her, or her story that she came up -- that she
19 was walking home from her boyfriend's house, holding a Silo
20 cup with water because her stomach was upset that he
21 misconstrued was beer, that he stuck something into her
22 side, forced her to have oral sex and forced her to have sex
23 on the ground outside in the cold.  Which of those stories
24 makes more sense using common sense?  Which rings true?
25         Now, I -- I'll point out one other thing, Your

1  Honor, that's in the record but wasn't played as part of --
2  of Emily's deposition and that was in Mr. Hawes'
3  cross-examination.
4      He asked her on cross-examination, "How many other
5  people have you had sex with?"
6      And she answered.  She said, "I've only had
7  consensual sex with one other person one time in high
8  school, and other than that, the only person I've had sex
9  with is the man that was my boyfriend then and is my husband
10 now."  When you try to use your common sense to say which of
11 those stories make more sense, it's Emily's story.
12     And then demeanor, Your Honor.  If you noticed,
13 during the videotape, she was pretty calm, but there were a
14 couple of times when she had to kind of take -- stop and
15 catch her breath and take a drink of water.
16     There's only one time she cried, Your Honor.  When
17 did she cry?  When she watched him on the videotape, she
18 reached the tissues.  Your Honor, her demeanor is very
19 consistent with what a rape victim would be -- would be
20 expect, somebody that she -- the other thing she testified
21 to is that she had just recently gone through treatment to
22 move on with her life.  Her demeanor was what you'd expect.
23     Contrast that to Mr. Francis's demeanor:
24 combative, agitated, arrogant, argumentative, controlling.
25 Your Honor, when you look at the demeanor, you can believe

1 Emily's story. Emily's story is consistent with the
2 experts' testimony that Mr. Francis lacks empathy; that he
3 is high on the psychopathy checklist; that's he's
4 controlling, angry, has sadistic qualities, anger towards
5 women.
6       And even Dr. Plaud, their expert, admitted that he
7 has many of these qualities, including anger towards women.
8 It's also consistent with behavior of his convictions.
9       You know, what did he do in those telephone calls?
10 He demeaned women. He intimidated. He scared them. He
11 used the word "terrorized":  "I terrorized these women."
12       And that's -- he also testified in 2009 -- or
13 didn't testify. He said in 2009 on that videotape that he
14 spoke harshly to Emily to make her afraid because that made
15 him more sexually excited and that's very consistent with
16 what he did on the telephone calls.
17       So, Your Honor, there's clear and convincing
18 evidence that Sean Francis raped Emily on December 16th,
19 2001. There's also clear and convincing evidence that these
20 date rapes occurred.
21       Now, I'll acknowledge that the evidence is not as
22 explosive or as voluminous, it's not as clear that these
23 date rapes occurred. But, Your Honor, the evidence that we
24 showed does demonstrate that the date rapes occurred as
25 well.

1           And I know that the evidence that we presented was
2    tedious.  It got boring sometimes and it sounded like the
3    same thing over and over again.  But, Your Honor, that was
4    precisely why I needed to do that, because it's precisely
5    that same pattern, the same kind of -- of offense over and
6    over again that makes it believable.
7           And he even described in the 2009 videotape what
8    his pattern of date rapes was:  that he would often use
9    alcohol, that he would convince women to come to his house
10   or his dorm room, that they would begin in kissing or
11   petting and then the woman would say no and then he would
12   say, "Too bad.  I'm going to get what I want.  I'm going to
13   take what I want."
14          And that's the pattern over and over and over
15   again.  And he said in his -- in the 2009 videotape, "If I
16   got what I wanted voluntarily, consensually, great.  If not,
17   I just take what I want."  And that's consistent internal to
18   his admissions in 2009.  It's also consistent with what he
19   said in 2003 at Butner.
20          Now, Mr. Webb was making a big deal in Dr.
21   Perkins' cross-examination about how many sexual victims he
22   had.  He filled out two victim lists.  In Butner, he said
23   there were 57 victims, and in Kentucky, he said there were
24   27 victims.  But if you look at those 27 victims and you
25   compare them to the 57 victims, it overlaps.  So what

1  accounts for that difference?  What are those other 30
2  victims that he admitted to in 2003 that he didn't admit to
3  in 2009?
4          Well, he tells us and that's -- you know, I know
5  it was a little humorous when I asked him, you know,
6  "Sometimes you were just being an asshole, weren't you?
7  Sometimes you -- you were just being a jerk," because those
8  are the words he used in 2009 when he told -- he kind of
9  interrupted the polygraph examiner and said, "Now, wait a
10 minute.  I just need to make sure.  There's some people that
11 I left off my list because I didn't force them to do it.  I
12 just was being a jerk."
13         And so the difference between the 27 victims and
14 the 57 victims is that on the 27-victim list, he left out --
15 off the people that he simply convinced to have sex with
16 him, but didn't force them to.  And that's the difference.
17 Other than that, those lists between 2003 and 2009 are
18 almost identical.
19         Your Honor, also, the ages he gave -- part of the
20 reason I put this on the timeline which is Exhibit 2 is that
21 if you look at the -- the dates that he put on the victim
22 list -- the victim list, he puts specifically what age he
23 was.  If you plot that out, those are the periods he was out
24 of prison.  So the dates that he gave for when he committed
25 these offenses makes sense with the timeline.

         Your Honor, again, common sense.  He brags on the
stand numerous times, "Mr. Acker, I've had 60 to 80 sexual
partners.  I don't have any problem getting a date."
         Well, what makes more common sense, that he --
that this man truly has gotten 60 to 80 to voluntarily have
sex with him or that this man has got 60 to 80 women to do
something with him; that he gets drunk with them, they start
kissing and then they say no; and if they say, yes, fine; if
they say no, then he takes what he wants.  That's what he
said he did.  That makes common sense.
         And, again, demeanor, when Dr. -- when Dr. Plaud
interviewed him, Dr. Plaud said he was cool, calm and
collected because he was -- it was something he wanted and
so it was fine.  But in court, he was combative.  He was
angry, confrontational, controlling, demanding.  Why?
Because I'm not giving him what he wants.
         It's not a very far stretch to say that that's the
way it is with women.  If he gets what he wants, he can be
suave.  He can be debonair.  He can be, you know, very --
very friendly.  But once they say no, once he's not getting
what he wants, then he takes what he wants and he's
controlling and demanding.  He's the same way with women.
         And, again, the date rapes are consistent with the
expert testimony of his hypersexuality, his need for control
with -- and power and is consistent with -- those are

consistent with date rapes.

It's also consistent with past violations, the telephone. And, again, he wanted to be controlling. He was wanting to get his sexual arousal out of this. He wanted to be called "sir." But the other past offense that is consistent with the date rapes is Emily's story. Because when put the story together, what happened?

He went out with Amy, the first girl, that night, on December 15th of 2001. They were drinking. He convinced her to go back to his -- his house on 56 Sunset. He then said that they were fooling around and that there was attempts to have oral sex and then she threw up and she either passed out or left -- at some point, she left. He went to sleep. He woke up. He couldn't do what he wanted to do. It didn't fit his pattern of trying to have consensual sex. If it didn't work, he took what he wanted.

So what did he do? She had gone -- Amy had left. So what did he do? He left, went out to go out and find another woman to have sex with, took what he wanted, just like he did with date rapes. So even that rape in 2001 is consistent with his pattern of date rapes.

So, in sum, Your Honor, there's clear and convincing evidence not only of the 2001 rape of Emily but also the date rapes we've shown. And if you find that -- that either of those things happened -- that the 2001 rape

1  or the date rapes or both happened -- then the only expert
2  testimony you have to rely on is that of Dr. Malinek and Dr.
3  Perkins, plus just common sense, Your Honor, that this
4  man -- if these things are true, this man is clearly
5  sexually dangerous.
6           Now, the last thing I want to say, Your Honor, is
7  there was one other part of the videotape of -- deposition
8  of Emily that we didn't play in court. It was at the very
9  end and I asked her -- I'm asking her about the fact that
10 this rape wasn't prosecuted, and I asked her, "Do you feel
11 like you were betrayed by the justice system?"
12          And she said, "I did. I was very upset."
13          Well, the truth, Your Honor, is the justice system
14 did betray her. For whatever reason -- and -- and we'd ask
15 the court to draw the reasonable inference that, for
16 whatever reason, they thought, "Well, we'll let the feds
17 take care of it. He's already in federal custody. We'll
18 let them take care of it. We're not going to worry about
19 having to writ him out, go through the interstate detainer
20 act and get him back from North Carolina."
21          For whatever reason, they didn't prosecute him,
22 and that was a betrayal -- the justice system betrayed
23 Emily. Well, today, in 2011, Your Honor, it's within your
24 power to make sure the justice system doesn't betray Emily
25 again, and we'd ask you to make sure that that doesn't

happen.

I'm asking you to make a decision to do justice to Emily and to do justice to society to keep this man off the street until he is no longer a danger to society. I'm asking you to find that he is a sexually dangerous person and should be civilly committed under the Adam Walsh Act.

THE COURT: Thank you very much. Mr. Hawes?

MR. HAWES: Your Honor, from the outset of this case, the government has made clear that to them this case is about justice for Emily. And throughout the -- this matter they've attempted to circumvent the criminal justice system by using the Adam Walsh Act to try Mr. Francis for a rape that occurred in 2001.

And it's their theory that he wasn't charged or arrested for this case because, as Mr. Acker just said, they thought they'd let the feds take core of it. The fact is the feds only sentenced Mr. Francis for the violation to 24 months. And another fact is -- don't you think -- doesn't it make sense that if that was the case, they would have called a police officer from the Poughkeepsie police department and asked him to testify at this hearing that that's what happened, that they said, "We're not going to deal with this rape because the feds already got him"? That's what makes the most sense.

This case is not about that. This case is about

1  Sean Francis, a man who in his earlier years lashed out in
2  extremely -- extremely, and admittedly so, inappropriate
3  ways by making threatening phone calls.  These phone calls
4  have cost Mr. Francis.  Most of his adult life has been
5  spent behind bars.
6          But in 2009, he got out.  And in 2009, what did
7  Mr. Francis do?  Let's look at that.  He did everything
8  right.  He had a steady job.  He had a relationship with a
9  girl who he lived with.  He had his own apartment.  He was
10 financially responsible.  And then this was all ripped away
11 from him for watching a pornographic movie on cable
12 television.
13         And here -- and he made a deal after that with the
14 fed -- with the government to do six months.  And here he
15 sits before you two and a half years later pursuant to 4248.
16 Your Honor, the government has not proved their burden and
17 we ask that you release Sean Francis.
18         THE COURT:  All right.  Thank you for your
19 arguments, and I know you put a lot of work into this case.
20 I appreciate that.
21         I would like both sides to submit proposed
22 findings of fact.  They don't have to be exhaustive, but I
23 would like you to propound the points that you feel if you
24 prevail need to be in the factual decision.
25         I'll give you until October 17th to do that.

1  That'll give you ten days.  It shouldn't be -- I'm -- I'm
2  not trying to make this a extra burden, but I feel that in
3  these cases it's critical for the court to know what each
4  party believes to be the defensible facts and -- and that
5  helps me a lot in composing the judgment.
6            MR. ACKER:  Thank you, Your Honor.
7            THE COURT:  Okay.  Thank you.
8            MR. HAWES:  Thank you, Your Honor.
9            [WHEREUPON, THIS HEARING WAS ADJOURNED.]
10                  [END OF TRANSCRIPT.]
11                - - - - - - - - - -

STATE OF NORTH CAROLINA

COUNTY OF FRANKLIN


<u>CERTIFICATE</u>

    I, PATRICIA C. ELLIOTT, VERBATIM REPORTER AND NOTARY PUBLIC FOR THE STATE OF NORTH CAROLINA, COUNTY OF FRANKLIN, HEREBY CERTIFY THAT THE FOREGOING PAGES REPRESENT THE HEARING BEFORE THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, THE HONORABLE TERRENCE W. BOYLE, U.S. MAGISTRATE JUDGE PRESIDING, IN THE MATTER OF <u>UNITED STATES OF AMERICA V. SEAN ROBERT FRANCIS</u>, AND THESE PAGES CONSTITUTE A TRUE AND ACCURATE TRANSCRIPT OF THE PROCEEDING.

    IN WITNESS WHEREOF, I HAVE HEREUNTO AFFIXED MY HAND THIS 23rd DAY OF OCTOBER, 2011.


    <u>/s/  PATRICIA C. ELLIOTT</u>

    PATRICIA C. ELLIOTT
    VERBATIM REPORTER
    NOTARY PUBLIC NO.: 19940480043